# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

RON BROWN, MINKA GARMON, and JESSIE CROFT, individually and on behalf of all others similarly situated,

     Plaintiff,

v.

JBS USA FOOD COMPANY; CARGILL, INC., CARGILL MEAT SOLUTIONS CORP.; HORMEL FOODS CORP.; AMERICAN FOODS GROUP, LLC; TRIUMPH FOODS, LLC; SEABOARD FOODS, LLC; NATIONAL BEEF PACKING CO., LLC; IOWA PREMIUM LLC; SMITHFIELD FOODS INC.; SMITHFIELD PACKAGED MEATS CORP.; AGRI BEEF CO.; WASHINGTON BEEF, LLC; PERDUE FARMS, INC.; AGRI STATS, INC.; and WEBBER, MENG, SAHL AND COMPANY, INC. d/b/a WMS & COMPANY, INC.,

     Defendants.

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

---

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................ 1

II. JURISDICTION AND VENUE ...................................................................... 8

III. PARTIES ......................................................................................................... 9

    A. Plaintiffs ............................................................................................. 9

    B. Defendants .......................................................................................... 9

        1. American Foods ...................................................................... 9

        2. Cargill Defendants ............................................................... 10

        3. Hormel ................................................................................. 12

        4. JBS ....................................................................................... 13

        5. National Beef Defendants ................................................... 14

        6. Perdue .................................................................................. 15

        7. Seaboard ............................................................................. 16

        8. Smithfield Defendants ........................................................ 17

        9. Triumph ............................................................................... 19

        10. Tyson ................................................................................... 20

        11. Agri Beef Defendants .......................................................... 21

        12. Agri Stats, Inc. .................................................................... 23

        13. Webber, Meng, Sahl and Company, Inc. ............................ 24

IV. AGENTS AND CO-CONSPIRATORS ........................................................ 25

    A. American Foods Co-Conspirators ..................................................... 25

    B. Hormel Co-Conspirators ................................................................... 26

    C. JBS Co-Conspirators ........................................................................ 29

    D. Perdue Co-Conspirators ................................................................... 30

| | E. | Seaboard and Triumph Co-Conspirators | 31 |
| | F. | Smithfield Co-Conspirators | 31 |
| | G. | Tyson Co-Conspirators | 32 |
| | H. | Kraft Heinz | 33 |
| | I. | Clemens Co-Conspirators | 34 |
| | J. | Indiana Packers | 35 |
| V. | | TRADE AND COMMERCE | 35 |
| VI. | | FACTUAL ALLEGATIONS | 36 |
| | A. | Background | 36 |
| | | 1. The Red Meat Industry | 36 |
| | | 2. Red Meat Processing Plants | 36 |
| | | 3. Red Meat Processing Plant Workers | 38 |
| | | 4. Compensating Red Meat Processing Plant Workers | 39 |
| | | 5. Centralized Determination of Compensation for Red Meat Processing Plant Workers | 41 |
| | | 6. The Role of Labor Unions | 42 |
| | | 7. Demographics of Hourly-Paid Red Meat Processing Plant Workers | 42 |
| | | 8. Demographics of Salaried Red Meat Processing Plant Employees | 44 |
| | B. | Conspiracy to Depress Compensation | 45 |
| | | 1. Defendant Processors Unlawfully Exchanged Compensation Information through Detailed Surveys They Designed | 46 |
| | | a. Red Meat Survey Group | 48 |
| | | b. Defendant Processors Entirely Controlled the Survey and Its Contents | 50 |

c.      Positions and Questions Covered by the Red Meat Industry Compensation Survey ....................................... 55

d.      Future Compensation Data in the Red Meat Industry Compensation Surveys .................................... 58

e.      Data from the Red Meat Industry Compensation Surveys Was Highly Valuable to Defendant Processors ................................................................... 62

2.      Defendant Processors Discussed and Suppressed Compensation at Annual Roundtable Meetings without WMS Present. ........................................................ 64

a.      Roundtables Sessions that Included Meng .................................. 65

b.      Roundtable Sessions that Excluded Meng .................................. 67

c.      Effects of the *Broilers* Antitrust Lawsuit on the Red Meat Industry Compensation Survey ............................................ 70

3.      Direct Communications between Defendant Processors' Senior Executives Regarding Compensation ............................................ 73

4.      The Pork Processor Defendants Exchanged Detailed Compensation Data through Agri Stats ..................................... 75

5.      Defendants Entered Illegal "No Poach" Agreements to Depress Class Members' Wages................................................. 85

6.      The Conspiracy Resulted in Parallel Limits on Defendants' Wage Increases and Harmonization of Defendants' Wages.................... 88

7.      Plus Factors that Render the Red Meat Industry Susceptible to Collusion ................................................................. 90

C.      Market Power of Defendant Processors................................................. 96

1.      Direct Evidence of Market Power................................................ 96

2.      Indirect Evidence of Market Power ............................................ 98

a.      Product or Services Market..................................... 98

b.      Geographic Market ................................................. 102

c.      High Collective Market Share and Monopsony Power ................................................................. 103

      D.      Anticompetitive Effects and Injury Suffered by Class Members ........................ 103

VII.    STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS.................. 105

      A.      Continuing Violation ..................................................................... 105

      B.      Fraudulent Concealment ................................................................ 106

           1.      Plaintiffs Did Not and Could Not Have Discovered
                  Defendants' Misconduct .......................................................... 106

           2.      Defendants Actively Concealed the Conspiracy..................................... 107

VIII.   CLASS ACTION ALLEGATIONS ............................................................. 113

IX.    CAUSES OF ACTION ...................................................................... 116

FIRST CLAIM FOR RELIEF  CONSPIRACY TO DEPRESS
COMPENSATION IN VIOLATION OF SECTION 1 OF THE
SHERMAN ANTITRUST ACT...................................................................... 116

SECOND CLAIM FOR RELIEF  CONSPIRACY TO EXCHANGE
COMPENSATION INFORMATION IN VIOLATION OF SECTION 1
OF THE SHERMAN ANTITRUST ACT .................................................... 118

PRAYER FOR RELIEF ........................................................................... 124

JURY TRIAL DEMAND ......................................................................... 125

Based on the investigation of counsel, including interviews with industry participants, consultation with economists, and a review of public statements, Plaintiffs Ron Brown, Minka Garmon, and Jessie Croft (collectively, "Plaintiffs") bring this action on behalf of themselves individually and on behalf of a class (the "Class") consisting of all persons employed by Defendants,[1] their subsidiaries, and related entities at beef- and pork-processing plants in the continental United States from January 1, 2014, to the present day (the "Class Period"). "Beef" and "pork" are hereinafter referred to collectively as "red meat."

## I.  INTRODUCTION

1.     Since at least 2014, Defendants have conspired and combined to fix and depress the compensation paid to employees at red meat processing plants in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

2.     Defendants include eleven red meat processors and several of their subsidiaries ("Defendant Processors"), which collectively produce approximately 80 percent of the red meat sold to consumers in the United States. Defendants also include two consulting companies, Agri Stats, Inc. ("Agri Stats") and Webber, Meng, Sahl and Company, Inc. d/b/a WMS & Company, Inc. ("WMS"), which helped Defendant Processors exchange competitively sensitive compensation data.

3.     Defendant Processors and their related entities own and operate approximately 140 red meat processing plants in the continental United States. These red meat processing plants have

---

[1] The term "Defendants" refers to the following companies: JBS USA Food Company; Tyson Foods, Inc.; Cargill, Inc.; Cargill Meat Solutions Corp.; Hormel Foods Corp.; American Foods Group, LLC; Triumph Foods, LLC; Seaboard Foods, LLC; National Beef Packing Co., LLC; Iowa Premium LLC; Smithfield Foods Inc.; Smithfield Packaged Meats Corp.; Agri Beef Co.; Washington Beef, LLC; Perdue Farms, Inc.; Agri Stats, Inc.; Webber, Meng, Sahl & Company, Inc. d/b/a WMS & Company, Inc..

employed hundreds of thousands of Class Members who processed beef and pork into red meat products sold to retailers and consumers. Class Members have worked in various positions in red meat processing plants—including slaughtering and aging, cutting and further processing, repairing processing machines, and supervising processing lines.

4.     Defendant Processors have compensated Class Members with hourly wages or annual salaries and employment benefits. Each Defendant Processor has established a schedule for hourly wage rates, annual salaries, and employment benefits based on the specific position and years of experience of the Class Members. Senior executives of each Defendant Processor established and approved those hourly wage rates, annual salaries, and employment benefits at corporate headquarters during the Class Period. This highly regimented process for determining compensation allowed Defendant Processors to compare compensation practices—and collectively suppress compensation—across their workforces.

5.     Defendants implemented, monitored, and enforced their conspiracy to fix and depress compensation paid to Class Members through a series of overt acts, including:

6.     *Secret Compensation Surveys*. Defendant Processors collectively designed, implemented, and concealed a compensation survey covering dozens of positions across red meat processing plants. From 2014 to 2019, a secret group of red meat processing executives designed a detailed "Red Meat Industry Compensation Survey" for Defendant Processors to complete each year. As Renee DeBar, Head of Compensation and Benefits at JBS USA Food Company ("JBS"), wrote during the development of the annual Survey's first iteration, this secret group of executives designed the Survey to provide "useful information for" Defendant Processors that was "as specific as possible." Consequently, the Survey allowed Defendant Processors to compare the hourly wages, annual salaries, and employment benefits paid to dozens of categories of red meat

processing workers. In 2016, Brad Sievers, Compensation Manager at JBS, held a conference call with the executives of other Defendant Processors to carefully review the annual Survey "in order to ensure alignment in the group on what we're reporting."

7. The Red Meat Industry Compensation Surveys featured both current and future compensation data. For example, most of the annual Survey Questionnaires sought data from Defendant Processors regarding projected increases to salary pay ranges as well as the timing of those future increases. In addition, each one of the annual Survey Results Reports disclosed data regarding the projected benefits that Defendant Processors were offering Class Members.

8. Defendant Processors hired WMS, a compensation-consulting firm, to administer the annual Red Meat Industry Compensation Survey in order to confer a veneer of legality on Defendant Processors' illicit information exchange. During the Class Period, Jonathan Meng, WMS's President and the Survey's administrator, warned the Defendant Processors that they were improperly exchanging future compensation data in a manner that was inconsistent with federal antitrust law. But Defendant Processors paid his warnings no heed for years.

9. *Secret Annual Meetings*. Defendant Processors sent their executives, including vice presidents of human resources and directors of compensation, to annual in-person meetings (the "Red Meat Industry Compensation Meetings"). The purpose, intent, and outcome of these annual Red Meat Industry Compensation Meetings was to depress and fix the wages, salaries, and benefits of Class Members at artificially depressed levels.

10. At the beginning of each Red Meat Industry Compensation Meeting, Meng customarily gave a presentation summarizing the results of that year's Red Meat Industry Compensation Survey. After Meng made his presentations, Defendant Processors sometimes excused him from the room so that they could have complete privacy while they held multiple,

hours-long, "roundtable" discussions. During those discussions, Defendant Processors' executives extensively discussed the Survey results and, upon information and belief, reached agreements about optimal and future compensation rates and practices. Indeed, Meng confirmed that the reason Defendant Processors needed a "consultant in the room" was to appear to comply with the antitrust laws—yet, at Defendant Processors' request, he was conspicuously absent during key roundtable discussions at some of the Red Meat Industry Compensation Meetings.

11. Defendant Processors had improper conspiratorial communications at the Red Meat Industry Compensation Meetings. The agendas for the Red Meat Industry Compensation Meetings, which were circulated by email to each participant beforehand, indicate that Defendant Processors' executives spent hours collectively discussing their detailed compensation data in the "survey results." Indeed, on April 7, 2017, Brad Sievers, Compensation Manager at JBS, emailed Defendant Processors' executives to discuss the forthcoming Red Meat Industry Compensation Meeting: "We'll review survey results and share updates on our companies with the group (both HR-related and general). If you have any questions for the group, this will be a great time to ask them." Similarly, on January 23, 2014, Renee DeBar, Head of Compensation and Benefits at JBS, confirmed to another Defendant Processor executive that there was "no problem" with her company failing to provide "detailed bonus information" as part of its written Red Meat Industry Compensation Survey submission because the "[s]pecifics" of competitors' detailed bonus information would be "discussed at the meeting."

12. At the Red Meat Industry Compensation Meetings, the unlawful communications between executives of Defendant Processors about compensation were not limited to the conference room. The executives also attended private dinners in the evenings before the actual Meeting was to take place, at which they discussed compensation and benefits. For example, on

April 13, 2015, Judith Sitton, Compensation and Retirement Manager at JBS, emailed Defendant Processors' executives on the eve of that year's Red Meat Industry Compensation Meeting: "A member of the team has requested that we meet at 5:00 in the main lobby in order to have a quick discussion before heading out to dinner. This will be a great opportunity for everyone to ask questions for which their company may need feedback." She later clarified, "We can take a shuttle to the restaurant and have our discussion over drinks before dinner."

13.     Notably, Defendant Processors were not permitted to remotely participate in the annual Red Meat Industry Compensation Survey, which would have reduced direct communications with competitors about their own and industry-wide compensation practices. Each Defendant Processor was required to attend the annual in-person Meetings as a condition of participating in the Red Meat Industry Compensation Survey. On June 12, 2018, Brad Sievers, Compensation Manager at JBS, emailed Defendant Processors' executives: "Keep in mind that regular attendance at the meeting is required to participate in the survey. We understand that extenuating circumstances sometimes make it impossible to attend, but absent those, attendance is required!"

14.     *Direct Communications among Executives*. Defendant Processors' senior executives extensively discussed, compared, and in turn further suppressed compensation through email and phone communications. Those conspiratorial communications included both group emails to senior executives for purposes of aligning Defendant Processors' compensation practices and bilateral communications meant to adopt time-sensitive plans for future compensation.

15.     For example, according to a former corporate HR employee at Defendant Processor Seaboard, another Seaboard executive, Trudie Diaz-Farmer, "was the head of a group of [corporate HR] employees from competing pork processors that directly exchanged detailed compensation

information with each other." The former Seaboard employee explained that, during "weekly telephone calls to" corporate HR executives "of competing pork processors," Diaz-Farmer, Seaboard's Human Resource Information System Manager, "often requested and obtained the pay ranges for both hourly-paid workers and salaried workers employed by those competing pork processors at their pork processing plants." The former employee stated that Seaboard used the compensation data Diaz-Farmer obtained from rivals "to align its own hourly and salaried workers' compensation schedules with the compensation schedules of competing pork processors." The former employee explained that Seaboard did so "to reduce and eliminate competition with those competing pork processors for labor and thereby reduce worker turnover."

16.     *Exchanging Compensation Data through Agri Stats.* Each month, Defendant Processors Hormel Foods Corporation, JBS, Seaboard Foods LLC, Smithfield Foods, Inc., Triumph Foods, LLC, and Tyson Foods, Inc. ("the Pork Processor Defendants") exchanged detailed, current, and non-public compensation information through Agri Stats. Each Pork Processor Defendant subscribed to and partnered with Agri Stats to exchange and receive, via monthly confidential reports, effective wage rates for various categories of pork-processing workers employed by each Pork Processor Defendant.

17.     The Pork Processor Defendants used the data obtained from Agri Stats to implement and monitor the conspiracy to suppress compensation and to ensure and confirm that no pork-processing conspirator deviated from the conspiracy.

18.     *No Poach Agreements.* In furtherance of their conspiracy to depress Class Members' wages, Defendant Processors also entered into illegal "no poach" agreements with each other to refrain from recruiting one another's employees.

19. For example, counsel's investigation revealed that in 2016, Defendants Iowa Premium LLC ("Iowa Premium") and JBS entered into an illegal "no-poach agreement" regarding their Tama and Marshalltown plants in Iowa. The former Director of Human Resources of Iowa Premium explained that JBS and Iowa Premium agreed not to "solicit or poach each other's employees. Specifically, they agreed that Iowa Premium would not recruit or poach employees from the JBS Marshalltown plant and that the JBS Marshalltown plant would not recruit or poach employees from Iowa Premium." On and about September 19, 2022, the Department of Justice sent a subpoena to National Beef Packing Company, LLC, which owns Iowa Premium, "seeking documents and information regarding the solicitation, recruitment and hiring of employees in the meatpacking industry."

20. The red meat processing industry has numerous characteristics that facilitated the formation and implementation of this conspiracy. These characteristics include but are not limited to: (1) high barriers to entry; (2) industry concentration; (3) fungibility of red meat processing plant labor; (4) inelastic labor supply; (5) a history of government investigations into collusive actions; (6) personal relationships between executives at competing red meat processors; and (7) numerous opportunities to collude.

21. Defendant Processors engaged in the conspiracy to increase their profits by reducing labor costs, which comprise a substantial share of each Defendant Processor's total operating costs. The intended and actual effect of Defendants' conspiracy to fix compensation has been to reduce and suppress the wages, salaries, and benefits paid to Class Members since January 2014 to levels materially lower than they would have been in a competitive market.

22. The agreement entered by Defendants to fix and depress compensation paid to employees of red meat processing plants has unreasonably restrained trade in violation of the

Sherman Act, 15 U.S.C. § 1. Plaintiffs, on their own behalf and on behalf of the Class, bring this antitrust action to enjoin Defendants from continuing their unlawful agreement and to recover actual, compensatory and treble damages, as well as costs, attorneys' fees and interest. Plaintiffs demand a trial by jury.

## II.    JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

24.     This Court has personal jurisdiction over each of the Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and Colorado's long-arm statute, Colo. Rev. Stat. § 13-1-124. Defendant JBS USA Food Company resides in this District and used its headquarters in Greeley, Colorado, to implement and coordinate the restraints of trade described below. In addition, Defendants (1) transacted substantial business in the United States, including in this District; (2) transacted with, and caused injury to, Class Members located throughout the United States, including in this District; and (3) committed substantial acts in furtherance of the unlawful scheme in the United States, including in this District. For example:

- Each of the Defendants regularly sold red meat products in Colorado during the Class Period and continues to sell red meat products in Colorado;

- Defendant JBS USA Food Company is headquartered and incorporated in Colorado;

- Defendants Cargill and JBS operated red meat processing plants in Colorado during the Class Period and provided compensation to Class Members in those plants at suppressed rates as a result of the conspiracy alleged herein;

- Defendants Cargill and JBS had employees located in Colorado during the Class Period;

- Defendants Agri Stats and WMS regularly provided services to Defendant Processors in Colorado during the Class Period, including to JBS USA Food Company.

25.    Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)–(d) because one or more of the Defendants transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein was carried out in this District.

### III.    PARTIES

#### A.    Plaintiffs

26.    Ron Brown was employed by Smithfield Farms, Inc. at a pork-processing plant in Iowa during the Class Period. As an employee, he was paid an hourly wage and benefits by Smithfield Farms. He is a resident of the state of Iowa.

27.    Minka Garmon was employed by National Beef Packing Co. at a beef-processing plant in Georgia during the Class Period. As an employee, she was paid an hourly wage and benefits by National Beef. She is a resident of the state of Georgia.

28.    Jessie Croft was employed by Iowa Premium at a beef processing plant in Iowa during the Class Period. As an employee, she was paid an hourly wage and benefits by Iowa Premium. She is a resident of the state of Iowa.

#### B.    Defendants

##### 1.    American Foods

29.    American Foods Group, LLC ("American Foods") is a Delaware limited-liability company headquartered in Green Bay, Wisconsin. During the Class Period, American Foods and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

30. During the Class Period, American Foods directly participated in the conspiracy to fix and depress compensation to red meat processing plant workers by, among other things, doing the following:

- American Foods employees attended the first Red Meat Industry Compensation Meeting held in 2014, where executives from competing red meat processors gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, and benefits at artificially depressed levels.

- In advance of and for discussion at the 2014 Red Meat Industry Compensation Meeting, American Foods employees submitted a Red Meat Industry Compensation Survey containing highly detailed current and future compensation data to WMS with the knowledge and expectation that the data would be distributed to and examined by other Defendant Processors. Employees of American Foods completed and submitted an annual Red Meat Industry Compensation Survey in 2014.

- As part of the conspiracy, American Foods established compensation schedules for and directed payments to Class Members at artificially depressed and fixed rates.

**2. Cargill Defendants**

31. Cargill, Inc. is a privately held Delaware corporation headquartered in Minneapolis, Minnesota. During the Class Period, Cargill and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

32. Cargill Meat Solutions Corporation ("CMS") is a Delaware corporation headquartered in Wichita, Kansas, and is a wholly owned subsidiary of Cargill, Inc. During the Class Period, CMS and/or its predecessors, wholly owned or controlled subsidiaries, or other

affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

33. Cargill, Inc. and CMS are referred to collectively herein as "Cargill."

34. During the Class Period, Cargill directly participated in the conspiracy to fix and depress compensation to red meat processing plant workers by, among other things, doing the following:

- Cargill employees regularly attended Red Meat Industry Compensation Meetings where executives from competing red meat processors gathered in person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, and benefits at artificially depressed levels. For example, employees of Cargill, Inc. attended Red Meat Industry Compensation Meetings held in at least 2018 and 2019, and employees of CMS attended Red Meat Industry Compensation Meetings held in at least 2014, 2015, and 2017.

- In advance of and for discussion at Red Meat Industry Compensation Meetings, Cargill employees submitted annual Red Meat Industry Compensation Surveys containing highly detailed current and future compensation data to WMS with the knowledge and expectation that the data would be distributed to and examined by other Defendant Processors. For example, employees of Cargill, Inc. completed and submitted a Red Meat Industry Compensation Survey in at least 2018 and 2019, and employees of CMS completed and submitted a Red Meat Industry Compensation Survey in at least 2014, 2015, 2016, and 2017.

- As part of the conspiracy, Cargill established compensation schedules for and directed payments to Class Members around the country at artificially depressed and fixed rates.

### 3. Hormel

35.     Hormel Foods Corporation ("Hormel") is a publicly held Delaware corporation headquartered in Austin, Minnesota. During the Class Period, Hormel and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

36.     During the Class Period, Hormel directly participated in the conspiracy to fix and depress compensation to red meat processing plant workers by, among other things, doing the following:

- Hormel employees regularly attended Red Meat Industry Compensation Meetings where executives from competing red meat processors gathered in person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, and benefits at artificially depressed levels. For example, employees of Hormel attended Red Meat Industry Compensation Meetings held in at least 2014 and 2015.

- In advance of and for discussion at Red Meat Industry Compensation Meetings, Hormel employees submitted annual Red Meat Industry Compensation Surveys containing highly detailed current and future compensation data to WMS with the knowledge and expectation that the data would be distributed to and examined by other Defendant Processors. For example, employees of Hormel completed and submitted a Red Meat Industry Compensation Survey in at least 2014, 2015, and 2016.

- During the Class Period, Hormel subscribed to Agri Stats to exchange current and disaggregated compensation data with competing pork processors on a monthly basis.

- As part of the conspiracy, Hormel established compensation schedules for and directed payments to Class Members around the country at artificially depressed and fixed rates.

**4.    JBS**

37.    JBS USA Food Company is a Delaware corporation headquartered in Greeley, Colorado. During the Class Period, JBS and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

38.    During the Class Period, JBS directly participated in the conspiracy to fix and depress compensation to red meat processing plant workers by, among other things, doing the following:

- JBS employees regularly attended Red Meat Industry Compensation Meetings where executives from competing red meat processors gathered in person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, and benefits at artificially depressed levels. JBS employees attended every Red Meat Industry Compensation Meeting held during the Class Period.

- In advance of and for discussion at Red Meat Industry Compensation Meetings, JBS employees submitted annual Red Meat Industry Compensation Surveys containing highly detailed current and future compensation data to WMS with the knowledge and expectation that the data would be distributed to and examined by other Defendant Processors. Employees of JBS completed and submitted a Red Meat Industry Compensation Survey during every year from 2014 through 2019.

- During the Class Period, JBS executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Defendant Processors' executives.

- During the Class Period, JBS subscribed to Agri Stats to exchange current and

disaggregated compensation data with competing pork processors on a monthly basis.

- During the Class Period, JBS entered an illegal no-poach agreement with other Defendant Processors, including Iowa Premium.

- As part of the conspiracy, JBS established compensation schedules for and directed payments to Class Members around the country at artificially depressed and fixed rates.

**5.     National Beef Defendants**

39.     National Beef Packing Company, LLC ("National Beef") is a Delaware corporation headquartered in Kansas City, Missouri. Marfrig Global Foods S.A., a Brazil corporation, holds an approximately 85 percent controlling interest in National Beef as of January 2020. During the Class Period, National Beef and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

40.     Iowa Premium LLC is a privately held Delaware limited liability company headquartered in Tama, Iowa. Iowa Premium specializes in the procurement, slaughter, processing, and packing of beef. Iowa Premium operates a beef processing plant in Tama, Iowa. During the Class Period, Iowa Premium employed, and paid wages, salaries, and/or benefits to, Class Members. On March 11, 2019, Iowa Premium was acquired by National Beef Packing Company LLC.

41.     During the Class Period, National Beef and Iowa Premium directly participated in the conspiracy to fix and depress compensation to red meat processing plant workers by, among other things, doing the following:

- Employees of National Beef regularly attended Red Meat Industry Compensation Meetings, where executives from competing red meat processors gathered in person to

exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, and benefits at artificially depressed levels. For example, employees of National Beef attended Red Meat Industry Compensation Meetings held in at least 2014, 2015, 2018, and 2019.

- In advance of and for discussion at Red Meat Industry Compensation Meetings, National Beef employees submitted annual Red Meat Industry Compensation Surveys containing highly detailed current and future compensation data to WMS with the knowledge and expectation that the data would be distributed to and examined by other Defendant Processors. Employees of National Beef completed and submitted a Red Meat Industry Compensation Survey during every year from 2014 through 2019.

- During the Class Period, Iowa Premium entered an illegal no-poach agreement with other Defendant Processors, including JBS.

- As part of the conspiracy, National Beef and Iowa Premium established compensation schedules for and directed payments to Class Members at artificially depressed and fixed rates.

**6.     Perdue**

42.     Perdue Farms, Inc. ("Perdue") is a Maryland corporation headquartered in Salisbury, Maryland. During the Class Period, Perdue and/or its predecessors, wholly owned or controlled subsidiaries, and/or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

43.     During the Class Period, Perdue directly participated in the conspiracy to fix and depress compensation to red meat processing plant workers by, among other things, doing the following:

- Perdue employees regularly attended Red Meat Industry Compensation Meetings, where executives from competing red meat processors gathered in person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, and benefits at artificially depressed levels. For example, employees of Perdue attended the Red Meat Industry Compensation Meetings in at least 2017, 2018, and 2019.

- In advance of and for discussion at Red Meat Industry Compensation Meetings, Perdue employees submitted annual Red Meat Industry Compensation Surveys containing highly detailed current and future compensation data to WMS, with the knowledge and expectation that the data would be distributed to and examined by other Defendant Processors. For example, employees of Perdue completed and submitted a Red Meat Industry Compensation Survey in at least 2016, 2017, 2018, and 2019.

- As part of the conspiracy, Perdue established compensation schedules for and directed payments to Class Members around the country at artificially depressed and fixed rates.

**7. Seaboard**

44.    Seaboard Foods LLC ("Seaboard") is an Oklahoma limited-liability company headquartered in Merriam, Kansas, and is a wholly owned subsidiary of Seaboard Corporation. During the Class Period, Seaboard Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

45.    During the Class Period, Seaboard directly participated in the conspiracy to fix and depress compensation to red meat processing plant workers by, among other things, doing the following:

- Seaboard employees regularly attended Red Meat Industry Compensation Meetings,

where executives from competing red meat processors gathered in person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, and benefits at artificially depressed levels. Employees of Seaboard attended every Red Meat Industry Compensation Meeting held during the Class Period.

- In advance of and for discussion at Red Meat Industry Compensation Meetings, Seaboard employees submitted annual Red Meat Industry Compensation Surveys containing highly detailed current and future compensation data to WMS with the knowledge and expectation that such surveyed data would be distributed to and examined by other Defendant Processors. Employees of Seaboard completed and submitted an annual Red Meat Industry Compensation Survey during every year from 2014 through 2019.

- During the Class Period, Seaboard executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Defendant Processors' executives.

- During the Class Period, Seaboard subscribed to Agri Stats to exchange current and disaggregated compensation data with competing pork processors on a monthly basis.

- As part of the conspiracy, Seaboard established compensation schedules for and directed payments to Class Members at artificially depressed and fixed rates.

**8.  Smithfield Defendants**

46.  Smithfield Foods, Inc. is a publicly held Virginia corporation headquartered in Smithfield, Virginia. During the Class Period, Smithfield Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

47. Smithfield Packaged Meats Corporation is a Delaware corporation headquartered in Smithfield, Virginia, and is a wholly owned subsidiary of Smithfield Foods, Inc. During the Class Period, Smithfield Packaged Meats Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

48. Smithfield Packaged Meats Corporation is a Delaware corporation headquartered in Smithfield, Virginia, and is a wholly owned subsidiary of Smithfield Foods, Inc. Prior to May 2014, Smithfield Farmland Corporation, a subsidiary of Smithfield Foods Inc., operated as The Smithfield Packing Company, Inc. until Farmland Foods, Inc., another subsidiary of Smithfield Foods, Inc., merged with The Smithfield Packing Company, Inc. to form Smithfield Farmland Corporation. Prior to January 2018, Smithfield Farmland Corporation operated as a subsidiary of Smithfield Foods, Inc. until it merged with Smithfield Packaged Meats Corporation, which became the surviving corporate entity. During the Class Period, Smithfield Packaged Meats Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

49. Smithfield Foods, Inc. and Smithfield Packaged Meats Corporation are referred to collectively as "Smithfield."

50. During the Class Period, Smithfield directly participated in the conspiracy to fix and depress compensation to red meat processing plant workers by, among other things, doing the following:

- Employees of Smithfield attended a Red Meat Industry Compensation Meeting in 2014 where executives from competing red meat processors gathered in person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, and

benefits of at artificially depressed levels. Specifically, employees of The Smithfield Packing Company, Inc. attended the Red Meat Industry Compensation Meeting held in 2014.

- In advance of and for discussion at the 2014 Red Meat Industry Compensation Meeting, employees of The Smithfield Packing Company, Inc. submitted a Red Meat Industry Compensation Survey containing highly detailed current and future compensation data to WMS with the knowledge and expectation that the data would be distributed to and examined by other Defendant Processors.

- During the Class Period, Smithfield Foods, Inc. subscribed to Agri Stats to exchange current and disaggregated compensation data with competing pork processors on a monthly basis.

- As part of the conspiracy, Smithfield established compensation schedules for and directed payments to Class Members around the country at artificially depressed and fixed rates.

**9. Triumph**

51.    Triumph Foods, LLC ("Triumph") is a Missouri limited-liability company headquartered in St. Joseph, Missouri. During the Class Period, Triumph and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

52.    During the Class Period, Triumph directly participated in the conspiracy to fix and depress compensation to red meat processing plant workers by, among other things, doing the following:

- Triumph employees regularly attended Red Meat Industry Compensation Meetings,

where executives from competing red meat processors gathered in person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, and benefits at artificially depressed levels. For example, Triumph employees attended Red Meat Industry Compensation Meetings held in at least 2015, 2017, and 2018.

- In advance of and for discussion at Red Meat Industry Compensation Meetings, Triumph employees submitted annual Red Meat Industry Compensation Surveys containing highly detailed current and future compensation data to WMS with the knowledge and expectation that the data would be distributed to and examined by other Defendant Processors. Triumph employees completed and submitted an annual Red Meat Industry Compensation Survey during every year from 2015 through 2018.

- During the Class Period, Triumph subscribed to Agri Stats to exchange current and disaggregated compensation data with competing pork processors on a monthly basis.

- As part of the conspiracy, Triumph established compensation schedules for and directed payments to Class Members at artificially depressed and fixed rates.

**10. Tyson**

53. Tyson Foods, Inc. ("Tyson") is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Class Period, Tyson and its predecessors, wholly owned or controlled subsidiaries, and/or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

54. During the Class Period, Tyson directly participated in the conspiracy to fix and depress compensation to red meat processing plant workers by, among other things, doing the following:

- Tyson employees regularly attended Red Meat Industry Compensation Meetings,

where executives from competing red meat processors gathered in person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, and benefits at artificially depressed levels. Tyson employees attended every Red Meat Industry Compensation Meeting held during the Class Period.

- In advance of and for discussion at Red Meat Industry Compensation Meetings, Tyson employees submitted annual Red Meat Industry Compensation Surveys containing highly detailed current and future compensation data to WMS with the knowledge and expectation that the data would be distributed to and examined by other Defendant Processors. Tyson employees completed and submitted an annual Red Meat Industry Compensation Survey during every year from 2014 through 2019.

- During the Class Period, Tyson executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Defendant Processors' executives.

- During the Class Period, Tyson subscribed to Agri Stats to exchange current and disaggregated compensation data with competing pork processors on a monthly basis.

- As part of the conspiracy, Tyson established compensation schedules for and directed payments to Class Members around the country at artificially depressed and fixed rates.

**11.    Agri Beef Defendants**

55.    Agri Beef Co. is an Idaho corporation headquartered in Boise, Idaho. During the Class Period, Agri Beef Co. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

56.     Washington Beef, LLC is an Idaho limited-liability company located in Toppenish, Washington, and is an indirect wholly owned subsidiary of Agri Beef Co. During the Class Period, Washington Beef, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

57.     Agri Beef Co. and Washington Beef, LLC are referred to collectively as "Agri Beef."

58.     During the Class Period, Agri Beef directly participated in the conspiracy to fix and depress compensation to red meat processing plant workers by, among other things, doing the following:

- Agri Beef employees attended Red Meat Industry Compensation Meetings where executives from competing red meat processors gathered in person to exchange information about, discuss, agree upon, and fix the wages, salaries, and benefits of Class Members at artificially depressed levels. Employees of Agri Beef Co. attended Red Meat Industry Compensation Meetings in 2014, 2015, 2017, and 2018, and employees of Washington Beef, LLC attended a Red Meat Industry Compensation Meeting in 2019.

- In advance of and for discussion at Red Meat Industry Compensation Meetings, Agri Beef employees submitted annual Red Meat Industry Compensation Surveys containing highly detailed current and future compensation data to WMS with the knowledge and expectation that the data would be distributed to and examined by other Defendant Processors. Agri Beef employees completed and submitted an annual Red Meat Industry Compensation Survey during every year from 2014 through 2019.

- As part of the conspiracy, Agri Beef established compensation schedules for and directed payments to Class Members at artificially depressed and fixed rates.

**12.** **Agri Stats, Inc.**

59. Agri Stats, Inc. is an Indiana corporation headquartered in Fort Wayne, Indiana. Throughout the Class Period, Agri Stats facilitated the exchange of confidential, proprietary, and competitively sensitive compensation data among the pork-processing Defendant Processors and their co-conspirators.

60. During the Class Period, Agri Stats directly participated in the conspiracy to fix and depress compensation to pork-processing plant workers by, among other things, doing the following:

- At the Pork Processing Defendants' request, Agri Stats uploaded each Pork Processing Defendant's salary and wage data for each of their own and their subsidiaries' pork-processing plants and then exchanged that proprietary compensation data between each of the Pork Processing Defendants on a monthly basis.

- Agri Stats provided weekly and monthly profit information to the Pork Processing Defendants which allowed them to monitor the profitability of all cartel members, and to punish any participant who deviated from their agreement.

- The compensation and profit data that Agri Stats exchanged between the Pork Processing Defendants each month was non-public, disaggregated, and current information.

- During the Class Period, Agri Stats met with each Pork Processing Defendant's executives on a regular basis and discussed the non-public data that Agri Stats had collected from pork processors.

- The Pork Processing Defendants knew that they could rely on Agri Stats data to facilitate the setting of compensation and to monitor the conspiracy because Agri Stats carefully audited the raw compensation data that it collected from each Pork Processing Defendant.

- Agri Stats facilitated the conspiracy by including the names of each participant on the opening page of each report. Agri Stats provided insights to the Pork Processing Defendants through special cuts of data and answering one-on-one questions in ways that allowed the Pork Processing Defendants to deanonymize critical parts of Agri Stats reports.

### 13. Webber, Meng, Sahl and Company, Inc.

61. Webber, Meng, Sahl and Company, Inc. d/b/a WMS & Company, Inc. ("WMS") is a Pennsylvania corporation headquartered in Pottstown, Pennsylvania. Throughout the Class Period, WMS facilitated the exchange of confidential, proprietary, and competitively sensitive compensation data among Defendant Processors and their co-conspirators.

62. During the Class Period, WMS directly participated in the conspiracy to fix and depress compensation to red meat processing plant workers by, among other things, doing the following:

- WMS conducted detailed annual surveys of the hourly wages, salaries, bonuses, and employment benefits paid by Defendant Processors and their subsidiaries to multiple categories of red meat processing plant workers and circulated the survey results to those Defendant Processors' executives. Some of those annual surveys contained information about Defendant Processors' future compensation rates.

- At annual Red Meat Industry Compensation Meetings, WMS delivered PowerPoint

presentations based on the survey data provided by the Defendant Processors.

- As a third-party compensation consultancy, Defendant Processors used WMS to conceal their unlawful information exchanges and confer a veneer of legality on those exchanges.

## IV. AGENTS AND CO-CONSPIRATORS

63. The entities named below participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy to fix and depress compensation alleged herein.

64. Defendants are jointly and severally liable for the acts of the co-conspirators named below, whether or not those co-conspirators are named as defendants in this Complaint.

65. Each Defendant and co-conspirator named below acted as the agent or joint-venturer of, or for, the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged herein.

### A. American Foods Co-Conspirators

66. Cimpl's, LLC is a Delaware limited-liability company headquartered in Yankton, South Dakota, and is a wholly owned subsidiary of American Foods. Cimpl's, LLC operates a beef-processing plant in South Dakota. During the Class Period, Cimpl's, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

67. Gibbon Packing, LLC is a Delaware limited-liability company headquartered in Gibbon, Nebraska, and is a wholly owned subsidiary of American Foods. Gibbon Packing, LLC operates a beef-processing plant in Nebraska. During the Class Period, Gibbon Packing, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

68.     Green Bay Dressed Beef, LLC is a Delaware limited-liability company headquartered in Green Bay, Wisconsin, and is a wholly owned subsidiary of American Foods. Green Bay Dressed Beef, LLC operates one or more beef-processing plants in Wisconsin. During the Class Period, Green Bay Dressed Beef, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

69.     Long Prairie Packing Company, LLC is a Delaware limited-liability company headquartered in Bloomington, Minnesota, and is a wholly owned subsidiary of American Foods. Long Prairie Packing Company, LLC operates a beef-processing plant in Minnesota. During the Class Period, Long Prairie Packing Company, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

70.     Skylark Meats, LLC is a Delaware limited-liability company headquartered in Omaha, Nebraska, and is a wholly owned subsidiary of American Foods. Skylark Meats, LLC operates a beef-processing plant in Nebraska. During the Class Period, Skylark Meats, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

**B.     Hormel Co-Conspirators**

71.     Alma Foods, LLC is a Delaware limited liability company headquartered in Austin, Minnesota, and is a wholly owned subsidiary of Hormel. Alma Foods, LLC operates a red meat processing plant in Kansas. During the Class Period, Alma Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

72. Burke Marketing Corporation is an Iowa corporation headquartered in Nevada, Iowa, and is a wholly owned subsidiary of Hormel. Burke Marketing Corporation operates a red meat processing plant in Iowa. During the Class Period, Burke Marketing Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

73. Dan's Prize, Inc. is a Minnesota corporation headquartered in Austin, Minnesota, and is a wholly owned subsidiary of Hormel. Dan's Prize, Inc. operates one or more red meat processing plants in Minnesota. During the Class Period, Dan's Prize, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

74. Dold Foods, LLC is a Delaware limited-liability company headquartered in Austin, Minnesota, and is a wholly owned subsidiary of Hormel. Dold Foods, LLC operates a pork-processing plant in Kansas. During the Class Period, Dold Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

75. Fontanini Foods, LLC is a Minnesota limited-liability company headquartered in Austin, Minnesota, and is a wholly owned subsidiary of Hormel. Fontanini Foods, LLC operates a red meat processing plant in Illinois. During the Class Period, Fontanini Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

76. Hormel Foods Operations, LLC is a Minnesota limited-liability company headquartered in Austin, Minnesota, and operating under the trade name Papillion Foods. Hormel Foods Operations, LLC is a wholly owned subsidiary of Hormel and operates a red meat

processing plant in Nebraska. During the Class Period, Hormel Foods Operations, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

77.     Lloyd's Barbeque Company, LLC is a Delaware limited-liability company headquartered in Austin, Minnesota, and is a wholly owned subsidiary of Hormel. Lloyd's Barbeque Company, LLC operates a red meat processing plant in Minnesota. During the Class Period, Lloyd's Barbeque Company, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

78.     Osceola Food, LLC is a Delaware limited-liability company headquartered in Osceola, Iowa, and is a wholly owned subsidiary of Hormel. Osceola Food, LLC operates a red meat processing plant in Iowa. During the Class Period, Osceola Food, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

79.     Progressive Processing, LLC is a Delaware limited-liability company headquartered in Dubuque, Iowa, and is a wholly owned subsidiary of Hormel. Progressive Processing, LLC operates a red meat processing plant in Iowa. During the Class Period, Progressive Processing, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

80.     Provena Foods, Inc. is a California corporation headquartered in Lathrop, California, and operating under the trade name Swiss American Sausage Company. Provena Foods, Inc. is a wholly owned subsidiary of Hormel and operates a red meat processing plant in

California. During the Class Period, Provena Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

81. Rochelle Foods, LLC is a Delaware limited-liability company headquartered in Austin, Minnesota, and is a wholly owned subsidiary of Hormel. Rochelle Foods, LLC operates a red meat processing plant in Illinois. During the Class Period, Rochelle Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

**C. JBS Co-Conspirators**

82. Swift Beef Company is a Delaware corporation headquartered in Greeley, Colorado, and is a wholly owned subsidiary of JBS. Swift Beef Company operates multiple beef-processing plants in several states. During the Class Period, Swift Beef Company and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

83. Swift Pork Company is a Delaware corporation headquartered in Greeley, Colorado, and is a wholly owned subsidiary of JBS. Swift Pork Company operates multiple pork-processing plants in several states. During the Class Period, Swift Pork Company and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

84. JBS Green Bay, Inc. is a Delaware corporation headquartered in Greeley, Colorado, and is a wholly owned subsidiary of JBS. JBS Green Bay, Inc. operates a beef-processing plant in Wisconsin. During the Class Period, JBS Green Bay, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

85. JBS Plainwell, Inc. is a Delaware corporation headquartered in Greeley, Colorado, and is a wholly owned subsidiary of JBS. JBS Plainwell, Inc. operates a beef-processing plant in Michigan. During the Class Period, JBS Plainwell, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

86. JBS Souderton, Inc. is a Pennsylvania corporation headquartered in Greeley, Colorado, and is a wholly owned subsidiary of JBS. JBS Souderton, Inc. operates a beef-processing plant in Pennsylvania. During the Class Period, JBS Souderton, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

87. JBS Tolleson, Inc. is an Arizona corporation headquartered in Greeley, Colorado, and is a wholly owned subsidiary of JBS. JBS Tolleson, Inc. operates a beef-processing plant in Arizona. During the Class Period, JBS Tolleson, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

## D. Perdue Co-Conspirators

88. Perdue Premium Meat Company, Inc. is a California corporation headquartered in Salisbury, Maryland, and is a wholly owned subsidiary of Perdue Farms, Inc. Perdue Premium Meat Company, Inc. operates a red meat processing plant in Michigan. During the Class Period, Perdue Premium Meat Company, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

89. Sioux-Preme Packing Company is an Iowa corporation headquartered in Salisbury, Maryland, and is a wholly owned subsidiary of Perdue Premium Meat Company, Inc. Sioux-Preme

Packing Company operates one or more pork-processing plants in Iowa. During the Class Period, Sioux-Preme Packing Company and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

## E. Seaboard and Triumph Co-Conspirators

90. Daily's Premium Meats, LLC is a Delaware limited-liability company headquartered in Merriam, Kansas, and is jointly owned by Seaboard and Triumph. Daily's Premium Meats, LLC operates multiple pork-processing plants in several states. During the Class Period, Daily's Premium Meats, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

91. Seaboard Triumph Foods, LLC is a Delaware limited-liability company headquartered in Sioux City, Iowa, and is jointly owned by Seaboard and Triumph. Seaboard Triumph Foods, LLC operates a pork-processing plant in Iowa. During the Class Period, Seaboard Triumph Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

## F. Smithfield Co-Conspirators

92. Smithfield Fresh Meats Corporation is a Delaware corporation headquartered in Smithfield, Virginia, and is an indirect wholly owned subsidiary of Smithfield Foods, Inc. Smithfield Fresh Meats Corporation operates multiple pork-processing plants in several states. During the Class Period, Smithfield Fresh Meats Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

93.     Kansas City Sausage Company, LLC is a Delaware limited-liability company headquartered in Clayton, Missouri, and is a wholly owned subsidiary of Smithfield Foods, Inc. Kansas City Sausage Company, LLC operates one or more red meat processing plants in Iowa. During the Class Period, Kansas City Sausage Company, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

94.     American Skin Food Group, LLC is a North Carolina limited-liability company headquartered in Burgaw, North Carolina, and is a wholly owned subsidiary of Smithfield Foods, Inc. American Skin Food Group, LLC operates one or more red meat processing plants in North Carolina and Iowa. During the Class Period, American Skin Food Group, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

**G.      Tyson Co-Conspirators**

95.     Tyson Prepared Foods, Inc. is a Delaware corporation headquartered in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods, Inc. Tyson Prepared Foods, Inc. operates multiple red meat processing plants in several states. During the Class Period, Tyson Prepared Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

96.     Tyson Fresh Meats, Inc. is a Delaware corporation headquartered in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods, Inc. Tyson Fresh Meats, Inc. operates multiple red meat processing plants in several states. During the Class Period, Tyson Fresh Meats, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

97.     The Hillshire Brands Company is a Maryland corporation headquartered in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods. The Hillshire Brands Company operates multiple red meat processing plants in several states. During the Class Period, the Hillshire Brands Company and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

98.     Tyson Processing Services, Inc. is a Delaware corporation headquartered in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods. Tyson Processing Services, Inc. operates a pork-processing plant in Nebraska. During the Class Period, Tyson Processing Services, Inc. employed and paid wages, salaries, and/or benefits to Class Members in the United States.

99.     Tyson Refrigerated Processed Meats, Inc. is a Delaware corporation headquartered in Springdale, Arkansas, and is a wholly owned subsidiary of Tyson Foods. Tyson Refrigerated Processed Meats, Inc. operates one or more pork-processing plants in Texas. During the Class Period, Tyson Refrigerated Processed Meats, Inc. employed and paid wages, salaries, and/or benefits to Class Members in the United States.

**H.      Kraft Heinz Co-Conspirator**

100.    Kraft Heinz Company ("Kraft Heinz") is a Delaware corporation headquartered in Pittsburgh, Pennsylvania. During the Class Period, Kraft Heinz and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

101.    In advance of and for discussion at the 2019 Red Meat Industry Compensation Meeting, employees of Kraft Heinz submitted a Red Meat Industry Compensation Survey containing highly detailed current and future compensation data to WMS, with the knowledge and

expectation that such surveyed data would be distributed to and examined by other Defendant Processors.

102.    As a consequence of the conspiracy, Kraft Heinz established compensation schedules for and directed payments to Class Members around the country at artificially depressed and fixed rates.

## I.    Clemens Co-Conspirators

103.    Clemens Food Group, LLC is a Delaware limited-liability company headquartered in Hatfield, Pennsylvania. During the Class Period, Clemens Food Group, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

104.    The Clemens Family Corporation is a Pennsylvania corporation headquartered in Hatfield, Pennsylvania. It is the parent company of Clemens Food Group, LLC. During the Class Period, the Clemens Family Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

105.    Clemens Food Group, LLC and the Clemens Family Corporation are referred to collectively as "Clemens."

106.    During the Class Period, Clemens subscribed to Agri Stats to exchange current, disaggregated, readily decodable and plant-specific compensation data with competing pork processors on a monthly basis.

107.    As part of the conspiracy, Clemens established compensation schedules for and directed payments to Class Members around the country at artificially depressed and fixed rates.

**J.      Indiana Packers Co-Conspirator**

108.    Indiana Packers Corporation ("Indiana Packers") is an Indiana corporation headquartered in Delphi, Indiana. During the Class Period, Indiana Packers and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, and/or benefits to Class Members in the United States.

109.    During the Class Period, Indiana Packers subscribed to Agri Stats to exchange current, disaggregated, readily decodable and plant-specific compensation data with competing pork processors on a monthly basis.

110.    As a consequence of the conspiracy, Indiana Packers established compensation schedules for and directed payments to Class Members around the country at artificially depressed and fixed rates.

## V.      TRADE AND COMMERCE

111.    The conspiracy formed, implemented, and enforced by Defendants was intended to depress, and did in fact depress, the compensation of Class Members nationwide.

112.    The conspiracy restrained competition between Defendant Processors for the payment of wages, salaries, and benefits to, and the hiring of, Class Members nationwide, including Class Members located in states other than the states in which the red meat processing plants that employed them were located.

113.    Defendant Processors made payments to Class Members by mailing or transmitting funds across state lines.

114.    Defendant Processors employed Class Members to process red meat for sale in interstate and foreign commerce.

115.    Defendants Agri Stats and WMS provided services to Defendant Processors located in multiple different states and exchanged confidential, proprietary, and competitively sensitive data among Defendant Processors across state lines.

116.    Defendants' activities were carried out within the flow of interstate commerce of the United States and were intended to, and did have, direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

## VI.    FACTUAL ALLEGATIONS

### A.    Background

#### 1.    The Red Meat Industry

117.    The United States Department of Agriculture refers to the production of cattle and hogs as "meat animals production."

118.    The beef and pork industry in the United States is among the world's largest producers of beef and pork. The industry produced 12,677,000 metric tons of beef and 12,553,000 metric tons of pork in 2021 alone.

119.    The industry is heavily concentrated in the Defendant Processors, who collectively control more than 80 percent of the production of red meat in the United States.

120.    Defendant Processors earn billions of dollars in annual revenue from the sale of processed red meat. For example, JBS alone made close to $30 billion from red meat sales in 2020. That same year, Tyson's pork and beef divisions generated more than $20 billion in revenue.

#### 2.    Red Meat Processing Plants

121.    The processing of beef and pork involves slaughtering cattle and hogs and then processing them for sale.

122.    There are two kinds of red meat processing plants that process cattle and hogs for consumption. The first, slaughterhouse plants, restrain and stun cattle and hogs, slaughter them,

and convert their carcasses into raw beef and pork products fit for human consumption. The second, further-processing plants, convert the raw beef and pork products into value-added forms (such as sausage or bacon) through additional processing. Each type of processing plant employs both hourly-paid and salaried workers.

123. The Class is comprised of workers employed by Defendant Processors, their subsidiaries, and related entities in both slaughterhouse plants and further-processing plants. The Class includes workers employed by Defendant Processors, their subsidiaries, and related entities in both kinds of red meat processing plants: slaughterhouse plants and further-processing plants.

124. Each Defendant Processor, its subsidiary, or related entities owns and controls its own red meat processing plants. Collectively, Defendant Processors, their subsidiaries, and related entities currently own approximately 140 red meat processing plants in the continental United States. Most of those red meat processing plants are in the South and Midwest.

125. Most red meat processing plants owned by Defendant Processors and their subsidiaries are clustered in groups in rural areas. Each Defendant Processor or its subsidiary owns at least one red meat processing plant located within 80 miles of a red meat processing plant owned by another Defendant Processor or another Defendant Processor's subsidiary.

126. The geographic proximity of red meat processing plants means that, in a competitive labor market, many employees of red meat processing plants could and would switch their employment to rival red meat processing plants when offered higher wages, higher salaries, and/or superior benefits. For that reason, each Defendant Processor has lost red meat plant workers to another Defendant Processor's red meat processing plant at some point.

127.    The following map identifies the locations of the Defendant Processors' red meat processing plants currently operating in the continental United States.[2]



### 3.    Red Meat Processing Plant Workers

128.    Each year during the Class Period, Defendant Processors, their subsidiaries, and related entities collectively employed approximately 150,000 workers at their red meat processing plants.

129.    Because Defendant Processors, their subsidiaries, and related entities slaughter and process commodity red meat products in a similarly efficient manner, their red meat processing facilities were and are characterized by highly similar operations and thus highly similar labor requirements. Accordingly, the workers employed by Defendant Processors, their subsidiaries, and related entities at each of their approximately 140 red meat processing plants in the continental United States during the Class Period—i.e., Class Members—were easily categorized into a limited set of discrete job positions.

---

[2] Some of the pins on the map reflect more than one red meat processing plant.

130.    For example, in their red meat processing plants, each Defendant Processor employs "production supervisors," "maintenance supervisors," "entry-level" and "full-fledged" laborers, and "full-fledged operatives" or equivalent positions.

**4.    Compensating Red Meat Processing Plant Workers**

131.    Employees at red meat processing plants owned by Defendant Processors, their subsidiaries, and related entities were paid either hourly wages or annual salaries, depending on their position.

132.    Approximately 90 percent of employees at those red meat processing plants were production workers who physically worked on processing lines to process red meat or maintenance workers who maintained and repaired processing-line machines. Those production and maintenance workers were paid hourly wages according to their specific position and experience and were categorized into positions such as "entry-level laborer," "full-fledged laborer," "full-fledged operative," and "scale/electronic technician."

133.    Approximately 10 percent of employees at red meat processing plants owned by Defendant Processors, their subsidiaries, and related entities were paid annual salaries. These employees included supervisory positions such as production and maintenance supervisors, who respectively supervised hourly-paid production and maintenance workers, cattle and hog buyers, health- and safety-related positions, human-resources positions, and quality-assurance positions.

134.    Both hourly-paid and salaried employees at red meat processing plants that Defendant Processors, their subsidiaries, and related entities owned received a similar set of employment benefits. Those benefits typically included health insurance, paid time off, a retirement-savings plan, disability insurance, and life insurance. Each Defendant Processor calculated a specific dollar value for the benefits paid to each Class Member.

135.    Some hourly-paid positions at red meat processing plants owned by Defendant Processors, their subsidiaries, and related entities were paid higher wages than other hourly-paid positions at the same red meat processing plants, largely due to the greater skill and experience required for those higher-paying positions. For example, employees skilled at deboning an animal were typically paid more than many other non-supervisory workers at red meat processing plants. Effectively deboning cattle or swine requires experience and training, and Defendant Processors earn more money when cattle or swine is deboned effectively (i.e., cut closest to the bone to maximize the amount of meat obtained). Nonetheless, each Defendant Processor systematically determined the compensation for all hourly-paid positions at the red meat processing plants that they, their subsidiaries, and related entities owned using compensation schedules that accounted for workers' skill and/or experience. Those schedules were aligned with compensation schedules that other Defendant Processors had established for the same positions.

136.    Similarly, some salaried positions at red meat processing plants that Defendant Processors, their subsidiaries, and related entities owned were paid higher salaries than other salaried positions, largely due to the greater skill and experience required by those higher paying salaried positions. For example, a general manager, who is responsible for all aspects of production, receives a higher salary than an operations manager, who is responsible for plant operations and acts as the general manager's assistant. Nonetheless, each Defendant Processor systematically determined the compensation for all salaried positions at the red meat processing plants that they, their subsidiaries, and related entities owned using compensation schedules that accounted for workers' skill and/or experience. Those schedules were aligned with compensation schedules that other Defendant Processors had established for the same positions.

5. **Centralized Determination of Compensation for Red Meat Processing Plant Workers**

137.     The compensation of red meat processing plant employees comprises a significant share of each Defendant Processor's total operating costs. As of October 2018, labor costs made up approximately 60 percent to 70 percent of beef- and pork-processing plants' operating costs.

138.     Decisions regarding the compensation of workers at red meat processing plants owned by Defendant Processors, their subsidiaries, and related entities were made by and at each Defendant Processor's corporate headquarters during the Class Period. The fact that they did so at the corporate level reflects the significance of labor costs to their overall profitability. While local plant managers sometimes made recommendations for wage adjustments, senior executives at each Defendant Processor's corporate headquarters ultimately determined and approved workers' hourly wages, annual salaries, and employment benefits. That centralization materially facilitated the formation and implementation of the compensation-fixing conspiracy alleged herein.

139.     During the Class Period, the Defendant Processors' senior executives determined the hourly wages, annual salaries, bonuses, and employment benefits for Class Members across the country in a formulaic way, establishing schedules that compensated employees according to their specific positions in Defendant Processors' red meat processing plants and their levels of proficiency at their red meat processing job duties.

140.     Defendant Processors' executives worked to standardize labor costs between different plants they owned and operated. For instance, in 2003, a senior vice president for human resources at Tyson explained the company's hard-line stance in labor negotiations with workers at a plant in Jefferson, Wisconsin, by stating that "the cost in Jefferson is out of line" with other Tyson plants.

### 6.     The Role of Labor Unions

141.    Approximately 70 percent to 80 percent of hourly-paid workers at red meat processing plants are union members, and the United Food and Commercial Workers International Union ("UFCW") represents most of them. The UFCW bargained for workers' wages with the Defendant Processors' corporate- and plant-level representatives. The coordination among Defendant Processors in fixing wages inhibited the UFCW's ability to negotiate higher salaries. Had Defendant Processors not conspired to set wages, union representatives would have been able to negotiate with each Defendant Processor individually, securing higher wages and better benefits for some if not all union members.

### 7.     Demographics of Hourly-Paid Red Meat Processing Plant Workers

142.    During the Class Period, the depressed compensation provided to hourly-paid workers in red meat processing plants owned by Defendant Processors, their subsidiaries, and related entities left many of those workers in poverty. According to the Center for Economic and Policy Research, about 45 percent of hourly-paid workers in red meat processing plants live in low-income families, and a disproportionate number of them lack health insurance.

143.    Despite the poor compensation, meatpacking is "far and away the most dangerous profession in the United States," according to the Yale Global Health Review, which reported that as of 2016, "[s]laughter facilities boast[ed] nonfatal injury rates of up to twenty out of every hundred workers." The Occupational Safety and Health Administration ("OSHA") reports that "[t]here are many serious safety and health hazards in the meat packing industry," including "exposure to high noise levels, dangerous equipment, slippery floors, musculoskeletal disorders, and hazardous chemicals." Beef- and pork-processing workers are nearly seven times more likely to suffer repetitive strain injuries than the average American worker. Indeed, as the *Guardian* has

reported, OSHA records reveal "that, on average, there are at least 17 'severe' incidents a month in US meat plants"—injuries involving "hospitalisations, amputations or loss of an eye."

144.    Debbie Berkowitz, a former OSHA official and now a senior fellow at the National Employment Law Project, has stated that "[p]art of the business model in this industry is to sacrifice worker safety on the altar of profits." As *Mother Jones* put it in a detailed 2001 piece titled "The Chain Never Stops":

> The golden rule in meatpacking plants is "The Chain Will Not Stop." USDA inspectors can shut down the line to ensure food safety, but the meatpacking firms do everything possible to keep it moving at top speed. Nothing stands in the way of production, not mechanical failures, breakdowns, accidents. Forklifts crash, saws overheat, workers drop knives, workers get cut, workers collapse and lie unconscious on the floor, as dripping carcasses sway past them, and the chain keeps going. "The chain never stops," Rita Beltran, a former . . . worker told me. "I've seen bleeders, and they're gushing because they got hit right in the vein, and I mean they're almost passing out, and here comes the supply guy again, with the bleach, to clean the blood off the floor, but the chain never stops. It never stops."

145.    Due to the poor compensation, grueling work and high risk of physical injury, many Americans have no interest in employment as an hourly-paid worker in a red meat processing plant. For that reason, Defendant Processors, their subsidiaries, and related entities often recruit hourly-paid workers who have limited alternative options for employment. Many of the hourly-paid workers recruited and hired by Defendant Processors, their subsidiaries, and related entities are migrant workers, refugees, asylum seekers, prison laborers, or participants in court-ordered substance-abuse programs.

146.    Many of the hourly-paid workers who Defendant Processors, their subsidiaries, and related entities hire to work in red meat processing plants do not speak English and lack formal education. For example, Tyson employees across its various plants speak more than 50 languages.

More than a quarter of all frontline workers at meatpacking plants live in a household without any English-proficient adults.

147.    A Human Rights Watch report explained that migrant workers "are less likely to report workplace abuses or even injuries, and are therefore more easily exploitable than US citizens, for fear of their employers' power to fundamentally disrupt their lives and the lives of their families." A former human-resources manager at a Defendant Processor explained that red meat processors target immigrant workers "because they don't complain and they work all the hours." One employee at a processing plant owned by Hormel told a reporter for the *Guardian* that undocumented workers "don't ask for breaks. They don't ask for raises. . . . They just work harder and harder, because they need to work." A former human-resources manager at another Defendant Processor stated that immigrant workers often "don't file for workers' compensation injuries." Academic research corroborates these employees' statements: a University of Iowa study of a pork-processing plant found that "undocumented workers from Mexico and other parts of Latin America are almost half as likely to report an injury or job-related illness as their white counterparts."

## 8.    Demographics of Salaried Red Meat Processing Plant Employees

148.    To obtain a salaried position at beef- or pork-processing plants owned by Defendant Processors, their subsidiaries, and related entities, an applicant must satisfy certain education and experience requirements.

149.    For example, when recruiting applicants for a position as a maintenance supervisor, Defendant Processors often seek the following qualifications: a high-school diploma or equivalent, a minimum of three to five years of background experience in general industrial maintenance, and a general knowledge of machinery used in the industry. Defendant Processors also often seek maintenance supervisors who possess background knowledge in hydraulic, welding, and PLC

("programmable logic controller") systems training. Accordingly, only educated, skilled, and experienced applicants can obtain salaried positions at red meat processing plants owned by Defendant Processors, their subsidiaries, and related entities.

150.    Similarly, when recruiting applicants for a production-supervisor position, Defendant Processors often seek the following qualifications: excellent written and verbal communication skills; experience in a beef- or pork-processing operation; knowledge of the production process, equipment, and product specifications; a high-school diploma or equivalent; computer skills; mathematical, analytical, and problem-solving skills; and proficiency or fluency in English and Spanish.

**B.      Conspiracy to Depress Compensation**

151.    Beginning in January 2014 and continuing to the present day, Defendants have conspired with each other to fix and depress the compensation paid to employees of Defendant Processors, their subsidiaries, and related entities at red meat processing plants in the continental United States.

152.    Defendant Processors carried out their conspiracy to depress compensation through several mutually reinforcing overt acts, including:

- Collaboratively designing and controlling the implementation of detailed surveys, conducted by Defendant WMS, to exchange data concerning Class Members' current and future compensation;

- Collaboratively planning and conducting annual in-person Red Meat Industry Compensation Meetings between Defendant Processors' senior executives, during which they reviewed compensation survey results and fixed and depressed the wages, salaries, bonuses, and benefits paid to Class Members;

- Engaging in direct email and telephonic communications between Defendant Processors' senior executives about Class Members' current and future compensation;

- Exchanging competitively sensitive compensation data on a monthly basis through Agri Stats, permitting continuous monitoring of how much the Pork Processing Defendants were paying Class Members; and

- Entering into "no poach" agreements in which Defendant Processors agreed to halt and refrain from soliciting or recruiting each other's employees.

153. Defendants formed and implemented the conspiracy to reduce labor costs and maximize profits. In the absence of the conspiracy, Defendant Processors, their subsidiaries, and related entities would have competed with each other for labor during the Class Period by offering higher wages, higher salaries and superior benefits to Class Members. The conspiracy permitted Defendant Processors to restrain competition for red meat processing plant workers and thus reduce labor costs.

1. **Defendant Processors Unlawfully Exchanged Compensation Information through Detailed Surveys They Designed**

154. During the Class Period, Defendant Processors designed, developed, operated, and participated in an annual Red Meat Industry Compensation Survey to exchange detailed current and future information about, and facilitate the fixing and depression of, wages, salaries, bonuses, and benefits provided to their workers at red meat processing facilities in the continental United States.

155. Various Defendant Processors designed, paid for, and participated in an annual Red Meat Industry Compensation Survey each year from 2014 through 2019. That process consisted of designing and completing a Survey Questionnaire each year that was distributed to each

participating red meat processor and then receiving and reviewing an annual report containing the results of the Survey (the "Survey Results Report").

156. The Red Meat Industry Compensation Surveys were implemented by WMS, a compensation-consulting firm. WMS distributed the Survey Questionnaires to Defendant Processors and compiled the results into Survey Results Reports that were also distributed to Defendant Processors. Jonathan Meng has served as President of WMS since 2000.

157. WMS has marketed its compensation-survey services by claiming that it conducts and administers surveys in a manner that complies with "Safe Harbor" guidelines issued by the United States Department of Justice ("DOJ") and the Federal Trade Commission ("FTC") (the "Safe Harbor Guidelines"). Originally published in 1996, the Safe Harbor Guidelines describe features of information exchanges that the DOJ and FTC "will not challenge under the antitrust laws absent extraordinary circumstances."[3] Information exchanges that fall within the Safe Harbor Guidelines can still violate the antitrust laws if their anticompetitive effects outweigh their procompetitive benefits, but the federal government has to date exercised its prosecutorial discretion and chosen not to challenge information exchanges that fully comply with the Safe Harbor Guidelines.

158. The Safe Harbor Guidelines provide that the federal government will "not challenge, absent extraordinary circumstances, [competitors'] participation in written surveys of . . . wages, salaries, or benefits . . . if the following conditions are satisfied: (1) the survey is managed by a third-party (e.g., a purchaser, government agency, health care consultant, academic institution, or trade association); (2) the information provided by survey participants is based on

---

[3] U.S. Dep't of Just. & Fed. Trade Comm'n, *Statements of Antitrust Enforcement Policy in Health Care* 5 (1996), https://www.justice.gov/atr/page/file/1197731/download#CONTNUM_49.

data more than three months old; and (3) there are at least five [competitors] reporting data upon which each disseminated statistic is based, no individual [competitor's] data represents more than 25 percent on a weighted basis of that statistic, and any information disseminated is sufficiently aggregated such that it would not allow recipients to identify the prices charged or compensation paid by any particular [competitor]."

159.     The Red Meat Industry Compensation Survey conducted by WMS on behalf of the Defendant Processors violated the Safe Harbor Guidelines in at least three ways. First, the Defendant Processors, not WMS, collectively managed and controlled the annual Red Meat Industry Compensation Surveys. Second, those Surveys often contained information about the Defendant Processors' future compensation plans and practices. Third, Defendant Processors had extensive discussions about the Survey results, including at in-person meetings, during which they disclosed their respective compensation rates, practices, and plans.

### a.     Red Meat Survey Group

160.     Participants in the annual Red Meat Industry Compensation Survey referred to themselves as the "Red Meat Survey Group." The Red Meat Survey Group (the "Survey Group" or "Group") consisted exclusively of red meat processors that the Group recruited after ensuring that they met the Group's membership criteria.

161.     During the Class Period, each Defendant Processor or one of its affiliates was a member of the Red Meat Survey Group and, in turn, participated in an annual Red Meat Industry Compensation Survey.

162.     Each member of the Red Meat Survey Group paid a flat annual rate to WMS to participate in the annual Red Meat Industry Compensation Survey and receive the Survey Results Report.

163.    Defendant Processors developed strict rules for a red meat processor's admission into and continued membership in the Red Meat Survey Group.

164.    First, the Defendant Processors required that a Red Meat Survey Group member operate similar red meat facilities and produce similar red meat products to those of the other members of the Red Meat Survey Group. This meant that a prospective member needed to have a red meat slaughter facility, a case-ready plant, or a red meat cook plant.

165.    Second, Defendant Processors required that a Red Meat Survey Group member *must* participate in the annual Red Meat Industry Compensation Meeting. For example, on June 12, 2018, Brad Sievers, Compensation Manager at JBS, wrote to the Red Meat Survey Group: "Keep in mind that regular attendance at the meeting is required to participate in the survey. We understand that extenuating circumstances sometimes make it impossible to attend, but absent those, **attendance is required!**"

166.    The Defendant Processors themselves, not WMS, determined who could join the Red Meat Survey Group. Indeed, when a prospective member of the Red Meat Survey Group wanted information regarding the "formal application process" for joining, Meng admitted that he "[did] not know the answer to [their] question" and advised that the query be directed to Defendant Processors "Cargill and Tyson."

167.    As another example, on September 1, 2015, Kim Huerta, Director of Compensation at Perdue, asked Meng if WMS "handle[s] any salary surveys for the pork industry[.]" Meng responded by directing Huerta to Judith Sitton, Compensation and Retirement Manager at JBS, adding, "[h]opefully you will be able to join the group." After Huerta asked Sitton how to join the upcoming survey, Sitton responded that Perdue's membership in the Group required the other

participants' approval: "I have no issue with this, but will double check with the other companies and let you know ASAP."

168.    After the 2016 Red Meat Survey, the Red Meat Survey Group formed "a steering committee to aid with communication and organization." The Steering Committee consisted of Elizabeth Farmer from Tyson, Brad Sievers from JBS, Max Byers from JBS, and Tanya Teeter from Cargill. According to Meng, the Steering Committee became his "main point of contact" regarding the Red Meat Industry Compensation Survey.

### b.    Defendant Processors Entirely Controlled the Survey and Its Contents

169.    Throughout the Class Period, the Red Meat Survey Group collectively maintained complete control over the design and implementation of the annual Red Meat Industry Compensation Survey, which Defendant Processors enlisted Defendant WMS to carry out.

170.    To design, implement, and modify the Survey, Defendant Processors often conducted their own in-person and telephonic meetings and, on information and belief, reached their own agreements in private, without WMS's involvement.

171.    According to Meng, the Red Meat Survey Group determined all the job positions, compensation metrics, and specific benefits to include in the Red Meat Industry Compensation Survey and Survey Results Reports. The Red Meat Survey Group would engage in substantial back-and-forth about the optimal metrics and positions to include in the Surveys and Reports. Meng explained that the Red Meat Survey Group carefully designed the Red Meat Industry Compensation Survey to ensure that each salaried position, category of hourly rate, and benefit substantially matched across each participating processor's compensation structure.

172.    The Red Meat Survey Group initially developed the Red Meat Industry Compensation Survey in late 2013. During this development process, Defendant Processors exercised complete decision-making power over the contents of the Survey, including identifying

which individual processing positions were to be surveyed and which types of data were to be collected from members of the Red Meat Survey Group.

173. On September 26, 2013, Javen Xu, Compensation and Benefits Analyst at JBS, emailed Meng to relay that "9 companies (including JBS) [had] confirmed to take part [in] the Red Meat Comp Survey," and that Xu "had collected 7 companies' feedback so far in terms of what positions they want to include in the survey," with "the remaining 2 [companies] . . . on the way." Xu related that the companies' feedback so far had produced a "consolidated catalog [of] about 70 [positions] (50 [salaried] Exempt, 10 [salaried nonexempt], and 10 Hourly)." Xu confirmed that "[a]ll the companies will meet together to finalize the catalog [of positions] and the [Survey] content to include." In his response, Meng confirmed that Defendant Processors (not WMS) held final decision-making power over how many and which specific positions the Survey would cover, as well as the type of information that the Survey would seek to obtain.

174. On October 28, 2013, certain Defendant Processors met together in Denver for the "first red meat industry survey group meeting" and took "the first step of finalizing the survey positions and questionnaire." Meng did not attend and took no part in this meeting.

175. A few days later, on November 1, 2013, Xu reported to Meng on the Red Meat Survey Group's initial meeting, informing Meng that the Group had refined the "consolidated catalog" to include the "42 positions" to be covered in the Red Meat Industry Compensation Survey. Xu provided Meng with the "catalog" chart of the 42 positions. Xu explained that 12 of these 42 positions were the result of the Group's division of "6 key positions into 2 levels by plant size," using 2,000 full-time employees as "the cutoff."

176. Later that same day, Renee DeBar, Head of Compensation and Benefits at JBS, emailed Meng with further instructions. Among other requirements, DeBar communicated that the

Red Meat Survey Group "need[ed] three questionnaires—salaried/salaried non-exempt, non-union hourly production and union hourly production." As DeBar explained to Meng, the Survey Group had made all of these specifications with the goal of having the Survey contain "useful information for us."

177.    On December 2, 2013, DeBar emailed the then-operative version of the Survey to the rest of the members of the Red Meat Survey Group (which then included JBS, Tyson, Seaboard, Agri Beef, American Foods Group, Cargill, Hormel, National Beef, and Smithfield) without copying Meng. DeBar noted that Tanya Teeter, Assistant VP of Labor at Cargill, had "suggested some additions to the survey," listing them and asking for feedback from the Group. The next day, Kay Stinson, VP of Human Resources at Seaboard, and Linda Wray, VP of Compensation/HRIS at Tyson, each responded with feedback. DeBar proposed "scheduling a call to discuss this and make final decisions."

178.    On December 6, 2013, Xu emailed Meng with an "updated survey questionnaire" that was based on the Survey Group's additional revisions. Xu also gave detailed instructions on how WMS should report Survey data, even down to mandating the specific formula that WMS should employ to standardize the calculation for hourly pay. DeBar explained in a follow-up email to Meng: "We want to have this information as specific as possible . . . ."

179.    Not only did the Red Meat Survey Group exercise complete control over the initial design of the Red Meat Industry Compensation Survey, but the Group also exerted full control over the implementation and modification of that Survey during the entire six-year duration of its use.

180.    During each year from 2014 to 2019, WMS sent the Red Meat Industry Compensation Survey Questionnaire to members of the Red Meat Survey Group and compiled

survey responses in an annual Survey Results Report. WMS then distributed the detailed Survey Results Report to each member of the Red Meat Survey Group in April or May, before the in-person Red Meat Industry Compensation Meeting.

181.     During the 2014 Red Meat Survey, after a Survey Group member asked how to calculate a particular Survey data point, Meng asked DeBar, "How should I respond to the following?" Xu instructed Meng on how that data point operated and how to respond.

182.     After the 2014 Red Meat Survey Questionnaire had been distributed to the Group, when a Survey Group member asked whether the inclusion of a particular field of survey data was actually "necessary" or "included in error," Meng asked DeBar to "please advise." She promptly did so.

183.     On October 21, 2014, DeBar informed Meng that the Survey Group "met a few weeks ago to begin discussions regarding the 2015 red meat survey." Meng was not present at this meeting and did not contribute in any way. DeBar then instructed Meng to make specific modifications to the 2015 Survey that had already been devised by the Red Meat Survey Group without him.

184.     In preparing for the 2017 Red Meat Survey, Tanya Teeter, Assistant VP of Labor at Cargill, and Brad Sievers, Compensation Manager at JBS, conducted a private conference call in early December 2016 without Meng present. On December 8, 2016, Sievers informed Meng that "Tanya and I just touched base on the red meat survey and wanted to let you know what we discussed": the Red Meat Survey Group (not Meng) was "going to reach out to a couple more companies to see if they're interested," and the Red Meat Survey Group was going to "hold a call" without Meng present "to review job descriptions and ensure everyone is on the same page."

Sievers also provided Meng with the location (Dallas) and general date (mid-April) of the 2017 Red Meat Survey Meeting.

185.     Later that day, Brad Sievers emailed the Red Meat Survey Group, indicating plans for "a conference call to review the [Survey's] job descriptions in order to ensure alignment in the group on what we're reporting." Sievers and the rest of the Red Meat Survey Group then held a "Comp Call" in mid-January 2017. During that call, the Red Meat Survey Group made several structural decisions about the scope of the Survey.

186.     In preparing the 2018 Red Meat Survey, Meng asked Brad Sievers whether the Red Meat Survey Group "want[ed] to make any changes to the hourly positions and data collection." Sievers followed up a day later with "some revisions to the job descriptions," as well as four other "changes/additions" to the Survey. Over the next month, the Red Meat Survey Group provided a series of iterative changes for Meng to implement, with Meng asking the Red Meat Survey Group to "[p]lease let me know exactly what data you are looking for."

187.     Considering that Defendant Processors exerted absolute control over the contents and implementation of the Red Meat Industry Compensation Survey, they could have readily conducted the annual survey themselves without the involvement of WMS (or any other third party). Instead, Defendant Processors elected to hire WMS to confer a veneer of legality on their Survey—while those very same Defendant Processors unlawfully designed the survey in a manner to exchange future compensation data and to provide information that would facilitate in-person meetings during which they discussed the survey results and agreed to fix and depress the wages, salaries, bonuses, and benefits provided to Class Members.

### c. Positions and Questions Covered by the Red Meat Industry Compensation Survey

188.     In each year of the Class Period, the Red Meat Industry Compensation Survey covered 33 to 38 distinct salaried exempt positions employed at red meat processing plants. Meng believed that the Defendant Processors competed on a nationwide basis for salaried positions at their red meat processing plants.

189.     For each specific salaried exempt position covered by the Red Meat Industry Compensation Survey, the Survey provided the following metrics:

a.     Base salary

b.     The bonus paid across all Survey participants

c.     Total compensation

d.     Target opportunity percent

e.     Maximum opportunity percent

f.     Base salary policy (including the minimum, midpoint, and maximum policy)

190.     For each of these pay metrics for salaried exempt positions, the Survey identified the values at the 75th percentile, median, average, weighted average, and 25th percentile.

191.     Each Survey Results Report was tailored for the recipient processor so that it could readily ascertain where it fell within industry compensation rates. Specifically, on each page disclosing industry compensation rates for a particular salaried position, the Survey Results Reports listed the recipient processor's own compensation information for that position (in blue) on the last line of the page.

192.     From 2014 to 2017, the Red Meat Industry Compensation Survey also covered four to six salaried nonexempt positions employed at red meat processing plants.

193.     For each specific salaried nonexempt position covered by the Red Meat Industry Compensation Survey, the Survey provided the following metrics:

     a.     Average base salary

     b.     Policy minimum (the minimum salary policy)

     c.     Policy midpoint (the midpoint salary policy)

     d.     Policy maximum (the maximum salary policy)

194.     For each of these pay metrics for salaried nonexempt positions, the Survey identified the values at the 75th percentile, median, average, weighted average, and 25th percentile.

195.     Most Red Meat Industry Compensation Surveys also covered specific hourly paid positions at red meat processing plants around the country. In 2014 and 2015, the Survey addressed four hourly positions: "scale/electronic technician," "entry-level laborer," "full-fledged laborer," and "full-fledged operative." In 2016, the Survey added three additional hourly positions—"top operative," "production lead," and "maintenance lead"—making for a total of seven. The 2017 Survey addressed the same seven hourly positions.

196.     For each of these specific hourly-paid workers covered by the Red Meat Industry Compensation Survey, the 2014 to 2017 Surveys provided the following metrics:

     a.     Start pay rate (the pay rate when a worker was hired)

     b.     "Top" pay rate (the maximum pay rate)

     c.     Average pay rate

197.     The 2014 to 2017 Surveys identified information for these metrics at the 90th percentile, the 75th percentile, average, the 25th percentile, and the 10th percentile.

198.     As well as providing pay metrics for specific hourly-paid positions, each Red Meat Survey also covered broader categories of hourly-paid employees at red meat plants around the

country. The Survey identified the following categories of hourly paid employees: all union employees, all non-union employees, all maintenance employees, maintenance union employees, maintenance non-union employees, all production/processing employees, production/processing union employees, and production/processing non-union employees.

199.     For each of the above categories, the 2014 to 2017 Surveys listed the number of employees and the hourly pay rate. For each of the above categories, the 2018 to 2019 Surveys listed the number of employees, the entry-level start rate, the entry-level base rate, the number of employees at the entry-level base rate, the weighted-average base rate, the highest-level base rate, the amount of the second-shift premium, the amount of the third-shift premium, and the turnover percentage.

200.     For each of these metrics for categories of hourly workers, the Survey identified the values at the 90th percentile, the 75th percentile, the 50th percentile, the average, the 25th percentile, and the 10th percentile.

201.     The 2014 to 2017 Surveys identified these values across all plant locations and provided more specific breakdowns by state.

202.     Each Survey also identified data about many of the benefits provided to employees at red meat processing plants operated by members of the Red Meat Survey Group. For example, the Surveys identified detailed information about:

> a.     value of contributions made to pension and other retirement plans;
>
> b.     amount of life-insurance coverage;
>
> c.     amount of insurance coverage for accidental death and dismemberment;
>
> d.     coverage plans for long-term disability insurance;
>
> e.     amount and duration of short-term disability insurance;

f.      provision of sick leave days;

g.      number of annual holidays;

h.      number of annual vacation days (based on the duration of employment);

i.      amount of health care costs per employee;

j.      amount of cost-sharing for medical insurance plans;

k.      size of deductibles for medical insurance plans;

l.      scope of prescription drug coverage; and

m.      scope and cost of dental plans.

203.    Each Survey identified benefits data for three categories of workers: (1) salaried nonexempt workers; (2) non-union hourly workers; and (3) union hourly workers.

204.    Each Survey listed contact information for all of the Defendant Processors that were participating in the Survey.

205.    Each Survey also requested information about which specific job titles the different Survey participants associated with each job code. As a result, each member of the Red Meat Survey Group was aware of how the other participants described the different job positions that the Survey covered.

### d.      Future Compensation Data in the Red Meat Industry Compensation Survey

206.    From 2014 through 2017, the Red Meat Industry Compensation Survey included detailed data regarding *future* salary increases. Specifically, during those four years, the Red Meat Industry Compensation Surveys collected data from each member of the Red Meat Survey Group about two future salary metrics: "salary merit increases" and "salary range movement."

207.    Members of the Red Meat Survey Group included this future compensation data in the Red Meat Industry Compensation Survey Questionnaire despite knowing that doing so fell

outside the Safe Harbor Guidelines and violated the antitrust laws. Meng recalled that he warned the Survey Group that the inclusion of future compensation information, including plans for future salary increases, would be inconsistent with the Safe Harbor guidelines if that future compensation information was not part of a publicly disclosed union contract.

208.    The metric "salary merit increases" in the Red Meat Industry Compensation Survey Questionnaire measured planned increases in salary. Each Red Meat Industry Compensation Survey Questionnaire distributed to members of the Red Meat Survey Group until 2018 requested four values related to salary range increases: (1) the average salary increase that had been planned for the prior year; (2) the average salary increase that had actually been paid during the prior year; and (3) the average salary increase anticipated for the next year or two years; and (4) which month the processor planned to increase those salaries during the next year or two years.

209.    For example, the following questions were included in the 2016 Red Meat Industry Compensation Survey distributed to members of the Red Meat Survey Group:

11.    Merit Budget:

The average salary increase for those receiving increases:*

| | |
|---|---|
| Actual (FY 2015): | % |
| Planned (FY 2015): | % |
| Merit Budget for This Year (FY 2016): | % |

When do you plan on granting merit increases?

Anniversary date? ☐    Common date? ☐    Month: _____

210.    The data collected from Defendant Processors regarding future "salary merit increases" were displayed in the Survey Results Reports. For example, the following chart concerning "salary merit increases" was included in the 2016 Survey Results Report:

## A. Salary Merit Increases

|  | FY 2015 Actual | FY 2015 Planned | FY 2016 |
|---|---|---|---|
| **Highest** | 4.2% | 3.0% | 3.0% |
| **75th Percentile** | 3.3% | 3.0% | 3.0% |
| **Median** | 3.0% | 3.0% | 3.0% |
| **Average** | 3.15% | 2.9% | 2.9% |
| **25th Percentile** | 3.0% | 3.0% | 3.0% |
| **Lowest** | 2.5% | 2.5% | 2.5% |
| **No. of Companies** | 9 | 8 | 5 |

211.    The metric "salary range movement" in the Red Meat Industry Compensation Survey Questionnaire measured planned increases in salary ranges. Each Red Meat Industry Compensation Survey Questionnaire distributed to members of the Red Meat Survey Group until 2018 requested three values related to salary range increases: (1) the planned increase in the salary range for the current budget year; (2) the planned increase in the salary range for the next budget year; and (3) which month the processor planned to increase the salary ranges.

212.    For example, the following questions were included in the 2016 Survey Questionnaire that was distributed to members of the Red Meat Survey Group:

12.    Salary Range:

Salary Range Movement for Current Budget Year:

Date: _____     Change: _____ %

Salary Range Movement for Next Budget Year:

Date: _____     Change: _____ %

When do you plan on adjusting salary ranges? (month)     _____

213.    The data collected from Defendant Processors regarding future "salary range movements" were displayed in the Survey Results Reports. For example, the following chart concerning the "salary range movements" was included in the 2016 Survey Results Report:

**B.    Salary Range Movement**

| | Current Budget Year | Next Budget Year |
|---|---|---|
| Highest | 2.5% | -- |
| 75th Percentile | 2.1% | -- |
| Median | 2.0% | 2.0% |
| Average | 1.4% | 1.65% |
| 25th Percentile | 0 | -- |
| Lowest | 0 | -- |
| No. of Companies | 6 | 4 |

214.    In addition to sharing future data concerning salaries, the Red Meat Industry Compensation Survey also shared future benefits data throughout the Class Period.

215.    When designing the Red Meat Industry Compensation Survey in 2013, the Red Meat Survey Group provided "clarity" that benefits data for "the nonunion facilities" "should be what the plans will be for 2014, not current year."

216.    Implementing the Red Meat Survey Group's directive, the 2014 Red Meat Industry Compensation Survey Questionnaire distributed to members of the Red Meat Survey Group advised that for the benefits section of the Survey "[f]or Salaried and Non-Union personnel," participants should "report plan 2014 information." The Red Meat Industry Compensation Surveys from 2015 to 2019 had similar instructions.

217.     In sum, the Red Meat Industry Compensation Survey collected multiple measures of *future* compensation data that allowed Defendant Processors to compare their own planned compensation increases against their competitors' planned increases and assess precisely *when* other members of the Red Meat Survey Group planned to implement their increases. These exchanges of future compensation data in furtherance of Defendant Processors' conspiracy to suppress compensation fell outside the Safe Harbor Guidelines and violated antitrust law.

**e.     Data from the Red Meat Industry Compensation Surveys Was Highly Valuable to Defendant Processors**

218.     The compensation data that was exchanged between Defendant Processors through the Red Meat Industry Compensation Survey was highly valuable to Defendant Processors, which used this data to make decisions concerning their respective compensation schedules.

219.     Defendant Processors used the current and future compensation data obtained from Red Meat Industry Compensation Surveys to analyze and benchmark their salaries and benefits against those of their competitors and to assist in determining their compensation schedules. Accordingly, the compensation data that was exchanged between Defendant Processors through Red Meat Industry Compensation Surveys was highly valuable to Defendant Processors.

220.     As Brad Sievers, Compensation Manager at JBS, reported to other Survey Group members and Meng on December 14, 2015, "the data that was provided as a result of last year's survey has met our needs from an analysis and benchmarking perspective."

221.     On April 7, 2015, Judith Sitton, Compensation and Retirement Manager at JBS, asked Meng for an ETA on the final Survey results for that year, admitting to Meng that Renee DeBar—Sitton's supervisor at JBS, and Head of Compensation and Benefits—was "really pressing me for the Health data."

222. On July 7, 2016, Sievers, after asking Meng multiple follow-up questions concerning the 2016 Survey's results, apologized "for the multiple inquiries," informing him that there were "some relatively big decisions in the making so all of our numbers are under a lot of scrutiny!"

223. On September 1, 2015, Kim Huerta, Director of Compensation at Perdue, contacted Meng requesting "salary surveys for the pork industry," as Perdue was "expanding in this industry" and she needed to "get data pretty quickly." Meng directed Huerta to contact Judith Sutton, Compensation and Retirement Manager at JBS, to discuss the Red Meat Industry Compensation Survey.

224. C-suite executives reviewed Red Meat Industry Compensation Survey data closely, discussing Survey results in detail with their key human-resources executives. On July 5, 2016, Brad Sievers informed Meng that "[w]e are reviewing some comp data from the survey and our CEO is questioning" a particular tranche of Survey results.

225. On September 19, 2018, Max Byers, HR Analytics and Compensation Manager at JBS, informed Meng of a "[d]iscussion with [the] CEO about the Red Meat and Poultry Surveys," with Byers "working closely with our CEO to" make salary decisions "using the Red Meat Survey results." Byers requested that Meng make efforts to deanonymize the Survey results, requesting that WMS provide data points "for [the] 25th, [m]edian, average, and 75th" levels "from the individual incumbents" as opposed to the status quo of "submitting summarized lines by company." Byers requested these changes because JBS's CEO was "really worried" about one Survey Group member's "ability to impact the results" of the Survey.

### 2. Defendant Processors Discussed and Suppressed Compensation at Annual Roundtable Meetings without WMS Present

226. Throughout the Class Period, representatives from Defendant Processors regularly attended and participated in in-person Red Meat Industry Compensation Meetings at which competitively sensitive compensation data was exchanged and the wages, salaries, bonuses, and benefits of Class Members were discussed and suppressed.

227. These annual Meetings were held each year from 2014 to 2019, with the exception of 2016. As noted above, Defendant Processors were required to attend these Meetings as a condition of participating in the annual Red Meat Industry Compensation Survey administered by WMS.

228. Each Red Meat Survey Group member sent one to three executives to the Red Meat Industry Compensation Meetings. Those Meetings were typically attended by top-ranking human-resources corporate executives such as Compensation Managers, vice presidents of Human Resources, and Directors of Human Resources. The Red Meat Survey Group referred to these Meetings as, among other names, "Compensation Meetings" and "Red Meat Industry Compensation and Benefits Survey Meetings."

229. The Red Meat Survey Group determined the location, schedule, and agenda for each Red Meat Industry Compensation Meeting. The Meetings were usually held in April or May, with the most commonly selected location being Kansas City, Missouri.

230. For example, the initial Red Meat Industry Compensation Meeting was held on April 15, 2014, at the Four Points by Sheraton Kansas City Airport Hotel in Kansas City, Missouri. Executives from Agri Beef, American Foods Group, Cargill, Hormel, JBS, National Beef, Seaboard, Smithfield, and Tyson attended this Red Meat Industry Compensation Meeting.

231.    As another example, a Red Meat Industry Compensation Meeting was held on July 17, 2018, at the Crowne Plaza Kansas City Downtown Hotel in Kansas City, Missouri. Executives from Agri Beef, Cargill, JBS, National Beef, Perdue Farms, Seaboard, Triumph, and Tyson attended this Red Meat Industry Compensation Meeting.

232.    The cost of each Red Meat Industry Compensation Meeting was split on a pro-rata basis among the attending Defendant Processors. One Defendant Processor would pay the upfront costs for each Meeting, and the other members of the Red Meat Survey Group would reimburse that member.

233.    Each Red Meat Industry Compensation Meeting consisted of multiple roundtable sessions that, in total, lasted multiple hours. During the roundtable sessions, executives from the members of the Red Meat Survey Group would discuss the results of Red Meat Industry Compensation Survey as well as their companies' current and future compensation practices and plans in detail.

234.    The attendees at the Red Meat Industry Compensation Meetings were asked to bring, and did bring, their company's compensation data and their Survey Results Reports to the roundtable sessions. The attendees typically brought this data to the roundtable sessions on their laptop computers, which contained all the compensation data in electronic form.

### a.    Roundtables Sessions that Included Meng

235.    At the Red Meat Industry Compensation Meetings, Jonathan Meng was invited to attend the first and/or second roundtable session to present the results of the Red Meat Industry Compensation Survey. During each of those sessions, he made a PowerPoint presentation that summarized some of the results of the Red Meat Industry Compensation Survey.

236.    From 2015 onwards, the PowerPoint presentations identified the average and median wage rates and salaries for each red meat processing position based on the survey data

provided by the Defendant Processors to WMS, thereby establishing benchmarks that facilitated compensation-fixing discussions.

237.    Meng's PowerPoint presentations focused on year-to-year changes in the compensation data reported in Red Meat Survey Results. Specifically, those PowerPoint presentations focused on how the compensation data reported in the current year for both salaried and hourly-paid workers compared to the prior year or two years.

238.    For each salaried position covered by the Red Meat Industry Compensation Survey, all but the first 2014 PowerPoint presentation identified how much the base salary, midpoint salary, and total compensation had increased, by percentage, since the previous year. Most PowerPoint presentations also identified how, for each salaried position, the percentage of employees that received a bonus in the current year compared to the percentage that had received a bonus during the prior two years.

239.    All of the PowerPoint presentations specifically addressed projections for future salary increases. The 2015 PowerPoint, for example, highlighted that the salary "merit increase" would be three percent for 2015 among participating companies, and that there would be a "salary structure increase" of "2.0% for 2015."

240.    For the hourly-paid positions covered by the Red Meat Industry Compensation Survey, all but the first 2014 PowerPoint presentation identified how much the median and average base rate had increased since the prior year.

241.    Meng's PowerPoint presentations also addressed each of the benefits covered by the Red Meat Industry Compensation Survey. All but the first 2014 PowerPoint identified whether the benefit amounts or policies had changed since the prior year. For example, the 2015 PowerPoint stated that the following benefits were "unchanged" since the 2014 Survey: Life

Insurance, Accidental Death and Dismemberment Insurance, Optional Insurance, Dependent Insurance, Long-Term Disability Insurance, Sick Days, Short-Term Disability, Group Health, Dental Plans, Vision Plans, Wellness Plans, Reimbursement Accounts, and Prescription Drug Benefits.

242. The 2014, 2015, and 2017 PowerPoint presentations contained a section titled "Noticeable Data Changes." For each salaried position covered by the Red Meat Industry Compensation Survey, this section identified whether one or two (unnamed) companies had made a substantial change to the salary since the prior year.

### b. Roundtable Sessions that Excluded Meng

243. In 2014, 2015, and 2017, after Meng summarized the results of the Red Meat Industry Compensation Survey to executives of the Defendant Processors using PowerPoint presentations, Defendant Processors asked and expected him to leave the Red Meat Industry Compensation Meeting to allow for entirely private roundtable sessions to proceed.

244. During these roundtable discussions that excluded Meng (any other third parties) in 2014, 2015, and 2017, executives of the Defendant Processors engaged in discussions to determine and agree upon the optimal compensation for red meat processing complex workers. Specifically, the executives of the Defendant Processors agreed upon and suppressed the wages, salaries, bonuses, and benefits that they would provide to employees at red meat processing plants in the continental United States (i.e., Class Members).

245. At these roundtable sessions which excluded Meng, executives of the Defendant Processors also specifically discussed, and agreed upon, plans for salary raises and bonus budgets for the upcoming year. These discussions and agreement had the predictable effect of limiting raises and bonuses paid to employees at red meat processing facilities owned by Defendant Processors, their subsidiaries, and related entities.

246.     Meng admitted that, at each Red Meat Industry Compensation Meeting held in 2014, 2015, and 2017, it was "quite possible" that executives from the participating red meat processors discussed their compensation practices and reached agreements regarding optimal compensation rates at the private roundtable sessions that excluded him.

247.     Meng noted that as compared to nearly all of WMS's other clients, it was "unique" that the members of the Red Meat Survey Group arranged for and conducted in-person roundtable discussions about the Survey results and compensation practices from which all WMS representatives were excluded. (One limited exception is WMS's poultry-processing clients, which include some of the same Defendant Processors and which also held in-person roundtable meetings without any WMS representatives. That industry is currently the subject of a DOJ investigation into those practices.)

248.     Meng confirmed that, to the extent members of the Red Meat Survey Group had attempted to discuss a particular processor's compensation practices, future compensation plans, or optimal compensation rates in his presence at any Red Meat Industry Compensation Meetings, he would have halted those discussions and warned the members that such discussions violated the Safe Harbor Guidelines. But nothing prevented the Defendant Processors from conducting such improper discussions during the private roundtable sessions that excluded Meng.

249.     For example, on January 23, 2014, Renee DeBar, Head of Compensation and Benefits at JBS, responded to concerns from Trudy Gokey, Vice President of Human Resources for American Foods, that certain detailed bonus information was not included in the Red Meat Industry Compensation Survey. DeBar explained this was "no problem" because "[s]pecifics" of the competitors' "detailed bonus information" would be "discussed at the meeting."

250.     Similarly, on April 7, 2017, Brad Sievers, Compensation Manager at JBS, emailed executives of Defendant Processors to discuss the forthcoming Red Meat Industry Compensation Meeting: "We'll review survey results and share updates on our companies with the group (both HR-related and general). If you have any questions for the group, this will be a great time to ask them."

251.     The written agendas prepared by the Steering Committee for the Red Meat Industry Compensation Meetings were careful to conceal the contents of the roundtable sessions that excluded WMS. For example, the agendas described the private roundtable sessions as covering unspecified "[g]roup discussion topics" and "outstanding items." The agendas further note that the companies would "share relevant updates" during the roundtable sessions.

252.     The Red Meat Industry Survey Meetings also presented Defendant Processors with many opportunities to collude beyond the formal roundtable discussion sessions. Defendant Processors often participated in off-the-books dinners and other activities that preceded the Meetings themselves.

253.     For example, Kay Stinson, VP of Human Resources at Seaboard, arranged a dinner for the Red Meat Survey Group for the evening before the 2014 Red Meat Industry Compensation Meeting held in Kansas City. Linda Wray, Vice President of Compensation/HRIS at Tyson, confirmed to Stinson that "Tyson will have 2 attending the dinner." Judith Sitton, Compensation and Retirement Manager at JBS, confirmed to Stinson that "JBS will have three at dinner." A few days before the 2014 Survey Meeting, Stinson confirmed the "reservations for our group . . . Monday evening" and provided her cell-phone number, telling the Red Meat Survey Group, "looking forward to seeing everyone on Monday!"

254.    As another example, in connection with the Red Meat Industry Compensation Meeting held in 2015 in Kansas City, Judith Sitton, Compensation and Retirement Manager at JBS, arranged a dinner for the Red Meat Survey Group for the evening before the actual Meeting date. A few hours before the dinner, Sitton relayed to the rest of the Red Meat Survey Group: "A member of the team has requested that we meet at 5:00 in the main lobby in order to have a quick discussion before heading out to dinner. This will be a great opportunity for everyone to ask questions for which their company may need feedback. I hope to see everybody at 5." Members of the Group agreed to "meet in the lobby at 5:30," "tak[ing] a shuttle to the restaurant and hav[ing] our discussion over drinks before dinner."

255.    In connection with the 2019 Survey Meeting, a representative from a benefits administrator for Pitman Farms offered to sponsor a "happy hour/dinner" alongside the Meeting itself. Meng said that a presentation by the benefits administrator would be permissible so long as "the group does not ask specific questions or convey any details about their plans in an ***open*** session" (emphasis added). In a "public forum," no member of the group should "share their actual practices." Meng suggested instead that [a]nything other than general questions should be undertaken in a ***private*** session" (emphasis added).

c.    **Effects of the *Broilers* Antitrust Lawsuit on the Red Meat Industry Compensation Survey**

256.    In September 2016, a separate lawsuit alleging the price-fixing of broilers (the "*Broilers* Antitrust Lawsuit") was filed against a group of leading poultry processors—including two of the Defendant Processors in this action (Perdue and Tyson) and a subsidiary of another Defendant Processor in this action (JBS), each of whom processed poultry as well as red meat.[4]

---

[4] *In re Broiler Chicken Antitrust Litig.*, No. 1:16-cv-08637 (N.D. Ill.).

The *Broilers* Antitrust Lawsuit alleged that these processors had secretly restricted the supply and inflated the prices of broilers in violation of the antitrust laws.

257.    The *Broilers* lawsuit generated heightened concerns about the possibility of antitrust liability among the Defendant Processors. Meng noted that as a result of those Defendant Processors' heightened concerns, two changes were made to the Red Meat Industry Compensation Surveys and Meetings.

258.    First, questions seeking, and survey results containing, future salary data were eliminated from the Survey Results Reports. On October 30, 2017, Meng emailed Brad Sievers, Compensation Manager at JBS, and confirmed that "future increase data questions [were] eliminated in order to comply with Safe Harbor Guidelines" in the 2018 survey, in accordance with discussion at the April 2017 meeting. In the 2019 Red Meat Compensation Survey Report, Meng added a disclaimer that "future increases are not part of the survey" per Safe Harbor Guidelines.

259.    As Meng explained, members of the Red Meat Survey Group had ignored his warnings regarding the risks of including future compensation data in the Survey Results Reports until the filing of the *Broilers* lawsuit. It was only following the filing of that lawsuit that the Red Meat Survey Group members agreed to eliminate future salary information from the Survey Results Report.

260.    Second, starting with the 2018 Red Meat Compensation Industry Meeting, Defendant Processors instructed Meng to remain for the entire annual meeting, including all the roundtable discussion. Meng believes he was asked to attend all the roundtable sessions in 2018 and 2019 to avoid the appearance of collusion.

261.     Concerns about incurring antitrust liability for participating in the Red Meat Survey eventually led the group to cease the Red Meat Survey altogether in 2020. This concern was further heightened after the filing of *Jien v. Perdue* in August 2019[5], which alleged that multiple poultry processors, including several of the Defendant Processors, had unlawfully conspired to depress the compensation of their poultry-plant workers by, among other things, exchanging their wage data through annual WMS surveys and conducting in-person meetings to discuss the survey results and their compensation practices.

262.     On January 3, 2020, Meng wrote the Red Meat Survey group to gauge interest in the future of the survey, noting that "[s]everal issues have arisen this past year that may affect conducting the survey in 2020. In light of the Jien, et al v Perdue, et al poultry antitrust lawsuit in which some of the participating companies are named defendants, I need to gauge your level of interest before sending the survey packet." Meng noted to the group in this same message that he had "been advised by Tyson that they will not participate in 2020."

263.     On the same day, Jennifer Moriarty, Supervisor of Compensation at Hormel, responded to Meng to decline participation in the Red Meat Survey: "I've consulted with our legal department and we would prefer to not become members in the Poultry Group until after the lawsuit has been settled." Agri Beef, Seaboard Foods, and Kraft Heinz also responded, declining participation in 2020.

264.     On January 16, 2020, Meng noted to Katie Mason, Compensation Lead at Cargill, that "[t]here appears to be no interest from most of the companies for 2020, so there will not be a survey this year." Mason responded that she was "hearing similarly internally, even though we find the data to be valuable."

---

[5] *Jien v. Perdue Farms, Inc.*, No. 1:19-cv-02521 (D. Md.).

265.     The Red Meat Survey Group members considered the data so valuable that they requested to be contacted about a potential 2021 Red Meat Industry Compensation Survey, despite the antitrust risks. As Meng also noted in his January 16, 2020, email to Mason, "[n]early all [companies] want to be contacted for 2021."

266.     Each of these ongoing communications between the Defendants indicates that any participation in the exchange of compensation information has only been temporarily paused given the ongoing litigation against the participants in the poultry survey. In the absence of injunctive relief from this Court, it is clear that Defendants will continue to engage in collusive activities with the purpose and intent of suppressing compensation to Class Members.

**3.     Direct Communications between Defendant Processors' Senior Executives Regarding Compensation**

267.     Throughout the Class Period, Defendant Processors' senior executives with the authority to determine or influence compensation of Class Members directly contacted one another to obtain information about and align their current and future compensation practices. Engaging in this direct communication enabled the executives to further suppress their employees' compensation.

268.     For example, according to a former corporate human-resources employee at Defendant Processor Seaboard, another Seaboard executive, Trudie Diaz-Farmer, "was the head of a group of [corporate HR] employees from competing pork processors that directly exchanged detailed compensation information with each other." Diaz-Farmer made "weekly telephone calls to [corporate HR] employees of competing pork processors," during which she "often requested and obtained pay ranges for both hourly-paid workers and salaried workers employed by those competing pork processors at their pork processing plants."

269. The same former Seaboard employee further explained that "Diaz-Farmer documented the compensation data that she obtained directly from competing pork processors" and "then provided that compensation data to human resources executives at Seaboard's corporate headquarters." According to the former employee, Seaboard used the compensation data Diaz-Farmer obtained from competitors "to align its own hourly and salaried workers' compensation schedules with the compensation schedules of competing pork processors." The former employee explained that Seaboard did so "to reduce and eliminate competition with those competing pork processors for labor and thereby reduce worker turnover."

270. In addition, Defendant Processors' executives engaged in conspiratorial communications through group emails sent to multiple Defendant Processors. For example, on May 6, 2015, Judith Sitton, Compensation and Retirement Manager at JBS, sent an email to executives from Agri Beef, Cargill, Hormel, National Beef, Seaboard, Smithfield, Triumph, and Tyson. In the email, Sitton stated that she had "just sent out an ad-hoc survey through" the Survey Monkey online platform, covering "Supervisor Weekend Pay & Bonus eligibility." Sitton asked the other executives for "[a] quick turnaround on these two questions," stating that "[t]he results will be anonymous and shared with all respondents."

271. Further, on April 20, 2015, Linda Wray, VP of Compensation/HRIS at Tyson, informed JBS and Seaboard executives as well as Meng that she was planning on sending a "[b]rief survey" to Red Meat Survey Group participants. Wray requested "to send the following: In anticipation of our FY16 budget planning we are compiling average industry data for our non-union hourly production budgeting process. If available, please provide your projected FY16 increase percentage for hourly production non-union. All information will remain confidential and the results will be compiled in aggregate format and provided to all participants." Notably, the JBS

and Seaboard executives immediately signed off on Wray's request. In response to Wray's email, Meng wrote that the Red Meat Survey Group should "not formally distribute a question pertaining to 2016 increases unless it refers specifically to union contracts that are in place for 2016."

272.    A former human-resources executive of Iowa Premium explained that JBS provided Iowa Premium with data about "both current and future wages" that JBS's plant in Marshalltown, Iowa, would pay its processing plant workers. Specifically, managers of the JBS Marshalltown plant provided compensation data to executives of Iowa Premium that showed how much the JBS Marshalltown plant was and would be paying its various categories of processing plant workers. The former Iowa Premium executive explained that "[t]his information was used by Iowa Premium to help determine how much to pay and offer to pay current and future workers at Iowa Premium."

### 4.    The Pork Processor Defendants Exchanged Detailed Compensation Data through Agri Stats

273.    In furtherance of the conspiracy to depress Class Members' compensation, the Pork Processor Defendants (Cargill, Hormel, JBS, Smithfield, Triumph, and Tyson) also exchanged detailed and competitively sensitive compensation data each month through a subscription to an intermediary company, Agri Stats.

274.    Over 80 percent of the United States pork processing market used Agri Stats. These participants received detailed reports and graphs from Agri Stats that allowed them to compare their labor costs to those of other participants.

275.    In a 2010 presentation, Agri Stats listed the following Pork Processor Defendants and co-conspirators as receiving reports:

## Participants – Pork Sales

USA:
- Cargill – Beardstown, Ottumwa*
- Farmland – Crete, Denison, Milan, Monmouth
- Hatfield
- Indiana Packers
- JBS – Louisville, Marshalltown, Worthington
- John Morrell – Sioux Falls
- Seaboard
- Smithfield – Clinton, Tar Heel, Virginia
- Triumph
- Tyson – Columbus Junction, Logansport, Madison, Perry

{DATE}
n = 21



276.    During the Class Period, the following Defendant Processors and co-conspirators exchanged detailed wage information through Agri Stats: Cargill, Clemens, Hormel, Indiana Packers, JBS, Seaboard, Smithfield, and Tyson. These Defendant Processors and co-conspirators comprised at least 70 percent of the red meat processing market.

277.    Agri Stats itself is a secretive company, headquartered in Fort Wayne, Indiana. It describes itself as a "management reporting and benchmarking company" that "provides consultation on data analysis, action plan development and management practices of participating companies." But its stated mission is to "[i]mprove the bottom line profitability for our participants by providing accurate and timely comparative data while preserving confidentiality of individual companies." That is, its entire purpose is to operate a secret clearinghouse of information for the

protein industry to aid companies in maximizing their profit margins at the expense of consumers, and in this case, workers.

278.     The agreement to exchange, and the actual exchange of, detailed compensation data through Agri Stats itself restrained compensation for processing-plant workers in the pork industry, and it greatly facilitated the formation, implementation, and enforcement of Defendants' conspiracy to depress compensation.

279.     Agri Stats keeps a low profile because its services were never intended to be noticed by the public. Blair Snyder, the former president of Agri Stats, said in 2009, "Agri Stats has always been kind of a quiet company. There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background, and really our specialty is working directly with companies about their opportunities and so forth."

280.     Agri Stats's internet presence is minimal. It has no marketing department. It does not offer any of its data for sale to the public. Rather, Agri Stats's business has focused on facilitating the exchange of recent and current competitively sensitive information among competitors.

281.     To maintain the secrecy of exchanges between these large processors, Agri Stats has instituted a give-data-to-get-data practice: only companies who are willing to share their information with Agri Stats can access the reports with their competitors' information. This give-data-to-get-data policy ensured that Class Members and members of the public were excluded from meaningful compensation information at the bargaining table.

282.     Agri Stats stated that participants had to "agree on calculation and data collection procedures," "[d]etermine tolerance and outlier status and enforce," "[h]ave an administrator to

compile the data and enforce procedures," and, most importantly, that "[e]ach participant has to commit."

283.    Agri Stats allowed the Pork Processor Defendants to routinely access and secretly exchange reams of competitively sensitive information.

284.    With every new subscriber, Agri Stats performed an initial data intake and collection procedure that included a week-long on-site meeting to identify data locations, files, and formats and to meet with the Defendant Pork Processor's accounting and production staff. This process ensured the accuracy of the data Agri Stats was collecting directly from the financial and production files of the Defendant Pork Processors. After completing this initial intake procedure, Agri Stats would spend the next three weeks finishing the conversion of data formats, setting up a system for the inputting of data, and preparing auditors. From that point on, the Defendant Pork Processor would send data to Agri Stats on the 18th of every month. Agri Stats would typically report this data to the wider group two weeks later.

285.    Dan Wiggs, controller at a Smithfield bacon and processed-ham plant in Dennison, Iowa, described Agri Stats as "collecting anything we could give them: expenses, assets, etcetera, just to compare to other companies . . . . They would compile it into a huge worksheet then check back with the controller." Agri Stats provided swine-processing reports to subscribers, which contained detailed cost information—including labor costs—for each participating plant. These reports totaled well over 300 pages each. A former senior executive for Agri Stats noted that these reports contained "column after column after column" of variables.

286.    Every month during the Class Period, Agri Stats distributed disaggregated compilations of data to each of the subscribing Pork Processor Defendants. These exchanges

allowed Pork Processor Defendants to share detailed labor-cost data, including current and recent wage and benefits information.

287.    The compilations included current effective salaries and hourly wage rates for categories of workers at pork-processing plants throughout the continental United States operated by the Pork Processor Defendants, their subsidiaries, and related entities. The compilations also included average salary and hourly wage rates for pork processing plant positions, both nationwide and broken down by region. Additionally, the compilations identified the productivity of particular pork plant positions, such as labor hours per pound.

288.    Agri Stats provided detailed plant-level information about labor costs in its pork-processing reports. For example, the swine-processing report broke down labor costs on a plant-wide basis as well as for divisions within each plant, such as the "kill" division and the "cut" division.

289.    In addition to receiving these books, the Pork Processor Defendants also regularly asked Agri Stats to provide custom data comparisons. Agri Stats routinely provided this additional data to the Pork Processor Defendants.

290.    Agri Stats account managers supplemented the detailed information available to Pork Processor Defendants in the Agri Stats reports by engaging in on-site visits. For a fee, Agri Stats' account managers conducted live reviews with the Pork Processor Defendants and helped them interpret the data. According to Agri Stats personnel, up to five Agri Stats employees focused specifically on swine data in the 2012 to 2017 period. Each of these employees specialized in a particular area of pork production, and they would use this expertise to assist Pork Processor Defendants interpret particular data tranches.

291.    Every quarter, Agri Stats would try to schedule in-person meetings with the senior executives from each Pork Processor Defendant who subscribed to Agri Stats. Since Agri Stats travelled between the various Pork Processor Defendants regularly and discussed non-public, proprietary data at those meetings, Agri Stats was in a unique position to share information among the Pork Processor Defendants to enforce the agreement.

292.    Agri Stats knew that these exchanges among competitors would be more valuable if every member of the pork-processing industry exchanged data. Agri Stats acknowledged that "[i]ndustry participation must be high" for its program to be successful.

293.    Agri Stats audited the data of each participant to ensure that co-conspirators could not cheat on the conspiracy. Inaccurate or incomplete data would have been of little use to the conspirators. Agri Stats ensured not only the timely collection and dissemination of data, but also its accuracy. The Pork Processor Defendants understood the value that Agri Stats brought to their scheme, particularly when monitoring their co-conspirators.

294.    For example, Tyson sent the following in an email to Agri Stats when requesting its monthly results: "We use this information (our position in Agri) in our quarterly presentations . . . and in our metrics . . . . It is VERY VISIBLE within our company[;] . . . we must make certain it is accurate . . . BUT at the same time, *I must have a high level of confidence that the OTHER companies are as accurate!!!"* Agri Stats gave the Pork Processor Defendants the assurance that they were seeking. To ensure the accuracy of each participating Pork Processor Defendant and co-

conspirator's data submissions, Agri Stats sent auditors to all participating pork processors. In 2008, Agri Stats boasted about its audit process in a sales pitch to Defendant JBS:

## New Report Format / Process

- ✓ Comprehensive on site set up of all participants.
- ✓ Electronic processing of data.
- ✓ Tied out reports to the financials and production files.
- ✓ Checks and Balances / Audit Process.
- ✓ Comprehensive Reports Designed to identify and drill down to specific areas of opportunity.
- ✓ Multiple plant view.
- ✓ Industry groupings.

295. Agri Stats personnel actively worked with individual plants to make sure the numbers each reported were not fabricated and were comparable across companies. Agri Stats was committed to "data integrity," which enabled an apples-to-apples comparison between the data of

each participant. As Agri Stats stated in one presentation: "Even if all companies include the same costs the costs can be calculated differently":

## *Data Integrity*

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



296.     Although the Agri Stats reports were supposed to anonymize each participant's data, the reports were sufficiently detailed to allow competitors to readily identify each other's data within the reports. Deanonymization was so simple that a former Agri Stats employee recognized the problem on her very first day in the office in 1996: "Day one I noticed that it was a problem—everyone knew who everyone was."

297.     Part of the reason companies could so easily deanonymize the data was that in each report, Agri Stats listed the names of companies that contributed data, including specific contributing plants and locations. For example, as part of a live review presentation in June 2009 to DuBreton, a Canadian pork integrator, Agri Stats identified the participating companies, the cities in which each company's plants were located, and sometimes exact dates when that company's data would be provided.

298.     Agri Stats also made sure each participant knew exactly which competitors were providing data for its reports through presentations it made to participants. For example, in a June

25, 2010, presentation to Hormel, Agri Stats included both the company name and specific plant information identified for participants whose data was included in the "Kill/Cut" Agri Stats report, including the exact facilities operated by these co-conspirators, that were participating in the "Kill/Cut" Agri Stats report:



Pork Kill/Cut Participants

USA:
• Cargill – *Beardstown, Ottumwa\**
• Farmland – *Milan, Monmouth, Denison\*, Crete\**
• Hatfield Quality Meats
• Indiana Packers
• JBS – *Marshalltown*
• John Morrell – *Sioux Falls\**
• Seaboard
• Smithfield – *Clinton, Tar Heel, Virginia\**
• Triumph
• Tyson – *Storm Lake*

(DATE)
n = 16

299.    In some reports, so few producers participated that their identities were obvious. Other reports contained such detailed "anonymized" data that it could be easily matched with publicly available data.

300.    There is no plausible, non-conspiratorial justification for the Pork Processor Defendants, with Agri Stats' agreement, facilitation, and participation, to have shared, on a monthly basis, highly confidential and proprietary information about their *current* compensation rates for pork processing plant workers, broken down by position. In a competitive market, such proprietary, competitively sensitive information would remain a closely guarded secret.

301.    As a result of their subscriptions to Agri Stats, during each month of the Class Period, each Pork Processor Defendant knew how much each subscribing Defendant was currently paying in compensation to Class Members at their red meat processing plants. The Pork Processor

Defendants used the Agri Stats exchange of current compensation data, in combination with the previously discussed meetings, to harmonize and suppress the compensation paid to Class Members and to monitor and confirm that no conspirator deviated from the compensation-fixing conspiracy.

302. The data exchanged between the Pork Processor Defendants through Agri Stats bears all the hallmarks of an enforcement mechanism for an anticompetitive compensation scheme. The information contained in Agri Stats reports was current and specific to individual Pork Processor Defendant and their plants. The information about each Pork Processor Defendant's compensation rates was highly detailed, including average salary and hourly wage rates for each pork-processing plant position, both nationwide and broken down by region. Moreover, none of the Agri Stats information exchanged between the Pork Processor Defendants was publicly available. Indeed, the Pork Processor Defendants were required to pay millions of dollars over the Class Period to access the Agri Stats compensation data, and Agri Stats only allowed a Pork Processor Defendant to receive compensation data if that processor reciprocated and shared detailed compensation data. Agri Stats's collection and dissemination of such competitively sensitive compensation data allowed the Pork Processor Defendants to compare and coordinate their compensation decisions and police each other to detect any violations of the conspiracy as they occurred.

303. Exchanging information about pork labor costs affected the beef industry because most of the companies who process beef (and set beef-processing salaries and wages) also process pork. Many of the same companies that dominate the pork industry also dominate the beef industry: Defendants Smithfield, JBS, Tyson, Seaboard, Triumph, Clemens, and Hormel together control

over 80 percent of all pork produced in the United States, while Defendants Tyson, JBS, Cargill, and National Beef together control approximately 70 percent of the beef market.

304.    Accordingly, the Pork Processor Defendants' monthly exchange of detailed, current, and disaggregated information regarding the compensation of pork processing workers resulted in lower compensation for all Class Members than each would have received in a competitive market.

305.    Agri Stats profited from collecting and reporting the Pork Processor Defendants' confidential business information, including by charging substantial fees of hundreds of thousands of dollars annually to each Pork Processor Defendant.

**5.    Defendants Entered Illegal "No Poach" Agreements to Depress Class Members' Wages**

306.    To advance their conspiracy to depress Class Members' wages, Defendant Processors also entered into illegal agreements not to recruit or solicit one another's employees, also known as a "no-poach agreements." In the absence of such an agreement, Defendants would have been able to actively recruit and poach each other's workers by offering superior wages, salaries, and benefits.

307.    For example, counsel's investigation revealed that, in 2016, Defendants Iowa Premium and JBS entered into a no-poach agreement that prohibited them from actively recruiting or soliciting each other's employees at two of their meat processing plants in Iowa. This no-poach agreement had the intended effect of depressing the hourly wages, salaries, and benefits paid to Class Members to levels materially lower than they would have been in a competitive market.

308.    Iowa Premium owns a beef-processing plant in Tama, Iowa, that was opened in November 2014 and employs approximately 1,000 workers. JBS owns a pork-processing plant in Marshalltown, Iowa, that was acquired in 2007 and employs approximately 2,500 workers. The

two meat-processing plants employ virtually identical categories of workers on their processing and packaging lines.

309. The Iowa Premium Tama and JBS Marshalltown plants would compete for labor in the absence of a no-poach agreement. Specifically, in a competitive market, Iowa Premium and JBS would recruit, solicit, and poach each other's workers at the two plants, and workers would switch their employment between the Tama and Marshalltown plants if offered higher wages, salaries, and/or superior benefits.

310. A former employee of Iowa Premium explained, "While I worked at Iowa Premium, the primary competitor for recruiting, hiring and employing processing plant workers was a JBS plant located in Marshalltown Iowa, approximately 23 miles from Iowa Premium's plant." The former employee of Iowa Premium said, "When there were no restrictions on competition between the Iowa Premium plant and the JBS Marshalltown plant, the plants would often recruit and poach each other's workers, as those workers had valuable experience that often made them optimal plant employees."

311. In approximately January 2016, JBS and Iowa Premium agreed to severely limit their competition for processing plant workers. Specifically, Defendants expressly agreed that the Iowa Premium plant in Tama would not recruit or poach employees from the JBS plant in Marshalltown, and that the JBS plant in Marshalltown would not recruit or poach employees from the Iowa Premium plant in Tama.

312. The illegal no-poaching agreement was reached in early 2016 when the CEO of Iowa Premium, Jeffrey Johnson, had a conversation with the complex manager of the JBS plant in Marshalltown. A former executive of Iowa Premium explained that during this communication, CEO Johnson and the complex manager of the JBS Marshalltown plant agreed that their plants

would not "solicit or poach each other's employees. Specifically, they agreed that Iowa Premium would not recruit or poach employees from the JBS Marshalltown plant and that the JBS Marshalltown plant would not recruit or poach employees from Iowa Premium." The former Iowa Premium executive learned of the illegal no-poaching agreement directly from Iowa Premium CEO Jeffrey Johnson soon after the agreement was reached.

313.    According to the former Iowa Premium executive, Iowa Premium CEO Johnson halted Iowa Premium's active recruitment measures that targeted employees of the JBS Marshalltown plant after the no-poaching agreement was reached. As a result, according to the former Iowa Premium executive, Iowa Premium (1) stopped distributing leaflets and flyers at the JBS Marshalltown plant that advertised job opportunities at the Iowa Premium plant and (2) halted the employee-referral program that awarded bonus compensation to employees of Iowa Premium who succeeded in recruiting job applicants from the JBS Marshalltown plant. This was an abrupt change from the companies' prior practices, which involved actively recruiting and poaching each other's workers employed at those plants by offering superior wages, salaries, and benefits.

314.    Another former executive of Iowa Premium said that he heard "there were certain restrictions, understandings, between [CEO] Johnson and JBS that they wouldn't hire certain people." He was not surprised when he learned of these restrictions because he knew "how close Johnson was to people within JBS" and that Johnson's "ties and love were truly with JBS." He said he "was sure" that CEO Johnson "had all kinds of conversations with people in JBS about how to survive."

315.    Defendants' no-poaching agreement was not made for any legitimate business purpose. Instead, the purpose and effect of Defendants' no-poaching agreement was to stop

competing for a limited pool of valuable workers and to stagnate and depress those workers' compensation.

316.    Subsequent to counsel's investigation, on November 7, 2022, U.S. Premium Beef announced in a 10-Q filing with the SEC that National Beef Packing Company, LLC, the parent company of Iowa Premium, received a DOJ subpoena regarding its employment practices.[6] The filing states: "On and about September 19, 2022, NBP and its personnel received grand jury subpoenas from the DOJ seeking documents and information regarding the solicitation, recruitment and hiring of employees in the meatpacking industry. NBP and its personnel are cooperating with the DOJ and are working to provide the documents and information requested by the grand jury subpoenas."

### 6.    The Conspiracy Resulted in Parallel Limits on Defendants' Wage Increases and Harmonization of Defendants' Wages

317.    As a direct consequence of their conspiracy to depress compensation, the Defendant Processors simultaneously and in parallel limited their annual wage increases to Class Members employed at their red meat processing plants. Absent this conspiracy in a competitive market, Defendants would have paid higher annual wage increases to Class Members.

318.    At this preliminary stage, Defendant Processors' compensation data is not public. But based on the small amount of information available to the Plaintiffs at this stage, Defendant Processors' wage alignment is evidence of the conspiracy.

---

[6]    U.S. Premium Beef, LLC, Quarterly Report (Form 10-Q) (Nov. 7, 2022), https://www.sec.gov/ix?doc=/Archives/edgar/data/1289237/000168316822007321/uspb_i10q-092422.htm.

319. For example, in 2017, as a direct consequence of the conspiracy to depress compensation, all the following red meat processing plants only increased base wages by a mere 2%:

- Cargill's plants in Dodge City, Kansas; Friona, Texas; and Schuyler, Nebraska

- National Beef's plant in Dodge City, Kansas

- JBS's plants in Greeley, Colorado; Grand Island, Nebraska; Hyrum, Utah; Green Bay, Wisconsin; Souderton, Pennsylvania; Tolleson, Arizona; and Omaha, Nebraska

- Smithfield's plants in Crete, Nebraska; Denison, Iowa; and Sioux Falls, South Dakota

- Tyson's plant in Joslin, Illinois

- Triumph's plant in St. Joseph, Missouri

- Seaboard's plant in Guymon, Oklahoma

320. In 2018, as a direct consequence of the conspiracy to depress compensation, all of the following red meat processing plants only increased base wages by a mere 2%:

- Cargill's plants in Dodge City, Kansas; Friona, Texas; and Schuyler, Nebraska

- National Beef's plant in Dodge City, Kansas

- JBS's plants in Marshalltown, Iowa; Hyrum, Utah; Green Bay, Wisconsin; Cactus, Texas; and Beardstown, Illinois

- Smithfield's plants in Crete, Nebraska; Denison, Iowa; and Sioux Falls, South Dakota

- Tyson's plants in Joslin, Illinois and Dakota City, Nebraska

- Triumph's plant in St. Joseph, Missouri

- Seaboard's plant in Guymon, Oklahoma

- A plant co-owned by Seaboard and Triumph in Sioux City, Iowa

321.     Defendants' participation in and collusion through the Red Meat Industry Compensation Survey and Meetings, direct communications between one another's executives, exchange of compensation data through Agri Stats, and no-poach agreements also resulted in the harmonization of wages among Defendants' red meat workers. For instance:

- In Dodge City, Kansas, where both National Beef and Cargill compete for workers at their beef-processing plants, the difference between the average hourly wages paid to production workers at both plants decreased from $0.53 in 2014 to $0.01 in 2017.

- In the region which overlaps both the Oklahoma and Texas panhandles, where there are three red meat processing plants within 64 miles of one another, the difference between the average hourly wages paid to production workers at the JBS beef plant in Cactus, Texas, and the National Beef plant in Liberal, Kansas, decreased from $0.22 in 2014 to $0.07 in 2018.

- In south-central Nebraska, where at least three red meat processing plants compete for workers within 53 miles of one another, the difference between the average hourly wages paid to production workers at the JBS beef plant in Grand Island and the Tyson beef plant in Lexington decreased from $0.63 in 2014 to $0.04 in 2017.

**7.     Plus Factors That Render the Red Meat Industry Susceptible to Collusion**

322.     The red meat processing industry is characterized by numerous features, or plus factors, that render the industry particularly susceptible to collusion and bolster the plausibility of the conspiracy alleged herein. These include: (1) high barriers to entry; (2) industry concentration; (3) fungibility of red meat processing plant labor; (4) inelastic labor supply; (5) a history of government investigations into collusive actions; and (6) numerous opportunities to collude.

323.    The red meat processing industry is characterized by high barriers to entry. These barriers include the high costs of constructing and operating slaughterhouse plants and further processing plants; establishing and operating a network capable of marketing and then distributing red meat products to grocery chains or wholesalers, finding and training a large workforce, and ensuring compliance with onerous federal and state government mandates and regulations. The cost of constructing a single pork- or beef-processing plant alone is tens if not hundreds of millions of dollars. It is exceptionally expensive and logistically complex for new red meat processors to emerge and compete with Defendant Processors.

324.    The red meat processing industry is highly concentrated. The top four beef-processing companies control approximately 70 percent of the market for beef, while the top seven pork-processing companies control over 80 percent of the market for pork.

325.    Red meat processors view the plant workers that comprise the Class as fungible. Workers within the same positions are generally treated as interchangeable, permitting Defendant Processors to readily compare and match each other's compensation levels. One former human-resources director at a National Beef plant described beef processing employees as "one hundred percent" interchangeable with pork processing workers.

326.    The market for red meat processing workers is characterized by inelastic labor supply. Industry-wide changes in compensation rates do not substantially affect the rate of participation in red meat processing positions.

327.    The history of the red meat processing industry is replete with government investigations and collusive actions. Concern over anticompetitive conduct by beef processors was a leading driver for the initial passage of the Sherman Act of 1890. In 1920, in response to antitrust action by the Department of Justice, the major meatpacking companies entered into a consent

decree requiring them to divest major assets. In the early 1990s, the Department of Justice launched several antitrust investigations into the meatpacking industry. As Assistant Attorney General Anne K. Bingaman explained in 1996, "we have been monitoring this industry on an ongoing basis since before I arrived." In 2019, the U.S. Department of Agriculture launched yet another investigation into beef processors' conduct, examining whether beef processors had violated the Packers and Stockyards Act. On May 22, 2020, after 11 state attorneys general urged the Department of Justice to investigate antitrust concerns in the beef industry, the Department sent civil investigative demands to Defendant Processors Cargill, JBS, National Beef, and Tyson.

328.     Beyond government investigations, Defendants' habitual collusion has triggered multiple civil class action lawsuits by private enforcers of the antitrust laws. In April 2019, an antitrust lawsuit was filed against Defendant Processors Cargill, JBS, National Beef, and Tyson, alleging that these processors colluded to widen the "meat margin" price gap between the cost of live cattle and the price of processed beef. And in June 2018, an antitrust lawsuit was filed against the Pork Processor Defendants (and several co-conspirators in this action), alleging that these processors colluded to fix and increase the price of processed pork, including through the use of Agri Stats to enforce and monitor the conspiracy.

329.     The red meat industry is ripe with opportunities for Defendants to collude. In addition to attending the annual Red Meat Industry Compensation Meetings and related dinners, the senior executives of Defendant Processors responsible for determining compensation for red meat processing plant workers attended multiple other in-person meetings during the Class Period. Many of those meetings were sponsored by trade associations that advocate for the interests of the Defendant Processors. Those meetings include:

a. *The National Pork Industry Forum, which is the annual business meeting of the National Pork Producers Council.* According to its website, "[t]he National Pork Producers Council ["NPPC"], which consists of 42 affiliated state associations, is the global voice for the U.S. pork industry, enhancing opportunities for the success of pork producers and other industry stakeholders by establishing the pork industry as a consistent and responsible supplier of high-quality pork to domestic and world markets." Executives from the Pork Processor Defendants have served on the NPPC Board of Directors during the Class Period, including Cory Bollum of Hormel, Don Butler of Smithfield Foods/Murphy-Brown LLC, Chris Hodges of Smithfield Foods, and Todd Neff of Tyson Fresh Meats. NPPC conducts its annual business meeting and election of officers and directors during its "National Pork Industry Forum," typically held in early March each year. NPPC advertises the National Pork Industry Forum as an opportunity for networking, as well as attending educational sessions. The event includes a political candidate meet-and-greet, state caucuses, meals and receptions, and delegate sessions.

b. *The National Pork Industry Conference ("NPIC"), which describes itself as "the largest annual conference in the US that is held for the swine industry."* This conference has taken place in the Wisconsin Dells each July since 2010 (and in the Ozarks before that). Descriptions on the conference website have said that the NPIC "is the largest annual conference in the US that is held for the swine industry," and has had 750 to "over 900" attendees each year, representing "the Top 150 pork production systems in North America." For instance, the website for the 2016 NPIC emphasized networking opportunities and promoted the "Focusing on Markets"

session "led by industry economic experts." Seaboard and Smithfield are among the Pork Processor Defendants whose executives have been session presenters at the NPIC.

c. *The biannual meetings of the 21st Century Pork Club.* The 21st Century Pork Club, founded in 1997 by former NPPC executive Larry Graham, meets twice a year. A March 2011 article about the Club states that it consisted of "60 industry stake holders" and that since its inception, the Club's two rules have been (1) "nothing that was said in the meeting was to be repeated outside the group, with a name attached" and (2) members will be dismissed from the group if they miss two meetings in a row without a valid reason.

d. *The Annual Meat Conference, first sponsored by the American Meat Institute, and then by the American Meat Institute Foundation.* Throughout the Class Period, the American Meat Institute ("AMI") (through 2014) or its offshoot, the American Meat Institute Foundation (since 2015), has co-sponsored (with the Food Marketing Institute) the industry's "Annual Meat Conference." The conference website describes the conference as "a complete education and networking experience." Many of Defendants' high-level executives attend the conference. For example, registered attendees in 2012 included Steven Binder, then the Executive VP President Hormel Business Units of Hormel Foods Corporation, as well as eight other Hormel executives; eight executives from JBS USA; Donnie Smith, then CEO of Tyson Foods, along with twelve other Tyson executives; Chris Hodges, then Senior Vice President of Smithfield Foods and ten additional Smithfield Foods

executives; and Blair Snyder and Brian Snyder, Chairman of the Board and President, respectively, of Agri Stats.

e.  *The Annual Meeting and Outlook Conference, first sponsored by the American Meat Institute, and then by the North American Meat Institute.* Until 2016, first AMI and then the North American Meat Institute ("NAMI") held an Annual Meeting and Outlook Conference each fall. The NAMI website described the 2015 Annual Meeting and Outlook Conference as "a great networking and educational opportunity for the entire industry" with presentations on "key industry topics . . . as well as outlook sessions for 2016 and the member to member education provided by Issues Answers Action." Scheduled presenters at the Annual Meeting and Outlook Conference have included Cameron Bruett of JBS in 2015 and Phil Clemens of the Clemens Family Corporation in 2016.

f.  *The annual Meat Industry Management Conference, sponsored by the North American Meat Institute and held until April 2017.* For years, NAMI also sponsored an annual "Meat Industry Management Conference." NAMI promoted the 2015 meeting as focusing on a variety of topics, including "economics, and general business topics" and an "always popular Answers Actions session" that "provides structured member interaction on a variety of issues and topics." The NAMI board met during the 2015 Management Conference.

g.  *The annual Meat Industry Summit, sponsored by the North American Meat Institute, and ongoing since April 2017.* In April 2017, NAMI replaced the Annual Meeting and Outlook Conference and the Meat Industry Management Conference with an annual "Meat Industry Summit." In addition to education sessions, the

summit has included "networking opportunities and social events," including a golf tournament, receptions, and an Issues, Answers, Actions Breakfast, as well as the annual Board of Directors meeting and what one publication described as "closed door committee meetings to discuss policies and association business."

h. *The spring annual meetings of the Global and U.S. Roundtables for Sustainable Beef ("USRSB").* In 2015, Defendant Processors Cargill, JBS, National Beef, and Tyson were among the founding members of the USRSB. Defendants Cargill and JBS have additionally held leadership positions in certain working groups.

i. *The National Cattlemen's Beef Association's annual convention (known as "CattleCon"), summer conference, legislative conference, regional meetings, and quarterly Beef Executive Forum.* The Beef Executive Forum is an invitation-only event and entails the meeting of the National Cattlemen's Beef Association's "Product Council," which includes Defendants Cargill, JBS, National Beef, and Tyson, other packers, and certain retailers and restaurants.

j. *The U.S. Meat Export Federation's spring and fall conferences and monthly international trade shows.* This trade association's leadership includes current and former employees and officers of Defendants Cargill, JBS, National Beef, and Tyson. It develops export opportunities for U.S. protein producers.

C.    **Market Power of Defendant Processors**

1.    **Direct Evidence of Market Power**

330.    The strongest evidence that Defendant Processors and co-conspirators collectively possessed the requisite *power* to suppress compensation for red meat processing workers is that

they *actually* suppressed such compensation during the Class Period.[7] As detailed above in section VI(B), numerous former employees confirmed that Defendants used a multi-faceted strategy—including annual surveys, in-person meetings, direct communications between executives, Agri Stats reports, and no-poach agreements—to suppress salaries, wages, and benefits paid to red meat processing workers.

331.    Defendant Processors refused to increase wages for certain employees for a significant amount of time. For instance, according to a former employee of Smithfield, wages for certain employees did not increase for consecutive years.

332.    Defendant Processors operated and participated in annual Red Meat Industry Compensation Survey administered by WMS, to exchange detailed current and future information about, and facilitate the fixing of, compensation provided to their workers at red meat processing facilities in the continental United States.

333.    Defendant Processors convened annual Red Meat Industry Compensation Meetings, where their executives discussed the results of the highly detailed Red Meat Industry Compensation Survey and reached agreements to depress Class Members' compensation.

334.    Executives from Defendant Processors discussed, compared, and further suppressed compensation through telephone communications. Some of those conspiratorial communications consisted of bilateral discussions between Defendant Processors' executives to disclose and harmonize their projected compensation increases. A subordinate of one Seaboard executive witnessed the executive communicate telephonically with competitors in order to align the pay ranges for Seaboard employees.

---

[7] Such "buyer" market power is also referred to as "monopsony power."

335.    Pork Defendant Processors exchanged detailed compensation information regarding processing plant workers through Agri Stats. They exchanged, on a monthly basis, plant-specific information concerning labor costs that could be easily deanonymized.

336.    Defendant Processors entered into no-poaching agreements that prohibited them from recruiting or soliciting each other's employees. These agreements were made in furtherance of the conspiracy to depress compensation.

337.    Finally, Defendant Processors' and co-conspirators' meetings and data exchanges were costly: they paid for the WMS surveys and Agri Stats reports, spent time and money answering detailed survey questions, paid for senior human-resource executives to attend in-person meetings, and exposed themselves to legal liability. Defendant Processors and co-conspirators would not have continued to incur these annual expenses and legal exposure unless they collectively had the power to use these meetings and data exchanges to reduce salaries, wages, and/or benefits for red meat processing workers. This indicates that Defendant Processors and co-conspirators believed and acted as though they had the market power to profitably suppress salaries, wages, and/or benefits.

## 2.    Indirect Evidence of Market Power

### a.    Product or Services Market

338.    The relevant market is the labor market for employment at red meat processing plants in the continental United States ("Relevant Market").

339.    A hypothetical cartel that controlled a large share of the Relevant Market, as Defendant Processors and Co-Conspirators collectively do here, could profitably suppress compensation paid to workers at red meat processing plants to levels below those that a competitive labor market would set. In such circumstances, red meat processing workers would

not be able to defeat artificial compensation suppression by switching their employment to other non-conspiring red meat processors.

340.    There are no close economic and/or functional substitutes for employment at red meat processing plants from the perspective of workers at those plants.

341.    Unskilled and low-skilled jobs are not reasonable substitutes for work at red meat processing plants because those jobs rarely pay more than the minimum wage. By contrast, red meat processing plant workers earn significantly more than the minimum wage in most areas. In part, this is because red meat processing workers develop industry- and employer-specific skills, and employers in the red meat processing industry are willing to pay for those skills. When red meat processing plant workers are first hired, often before they have developed skills specific to the Relevant Market, they are kept on a "probation period" during which they are supervised by a trainer and paid less than other workers. Once on the job for an appreciable period, however, red meat processing plant workers learn new skills, such as deboning, trimming, and cutting.

342.    Defendant Processors value these skills in experienced red meat processing plant workers and recognize that such skills are differentiated from those necessary for other jobs. For example, one recruiter from Triumph would only recruit from other red meat processing plants and would never recruit from poultry-processing plants. This is because someone who previously worked in a red meat processing plant was much easier to train than someone with no experience in those plants. To that end, Defendant Processors pay line workers who develop specific skills related to red meat processing more than other workers—though they would be paid even more absent the conspiracy. And because it is difficult to find hourly-paid red meat processing plant workers who have acquired adequate skills specific to the Relevant Market, Defendant Processors give workers with those skills larger year-end raises than other workers.

343. Those skills are not transferrable to other jobs even if those other jobs may be generally termed as low-skilled or seem superficially related. For example, the skills of deboning and trimming make a red meat processing plant worker a more valuable employee for red meat processing companies, but not for other companies seeking low-skilled manual labor. As a result, workers in the Relevant Market receive higher wages as they gain more experience working in red meat processing plants (even as those wages are suppressed by the conspiracy).

344. Indeed, each Defendant Processor materially increases wages to processing plant workers according to their skill level. For example, Defendant Processors increase wages systematically for hourly-paid red meat processing workers upon reaching certain levels of seniority. Those Processors also implement raises for employees who gain specific skill sets and are able to do more complex jobs. One Defendant Processor, for instance, increases the hourly wage for workers who are "fully qualified" in trimming, sawing, and deboning. The wage premium associated with greater skill and experience reduces the substitutability of jobs outside of the Relevant Market and makes remaining in red meat processing plant positions more attractive to plant workers. In other words, those higher wages make it costly for a worker at a red meat processing plant to seek a position outside the Relevant Market that would not value the skills the worker obtained while working at the plant.

345. Salaried red meat processing workers require even more training and skills specific to red meat processing that would not be transferable to occupations outside of the Relevant Market and therefore make it even more difficult for salaried red meat processing workers to switch to occupations outside of the Relevant Market. *See supra*, section VI.A.8. For example, maintenance supervisors were often required to have hydraulic, welding, and PLC ("programmable logic controller") systems training, in addition to other job requirements. The Defendant Processors also

often preferred or required salaried workers to have previous experience in pork- or beef-processing plants.

346.     Additionally, unskilled jobs are not adequate substitutes for red meat processing jobs because, as explained above, red meat processing work is extremely dangerous. The types of workers who choose to work in a red meat processing plant prefer to receive extra pay for dangerous labor, instead of accepting lower wages at safer positions. This indicates that unskilled and low-skilled jobs are not reasonable economic substitutes for employment in the Relevant Market, which mostly pays hourly wages well above the minimum wage (but at the same time, less than what red meat processing plant workers would make in a competitive market).

347.     Similarly, employment at plants that process another protein besides red meat is not a reasonable substitute for employment in the Relevant Market. For example, even though wages in the Relevant Market are artificially suppressed due to the Defendants' conspiracy, poultry processing plants still pay processing plant workers substantially less than employers in the Relevant Market do—on average about 25% less than what red meat processing plants pay. This indicates that workers in the Relevant Market cannot readily switch to a job at a poultry processing plant because such a switch would entail a significant decrease in wages.

348.     In addition, as discussed above, many hourly-paid workers in red meat processing plants do not speak English and lack significant education. Accordingly, many hourly-paid workers in red meat processing plants cannot easily obtain stable employment at a similar level of compensation outside the red meat industry.

349.     Employees in the industry have continually noted these language and educational challenges that many red meat processing workers face. One refugee who speaks Swahili said through an interpreter that working at Tyson is his only option: "Not knowing the culture, not

knowing people, the only way is by getting this job—being in this job is how I can help my family, help my kids and provide." Tyson Foods has formally recognized this challenge faced by its workforce by instituting a program to "enable hourly employees to access English as a second language." Thus, many unskilled or low-skilled jobs such as retail sales, fast food, or some manual labor jobs—which require proficiency in English—are not a reasonable substitute for the majority of workers in the Relevant Market.

350. Red meat processing plant workers, like most laborers, cannot withhold their services until a later date as a means of negotiating for higher compensation. They depend on a regular income. This weakens their negotiating position with red meat processing employers and enhances the Defendant Processors' market power.

351. Recent empirical econometric work has found that many low-skilled occupations face sufficiently inelastic labor supply curves such that the occupation would be considered a relevant antitrust market that would satisfy the hypothetical-monopsonist test. One recent paper analyzed low-skilled labor markets defined by the six-digit Standard Occupational Classifications (SOC) tracked by the Bureau of Labor Statistics and found that for each such occupation, a hypothetical monopsonist would find it profitable to decrease wages by at least 5% or more. The paper demonstrates economically that low-skilled occupations can be relevant antitrust markets and thus supports the plausibility of the Relevant Market.

### b.    Geographic Market

352. The relevant geographic market is the continental United States. A small but significant decrease in compensation from the competitive level could be profitably imposed collectively by the red meat processors in the continental United States without causing too many red meat workers to leave the country or move to a different occupation.

353.    Defendant Processors set their compensation and recruiting policies for red meat processing plant workers largely on a nationwide basis, and therefore treat such workers as if they were participating in a nationwide labor market. Each Defendant Processor establishes compensation for workers at red meat processing plants at identical or near identical levels, regardless of the region, state, county, or locality in which those plants are located. Because each Defendant Processor establishes the same, or nearly the same, compensation for workers at red meat processing plants regardless of geographic region, state, county or locality, conduct that suppresses compensation for those workers in one red meat processing plant location would necessarily suppress compensation for workers employed in all of the red meat processing plants owned by the Defendant Processor, its subsidiaries, and related entities throughout the continental United States.

### c.    High Collective Market Share and Monopsony Power

354.    Defendant Processors collectively possess market and monopsony power in the Relevant Market in that they have the power, collectively, and through the challenged conduct, to profitably suppress compensation to workers at red meat processing plants below competitive levels.

355.    Defendant Processors pay compensation to workers at red meat processing plants that comprise at least 70 percent of the Relevant Market.

### D.    Anticompetitive Effects and Injury Suffered by Class Members

356.    As a result of Defendants' anticompetitive conduct alleged herein, competition between Defendant Processors over compensation was restrained or eliminated in the market for workers in red meat processing plants in the continental United States during the Class Period.

357. As a result of Defendants' anticompetitive conduct alleged herein, the compensation of workers in red meat processing plants in the continental United States was fixed, stabilized, or maintained at artificially depressed levels during the Class Period.

358. The purpose of the conspiratorial conduct of Defendants was to depress, fix, or maintain the compensation of workers in red meat processing plants in the continental United States and, as a direct and foreseeable result of the conspiratorial conduct, Plaintiffs and the Class received compensation at artificially depressed rates during the Class Period.

359. By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having received lower compensation during the Class Period than they would have received in the absence of Defendants' illegal contract, combination, or conspiracy. As a result, Plaintiffs and the Class have suffered damages.

360. This is an injury of the type that the antitrust laws were meant to punish and prevent.

361. During the Class Period, as a result of the conspiracy to restrain and depress compensation, the hourly wages of red meat processing plant workers employed by Defendant Processors, their subsidiaries, and related entities often only increased approximately [25] cents to $1 a year. These annual "raises" for red meat processing plant workers were perceived by Defendant Processors to be merely cost-of-living adjustments rather than material increases to compensation.

362. In a competitive market, Defendant Processors would have competed to recruit, hire, and retain workers during the Class Period by offering higher wages, higher salaries, and superior benefits, and many Class Members would have switched employment to different red meat processors as a result of that competition for labor. Yet by entering into the alleged conspiracy, Defendant Processors were able to reduce and stabilize turnover rates. Defendants'

scheme harmonized compensation to Class Members across the red meat processing industry and thus reduced the incentive for Class Members to switch employment between Defendant Processors.

363.    The effects and injuries caused by Defendants' anticompetitive agreement commonly impacted all workers at red meat processing plants owned by Defendant Processors, their subsidiaries, and related entities in the continental United States because Defendant Processors valued internal equity, the idea that similarly situated employees should be compensated similarly. Each Defendant Processor established a pay structure to accomplish internal equity. Each Defendant Processor established narrow compensation ranges for red meat processing plant workers in the continental United States with similar job positions and similar levels of experience and also maintained certain compensation differentials between different red meat processing plant positions.

## VII.    STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.    Continuing Violation

364.    During the Class Period, Defendants' conspiracy was a continuing violation in which Defendants repeatedly invaded Plaintiffs' and Class Members' interests by adhering to, enforcing, and reaffirming the anticompetitive agreement described herein.

365.    Defendants' continuing adherence to, enforcement of, and reaffirmation of the anticompetitive agreement throughout the Class Period was and is consummated through, among other conspiratorial acts: participation in the annual Red Meat Industry Compensation Survey to exchange detailed compensation information; regular, in-person Red Meat Industry Compensation Meetings and related dinners and roundtable events conducted to discuss and fix compensation to Class Members; the monthly exchange of competitively sensitive compensation data through Agri Stats and annual renewal of subscriptions to Agri Stats; and e-mail and phone communications

between Defendants to discuss and exchange compensation information, including weekly telephone calls conducted by Seaboard.

**B.      Fraudulent Concealment**

**1.      Plaintiffs Did Not and Could Not Have Discovered Defendants' Misconduct**

366.    Plaintiffs and other Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and Class Members did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy. No facts were revealed publicly or to Plaintiffs that would have put them or the Class on inquiry notice that they were the victims of a conspiracy to depress compensation paid to workers in red meat processing plants.

367.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Red meat processors are not exempt from antitrust regulation, and thus Plaintiffs reasonably considered the red meat processing industry to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of wages, salaries or benefits paid by Defendant Processors to workers in red meat processing plants in the continental United States.

368.    Defendant JBS and co-conspirator Iowa Premium similarly engaged in a secret agreement in furtherance of the conspiracy that did not reveal facts that would put Plaintiff or the Class on inquiry notice that there was a no-poaching agreement or conspiracy to depress their compensation. Indeed, only a handful of executives and human-resources employees of Iowa Premium and JBS were even aware of the existence of the no-poaching agreement. Plaintiffs' counsel unexpectedly first learned of the no-poaching agreement in May 2019 from a former

executive of Iowa Premium when interviewing him regarding his experiences with another employer involving a separate matter.

369. Plaintiffs exercised reasonable diligence. Plaintiffs and the other Class Members could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and co-conspirators to conceal their combination.

## 2. Defendants Actively Concealed the Conspiracy

370. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the other Class Members.

371. The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to: conducting secret meetings that excluded non-conspirators; engaging in surreptitious communications that did not create or involve written records; exchanging competitively sensitive compensation data through a non-public and proprietary system; using WMS and Agri Stats, companies that intentionally operate under the public's radar, to exchange sensitive compensation data; instituting "give-data-to-get-data" requirements so that no company could access the sensitive compensation data exchanges unless it provided data of its own; and concealing the existence and results of commissioned compensation surveys.

372. During the Class Period, Defendants affirmatively and falsely represented that they paid wages, salaries, and benefits reflecting a competitive market for labor. For example, the human resources director of National Beef's Liberal, Kansas, plant made several social-media posts touting the wages that plant workers received.

373.     Defendant Processors also advertised to potential processing plant employees that the compensation offered and provided was "competitive"—i.e., the result of competition in the labor market for red meat processing plant employees. The examples below were promoted on Defendant Processor websites and in job postings for processing plant positions:

- *Agri Beef.* Agri Beef job postings promised "competitive wages with incentive opportunities."

- *American Foods.* American Foods claimed that: "From health benefits, to a 401k plan, we show employees how much we appreciate their hard work through our competitive benefits."

- *Cargill.* Cargill stated on their website that: "We reward employees with pay for their work in a way that is equitable to the market. We provide competitive base pay, pay transparency and a system of oversight that drives pay consistency throughout the company." It went on to say: "We deliver locally competitive insurance, retirement, vacation and more." Specific job postings for processing plant positions at Cargill boasted that employee benefits included "Competitive Pay;" "Medical, Dental, Vision, and Prescription Drug Insurance;" "Paid Vacation and Holidays;" and "401(k) with Cargill matching contributions."

- *Hormel.* The Hormel website claimed that: "We offer competitive benefits."

- *JBS.* The JBS "Team Members" web page promoted that: "For our hourly team members, we do a competitive wage analysis two times per year, and for salaried team members, we do a competitive wage analysis one time per year to ensure we are paying competitively for where they work and live."

- *National Beef.* Job postings for processing plant openings at Iowa Premium, a

subsidiary of National Beef, advertised that: "With competitive pay and benefits, safe and stable work, and an environment that is caring and supportive, Iowa Premium could become your next career move!"

- *Perdue*. Perdue's career page for plant jobs claimed that their "hourly production jobs offer stable employment, high wages, [and] great benefits . . . ."

- *Seaboard*. Seaboard's career page on its website stated that: "We believe in providing our employees with the opportunity to earn a good living, so they can provide for their families and be more productive at work. That's why we offer competitive pay, on-the-job training and endless opportunities to advance throughout our plant."

- *Smithfield*. Smithfield's website claimed to "offer competitive pay, tuition assistance and a pension and employer-matched 401K," and specific job listings promised "[c]ompetitive pay and benefits among the best in the industry."

- *Triumph*. Triumph publicized that: "We take pride in being an employer of choice, offering competitive compensation, health benefits, and holiday paid time off." It continued to guarantee "[g]reat weekly pay;" "[h]ealth, vision, and dental insurance;" "[p]aid holidays and vacations;" "[o]vertime available;" and "[n]o layoffs." Specific postings for processing plant jobs claimed that "Triumph Foods offers competitive wages and a comprehensive benefits package."

- *Tyson*. The Tyson careers website promised that "we believe in fair compensation. We offer employees competitive pay and benefits because we appreciate all they do."

374.    Indeed, all Defendant Processors have made similar statements falsely indicating that Defendant Processors' compensation for red meat processing plant workers is determined through genuine competition in the labor market with other Defendant Processors.

375.    Defendants took affirmative and specific steps to fraudulently conceal each component of the compensation-suppressing conspiracy. Defendants formed and implemented the combination and conspiracy in a manner specifically designed to avoid detection.

376.    To begin, Defendant Processors hired WMS to conceal their misconduct. WMS was retained to impart a veneer of illegality to Defendant Processors' illicit exchange of compensation data. Despite hiring WMS to conduct the Red Meat Industry Compensation Survey, Defendant Processors developed every facet of the Red Meat Industry Compensation Survey and maintained full control over its administration. Defendant Processors also took actions to purposefully exclude WMS from roundtable sessions at Red Meat Industry Compensation Meetings, where they discussed and ultimately agreed to suppress the compensation of Class Members.

377.    Defendant Processors took steps to conceal their participation in, and the data exchanged through, the Red Meat Industry Compensation Surveys from the Plaintiffs and the public. WMS only released the compensation survey results via email to a limited number of Defendant Processor executives. Each of the Red Meat Industry Compensation Surveys provided to Defendant Processors specifically mandated that: "Strict confidentiality is maintained of each organization's individual compensation data." According to Meng, Defendant Processors were not permitted to share survey results outside the Red Meat Survey Group. When Sonja Totland, Director of Human Resources at Agri Beef, sought to share the Red Meat Survey Report with an outside organization, Meng informed Totland that "the [Red Meat Survey] group . . . absolutely do[es] not want you to share the report with anyone outside the company."

378.    Furthermore, Defendant Processors and WMS employed sham data anonymization techniques to create the illusion of legality and conceal the true purpose of the data exchanges: to

facilitate a compensation fixing scheme. When WMS circulated the results of the annual survey, the names of Defendant Processors were replaced by a randomly assigned letter, yet attendees at the Meetings could readily ascertain which red meat processor had reported which compensation data when they discussed the survey results at the Red Meat Industry Compensation Meetings.

379.    Defendant Processors required in-person attendance at the Red Meat Industry Compensation Meetings, rather than permitting the remote exchange and discussion of compensation data.  The Meetings and related materials (such as agendas and presentations) were not accessible to Plaintiffs.  Only Defendants' executives and top-ranking corporate HR managers attended the Red Meat Industry Compensation Meetings.  This requirement ensured that attendees of the Red Meat Industry Compensation Meetings discussed and depressed the compensation of Class Members in a confidential setting without leaving a paper trail.  Even the agendas circulated to participants in the Red Meat Industry Compensation Meetings provided little information about the contents of the roundtable discussions.

380.    Defendant Processors also took multiple steps to conceal the actual substance of their compensation-fixing discussions at those Red Meat Industry Compensation Meetings. Defendant Processors excluded Meng and other potential witnesses from those roundtable sessions.  Meng conceded that he may have been excluded from those roundtable discussions so that the Defendant Processors could share their compensation practices without his oversight.

381.    The Pork Processing Defendants also concealed their exchange of compensation data through Agri Stats from Plaintiffs and the public in multiple ways.  First, Agri Stats concealed its work on behalf of the red meat industry.  In 2009, the President of Agri Stats, Blair Snyder, commented on the secretive nature of Agri Stats: "There's not a whole lot of people that know a

lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do."

382. Second, because of Agri Stats' "give-data-to-get-data" policy, only the Pork Processing Defendants, who were willing to upload their own detailed and disaggregated compensation data and willing to pay millions of dollars in fees to Agri Stats, could access the compensation data collected and distributed by Agri Stats during the Class Period. Accordingly, Plaintiffs and other processing plant workers could not possibly have obtained access to the data that Agri Stats provided to Defendant Pork Processors during the Class Period. In 2019, the *Guardian* obtained a "leaked" copy of a Agri Stats report and described some of its contents; characterizing Agri Stats as "a secretive data-sharing firm" and noting that "none of the information in Agri Stats' reports is available to the farmers" which "puts them at a severe disadvantage when they try to negotiate contracts or ask for pay rises."

383. Third, Agri Stats employed sham anonymization techniques to create the illusion of anonymity and of legality. While Agri Stats claimed the data distributed each month was anonymous, that data was sufficiently granular and disaggregated such that executives of Defendant Pork Processors could and did identify competitors' data within the reports. These sham anonymization techniques assured that if an Agri Stats report was ever leaked to the public or government enforcement authorities, the report would on its surface appear to be anonymized.

384. Fourth, Agri Stats fraudulently concealed and expressly denied that the data it exchanged between its customers could be reverse engineered by those companies' executives. According to the *Guardian* article, Agri Stats denies that "the data in its reports were identifiable to industry insiders," claiming that "it preserves confidentiality among processors by masking the

sources of the data it reports" and thus "couldn't be used by competitors in an anti-competitive manner."

385. By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other Class Members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## VIII. CLASS ACTION ALLEGATIONS

386. Plaintiffs bring this action on behalf of themselves, and on behalf of the members of the following class, under Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3):

> All persons employed by Defendant Processors, their subsidiaries, and/or related entities at beef-processing or pork-processing plants in the continental United States from January 1, 2014 until the present.

387. The following persons and entities are excluded from the proposed Class: plant managers; human-resources managers and staff; clerical staff; guards and watchmen, salesmen; Defendants, co-conspirators, and any of their subsidiaries, predecessors, officers, or directors; and federal, state, or local governmental entities.

388. The Class definition provides clear, objective criteria understood by Class Members and Defendants, and it allows the parties to identify the members of the Class.

389. Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

390. The Class is so numerous that joinder of all members in this action is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains hundreds of thousands of similarly situated workers.

391. The Class is readily identifiable and is one for which records should exist.

392.     Plaintiffs' claims are typical of those of the Class. Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

393.     Plaintiffs and Class Members were injured by the same unlawful conduct, which resulted in them receiving less in compensation for working in beef or pork processing plants than they would have in a competitive market.

394.     Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are aligned with, and not antagonistic, to the Class.

395.     Questions of law and fact common to Class Members predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to Class Members.

396.     Questions of law and fact common to the Class include:

    a.  Whether Defendants engaged in an agreement, combination, or conspiracy to fix, depress, maintain, or stabilize the compensation paid to Class Members;

    b.  Whether Defendants' exchange of nonpublic, competitively sensitive information about compensation paid to Class Members constitutes, or furthered, an agreement, combination, or conspiracy in restraint of trade;

    c.  Whether such agreements constituted violations of the Sherman Antitrust Act;

    d.  The identity of the participants of the alleged conspiracy;

    e.  The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

    f.  Whether Defendants fraudulently concealed their misconduct;

g.  Whether and to what extent Defendants' anticompetitive scheme suppressed compensation paid to Class Members below competitive levels;

h.  The nature and scope of injunctive relief necessary to restore competition; and

i.  The measure of damages suffered by Plaintiffs and the Class.

397.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

398.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other benefits, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Furthermore, individual joinder of all damaged members of the Class is impractical, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that is not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

399.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

# IX.  CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

## CONSPIRACY TO DEPRESS COMPENSATION IN VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

### (Against All Defendants except Agri Stats)

400.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

401.  Beginning on January 1, 2014, and continuing through the present, Defendants JBS USA Food Company, Tyson Foods, Inc., Cargill, Inc., Cargill Meat Solutions Corp., Hormel Foods Corp., American Foods Group, LLC, Triumph Foods, LLC, Seaboard Foods, LLC, National Beef Packing Co., LLC, Iowa Premium LLC; Smithfield Foods Inc., Smithfield Packaged Meats Corp.; Agri Beef Co., Washington Beef, LLC; Perdue Farms, Inc., Webber, Meng, Sahl & Company, Inc. d/b/a WMS & Company, Inc., as well as their co-conspirators, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to fix, depress, maintain, and stabilize the compensation paid to workers at their red meat processing plants in the continental United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

402.  In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants JBS USA Food Company, Tyson Foods, Inc., Cargill, Inc., Cargill Meat Solutions Corp., Hormel Foods Corp., American Foods Group, LLC, Triumph Foods, LLC, Seaboard Foods, LLC, National Beef Packing Co., LLC, Iowa Premium LLC; Smithfield Foods Inc., Smithfield Packaged Meats Corp., Agri Beef Co., Washington Beef, LLC; Perdue Farms, Inc., Webber, Meng, Sahl & Company, Inc. d/b/a WMS & Company, Inc., as well as their co-conspirators, did those things that they combined and conspired to do, including, but not limited to:

a. Reached agreements, through in-person meetings and exchanges of information, to fix, depress, maintain, and stabilize the compensation paid to workers at their red meat processing plants in the continental United States;

b. Reached no-poaching agreements that prohibited them from recruiting, poaching or soliciting each other's employees, all with the purpose and effect of artificially suppressing the compensation paid to Class Members.

c. Implemented, monitored, and enforced that conspiracy to depress compensation through the regular exchange of competitively sensitive, nonpublic, and detailed compensation data with the assistance of WMS and Agri Stats; and

d. Paid the fixed, depressed, maintained, and stabilized compensation to their employees at red meat processing plants in the continental United States.

403. This conspiracy to fix, depress, maintain, and stabilize compensation (which includes Defendants' "naked" no-poaching agreements) is a per se violation of Section 1 of the Sherman Act.

404. The combination and conspiracy alleged herein has had the following effects, among others:

a. Competition for the hiring and retaining of workers at red meat processing plants operated by Defendant Processors, their subsidiaries, and/or related entities has been restrained, suppressed, and/or eliminated in the continental United States; and

b. Compensation paid to employees at red meat processing plants operated by Defendant Processors, their subsidiaries, and/or related entities has been fixed, depressed, maintained, and stabilized at artificially low, noncompetitive levels throughout the continental United States.

405. Plaintiffs and the other Class Members have been injured and will continue to be injured in their businesses and property by receiving less compensation from Defendant Processors, their subsidiaries, and/or related entities than they would have in the absence of the combination and conspiracy.

## SECOND CLAIM FOR RELIEF

## CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION IN VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

### (Against all Defendants)

406. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

407. Beginning on January 1, 2014, and continuing through the present, Defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information about the compensation being paid or to be paid to their employees at red meat processing plants in the continental United States. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

408. The relevant market is the labor market for employment at red meat processing plants in the continental United States. The relevant geographic market is the continental United States.

409. Defendant Processors and co-conspirators collectively possess market power in the Relevant Market. Defendant Processors and co-conspirators together control at least 70 percent of the Relevant Market. Defendant Processors' and co-conspirators' collective market power includes the power to jointly set compensation for workers at red meat processing plants in the continental United States below competitive levels. This joint power clearly exists because it has been used

by Defendant Processors and co-conspirators to pay Class Members sub-competitive compensation.

410. Defendants could and did profitably suppress compensation paid to workers at red meat processing plants in the continental United States below competitive levels. In such circumstances, red meat processing workers would not be able, and were not able, to defeat such artificial compensation suppression by switching their employment to non-conspiring red meat processors, as Defendant Processors and co-conspirators control more than 90 percent of the red meat processing plants.

411. A slight decrease in compensation to workers at red meat processing plants in the continental United States from a competitive level could be imposed collectively by the Defendant Processors without causing too many such workers to switch employment to non-red meat occupations.

412. Defendant Processors view workers that comprise the Class as fungible. Workers within the same positions are generally treated as interchangeable, permitting Defendant Processors to readily compare and match each other's compensation.

413. The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive, and non-public information about current and future compensation to workers at red meat processing plants. The information exchanges specifically included:

   a. The exchange, each year, through the Red Meat Industry Compensation Survey, of salaries, wages, and benefits provided to each position at red meat processing plants in the continental United States operated by Defendant Processors;

b. The oral exchange, at in-person Red Meat Industry Compensation Meetings, of current and future compensation paid to categories of workers at red meat processing plants operated by Defendant Processors;

c. Regular email and telephonic exchanges directly between Defendant Processors' executives regarding compensation practices and plans;

d. The exchange, each month, through Agri-Stats, of *current* compensation for categories of workers at pork processing plants in the continental United States operated by Defendant Pork Processors.

414. Defendant Processors' regular compensation information exchanges, directly and through Agri Stats and WMS, reflected concerted action between horizontal competitors in the Relevant Market.

415. Each Defendant Processor furnished competitively sensitive information to other Defendant Processors with the understanding that it would be reciprocated. That is, one Defendant Processor would not have provided information to Agri Stats or WMS or directly to another Defendant Processor's plants, without the understanding that they would receive comparable information from other Defendant Processors.

416. The exchanging of such compensation information by Defendant Processors is inconsistent with the joint guidance provided by the DOJ and the FTC. In October 2016, the two agencies issued a joint "Antitrust Guidance for Human Resource Professionals." That Antitrust Guidance states:

> Sharing information with competitors about terms and conditions of employment can also run afoul of the antitrust laws. Even if an individual does not agree explicitly to fix compensation or other terms of employment, exchanging competitively sensitive information could serve as evidence of an implicit illegal agreement. While agreements to share information are not per se illegal and

therefore not prosecuted criminally, they may be subject to civil antitrust liability when they have, or are likely to have, an anticompetitive effect. Even without an express or implicit agreement on terms of compensation among firms, evidence of periodic exchange of current wage information in an industry with few employers could establish an antitrust violation because, for example, the data exchange has decreased or is likely to decrease compensation. …

However, not all information exchanges are illegal. It is possible to design and carry out information exchanges in ways that conform with the antitrust laws. For example, an information exchange may be lawful if:

- a neutral third party manages the exchange,

- the exchange involves information that is relatively old,

- the information is aggregated to protect the identity of the underlying sources, and

- enough sources are aggregated to prevent competitors from linking particular data to an individual source.

417. The compensation information exchanges by Defendant Processors through Agri Stats, WMS surveys, and other means have not complied with the criteria established by the DOJ and FTC. The exchanged compensation information was not "relatively old" or historical; rather, the information concerned *current* and *future* compensation. The exchanged compensation information was not presented in a manner "to prevent competitors from linking particular data to an individual source." Rather, the information in WMS surveys was shared and extensively discussed at in-person meetings between senior executives of competing Defendant Processors, who could and did match specific compensation data in those surveys to individual red meat processing plants operated by competitors.

418. The federal government recently recommended that existing Antitrust Guidance concerning the exchange of wage information be strengthened. Specifically, in July 2021, President Biden issued an Executive Order that explicitly "[e]ncourage[d] the FTC and DOJ to

strengthen antitrust guidance to prevent employers from collaborating to suppress wages or reduce benefits by sharing wage and benefit information with one another."[8] President Biden's Executive Order acknowledged that precisely the type of conduct Defendants engaged in here—exchanging wage data through third parties—is anticompetitive and harmful to workers when used "to collaborate to suppress wages and benefits."

419.    The agreement to exchange compensation information eliminated a major incentive for Defendant Processors and co-conspirators to increase compensation to workers at their red meat processing plants in the continental United States during the Class Period. The advantage of raising compensation is to retain and attract more such workers by exceeding the compensation paid by competing red meat processing plants.

420.    The agreement to regularly exchange detailed and non-public information about current and prospective compensation to workers at red meat processing plants in the continental United States assured that the provision of superior compensation by any Defendant Processor would be timely and specifically known by its competitors. Such an agreement, therefore, eliminated the incentive of each Defendant Processor to compete with other processors during the Class Period by offering better compensation.

421.    When red meat processors that are competing for the same workers exchange their compensation plans and levels, comfort replaces uncertainty and reduces incentives to raise wages, salaries, or benefits. Accordingly, each Defendant Processor used the compensation data obtained

---

[8] White House, *Fact Sheet: Executive Order on Promoting Competition in the American Economy* (July 9, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/09/fact-sheet-executive-order-on-promoting-competition-in-the-american-economy/; *see also* Exec. Order No. 14,036 at § 5(f), 86 Fed. Reg. 36,987 (July 9, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/07/09/executive-order-on-promoting-competition-in-the-american-economy/.

through the information exchanges to reduce the uncertainty that it should have faced from not knowing what their competitors were offering and providing in the labor market. This strategic information was a material factor in Defendant Processors' decisions to depress and stabilize compensation paid to workers at their and their related entities' red meat processing plants in the continental United States during the Class Period.

422.     The exchange of compensation information between Defendant Processors during the Class Period increased their relative bargaining power in setting wages, salaries, and benefits for workers at red meat processing plants owned by Defendants, their subsidiaries, and related entities in the continental United States. With such information, Defendant Processors knew what their competitors were paying comparable workers while those workers and new applicants lacked access to most or all of such information and thus knew much less about the competitive landscape.

423.     The regularity and detail of the compensation information exchanged, the related communications about compensation between individuals exchanging the information, the relationships of trust developed among the individuals exchanging the information, and the pervasive desire to control and restrain labor costs, encouraged Defendants and their co-conspirators to use the information to match (and not exceed) each other's compensation levels for workers at their red meat processing plants in the continental United States during the Class Period.

424.     Defendants' unlawful agreement to exchange, and the actual exchanges of, nonpublic, timely, and detailed compensation data was not reasonably necessary to further any procompetitive purpose.

425.     The information-exchange agreement has had the effect of: (1) reducing and suppressing competition among Defendant Processors, their subsidiaries, and related entities for

the compensation of workers at their red meat processing plants in the continental United States; and (2) depressing the compensation of such employees.

426.     As a result of the unlawful agreement alleged herein to exchange compensation information, Plaintiffs and the other Class Members have been injured in their business or property by receiving artificially depressed compensation during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that:

A.     The Court declare, adjudge, and decree this action to be a proper class action under Rule of Civil Procedure 23 on behalf of the Class defined herein, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class once certified;

B.     Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.     Plaintiffs and the other Class Members recover their damages from each Defendant, jointly and severally, in an amount to be determined, and that this damages amount be trebled under 15 U.S.C. § 15(a);

D.     Plaintiffs and the other Class Members be awarded pre- and post-judgment interest as allowed by law and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

E.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other entities or persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination

alleged herein, and from entering into any other conspiracy or combination having a similar purpose or effect;

F.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information concerning compensation, benefits or the hiring or recruiting of employees;

G.      Plaintiffs and the other Class Members recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

H.      Plaintiffs and the other Class Members be granted such other relief as the case may require and deemed proper to this Court.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this case.

Dated: November 11, 2022          Respectfully submitted,

/s/ *Robert B. Carey*
Robert B. Carey (Co. Bar #17177)

HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
rob@hbsslaw.com

Shana E. Scarlett
Rio S. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com
riop@hbsslaw.com

Steve W. Berman
Breanna Van Engelen
Abigail D. Pershing
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
breannav@hbsslaw.com
abigailp@hbsslaw.com

William H. Anderson (Co. Bar 45960)
HANDLEY FARAH & ANDERSON PLLC
4730 Table Mesa Drive, Suite G-200
Boulder, CO 80305
Telephone: (202) 559-2433
wanderson@hfajustice.com

Matthew K. Handley
Rachel E. Nadas
HANDLEY FARAH & ANDERSON PLLC
200 Massachusetts Avenue, NW, Seventh Floor
Washington, DC 20001
Telephone: (202) 559-2433
mhandley@hfajustice.com
rnadas@hfajustice.com

George F. Farah
Rebecca P. Chang
Nicholas J. Jackson
HANDLEY FARAH & ANDERSON PLLC
33 Irving Place
New York, NY 10003
Telephone: (212) 477-8090
gfarah@hfajustice.com
rchang@hfajustice.com
njackson@hfajustice.com

Martha E. Guarnieri
HANDLEY FARAH & ANDERSON PLLC
1727 Snyder Avenue
Philadelphia, PA 19145
Telephone: (215) 422-3478
mguarnieri@hfajustice.com

Brent W. Johnson
Benjamin D. Brown
Daniel H. Silverman
Alison S. Deich
Zachary Glubiak
Louis Katz
Zachary I. Krowitz
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, 5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile:  (202) 408-4699
bjohnson@cohenmilstein.com
bbrown@cohenmilstein.com
dsilverman@cohenmilstein.com
adeich@cohenmilstein.com
zglubiak@cohenmilstein.com
lkatz@cohenmilstein.com
zkrowitz@cohenmilstein.com

*Proposed Interim Co-Lead Counsel for Plaintiffs*
*and the Proposed Class*

Brian D. Clark
Stephen J. Teti
Eura Chang
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile:  (612) 339-0981
bdclark@locklaw.com
sjteti@locklaw.com
echang@locklaw.com

Eric L. Cramer
Candice J. Enders
Julia R. McGrath
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA19103
Telephone: (215) 875-3000
ecramer@bm.net
cenders@bm.net
jmcgrath@bm.net

*Additional Counsel for Plaintiffs and the
Proposed Class*