# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

RON BROWN, MINKA GARMON, and
JESSIE CROFT, individually and on behalf of
all others similarly situated,

       Plaintiffs,

v.

JBS USA FOOD COMPANY; TYSON
FOODS, INC., CARGILL, INC., CARGILL
MEAT SOLUTIONS CORP.; HORMEL
FOODS CORP.; AMERICAN FOODS
GROUP, LLC; TRIUMPH FOODS, LLC;
SEABOARD FOODS, LLC; NATIONAL
BEEF PACKING CO., LLC; IOWA
PREMIUM LLC; SMITHFIELD FOODS
INC.; SMITHFIELD PACKAGED MEATS
CORP.; AGRI BEEF CO.; WASHINGTON
BEEF, LLC; PERDUE FARMS, INC.; AGRI
STATS, INC.; and WEBBER, MENG, SAHL
AND COMPANY, INC. d/b/a WMS &
COMPANY, INC.,

       Defendants.

Civil Action No. 1:22-cv-02946-PAB-STV

## DEFENDANTS' JOINT MOTION TO DISMISS

Named Plaintiffs ("NPs") allege a sweeping antitrust conspiracy that rests on a foundation of supposition, speculation, and implausible inferences. NPs cobble together disparate acts allegedly undertaken at different times, in different places, and by different Defendants, apparently hoping that this Court will take these jumbled allegations as evidence of a nationwide conspiracy spanning the beef and pork processing industries. But the whole is not greater than the sum of its parts. None of NPs' allegations, considered individually or together, "raises a suggestion of a preceding agreement" among all Defendants. *See Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 557 (2007). There are at least four reasons why this "potentially massive factual controversy" should not proceed to discovery. *See id.* at 558.[1]

*First*, NPs do not plausibly allege that Defendants reached any *per se* unlawful agreement to fix or depress red-meat plant workers' wages (Claim 1). Instead, NPs ruminate on what *could* have happened in meetings about wage surveys or in one-off bilateral conversations—interactions that are "not only compatible with, but indeed [were] more likely explained by, lawful, unchoreographed free-market behavior." *See Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009). None of NPs' allegations tends to exclude the possibility that each Defendant made independent decisions about how to compensate its plant workers during the Class Period.

*Second*, NPs do not adequately plead an anticompetitive agreement to share compensation information (Claim 2). For one, they do not define a cognizable relevant market, but rather implausibly lump all jobs and workers into a single relevant market without alleging that any particular class of employees lacks reasonable alternative job opportunities outside Defendant Processors' plants. Nor do they plead plausible anticompetitive effects; NPs do not even attempt to marshal facts that demonstrate wage suppression in the market as a whole.

*Third*, NPs waited too long to sue. The Clayton Act's four-year statute of limitations applies to every private claim under the federal antitrust laws, including NPs' causes of action. As their pleadings demonstrate, NPs knew about but slept on their claims for years after the limitations period expired. Their claims are time-barred.

---

[1] This motion is filed on behalf of all Defendants except Webber, Meng, Sahl & Company and Perdue Farms, Inc. Consistent with Section III.F.2 of this Court's Civil Practice Standards, Defendants conferred with NPs before filing this Motion. NPs declined to amend their pleadings. Unless noted, all emphasis is added and internal quotations, citations, and alterations omitted.

*Finally*, NPs cannot establish Article III standing to assert claims for injuries they did not suffer. NPs allege a broad conspiracy to suppress compensation for both hourly *and* salaried employees. Because NPs earned only hourly wages, they have not suffered any injury from Defendants' alleged suppression of salaries and cannot assert claims for salaried workers.

The Court should decline NPs' invitation to wave their Complaint past the pleading stage and into the quagmire of antitrust discovery. The pleadings present the Court with ample reason to perform its Rule 12 gatekeeping role. It should dismiss both claims for relief.

## FACTUAL BACKGROUND

### I.     The "Red Meat Industry."

NPs allege a sprawling conspiracy in what they call the "Red Meat Industry," a loosely defined collection of firms that play some role in the commercial production of beef and pork products. Compl. ¶¶ 117-20. NPs sweep most Defendants into vague and overlapping categories. While NPs name benchmarking firm Agri Stats and consultant Webber, Meng, Sahl & Company ("WMS") individually, they brand the remaining Defendants either "Defendant Processors"[2] or "Defendant Pork Processors."[3] *Id.* ¶¶ 16, 284. NPs never define a comparable "Beef Processor

---

[2] The "Defendant Processors" appear to include any Defendant that processes either beef or pork. They include Agri Beef, American Foods Group ("AFG"), Cargill, Cargill Meat Solutions, Hormel, Iowa Premium, JBS, National Beef, Perdue, Seaboard, Smithfield, Smithfield Packaged Meats, Triumph, Tyson, and Washington Beef. Compl. ¶ 2.

[3] The "Pork Processor Defendants" include the "Defendant Processors" who, according to NPs, produce pork products. NPs describe this category inconsistently: it appears to include at least Hormel, JBS, Smithfield, Triumph, and Tyson; NPs include Cargill in one list of "Pork Processor Defendants" but omit it from another, and do the same for Seaboard. *Compare* Compl. ¶ 16 (identifying Hormel, JBS, Seaboard, Smithfield, Triumph, and Tyson), *with id.* ¶ 273 (identifying Cargill, Hormel, JBS, Smithfield, Triumph, and Tyson). As Plaintiffs' counsel know, Cargill sold its pork processing business in 2015 and has not operated a pork-processing business since.

Defendant" category. The following diagram attempts to reconcile these inconsistencies and shows that very few Defendant Processors operate both pork and beef businesses:



DEFENDANT PROCESSORS

**Pork Processors**

Hormel
Smithfield
Triumph
Seaboard*

Tyson
Cargill*
JBS

**Beef Processors**

Agri Beef
AFG
Cargill Meat Solutions
Iowa Premium
National Beef
Perdue
Washington Beef

*Inconsistently described in NPs' Complaint

## II.     The Putative Class.

NPs claim to be former hourly employees of Smithfield Farms, National Beef Packing Co., and Iowa Premium. *Id.* ¶¶ 26-28. They seek to represent a putative class that includes (with few exceptions) every individual who worked at any one of Defendant Processors' "approximately 140" beef or pork processing plants across the continental United States from January 1, 2014, through the present (the "Class Period"). *Id.* ¶¶ 124, 386-87. The putative class includes employees who worked in hourly, salaried, union, non-union, slaughtering, aging, cutting, further processing, maintenance, or supervisory roles in at least three types of facilities: a "red meat slaughter facility, a case-ready plant, or a red meat cook plant." *Id.* ¶¶ 3-4, 164.

## III.    Employment and Compensation in the "Red-Meat Industry."

NPs assert that all of Defendant Processors' 140 processing facilities maintain "highly similar operations and thus highly similar labor requirements" due to a common need to

"slaughter and process commodity red meat products in a similarly efficient manner." *Id.* ¶ 129. NPs allege that, for this reason, Defendant Processors' plant workers could be "easily categorized into a limited set of discrete job positions." *Id.* ¶¶ 129-30. The upshot, NPs contend, is that "workers that comprise the Class [were] fungible," "permitting Defendant Processors to readily compare and match each other's compensation." *Id.* ¶ 412.

NPs allege that the wage-setting process for every employee played out at corporate headquarters, where executives for each Defendant Processor "established and approved . . . hourly wage rates, annual salaries, and employment benefits" along a wage-and-benefits schedule. *Id.* ¶ 4. Those executives faced common pressure to minimize labor costs. *Id.* ¶ 137. Still, local plant managers sometimes recommended wage adjustments, *id.* ¶ 138, and compensation varied from employee to employee on the basis of skill and experience, *id.* ¶ 136.

Unions represented about 70 to 80% of all hourly workers at red meat processing plants, and a single union—the United Food and Commercial Workers International—represented "most" of those workers. *Id.* ¶ 141. The UFCW's representatives bargained with corporate- and plant-level executives from each Defendant Processor over the wages and benefits to be paid to its members. *Id.* For their part, the executives who bargained with the UFCW worked to standardize wages and benefits across the different plants each Defendant owned and operated, *id.* ¶ 140, some of which employed union workers and some of which did not, *id.* ¶ 215.

As is commonplace for many employers, some Defendant Processors used surveys and data compilations "to analyze and benchmark their salaries and benefits against those of their competitors and to assist in determining their compensation schedules." *Id.* ¶ 219. NPs allege that at least some "Pork Processor Defendants" subscribed to Agri Stats, a service that provided

"management reporting and benchmarking" to its clients in the pork industry. *Id.* ¶¶ 273, 276. None of the Defendants that only processed beef subscribed to Agri Stats. *Compare supra* at 4 (right side of Venn diagram), *with* Compl. ¶ 276 (identifying Agri Stats subscribers). Similarly, some but not all of the Defendant Processors participated in certain compensation surveys that WMS conducted during the Class Period. Compl. ¶¶ 30, 34, 36, 38, 41, 43, 45, 50, 52, 54, 58.

## IV.    The Alleged Conspiracies.

NPs allege (1) a conspiracy to "fix and depress the compensation paid to employees at red meat processing plants" across the United States, and (2) a conspiracy to "regularly exchange detailed, timely, competitively sensitive, and non-public information about the compensation being paid or to be paid" to employees at their processing plants. *Id.* ¶¶ 1, 407. Based on a series of disjointed factual allegations involving subsets of the 17 Defendants and 39 non-Defendant co-conspirators, NPs assert that these conspiracies date back to 2014. *Id.* ¶¶ 15, 66-110.

### A.    The Alleged *Per Se* Wage-Fixing Conspiracy.

NPs' wage-fixing allegations fall into four principal categories. *First*, they allege that a subset of Defendant Processors participated in WMS annual compensation surveys and presentations at some point between 2014 and 2019. *Id.* ¶¶ 154-266. NPs contend these Defendant Processors used WMS survey data to "analyze and benchmark" their compensation data "against" their competitors and "to make decisions concerning their respective compensation schedules." *Id.* ¶¶ 218-19. NPs do not allege facts showing that any Defendant participated in unlawful discussions during or on the sidelines of WMS presentations; in fact, NPs assert that if any unlawful discussions took place in the presence of Jonathan Meng—the WMS principal running the surveys—Meng would have stopped them. *Id.* ¶ 248. NPs allege that

Meng attended every meeting after 2017, *id.* ¶ 260, and that WMS last conducted a survey (and delivered a corresponding presentation) in 2019, *id.* ¶¶ 261, 264.

*Second*, NPs allege bilateral communications between certain Defendants—ostensibly about wage and compensation topics, but often without any indication as to subject matter. *Id.* ¶¶ 267-72. NPs claim Defendant Processors "directly contacted one another" to "align" wage practices and depress wages, *id.* ¶ 267, but acknowledge that Defendant Processors likely used the information they gleaned to independently set wages, *e.g.*, *id.* ¶¶ 218-19. Iowa Premium, for example, allegedly used JBS wage data about one plant in Marshalltown, Iowa "to help [it] determine how much to pay and offer to pay" workers at its own plant in Tama, Iowa. *Id.* ¶ 272.

*Third*, NPs allege that some Pork Processor Defendants—but not any other Defendants—subscribed to Agri Stats to "implement and monitor" the conspiracy. *Id.* ¶¶ 16-17, 273-305. NPs assert that these allegations are relevant to their "red meat industry" wage-fixing claim because "[e]xchanging information about pork labor costs affected the beef industry," in that "most" beef processors "also process pork." *Id.* ¶¶ 303. NPs' own factual allegations show that to be incorrect. *See supra* at 4 (Venn diagram).

*Finally*, NPs allege that Iowa Premium and JBS agreed to abstain from soliciting each other's employees at two Iowa facilities. Compl. ¶¶ 306-16. That bilateral "no-poach" agreement apparently had little, if any, effect on competition for workers. *Id.* ¶ 310 (noting that, aside from this agreement, "the plants would often recruit and poach each other's workers, as those workers had valuable experience"). NPs do not allege any other "no-poach" agreement, nor do they link the alleged Iowa Premium-JBS agreement to the nationwide wage-fixing conspiracy they posit.

According to NPs, the alleged wage-fixing agreement manifested in the following ways: (1) in 2017, 17 of Defendant Processors' 140 plants increased base wages by 2%, and in 2018, a slightly different set of 17 plants increased base wages by 2%; and (2) in three geographies, the range of average hourly wages at six plants narrowed from 2014 to 2017 or from 2014 to 2018. *Id.* ¶¶ 3, 318-21. NPs characterize this hodgepodge as a "simultaneous[]" and "parallel" reduction of annual wage increases, and as a "harmonization" of wages. *Id.* ¶¶ 317, 321.

**B.    The Alleged Information-Exchange Conspiracy.**

NPs' second cause of action claims a conspiracy among Defendants "to regularly exchange detailed, timely, competitively sensitive, and non-public information" about plant-worker compensation. *Id.* ¶ 407. To support this claim, NPs define a relevant market comprising "employment at red meat processing plants in the continental United States." *Id.* ¶ 408. NPs assert that Defendant Processors and their co-conspirators controlled at least a 70% market share, and "clearly" enjoyed joint market power because they "used" it "to pay Class Members sub-competitive compensation." *Id.* ¶ 409. NPs characterize every position in every red meat processing facility—from salaried professionals to hourly line workers who debone carcasses—as "fungible" jobs in a single, unified labor market. *Id.* ¶¶ 338-50, 412.

As for the alleged effects of this conspiracy, NPs reprise the claim that it suppressed the compensation of employees at red meat processing facilities. *Id.* ¶ 425. Other than the scant allegations of parallel wage increases and wage "harmonization" referenced above, NPs do not plead any facts to support that assertion or their corresponding claim that Defendant Processors "refused to increase wages for certain employees for a significant amount of time." *Id.* ¶ 331.

## LEGAL STANDARD

To overcome a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's allegations must "raise a right to relief above the speculative level" and contain sufficient factual material "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.*

Moreover, a plaintiff "must demonstrate standing for each claim he or she seeks to press." *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016) (cleaned up). This requires that a plaintiff "personally" suffered an actual or threatened injury due to defendants' alleged conduct. *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982). "It is not enough that the conduct of which the plaintiff complains will injure *someone*." *Id.* (emphasis in original).

## ARGUMENT

### I.    NPs Do Not Adequately Plead Either of Their Sherman Act Claims.

NPs' factual allegations do not support the sweeping scope of their conspiracy claims. To state a claim under Section 1 of the Sherman Act, a plaintiff "must plead not just ultimate facts (such as a conspiracy), but *evidentiary facts* which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008). NPs miss that mark.

**A.      NPs Do Not Plausibly Allege a *Per Se* Unlawful Agreement to Fix Wages.**

NPs do not plead the factual predicates of their first claim for relief—a *per se* violation of Section 1 of the Sherman Act in the form of a wage-fixing agreement. In a Section 1 case, the "crucial question" is "whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1174 (10th Cir. 2019). A plaintiff may plead an agreement through direct or circumstantial evidence. Where a complaint relies on the latter, it must present facts that suggest "a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. Allegations that are "merely consistent with" conspiracy are insufficient. *Id.* at 557, 570. Here, NPs allege neither direct nor circumstantial evidence of a wage-fixing conspiracy.

**1.      NPs Do Not Allege Direct Evidence of a Wage-Fixing Agreement.**

NPs all but concede that they cannot present direct evidence of any wage-fixing agreement. *See* Compl. ¶¶ 6-20. Direct evidence "requires no inferences to establish the proposition or conclusion being asserted." *Llacua*, 930 F.3d at 1177. It must "explicitly manifest[] the existence of *the agreement in question*," *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3d Cir. 2010)—here, an alleged agreement among Defendants to fix wages. Put another way, direct evidence is "tantamount to an acknowledgement of guilt." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002).

The Complaint does not allege any "admission by an employee of one of the conspirators" of any nationwide wage-fixing agreement, nor any evidence "that officials of the defendants had met and agreed explicitly on the terms of a conspiracy," and there is certainly no "smoking gun." *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010).

10

Instead, NPs concentrate on Defendant Processors' use of third-party benchmarks, and then leap to the conclusion "*upon information and belief*" that Defendant Processors privately "reached agreements" on wages for hundreds of thousands of workers. *E.g.*, Compl. ¶ 10. These bare assertions are not direct evidence of a wage-fixing agreement.

### 2. NPs' Circumstantial Allegations Do Not Plausibly Suggest the Existence of a Wage-Fixing Agreement.

Lacking direct evidence, NPs resort to circumstantial allegations. "The Supreme Court has long warned courts to be hesitant about inferring concerted action from evidence that is merely circumstantial." *Llacua*, 930 F.3d at 1179. For good reason: competitors' "common perceptions of the market" often give rise to similar or even "consciously parallel" decisions. *Twombly*, 550 U.S. at 552-54. Absent a "preceding agreement," there is no concern. *Id*. at 557.

To plead a conspiracy, then, NPs must allege facts that "tend to exclude the possibility of independent action," *Llacua*, 930 F.3d at 1179—*i.e.*, parallel conduct and "plus factors." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) (plus factors are "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action"); *see Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 333 (3d Cir. 2018) ("[A] plaintiff must allege both parallel conduct and something more, which we have sometimes called a plus factor."). Because NPs do not adequately plead parallel conduct *or* plus factors, their Complaint does not cross "the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570.

### a. NPs Do Not Plausibly Allege Parallel Conduct.

NPs do not even clearly identify their parallel-conduct allegations, much less adequately plead that Defendant Processors set wages in parallel. The relevant allegations appear to

comprise (1) an alleged 2% year-over-year increase in base wages at certain plants, owned by some but not all Defendants; and (2) the gradual clustering of hourly wages at a few plants in three geographies. Compl. ¶¶ 317-21.

"'Parallel conduct' refers to the same or substantially similar actions taken by actors on the same level." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 296 F. Supp. 3d 442, 460 n.26 (E.D.N.Y. 2017). Parallel conduct "need not be exactly simultaneous and identical." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 429 (4th Cir 2015). But conduct that is differentiated by time, nature, or actors does not evince parallelism. *See, e.g.*, *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516-17 (8th Cir. 2018) (defendants' termination of plaintiff from their networks six months apart was not parallel conduct); *Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, 2022 WL 4017895, at *6 (W.D.N.Y. 2022) (defendants' assertedly parallel policies were "different in their particulars, their timing, and their outcomes").

The Complaint contains no allegations that all Defendant Processors set "the same or substantially similar" wages. *See N. Am. Soccer*, 296 F. Supp. 3d at 460 n.26. Starting with the 2% wage increase: these allegations implicate just 22 of 140 plants, seven of 15 Defendant Processors, and two of eight years in the Class Period. Compl. at 1, ¶¶ 3, 319-20. Pleadings that touch only *half* the Defendant Processors—and do not speak to 85% of the plants or 75% of the Class Period—cannot demonstrate a commonality of action. *See Twombly*, 550 U.S. at 553 (describing parallelism as a "common reaction"); *LaFlamme v. Société Air France*, 702 F. Supp. 2d 136, 151 (E.D.N.Y. 2010) (finding parallelism allegations "dubious" where defendants' surcharges often differed in amount, timing, and participants; noting that plaintiffs "in several instances plead[ed] . . . action by only some defendants and no action by other defendants").

How did the few alleged wage increases of 2% that NPs identify compare to wage increases at the 85% of plants they omitted? Or to wage increases during other years? NPs do not say. Without those allegations, the Complaint does not demonstrate parallel behavior. *See Hogan v. Pilgrim's Pride Corp.*, 2018 WL 1316979, at *7 (D. Colo. 2018) (allegations about one firm's production cuts did "not establish parallel conduct" absent detail about "how these [cuts] compared to competitors' cuts"); *Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 832-36 (N.D. Ill. 2018) ("probative force" of alleged parallel recalls "particularly weak" where they unfolded months apart and "d[id] not occur in a predictable pattern or scale, much less move in lockstep"); *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 463-65 (S.D.N.Y. 2017) ("shards of parallel conduct" insufficient to plead parallelism).

NPs' wage-clustering allegation fares no better. The Complaint asserts that over the course of three or four years, average wages at two plants in Dodge City, Kansas; two plants in the Oklahoma and Texas panhandles; and two plants in south-central Nebraska "harmoniz[ed]." Compl. ¶ 321. For instance, NPs claim that for two plants in the panhandles, "the difference between the hourly wages paid to production workers . . . decreased from $0.22 in 2014 to $0.07 in 2017." *Id.* But these allegations—even if true and supportive of a conspiracy—touch just six plants that four Defendants own. These few datapoints are far too thin a reed to support NPs' broad allegation of "harmonization of wages among Defendants' red meat workers." *Id.*[4] "To find 'parallel conduct,' it is not enough to simply show that companies were acting similarly in

---

[4] Even within their gerrymandered geographies, NPs' parallelism allegations do not hold up. *E.g.*, Compl. ¶ 321 (identifying three plants but alleging wage "harmonization" at only two).

*any* limited way." *See Jien v. Perdue Farms, Inc.*, 2020 WL 5544183, at *8 (D. Md. 2020) (emphasis in original).

Because NPs do not allege that Defendant Processors made "the same or substantially similar" decisions about wages, *see N. Am. Soccer*, 296 F. Supp. 3d at 460 n.26, their wage-fixing claim fails and "no discussion of any 'plus factors' is necessary," *see Park Irmat*, 911 F.3d at 517; *In re Cedar Shakes & Shingles Antitrust Litig.*, 2020 WL 832324, at *7 (W.D. Wash. 2020) (without parallel conduct, "there is no further inquiry").

### b.    NPs' Plus-Factor Allegations Do Not Support a Plausible Inference of Conspiracy.

Even if NPs adequately pleaded parallel conduct, they would still fall short of alleging the "factual matter" needed to support a plausible inference of a nationwide wage-fixing conspiracy among Defendant Processors. *Twombly*, 550 U.S. at 556. To do that, NPs must also plead "plus factors" that "tend to exclude the possibility of independent action." *Llacua*, 930 F.3d at 1179-80. Collectively, NPs' plus-factor allegations fail because they are "just as consistent with unilateral action as with concerted action." *See id.* at 1180.

### (1)    Aggregated, Anonymized Information Exchanges Do Not Support a Plausible Inference of Conspiracy.

NPs' central allegation is that Defendant Processors' participation in aggregated, anonymized, third-party surveys is evidence of a massive wage-fixing conspiracy. Not so. Market surveys are commonplace, and the exchange of price information alone does not warrant an inference of price-fixing since it "does not invariably have anticompetitive effects." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 475 (10th Cir. 1990) (conspiracy law does not prohibit competitors from

exchanging "information on independently derived prices"). Exchanging wage data is consistent with independent wage-setting. *See Jien*, 2020 WL 5544183, at *8 (exchange of industry benchmarking data "is not surprising, nor illegal, nor evidence of companies acting in parallel to comport with a conspiratorial agreement"). Without additional evidence of an unlawful agreement, information-exchange allegations do not support a plausible inference of a sweeping wage-fixing conspiracy. *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999).

**WMS Red Meat Survey and Compensation Meetings.** Stripped of rhetoric and speculation, the Complaint alleges that Defendant Processors (1) participated in a third-party survey group through which they received anonymized, aggregated compensation data; and (2) considered this information when independently setting wages. Even taken as true, these practices would be in each Defendant's independent self-interest.

For example, in *In re Local TV Advertising Antitrust Litigation*, 2022 WL 3716202 (N.D. Ill. 2022), the court characterized allegations that competitors exchanged anonymized price and margin averages through an industry analyst as insufficient to support an inference that the exchanges enabled competitors to "police a secret or tacit conspiracy to [fix] prices." *Id.* at *6. The plaintiffs alleged that the analyst provided defendants with a report providing industry averages "alongside each [participant's] *own*" metrics. *Id.* at *7. Noting that "data exchanged in the form of industry averages[] is generally favored in the antitrust context," *id.* at *3, the court held that without more, the allegations did not support an inference that the exchanges "secretly served to channel" identifiable information between competitors. *Id.* at *7.[5]

---

[5] While the *Local TV Advertising* court also denied a parallel motion to dismiss, that complaint adequately pleaded (1) parallel conduct against defendants' individual self-interest and (2) public

So too here. NPs' allegations about the WMS Red Meat Survey describe the permissible dissemination of aggregated and largely historical compensation information. NPs allege that the Red Meat Survey reported *average* metrics for the categories of positions it covered. Compl. ¶¶ 190, 194, 199-200. And as in *Local TV Advertising*, the reports described in the Complaint "tailored" data for each participant so that only its *own* metrics appeared alongside industry averages. *Compare* 2022 WL 3716202, at *7 (report showing clients "a picture of what is happening in the market as a whole alongside each client's *own* [data]"), *with* Compl. ¶ 191 (WMS tailored reports for processors such that they disclosed only "industry compensation rates" and listed the recipient processor's compensation information in blue).

The only allegations suggesting that Defendant Processors deanonymized these data or otherwise used them to collude are pure speculation. NPs allege, for example, that the survey employed "sham" anonymization techniques because Compensation Meeting attendees "could readily ascertain which red meat processor had reported which compensation data." Compl. ¶ 378. But NPs do not plead any facts to backstop that assertion. They just insist that Defendant Processors *could* have deanonymized data or reached agreements in the private meetings. *See, e.g.*, *id.* ¶ 246 ("it was '*quite possible*'" that competitors discussed specific data and entered into agreements at compensation meetings); *id.* ¶ 248 ("nothing prevented the Defendant Processors" from discussing particular compensation practices during meetings); *id.* ¶ 251 (theorizing that meetings must have included unlawful discussions because agendas included vague items such as "unspecified 'group discussion topics'"); *id.* ¶ 380 (speculating that Meng "may" have been

_____

statements by executives regarding "cooperation" between competitors on the subject matter at issue. *In re Local TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *9-10 (N.D. Ill. 2020).

16

excluded from meetings so Defendant Processors could deanonymize data). This is not enough. NPs also undermine their guesswork with factual allegations acknowledging that participants could *not* deanonymize survey data without Meng's assistance. *E.g.*, *id.* ¶ 225. In any event, allegations (like NPs') that merely posit the opportunity for unlawful coordination do not suffice. *See, e.g.*, *Snyder v. ACORD Corp.*, 2016 WL 192270, at *10 (D. Colo. 2016) ("[M]ere opportunity to conspire is not enough to plead antitrust liability.").

Likewise, allegations that Defendant Processors shared information through an industry analyst do not advance NPs' wage-fixing claim. In *Jien*, the court found similar allegations that poultry processors relied on third-party benchmarking data to inform their wage decisions to be inadequate. 2020 WL 5544183, at *8. Reliance on these data, the *Jien* court concluded, "is not surprising, nor illegal, nor evidence of companies acting in parallel to comport with a conspiratorial agreement." *Id.* Here, NPs simply allege that Defendant Processors used the same benchmarking data and independently set wages within an unspecified range. These allegations do not tend to exclude the possibility that Defendant Processors acted independently. *Cf. Jien v. Perdue Farms, Inc. (Jien II)*, 2021 WL 927456, at *4-5 (D. Md. 2021) (alleged direct evidence of conspiracy "critical" to upholding *per se* claim based on information exchange through WMS and Agri Stats).[6] Since Section 1 of the Sherman Act "does not reach independent decisions,"

---

[6] In denying certain defendants' motions to dismiss, the *Jien* court pointed to what it characterized as direct evidence of a *per se* unlawful wage-fixing agreement: an executive's comment that "discussions about wages, salaries and benefits" during "off the books meetings" at a hotel "were so inappropriate and improper that the company would no longer attend them." *Jien*, 2020 WL 5544183, at *5. Putting aside whether that allegation actually constitutes direct evidence of a nationwide wage-fixing agreement, NPs allege nothing of the sort here. *See Llacua*, 930 F.3d at 1177 (direct evidence "requires *no inferences* to establish the proposition or conclusion being asserted").

these allegations do not make NPs' wage-fixing conspiracy claim any more plausible. *See White v. R.M. Packer Co.*, 635 F.3d 571, 575 (1st Cir. 2011).

*Agri Stats.* As an initial matter, NPs' allegations regarding Agri Stats only apply to the Pork Processor Defendants. While the Complaint leaves the composition of that group unclear, *see supra* at 3 n.3, it unambiguously states that pork processors who did not share their own data could not access Agri Stats data. *See* Compl. ¶ 382 ("because of Agri Stats' 'give-data-to-get-data' policy, only the Pork Process[or] Defendants" who uploaded data to Agri Stats could access Agri Stats data). NPs do not attempt to establish a plausible nexus between Agri Stats reports and the beef processors who never received them. *See supra* at 7 (NPs' pleadings refute assertion that "[e]xchanging information about pork labor costs affected the beef industry," in that "most" beef processors "also process pork").

This lack of specificity infects all of the Agri Stats allegations. For example, NPs allege that Agri Stats provided "Pork Processor Defendants" with custom data comparisons and "supplemented the detailed information" in reports "by engaging in on-site visits." Compl. ¶¶ 289-91. But NPs never say which Defendants supposedly received these supplements, or why it would be plausible to infer a conspiratorial agreement from one-on-one meetings with a third-party benchmarking firm. *See In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019) (to state a claim, a complaint must provide a "basis to infer the culpability of the *specific* defendants named in the complaint").

NPs gloss over these shortcomings and assert that Agri Stats participants found the data useful in part because of its confidentiality and accuracy. Compl. ¶¶ 277-85, 293-97. But it is neither "surprising, nor illegal" that firms might seek out and rely upon reliable, confidential

benchmarking data. *Jien*, 2020 WL 5544183, at *8. As in *Jien*, "the fact that companies all used the same benchmarking companies' data to inform their wages is insufficient to permit a circumstantial inference of collusion." *See id.* In the absence of more probative conspiracy allegations, NPs' allegations regarding the Pork Processor Defendants' participation in Agri Stats describe conduct that "is neither illegal nor inherently collusive." *Id.*; *cf. Jien II*, 2021 WL 927456, at *4-5. Because NPs' allegations do not tend to exclude the possibility that Pork Processor Defendants used Agri Stats data to make independent decisions, they do not support any plausible inference of conspiracy. *See Llacua*, 930 F.3d at 1179.

(2)    <strong>NPs' Allegations of Interfirm Communications Only Describe Lawful Information Exchanges.</strong>

NPs' handful of allegations regarding interfirm communications similarly fail to support an inference of a nearly decade-long antitrust conspiracy across the beef and pork industries. To start, NPs' allegations of "direct communications" between competitors describe garden variety information exchanges. For example, NPs allege that interfirm communications amounted to "direct[] exchange[s]" of compensation information between discrete sets of processors, Compl. ¶¶ 268-69, 272, and concerned ad hoc surveys containing anonymized and aggregated data*, see id.* ¶ 270 (describing a survey regarding "Supervisor Weekend Pay & Bonus Eligibility," the results of which would be "anonymous"); *id.* ¶ 271 (describing a request for "average industry data" for non-union hourly employees, which would be reported "in aggregate format"). These allegations just describe anonymized and aggregated information—the format "generally favored in the antitrust context." *Local TV Advert.*, 2022 WL 13830733, at *3.

Again, it "is neither illegal nor inherently collusive" to exchange disaggregated competitive data. *Jien*, 2020 WL 5544183, at *8; *see Mitchael*, 179 F.3d at 859 ("Mere

19

exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange."). For example, in *Jones v. Micron Technology, Inc.*, 400 F. Supp. 3d 897 (N.D. Cal. 2019), *aff'd sub nom. In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42 (9th Cir. 2022), the court recognized that alleged information exchanges through industry organizations did not imply a conspiracy because "[d]ata-gathering and information sharing are perfectly legitimate objectives of trade associations" and do not "tend to exclude the possibility of legitimate behavior." *Id.* at 918. Likewise here, NPs' allegations indicate that Defendant Processors used any benchmarking and survey data to set wages independently. *See* Compl. ¶ 269 (Defendant Processor used data to set its "own" compensation schedules); *id.* ¶ 272 (Defendant Processor used data to unilaterally determine how much to pay workers). Because these allegations do not "tend[] to exclude the possibility" that the parties acted independently, they do not give rise to a plausible inference of conspiracy. *See Twombly*, 550 U.S. at 554; *Llacua*, 930 F.3d at 1179-80.

Finally, NPs' allegation that a former HR employee at one Defendant Processor believes another HR employee at the same Defendant Processor exchanged compensation information with unnamed competing pork processors gets nowhere. Compl. ¶¶ 268-69. As with the Agri Stats allegations, NPs do not even attempt to plead facts connecting this allegation to a nationwide conspiracy that included beef processors or all plants. *See, e.g.*, *Mexican Gov't Bonds*, 412 F. Supp. 3d at 388 (an antitrust claim requires "a coherent explanation for each defendant's participation in the alleged conspiracy").

20

**(3)**     **Alleged Industry Characteristics Do Not Permit a Plausible Inference of Conspiracy.**

NPs allege that characteristics of the red meat processing industry render it "susceptible to collusion and bolster the plausibility" of their wage-fixing conspiracy. Compl. ¶ 322. None of the asserted characteristics, individually or in the aggregate, support an inference of conspiracy.

***High Barriers to Entry and Industry Concentration.*** NPs allege that "the red meat processing industry" is highly concentrated and "characterized by high barriers to entry," including high construction costs, complex distribution networks, labor needs, and an onerous regulatory environment. *Id.* ¶¶ 323-24. But allegations concerning the alleged red meat processing industry are irrelevant, as NPs define the relevant market as "the *labor market* for employment at red meat processing plants" in the United States. *Id.* ¶¶ 338, 408. In any event, courts recognize that these characteristics make it *more* likely that parallel conduct is the product of "similar market pressures" rather than unlawful agreement. *See, e.g.*, *DRAM*, 28 F.4th at 52 (high barriers to entry and industry concentration make it "more likely" that firms will imitate one another's behavior without prior agreement); *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 871 (7th Cir. 2015) (same); *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 824 (N.D. Ill. 2017) (same), *aff'd sub nom. Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018). These allegations do not move the needle toward an inference of conspiracy.

***Fungibility of Labor and Inelastic Labor Supply.*** NPs allege that the interchangeability of "[w]orkers within the same positions" and inelasticity of the supply of labor for red meat processing positions render employers in the alleged market more susceptible to collusion. Compl. ¶¶ 325-26. The factual support NPs offer in support of these sweeping conclusions? One former HR director from one Defendant Processor viewed "beef processing employees as 'one

hundred percent' interchangeable with pork processing workers." *Id.* ¶ 325. Taken at face value, this allegation speaks to *one* individual's view about the interchangeability of *workers*, not employment opportunities—the relevant dimension of competition in labor markets. Moreover, it offers no support for NPs' assertion that the supply of labor for these positions is inelastic.

In any event, these characteristics do not invariably suggest that an industry is susceptible to collusion—much less that there *was* any collusion. To the contrary, in markets characterized by product interchangeability and inelasticity of demand, competing firms may be incentivized not to compete on price even in the absence of an agreement, because doing so would diminish all firms' margins. *Kleen Prods.*, 276 F. Supp. 3d at 823. Because these characteristics are entirely consistent with independent decision-making, they do not make NPs' wage-fixing conspiracy claim any more plausible. *Id.* at 824; *see also White*, 635 F.3d at 582 (inelasticity of demand does not "help[] to distinguish between agreement and mere conscious parallelism").

***Historical Conduct.*** NPs' allegations about past government investigations in the "red-meat industry" are wholly irrelevant. Much of that discussion involves century- and decades-old alleged conduct, some even predating the Sherman Act's enactment. Compl. ¶ 327 (discussing alleged anticompetitive conduct in the beef industry prior to 1890, in 1920, and in 1996). These dated allegations provide no support for an alleged contemporary conspiracy. *See Jones*, 400 F. Supp. 3d at 921.

Even NPs' more recent allegations do not support a plausible inference of conspiracy. The mere existence of an investigation "carries no weight in pleading an antitrust conspiracy claim" because neither the scope of the investigation nor its results are evident to the public or the Court. *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D.

Cal. 2007); *see Jones*, 400 F. Supp. 3d at 921 ("past or ongoing investigations" are "not particularly helpful to suggest a contemporary conspiracy"). These types of "if it happened there, it could have happened here" allegations offer no support for the nationwide wage-fixing conspiracy that NPs allege in their Complaint. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007); *see Mexican Gov't Bonds*, 412 F. Supp. 3d at 391 (allegations that Defendants "conspired in other markets in recent years" do not support inference of separate conspiracy).

*Opportunities to Collude.* NPs also contend that the "red meat industry is ripe with opportunities for Defendants to collude." Compl. ¶ 329. But NPs just identify trade associations that hold meetings that some Defendants attend. Certain associations are specific to pork or beef, *id.* ¶¶ 329a-c, 329h-i, and others have nothing to do with compensation, *id.* ¶ 329j (describing association that "develops export opportunities for U.S. protein producers"). Regardless, "mere opportunity to conspire is not enough to plead antitrust liability." *Snyder*, 2016 WL 192270, at *10; *see also Mexican Gov't Bonds*, 412 F. Supp. 3d at 391 (allegations of "a professional and social network that afforded Defendants the 'opportunity to conspire'" do not support an inference of antitrust conspiracy). NPs' speculation that Defendants *could* have conspired through these organizations is just guesswork. *See Snyder*, 2016 WL 199270, at *10.

### (4)   A Single No-Poach Agreement Does Not Imply a Nationwide Wage-Fixing Conspiracy.

Finally, NPs' no-poach allegation does not suggest the existence of a nationwide wage-fixing conspiracy. Notwithstanding NPs' assertion that Defendants had multiple "no-poach agreements," Compl. ¶ 306, the Complaint alleges a single, bilateral no-poach agreement between JBS's Marshalltown, Iowa plant and Iowa Premium's Tama, Iowa plant, which are

approximately 23 miles apart, *id.* ¶¶ 307-15.[7] This lone allegation relating to two plants in central Iowa does not plausibly support an inference of a nationwide wage-fixing conspiracy among 17 Defendants and 39 non-Defendant co-conspirators in the pork and beef processing industries. *See In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 975 (N.D. Iowa 2011) (allegations of "certain bilateral agreements" did not support "inferences of a wider conspiracy").

### 3. NPs' Allegations Are Consistent With Independent Decision-Making.

At bottom, the Complaint's factual allegations do not "tend[] to exclude the possibility" that Defendants made independent wage-setting decisions. *Llacua*, 930 F.3d at 1179-80. NPs suggest that answering industry surveys, receiving reports on wage and compensation data, and attending meetings are tantamount to collusion. They are wrong. It is "not unlawful for competitors to meet" or "exchange information"—even about "prices"—so long as they set prices "independently." *Suntar Roofing*, 897 F.2d at 475. This is why "courts are reluctant to infer conspiracy" from allegations that competitors "[g]ather[ed] information about pricing and competition" during "meetings" with rivals. *DRAM*, 28 F.4th at 52; *see Jien*, 2020 WL 5544183, at *8 (allegations that poultry processors relied on Agri Stats data to inform wage decisions insufficient to support inference of conspiracy).

For all its rhetoric, the Complaint acknowledges that Defendants set wages and benefits independently. According to NPs, Defendant Processors "used" benchmarking data to "make decisions concerning their *respective* compensation schedules." Compl. ¶¶ 218-19. This

---

[7] The Complaint also alleges that National Beef, Iowa Premium's parent company, received a grand jury subpoena for information on "the solicitation, recruitment, and hiring of employees in the meatpacking industry." Compl. ¶ 316. However, as discussed above, allegations of a grand jury investigation, the scope and status of which are secret, carry no weight in pleading an antitrust conspiracy. *Graphics Processing Units*, 527 F. Supp. 2d at 1024.

admission—that Defendants did not agree on compensation schedules, but rather made their own "respective" decisions based on market data and other factors—defeats NPs' *per se* wage-fixing conspiracy claim. The Court should dismiss it. *See Llacua*, 930 F.3d at 1179-82 (affirming dismissal of wage-fixing antitrust claim where allegations did not "tend[] to exclude the possibility" that trade association members were "acting independently").

### B.   NPs Do Not Plausibly Plead an Unlawful Information-Sharing Agreement Under the Rule of Reason.

NPs' second claim for relief alleges a "conspiracy to exchange compensation information." Compl. ¶¶ 406-26. Because information exchanges often "increase economic efficiency and render markets more, rather than less, competitive," federal courts assess them under the "rule of reason." *U.S. Gypsum Co.*, 438 U.S. at 411 n.16; *see Mitchael*, 179 F.3d at 859. The rule of reason is "an inquiry into market power and market structure designed to assess the combination's actual effect" on competition. *Copperweld v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). An agreement does not violate the rule of reason (and thereby the Sherman Act) unless its "anticompetitive consequences . . . outweigh [its] legitimate business justifications." *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 963 (10th Cir. 1994).

To state a rule-of-reason claim, NPs must plausibly allege that Defendants entered into "an agreement [that] had a substantial[] adverse effect on competition." *Compliance Mktg., Inc. v. Drugtest, Inc.*, 2010 WL 1416823, at *5-6 (D. Colo. 2010). That requires NPs to adequately plead that Defendants possess "market power"—that is, power over price and output. *See Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008) ("[T]he 'rule of reason' . . . requires us to analyze the relevant market power of the defendants."); *SCFC*, 36

F.3d at 965 ("Rule of reason analysis first asks whether the offending competitor . . . possesses market power in the relevant market where the alleged anticompetitive activity occurs.").

To demonstrate market power and anticompetitive effects, NPs must first "allege a valid market." *Campfield*, 532 F.3d at 1119. "Because the relevant market provides the framework against which economic power can be measured"—that is, firms cannot injure competition unless they exercise sufficient power within the market at issue—"defining the product and geographic markets is a threshold requirement." *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1244 (10th Cir. 2016). If NPs' relevant market pleadings are "legally inadequate," their claim "under the rule of reason must fail." *Campfield*, 532 F.3d at 1117-19 (affirming dismissal of rule-of-reason claim).

Because NPs allege neither a plausible relevant market nor substantial anticompetitive effects within that market, the Court should dismiss their second claim for relief.

### 1.    NPs Do Not Plead a Plausible Relevant Product Market.

NPs posit a relevant market comprising "the labor market for employment at red meat processing plants in the continental United States." Compl. ¶ 408. The question at the pleading stage is whether this allegation accounts for "reasonable interchangeability and cross-elasticity of demand." *Campfield*, 532 F.3d at 1118.[8] It does not.

In cases challenging conduct that allegedly affects compensation, the relevant market comprises employers "who are seen by [employees] as being reasonably good substitutes." *Id.*; *see Mooney v. AXA Advisors, LLC*, 19 F. Supp. 3d 486, 499 (S.D.N.Y. 2014) ("antitrust

---

[8] Products and services "share a high-cross elasticity of demand" and likely compete in the same market where "an increase in the price of one . . . causes consumers to switch to the other." *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1313 (10th Cir. 2017).

complaints that plead a labor market" must "discuss[] cross-elasticity [and] substitutes"). A "good substitute" is an employment opportunity that similarly situated workers view as reasonably interchangeable with the job opportunities defendants offer. *See Eichorn v. AT&T Corp.*, 248 F.3d 131, 147-48 (3d Cir. 2001) (relevant market includes employers who "actively compete for employees with the skills and training possessed by plaintiffs").

 NPs allege a single "market" that encompasses a huge range of job opportunities that distinct pools of workers pursue. This proposed "market"—which includes positions held by all or virtually all 150,000 employees who work at Defendants' plants—combines both hourly and salaried positions (not to mention both union and non-union employees and both pork and beef employees). Compl. ¶¶ 121-23, 128, 132-33. Each of these broad classifications in turn encompasses disparate levels and types of employment. By NPs' telling, the "hourly employee" category includes "entry-level laborer[s]," "full-fledged laborer[s]," "full-fledged operative[s]," and "scale/electronic technician[s]." *Id*. ¶ 132. The "salaried employees" category similarly reflects a kaleidoscope of positions, from quality assurance managers to maintenance supervisors, cattle and hog buyers, and other professionals. *Id*. ¶¶ 133, 136. As NPs allege, each of these jobs entails different responsibilities, skills, experience, and compensation. *Id*. ¶¶ 131-36, 141-50. And even these variations do not account for differences between employment at pork and beef plants; between positions at slaughter, further processing, or cook plants, *id.* ¶¶ 3, 164; and between union and non-union workers.[9]

---

[9] NPs tellingly allege that "[w]orkers *within the same positions* are generally treated as interchangeable" by Defendant Processors, Compl. ¶¶ 325, 412, implicitly conceding that employment in *different* job categories is not interchangeable.

Indiscriminately lumping all types of employment opportunities together "disables the court from engaging in the necessary consideration of potential substitutes" that market definition requires. *See Vital Pharms., Inc. v. Berlin Packaging, LLC*, — F. Supp. 3d —, 2022 WL 4552094, at *4 (N.D. Ill. 2022) (dismissing complaint that combined different product lines in a single market). In a labor market, interchangeability hinges on the "qualifications and experience" that each position requires, among other factors. *In re Comp. of Managerial, Pro., & Tech. Emps. Antitrust Litig.*, 2008 WL 3887619, at *9 (D.N.J. 2008). That makes sense; one would not expect workers pursuing an hourly "deboning" position and workers pursuing a salaried cattle buying position to view these job opportunities as interchangeable. Compl. ¶¶ 133, 135. But according to NPs, both types of positions (and more) belong in the same labor market. That is not plausible. *See Brooklyn Downtown Hotel LLC v. N.Y. Hotel & Motel Trades Council AFL-CIO*, 2017 WL 1192179, at *6 (S.D.N.Y. 2017) (finding alleged market for "full line of . . . hotel labor services" implausible); *Rock v. NCAA*, 928 F. Supp. 2d 1010, 1022 (S.D. Ind. 2013) (holding proposed "market for the labor of student athletes" "impermissibly broad" because it failed to "account[] for germane differences such as gender and sport played").

To excuse their failure to allege that any particular class of employees lacks reasonable opportunities outside the "red-meat-plant labor market," NPs point to a handful of characteristics that discrete sets of plant workers purportedly share. For example, NPs allege that "many" hourly employees do not speak fluent English and "lack formal education." Compl. ¶¶ 146, 348. But NPs do not state whether these characteristics apply to a significant percentage of employees in any one category, let alone the whole class. Those allegations certainly do not apply to salaried workers, who by the Complaint's own admission "must satisfy certain education and experience

requirements." *Id.* ¶ 148. Similarly, NPs allege that some hourly workers developed red-meat-specific skills that are not transferable to other industries (*e.g.*, deboners). *Id.* ¶¶ 135-36. But again, NPs leave the details out. Plainly, it cannot be the case that all "entry-level" employees or all salaried employees develop deboning or meat-cutting skills. Unsurprisingly, there are many categories of employees at these plants NPs do not address at all.

NPs' stated reasons for defining a single red-meat labor market make little sense. For example, NPs allege that "only educated, skilled, and experienced applicants can obtain salaried positions at red meat processing plants," *id.* ¶ 149, but never explain why those applicants would not view opportunities in *other* industries as substitutes. NPs do not (and could not) contend that these applicants' qualifications—which include "excellent written and verbal communication skills," a "high-school diploma or equivalent," "problem-solving skills," and "knowledge in hydraulic, welding, and PLC ('programmable logic controller') systems training"—are valuable only in red meat processing plants. *Id.* ¶¶ 149-50. Indeed, given that so many categories of employees within the proposed "market" go undescribed and unquantified in the Complaint, there are entire groups of workers for which NPs offer no explanation for why they would be limited to "red meat" job opportunities. This failure is fatal. *See Compliance Mktg.*, 2010 WL 1416823, at *8 (dismissing rule-of-reason claims where alleged market for services in energy industry did not "differ in any material way" from services provided in other industries).

NPs advance a facially implausible market that would require the Court to "don blinders and ignore commercial reality when analyzing Plaintiffs' market allegations." *See Rock*, 928 F. Supp. 2d at 1022. The Court should decline that invitation and dismiss the rule-of-reason claim for failure to plead a plausible product market. *See Uhlig LLC v. CoreLogic, Inc.*, 2022 WL

4597858, at *4-7 (D. Kan. 2022) (dismissing Section 1 claim for failure to "allege an adequate market definition"); *Allergy Rsch. Grp. LLC v. Rez Candles Inc.*, 2022 WL 1004214, at *6 (D. Utah 2022) (dismissing Section 1 claim where proposed market "d[id] not satisfy the pleading requirements for this threshold element").

**2.      NPs Do Not Plausibly Allege Anticompetitive Effects.**

The information-exchange claim fails for an additional reason: NPs do not plausibly allege anticompetitive effects. *See Allergy Rsch.*, 2022 WL 1004214, at *5-9 (rule-of-reason claim must be dismissed where compliant does not allege that "the restraint adversely affects competition"). A plaintiff must allege anticompetitive effects in the "market as a whole." *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 n.11 (2d Cir. 2021); *see Buccaneer*, 846 F.3d at 1312 (evaluating competitive effects across entire market). NPs' allegations come nowhere close.

As noted earlier, NPs assert that Defendant Processors acted in parallel in the following ways: (1) in 2017, 17 of 140 plants increased base wages by 2%; (2) in 2018, a slightly different set of 17 plants increased base wages by 2%; and (3) in three isolated geographies, the hourly wages at certain plants narrowed from 2014 to 2017 or 2014 to 2018. Compl. ¶¶ 319-21. These allegations apparently have to do double duty as evidence of anticompetitive effects. NPs never compare these data to periods outside the alleged conspiracy, to wages in comparable positions outside beef- and pork-packing plants, to wages at any but the 22 plants that a handful of Defendants operate, or to any kind of a competitive benchmark. Accordingly, these allegations do not plausibly support an inference of *market-wide* anticompetitive effects. *See Rock*, 928 F.

30

Supp. 2d at 1024 (pleadings about certain men's Division 1 basketball and football teams did not "adequately allege anticompetitive effects" across all NCAA teams in all divisions).[10]

Moreover, here again, by grouping all categories of jobs and employees in a single omnibus market, the Complaint disables the Court from carefully analyzing the plausibility of its anticompetitive effects allegations. NPs' few allegations about impact on wages concern hourly employees only. *See* Compl. ¶¶ 319-21. The Complaint offers no factual allegations about impact on salaries, and NPs do not plead any conduct that *could have* affected salaries across their proposed "market." *E.g.*, *id.* ¶ 273 (Agri Stats data concerned only pork employees).

NPs' implausible market definition and threadbare allegations of market-wide effects cannot unlock the door to discovery of a decade's worth of compensation decisions at each of the Defendants' 140 processing plants in the United States. *See Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1267 (11th Cir. 2019) (implausible Section 1 claim should not proceed "into the expensive and settlement-inducing quagmire of antitrust discovery"). The Court should dismiss NPs' rule-of-reason claim.

## II.      NPs' Claims Are Time-Barred.

NPs allege that Defendants' wage-fixing and information-sharing conspiracies began on January 1, 2014, nearly nine years before they sued on November 11, 2022. Compl. ¶¶ 151, 401, 407. The four-year statute of limitations for a private antitrust action starts when a defendant commits an economic harm to a plaintiff. 15 U.S.C. § 15b. To sidestep the fact that they filed

---

[10] In another paragraph, under the heading "Direct Evidence of Market Power," NPs allege that Defendant Processors "*actually* suppressed" compensation during the Class Period." Compl. ¶ 330. NPs do not support this conclusory assertion with any factual allegations demonstrating that Defendant Processors suppressed compensation at all, let alone on a market-wide basis. *See id.* ¶¶ 330-37 (merely summarizing earlier conduct allegations).

their claims more than four years late, NPs allege that (1) the limitations period should be extended because Defendants committed a continuing violation of the antitrust laws, or (2) the limitations period should be tolled because Defendants fraudulently concealed the alleged conspiracies. *Id.* ¶¶ 364-85. Both theories fail.

A.    **NPs Fail To Plead A Continuing Violation.**

To plead a continuing violation, NPs must allege an "overt act" during the limitations period. *Kaw Valley Elec. Co-op. Inc. v. Kan. Elec. Power Co-op, Co.*, 872 F.2d 931, 933 (10th Cir. 1989). An "overt act" must (1) be "new and independent" and "not merely a reaffirmation of a previous act," and (2) "inflict new and accumulating injury on the plaintiff." *Id.* A continuing violation exists "only if acts committed within the limitations period" are more than "unabated inertial consequences of some pre-limitations action." *Id.*

NPs allege a conspiracy spanning nearly a decade and involving two meat industries, more than 50 conspirators, and 140 red meat processing plants. Compl. ¶¶ 29-110, 124. Their supporting allegations broadly fall in three categories: (1) alleged participation in the "Red Meat Industry Compensation Surveys" and associated meetings, *id.* ¶¶ 6, 9; (2) alleged bilateral communications, including a single alleged no-poach agreement between processors in Iowa, *id.* ¶ 14; and (3) alleged information-sharing via Agri Stats, *id.* ¶ 16. According to NPs, these allegations reflect Defendants' "continuing adherence to, enforcement of, and reaffirmation" of the alleged January 2014 conspiracy. *E.g.*, *id.* ¶ 365.

Alleging that Defendants "reaffirm[ed]" an earlier agreement does not trigger a continuing violation. *Kaw Valley*, 872 F.2d at 933. Nor is it sufficient to claim that continuing wage payments kept the limitations period running. *See In re Animation Workers Antitrust Litig.*,

87 F. Supp. 3d 1195, 1212 (N.D. Cal. 2015) (distinguishing wage-fixing claims from price-fixing claims; "bald assertion" that "Defendants repeatedly invaded Plaintiffs' and class member' interests by adhering to, enforcing, and reaffirming the anticompetitive agreements" is "insufficient to show a continuing violation"). Rather, NPs must allege specific conspiratorial acts during the limitations period that are "new and independent" of any prior agreement. *Kaw Valley*, 872 F.2d at 933; *see also Animation Workers*, 87 F. Supp. 3d at 1213; *Reveal Chat Holdco LLC v. Facebook, Inc*., 2021 WL 1615349, at *6 (N.D. Cal. 2021) (the mere "continued existence of" allegedly illegal agreement "does not constitute [a] new and independent act[] that restart[s] the statute of limitations")*, aff'd in relevant part*, 2022 WL 595696 (9th Cir. 2022).

NPs do not allege any "new and independent" conspiratorial acts after November 11, 2018. *First*, while NPs allege that certain Defendants participated in the Red Meat Surveys and related meetings as late as 2018 and 2019,[11] they make clear that the exchange of future salary data—which NPs contend facilitated the alleged wage-fixing conspiracy, *see, e.g.*, Compl. ¶ 187—ended by 2017. *Id.* ¶ 258. In fact, NPs allege that changes to the Red Meat Survey in 2018 would have *prevented* Defendants from exchanging such information: Defendants "eliminated" "future salary data" from the surveys and reports, and "instructed Meng to remain for the entire annual meeting." *Id.* ¶¶ 258-60. NPs allege that Meng would have "halted" any conspiratorial discussions that took place "in his presence." *Id.* ¶ 248.

*Second*, the Complaint does not allege any unlawful bilateral communications after 2016. *See id.* ¶ 307. NPs assert in conclusory fashion that certain, mostly unidentified executives

---

[11] NPs do not allege that every Defendant attended every meeting or participated in each survey within the Class Period. Compl. ¶¶ 29-62.

participated in "weekly" calls at unidentified times. *Id.* ¶¶ 268-69. And they allege that a bilateral no-poach agreement between two processors in Iowa began in 2016, but never say how long it continued or whether it existed after November 11, 2018. These vague, undated assertions do not establish a continuing conspiracy. *See Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1071 (N.D. Cal. 2016) (no continuing conspiracy where all allegations about enforcement of alleged agreements "are undated or pre-date" the limitations period).

*Finally*, the latest act NPs allege in connection with Agri Stats involves data collected in 2017. Compl. ¶ 290. The remaining Agri Stats allegations are of no help, as they relate to conduct that took place at unidentified times "during the Class Period." *Id.* ¶¶ 29-62, 273-305; *see Garrison*, 159 F. Supp. 3d at 1071. Because NPs do not allege new and independent acts in furtherance of the alleged conspiracies beyond November 11, 2018, their claims are untimely.[12]

### B.      NPs Fail To Plead Fraudulent Concealment.

Nor do NPs allege facts sufficient to toll the statute of limitations under the doctrine of fraudulent concealment. To plead fraudulent concealment, NPs must allege: (1) Defendants' use of fraudulent means, (2) successful concealment from NPs, and (3) that NPs did not know or by the exercise of due diligence could not have known that they might have a cause of action. *See King & King Enters. v. Champlin Petroleum Co.*, 657 F.2d 1147, 1154 (10th Cir. 1981). Fraudulent concealment is subject to Rule 9(b)'s heightened pleading standard, so NPs' allegations must "set forth the time, place and contents of the false representation, the identity of

---

[12] Even if NPs sufficiently alleged a continuing violation, they could not recover damages from the entire Class Period. Rather, NPs could only recover damages for the four years preceding the filing of their Complaint. *See Zenith Radio Corp. v. Hazeltine Rsch. Inc.*, 401 U.S. 321, 338 (1971). For that reason, the Court should strike NPs' request for damages prior to November 11, 2018.

the party making the false statements and the consequences thereof." *See Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000). The Complaint does not do so.

### 1.    NPs Do Not Allege Affirmative Acts of Concealment.

The "mere failure to disclose the existence of a cause of action does not constitute fraudulent concealment." *King & King*, 657 F.2d at 1155. Rather, to plead an "affirmative act of concealment," NPs must allege that Defendants "engaged in specific, identifiable, affirmative acts of concealment." *In re Urethane Antitrust Litig.*, 235 F.R.D. 507, 519-20 (D. Kan. 2006). The Complaint falls short at this threshold step.

*First*, allegations of "secret" Red Meat Survey meetings, Compl. ¶¶ 376-80, are too vague to constitute fraudulent acts. Courts routinely reject generalized allegations of "secret" meetings. *See, e.g.*, *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 773-74 (D. Minn. 2020) (characterizing "vague allegations" of "secret" "in-person meetings," and "secret" information exchanges as insufficient). Allegations of "executive-level secrecy" about Red Meat Surveys, Compl. ¶¶ 160-87, fare no better. Even if confidentiality meant "concealment" (it does not), NPs themselves allege that Defendant Processors' HR employees openly discussed the surveys. *E.g.*, *id.* ¶¶ 165, 167, 177, 218-66; *see Garrison*, 159 F. Supp. 3d at 1075-78 (finding "secrecy" allegations implausible where complaint indicated that "[defendants'] employees spoke openly about the [allegedly illegal] agreements, both within [the company] and with other companies").

*Second*, NPs' Agri Stats allegations are too vague to constitute fraudulent acts, *see* Compl. ¶¶ 381-84, as another court recently found. Just like NPs, the plaintiffs in *In re Pork Antitrust Litigation* alleged that Agri Stats is a secretive company, and that despite their facial anonymity, Agri Stats reports permitted meat processors to deanonymize data. 495 F. Supp. 3d at

766-67, 774; *see* Compl. ¶¶ 381-84. The court in *Pork* held that these allegations did not meet Rule 9(b)'s heightened pleading requirements for fraudulent concealment. 495 F. Supp. 3d at 774. The same is true of NPs' Agri Stats allegations here.

*Finally*, the assertion that "Defendants affirmatively and falsely represented that they paid wages, salaries and benefits reflecting a competitive market for labor," *see* Compl. ¶¶ 372-74, does not save NPs' claims. These statements are too vague to plead concealment—especially because NPs do not allege that they saw or relied on the allegedly misleading statements. *See Garrison*, 159 F. Supp. 3d at 1075, 1078-81 (statements about "competitive" wages insufficient to plead fraudulent concealment because the complaint omitted when and where the statements occurred and did not plead reliance); *see also Pork*, 495 F. Supp. 3d at 773-74 (that "some defendants gave pretextual (non-conspiracy) reasons to explain why production was slowing" is not evidence of fraudulent concealment). NPs do not adequately plead fraudulent concealment as a basis for tolling the limitations period.

### 2.    NPs Do Not Allege Due Diligence.

NPs also fail to allege with particularity that they "did not know or by the exercise of due diligence could not have known that [they] might have a cause of action" until after the limitations period ran. *Ballen v. Prudential Bache Secs., Inc*., 23 F.3d 335, 336-37 (10th Cir. 1994). NPs attempt to meet this requirement by asserting that "[n]o facts were revealed publicly or to the [NPs] that would have put them or the Class on inquiry notice." Compl. ¶ 366. But NPs' reliance on years-old lawsuits disproves that assertion: they have been on inquiry notice since at least September 2016. *See, e.g*., *id.* ¶ 256 (citing the "Broilers Antitrust Lawsuit" filed against several Defendants in "September 2016"); *id.* ¶ 328 (citing lawsuit filed against the "Pork

Producer Defendants" in "June 2018"); *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1203-04 (10th Cir. 1998) (negative news article and lawsuits sufficient to put plaintiff on notice because public disclosures "need not discuss each and every aspect of the alleged [illegal] activity" to provide inquiry notice); *see also Pork*, 495 F. Supp. 3d at 774 (holding that plaintiffs in case involving Agri Stats were on "inquiry notice" since "2017," when "an article on the role of Agri Stats in the broiler-chicken industry appeared in *Bloomberg News* and a lawsuit was filed").

Indeed, these prior lawsuits prompted NPs' counsel to file a "poultry-wage fixing" complaint more than two years before they filed this Complaint. *See* Compl. ¶ 261 (*Jien* filed in August 2019). NPs were on notice, yet inexplicably delayed filing this case. *See Kreek v. Wells Fargo & Co.*, 652 F. Supp. 2d 1053, 1060 (N.D. Cal. 2009) ("The fact that other similarly situated plaintiffs were able to file an identical action [following the public disclosure] affirms this order's finding that plaintiffs were on inquiry notice."). Because NPs have not adequately alleged the elements of fraudulent concealment, their claims are untimely.

## III.    NPs Have No Standing To Assert Claims For Injuries They Did Not Suffer.

Each NP "must demonstrate standing for each claim he or she seeks to press." *Colo. Outfitters Ass'n*, 823 F.3d at 551. That "a suit may be a class action" makes no difference; NPs still must "show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40, n.20 (1976). A plaintiff who claims to have "been subject to injurious conduct of one kind" lacks "the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Blum*, 457 U.S. at 999. This is where NPs fall short. They allege a broad conspiracy to suppress compensation for both hourly and salaried employees, yet none of them

earned a salary. Compl. ¶¶ 26-28. Injuries NPs allegedly sustained as hourly employees do not give them "the necessary stake" to prosecute claims of salaried employees, who supposedly incurred "similar" but different injuries. *See Blum*, 457 U.S. at 999.

As NPs allege, hourly and salaried employees at meatpacking plants comprise distinct sets of employees. They perform different functions. *Compare* Compl. ¶ 132 (hourly employees are "production workers who physically worked on processing lines to process red meat or maintenance workers who maintained and repaired processing-line machines"), *with id.* ¶ 133 (salaried employees serve as "production and maintenance supervisors" or "cattle and hog buyers" and hold "health and safety related positions, human resources positions, and quality-assurance positions"). Their jobs require different qualifications. *Compare id.* ¶ 146 (hourly employees often "do not speak English and lack formal education"), *with id.* ¶ 149 (maintenance supervisors must have a "high school diploma or equivalent," three to 5 years' experience in "general industrial maintenance," and "general knowledge of machinery used in the industry"). And they are compensated in fundamentally different ways. *Compare id.* ¶ 135 (hourly workers paid per schedules "that account for workers' skill and/or experience" within varying "hourly-paid positions at the same red meat processing plants"), *with id.* ¶ 136 (salaried workers paid per schedules that account for the "skill and/or experience" necessary for each particular salaried position). These allegations confirm that no NP is "a proper party to invoke judicial resolution of [a] dispute" over alleged collusion as to salaried employee compensation. *See Habecker v. Town of Estes Park*, 518 F.3d 1217, 1223 (10th Cir. 2008).

That NPs allege a single conspiracy does not alter this conclusion. In *Kjessler v. Zaappaaz, Inc.*, 2019 WL 3017132 (S.D. Tex. 2019), for example, the plaintiffs filed a putative

class action alleging a conspiracy to fix the prices of custom wristbands, buttons, and lanyards. *Id.* at *1-2. The defendants moved to dismiss the lanyard claims on the ground that the plaintiffs, who purchased only wristbands and buttons, lacked standing to pursue claims on behalf of absent class members who bought lanyards. *Id.* The court granted the motion. It found that the plaintiffs lacked standing to pursue the lanyard claims because they did not "possess the same interest and suffer the same injury" as the absent class members. *Id.* at *6. The court specifically rejected the plaintiffs' argument that they had standing to pursue those claims because they alleged a "single conspiracy covering all three relevant [products]," finding that it was not enough that the plaintiffs' injuries were "similar" to lanyard buyers' injuries. *Id.* at *5-6. As the court explained, "the Sherman Act's provision of joint and several liability does not relieve Plaintiffs of their burden to allege personal injury flowing from Defendants' lanyard price fixing." *Id.* at *8.

The Court should dismiss NPs' claims on behalf of salaried employees for the same reasons. It is immaterial that NPs allege overarching conspiracies to exchange information and "to fix and depress compensation to red meat processing plant workers." Compl. ¶ 34. NPs still must show that they "possess the same interest and suffer[ed] the same injury" as salaried workers. *Schlesinger*, 418 U.S. at 216. They have not. Just as no *Kjessler* plaintiff bought a price-fixed lanyard, no NP suffered any injuries attributable to alleged salary suppression because none of them were paid "reduce[d] salaries." Compl. ¶ 337. Even if an alleged reduction of hourly wages is "similar" to a suppression of salaries, NPs still lack standing to prosecute claims for salaried workers. *See Blum*, 457 U.S. at 999; *Kjessler*, 2019 WL 3017132, at *6.

*Kjessler* is not an outlier. For example, in *Pearson v. Target Corp.*, 2012 WL 7761986 (N.D. Ill. 2012), the plaintiff alleged that the defendant engaged in the same deceptive business

practices concerning two dietary supplements. *Id.* at *1. But because the plaintiff only purchased one of the supplements, the court found that he lacked standing to assert claims for the other. *Id.* at *1-2. And in *In re AIG Advisor Group Securities Litigation*, 2007 WL 1213395 (E.D.N.Y. 2007), *aff'd on other grounds*, 309 F. App'x 495 (2d Cir. 2009), the plaintiffs claimed that the defendant made the same fraudulent representations about 19 different investment funds. *Id.* at *2-3. The court held that the plaintiffs lacked standing to pursue claims for funds in which they did not invest. *Id.* at *4-6.[13] The same principle applies with equal force to NPs' Complaint: NPs earned only hourly wages and they cannot assert claims for injuries they did not suffer. The Court should dismiss NPs' claims seeking redress on behalf of salaried employees.

## CONCLUSION

For the foregoing reasons, the Court should dismiss NPs' Complaint.

---

[13] Where courts have reached a different conclusion, distinctions between plaintiffs' and absent class members' injuries were non-existent or less clear from the complaint, *e.g.*, *Singh v. Lenovo (U.S.) Inc.*, 510 F. Supp. 3d 310, 320 (D. Md. 2021) (reserving standing for class certification where injury allegations could be construed broadly enough across the class), or the named plaintiffs and absent class members occupied the same market, *e.g.*, *Jien II*, 2021 WL 927456, at *3 (where plaintiffs sufficiently pleaded a single poultry labor market, refusing to dismiss claims for lack of standing at pleading stage). Neither circumstance applies here. *See supra* at 26-30, 38.

Dated: February 17, 2023                    Respectfully submitted,

/s/ Michael F. Tubach
Michael F. Tubach
Margaret P. Tomlinson
O'MELVENY & MYERS LLP
Two Embarcadero Center
San Francisco, California 94111
Telephone: (415) 984-8700
Facsimile: (415) 984-8701
Email: mtubach@omm.com
Email: mtomlinson@omm.com

Stephen J. McIntyre
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
Email: smcintyre@omm.com

Benjamin G. Bradshaw
Brian P. Quinn
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: 202-383-5414
Email: bbradshaw@omm.com
Email: bquinn@omm.com

*Counsel for National Beef Packing Company, LLC*

/s/ Jennifer Milici
Jennifer Milici
WILMER CUTLER PICKERING HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
E-mail: Jennifer.Milici@wilmerhale.com

Mark Ford
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000
E-mail: Mark.Ford@wilmerhale.com

John Walsh
WILMER CUTLER PICKERING HALE AND DORR LLP
1225 Seventeenth St., Suite 2600
Denver, CO 80202
Telephone: (720) 274-3135
Facsimile: (720) 274-3133
E-mail: John.Walsh@wilmerhale.com

Nana Wilberforce
WILMER CUTLER PICKERING HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400
E-mail: Nana.wilberforce@wilmerhale.com

*Counsel for Cargill, Inc. and Cargill Meat Solutions Corp.*

/s/ Timothy R. Beyer
Timothy R. Beyer
Adam B. Stern
BRYAN CAVE LEIGHTON PAISNER LLP
1700 Lincoln Street, #4100
Denver, CO 80203
Telephone: (303) 866-7000
E-mail: tim.beyer@bclplaw.com
E-mail: adam.stern@bclplaw.com

*Counsel for Agri Beef Co. and Washington Beef, LLC*

*/s/* Richard B. Benenson
Richard B. Benenson, #32566
Martine T. Wells, #42340
Emily R. Garnett, #45047
BROWNSTEIN HYATT FARBER SCHRECK, LLP
410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432
Telephone: (303) 223-1100
Fax: (303) 223-1111
E-mail: rbenenson@bhfs.com
E-mail: mwells@bhfs.com
E-mail: egarnett@bhfs.com

David L. Hashmall, #138162
FELHABER LARSON
220 South Sixth Street, Suite 2200
Minneapolis, Minnesota 55402
Telephone: (612) 339-6321
Fax: (612) 338-0535
E-mail: dhashmall@felhaber.com

*Counsel for American Foods Group, LLC*

*/s/* William L. Monts III
William L. Monts III
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Tel.: (202) 637-5600
Fax: (202) 637-5910
william.monts@hoganlovells.com

*/s/* Peter H. Walsh
Peter H. Walsh
HOGAN LOVELLS US LLP
80 South Eighth Street, Suite 1225
Minneapolis, MN 55402
Tel.: (612) 402-3017
Fax: (612) 339-5167
peter.walsh@hoganlovells.com

*Counsel for Agri Stats, Inc.*

*/s/* John F. Terzaken
John F. Terzaken
Abigail W. Williams
Laurel Fresquez
Jonathan R. Myers
SIMPSON THACHER & BARTLETT LLP
900 G Street, N.W.
Washington, DC 20001
Telephone: (202) 636-5858
Facsimile: (202) 636-5502
E-mail: john.terzaken@stblaw.com
E-mail: abigail.williams@stblaw.com
E-mail: laurel.fresquez@stblaw.com
E-mail: jonathan.myers@stblaw.com

*Counsel for Tyson Foods, Inc.*

*/s/* Desmonne A. Bennett
Desmonne A. Bennett
FAEGRE DRINKER BIDDLE & REATH LLP
1144 Fifteenth Street, Suite 3400
Denver, CO 80202
Phone: (303) 607-3500
Facsimile: (303) 607-3600
desmonne.bennett@faegredrinker.com

Craig S. Coleman
Emily E. Chow
Anderson C. Tuggle
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Phone: (612) 766-7000
Fax: (612) 766-1600
craig.coleman@faegredrinker.com
emily.chow@faegredrinker.com
anderson.tuggle@faegredrinker.com

Kathryn E. Bettini
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, N.W., Suite 1100
Washington, D.C. 20005-1209
Phone: (202) 230-5823

Fax: (202) 842-8465
kathryn.bettini@faegredrinker.com
Jacob D. Bylund
Robert C. Gallup
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA 50309
Phone: (515) 248-4733
Fax: (515) 248-9010
jacob.bylund@faegredrinker.com
robert.gallup@faegredrinker.com

*Counsel for Hormel Foods Corporation*

*/s/* Brian Byrne
Brian Byrne
CLEARY GOTTLIEB STEEN & HAMILTON LLP
bbyrne@cgsh.com
1841 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 815-4110
Facsimile: (650) 815-4199

Carl Lawrence Malm
Blair Kuykendall
CLEARY GOTTLIEB STEEN & HAMILTON LLP
lmalm@cgsh.com
bkuykendall@cgsh.com
2112 Pennsylvania Ave., NW
Washington, DC 20037
Telephone: (202) 974-1500
Facsimile: (202) 974-1999

*Counsel for Iowa Premium, LLC*

*/s/* Marc E. Kasowitz
Marc E. Kasowitz
Daniel J. Fetterman
Kenneth R. David
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Fax: (212) 506-1800

45

MKasowitz@kasowitz.com
DFetterman@kasowitz.com
KDavid@kasowitz.com

Jonathon Watson
Joseph Hunt
SPENCER FANE LLP
1700 Lincoln Street, Suite 2000
Denver, CO 80203
Telephone: (303)-839-3800
Fax: 303-839-3838
jmwatson@spencerfane.com
jhunt@spencerfane.com

*Counsel for JBS USA Food Company*

*/s/* Amy B. Manning
Amy B. Manning
Sarah A. Zielinski
Kali M. Yallourakis
MCGUIREWOODS LLP
77 West Wacker Drive, Suite 4100
Chicago, IL 60601-1818
Telephone: (312) 849-8100
E-mail: amanning@mcguirewoods.com
E-mail: szielinski@mcguirewoods.com
E-mail: kyallourakis@mcguirewoods.com

*Counsel for Smithfield Foods, Inc. and Smithfield Packaged Meats Corp.*

*/s/* Andrew K. Glenn
Andrew K. Glenn, #45018
A. James Spung*
HUSCH BLACKWELL LLP
1801 Wewatta Street, Suite 1000
Denver, CO 80202
Tel: 303.749.7200
Fax: 303.749.7272
andrew.glenn@huschblackwell.com
james.spung@huschblackwell.com
*Admitted to practice pending admission.

Christopher Smith
Sarah Zimmerman
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Tel: 314.480.1500
Fax: 314.480.1505
Chris.smith@huschblackwell.com
Sarah.zimmerman@huschblackwell.com

*Counsel for Triumph Foods, LLC*

/s/ Chad D. Williams
Chad D. Williams
DAVIS, GRAHAM & STUBBS LLC
1550 17th Street, Suite 500
Denver, Colorado 80202
Telephone: 303-892-7474
chad.williams@dgslaw.com

*Counsel for Seaboard Foods, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 17, 2023, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

*s/ Michael F. Tubach*
Michael F. Tubach