# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

RON BROWN, *et al.*,

           Plaintiffs,

    v.

JBS USA FOOD COMPANY, *et al.*,

           Defendants.

CIVIL ACTION NO. 1:22-CV-02946

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS

## I.    INTRODUCTION

Plaintiffs' Complaint describes a conspiracy to suppress compensation for red meat workers in rare detail. As is typical in wage suppression cases, the conspiracy operated through a series of information exchanges—including formal surveys, in-person meetings, emails, and phone calls—where Defendants shared their current and future compensation plans with one another and provided mutual assurances that they would limit competition for red meat workers. The Complaint meticulously documents each facet of the conspiracy with excerpts from Defendants' surveys, copies of their emails, and statements from Defendants' current and former employees, who admitted that Defendants' information exchanges were "inconsistent with federal antitrust law" and that Defendants sought "to reduce and eliminate competition" for labor.

Dismissing these remarkably specific allegations as "speculation," Defendants argue that Plaintiffs have not adequately pleaded a *per se* unlawful conspiracy to suppress compensation. Their argument, however, overlooks three admissions from Defendants' employees conceding the existence and contours of the conspiracy. Defendants likewise disregard strong circumstantial evidence of a *per se* unlawful agreement, including parallel conduct and plus factors.

Plaintiffs have also alleged more than enough facts to show that Defendants agreed to exchange competitively sensitive information in violation of the rule of reason. The Complaint shows that these information exchanges had the purpose and effect of suppressing Class Members' wages. Data from seven Defendant Processors[1] across as many states shows that Defendants placed identical caps on wage growth at their processing plants and that wages paid by different plants converged during the Class Period. Given this direct evidence that the information exchanges had anticompetitive effects, Plaintiffs do not need to define a relevant labor market and show that Defendants exercised power within that market. Nevertheless, Plaintiffs have done so.

Defendants next argue that Plaintiffs' claims are time-barred. Defs.' Joint Mot. to Dismiss at 31-37, ECF No. 164 ("Br."). But the limitations period was tolled because the Complaint alleges, with requisite particularity, that Defendants fraudulently concealed each facet of the conspiracy. And Plaintiffs have also pled that Defendants committed multiple conspiratorial acts within the limitations period, thus warranting application of the continuing conspiracy exception.

Finally, Defendants argue that the Named Plaintiffs, who were hourly-paid workers, lack standing to assert claims for salaried workers. Br. at 37-40. But because hourly and salaried workers in red meat processing plants were affected by the same anticompetitive conduct, this argument is baseless.

---

[1] The term "Defendant Processors" refers to Agri Beef Co.; American Foods Group, LLC; Cargill, Inc.; Cargill Meat Solutions Corp.; Hormel Foods Corp.; Iowa Premium LLC; JBS USA Food Co.; National Beef Packing Co., LLC; Perdue Farms, Inc.; Seaboard Foods, LLC; Smithfield Foods Inc.; Smithfield Packaged Meats Corp.; Triumph Foods, LLC; Tyson Foods, Inc.; and Washington Beef, LLC.

## II.    FACTUAL BACKGROUND

The Complaint documents a multifaceted conspiracy to fix and depress the compensation paid to employees at red meat processing plants. The architects of this conspiracy include Defendant Processors and their subsidiaries who collectively produce approximately 80 percent of the red meat sold in the United States. ¶¶ 2, 29-110.[2]

The Complaint details how Defendant Processors formed a secret Red Meat Survey Group to design annual Red Meat Industry Compensation Surveys, through which Defendants exchanged information about their current and future compensation paid to dozens of categories of red meat processing workers. ¶¶ 154-225. While Defendant Processors hired a compensation consulting firm, Webber, Meng, Sahl and Company, Inc. ("WMS"), to administer the survey, ¶156, Defendant Processors retained complete control over the contents of the survey and list of survey participants. ¶¶ 160-225. WMS's President, Jonathan Meng, repeatedly warned Defendant Processors that their survey was "improperly exchanging future compensation data in a manner that was inconsistent with federal antitrust law," ¶ 8, but those warnings went unheeded for years. Ultimately, Mr. Meng concluded that Defendants Processors hired WMS to create a "veneer of legality." *Id.*

The Red Meat Survey Group also held secret annual Red Meat Industry Compensation Meetings, where Defendant Processors' senior executives spent hours discussing the results of the surveys and fixed Class Members' wages. ¶¶ 9-13, 226-66. At the start of these meetings, Mr. Meng would summarize the survey results; then, Defendant Processors excused him from the room "to allow for entirely private roundtable sessions to proceed." ¶ 243.

---

[2] References to "¶" are citations to the Corrected Class Action Complaint, ECF No. 23-1.

Defendants implemented and monitored their conspiracy through at least three other avenues. First, Defendant Processors' executives communicated directly with each other over email and on the phone to exchange and discuss compensation data. ¶¶ 14-15, 267-72. As one executive put it, they conducted "weekly telephone calls" to obtain wage data from others "to *reduce and eliminate competition with those competing pork processors for labor*." ¶¶ 268-69 (emphasis added). Second, Defendant Processors entered into illegal "no poach" agreements that prohibited them from recruiting each other's employees at red meat processing plants. ¶¶ 18-19, 306-16. Third, each month, the Pork Processor Defendants[3] exchanged detailed, current, and non-public compensation information through Agri Stats, a secretive consulting company, using sham anonymization to conceal the illicit nature of the exchange. ¶¶ 16-17, 273-305.

All these methods of implementing and monitoring the conspiracy worked. The actions of Defendant Processors, which collectively possess the requisite market power to suppress compensation, ¶¶ 330-63, caused their workers' wages, salaries, and benefits to be materially lower than would have been in a competitive market since 2014, ¶¶ 21, 317-21.

## III.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[4] "In considering whether the complaint's allegations are sufficient, the court first eliminates conclusory allegations, mere labels and conclusions, and any formulaic recitation of the elements of a cause of action. The court then accepts as true all well-pled factual allegations and considers whether they plausibly give rise

---

[3] The term "Pork Processor Defendants" refers to Hormel Foods Corp.; JBS USA Food Co.; Seaboard Foods, LLC; Smithfield Foods, Inc.; Triumph Foods, LLC; and Tyson Foods, Inc.

[4] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

to an entitlement to relief."[5] "In conducting this analysis, the court draws all reasonable inferences in favor of the plaintiff."[6] An alleged conspiracy need not be "probable," but only "plausible," and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."[7]

## IV.    ARGUMENT

### A.    Defendants Misstate the Governing Legal Standard.

Defendants' arguments turn on two key misstatements of the law governing motions to dismiss. First, repeatedly pulling a snippet from *Twombly* out of context, Defendants argue that Plaintiffs' allegations must "'tend[] to exclude the possibility' that the parties acted independently." Br. at 20 (quoting *Twombly*, 550 U.S. at 554). This, however, is the standard on a motion for summary judgment, not on a motion to dismiss. The full quote from *Twombly* reads: "*at the summary judgment stage* a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently."[8] By contrast, when actually addressing the pleading standard for a motion to dismiss, the Supreme Court in *Twombly* held that a plaintiff need only allege "plausible grounds to infer an agreement" among defendants.[9]

Likewise, in *Llacua v. Western Range Association*,[10] the Tenth Circuit quoted *Twombly*'s recitation of the summary judgment standard to note that the "Supreme Court has long warned courts to be hesitant" at the summary judgment stage "about inferring concerted action from

---

[5] *Bledsoe v. Carreno*, 53 F.4th 589, 606 (10th Cir. 2022) (cleaned up).
[6] *Id.* at 607 (cleaned up).
[7] *Twombly*, 550 U.S. at 556 (cleaned up).
[8] *Id.* at 554 (cleaned up) (emphasis added).
[9] *Id.* at 554-56.
[10] *Llacua v. W. Range Ass'n*, 930 F.3d 1161 (10th Cir. 2019).

evidence that is merely circumstantial."[11] But *Llacua* also cautioned that there is no "probability requirement at the pleading stage," where plaintiffs need only allege "enough facts to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement."[12] Here, Plaintiffs have more than cleared this hurdle.[13]

Second, Defendants incorrectly assert that the "whole" of the Complaint cannot be "greater than the sum of its parts." Br. at 1. Courts analyzing antitrust cases have long recognized the opposite rule: "While no single piece of information may win the day, the whole may be greater than the sum of its parts . . . ."[14] Considering the Complaint as a whole, as *Continental Ore* requires, it is more than plausible that Defendants conspired to suppress Plaintiffs' compensation.

## B.    Plaintiffs Have Plausibly Alleged a *Per Se* Claim.

Plaintiffs can plead a *per se* antitrust claim with "direct or circumstantial evidence, or a combination of the two."[15] The Complaint is replete with both direct and circumstantial evidence that Defendants formed a *per se* unlawful conspiracy to suppress Class Members' compensation.[16]

---

[11] *Id.* at 1179 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (summary judgment case)).

[12] *Id.* at 1179 n. 28.

[13] And even if the summary judgment standard applied, Plaintiffs' allegations, taken as true and as a whole, *do* tend to exclude the possibility that Defendants were acting independently.

[14] *Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 934 (7th Cir. 2018); *see also Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."); *Beltran v. InterExchange, Inc.*, 176 F. Supp. 3d 1066, 1073 (D. Colo. 2016) (courts consider allegations of an antitrust conspiracy "as a whole").

[15] *Suture Express, Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1223-24 (D. Kan. 2013) (internal quotation marks omitted); *see also Llacua*, 930 F.3d at 1174 ("[T]he facts showing [an antitrust] agreement can be direct or circumstantial.").

[16] *See Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 624 (E.D. Mich. 2012) ("[A] conspiracy among competing hospitals to fix wages, like an analogous horizontal price-fixing conspiracy, would be subject to *per se* treatment.").

### 1.  The Complaint Contains Direct Evidence of a Conspiracy.

The Complaint presents direct evidence that Defendants conspired to suppress compensation paid to Class Members. Direct evidence "is explicit and requires no inferences to establish" the conspiracy.[17] Plaintiffs are rarely able to offer direct evidence of an anticompetitive conspiracy at any stage of litigation, let alone prior to discovery.[18] Here, Plaintiffs *have* included direct evidence in the Complaint, including statements from Defendants' employees that establish an unlawful agreement.[19] These employee statements—construed, as they must be, in Plaintiffs' favor—are sufficient to state a Sherman Act claim, even if they stop short of describing the conspiracy in detail.[20]

For example, Defendant WMS's President, Jonathan Meng—who helped red meat processors exchange compensation information—provided direct evidence of a conspiracy to suppress compensation when he admitted that Defendant Processors were using WMS to "improperly exchang[e] future compensation data in a manner that was inconsistent with federal antitrust law." ¶ 8. This admission is more specific and unequivocal than the direct evidence in *Jien*, which the court found sufficient to defeat a motion to dismiss.  In *Jien*, the court held that a Tyson employee had provided direct evidence of a *per se* conspiracy to suppress compensation

---

[17] *Llacua*, 930 F.3d at 1177.

[18] *Beltran*, 176 F. Supp. 3d at 1072 ("[B]ecause direct evidence of concerted action is 'so rare,' the antitrust law has 'granted fact finders some latitude to find collusion or conspiracy from parallel conduct and inferences drawn from the circumstances.'" (quoting *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1450-51 (9th Cir. 1988))).

[19] *Beltran*, 176 F. Supp. 3d at 1073-74 (employee admissions are direct evidence).

[20] *See Jien v. Perdue Farms, Inc.*, 2020 WL 5544183, at *6 (D. Md. Sept. 16, 2020) ("*Jien I*") ("Defendants rightly point out that Plaintiffs' direct evidence is light on specifics, in terms of what precisely was 'inappropriate' about the secret meetings, or what 'collaboration' specifically occurred. Plaintiffs do not pinpoint the date of the supposed agreement to fix wages, the participants in the original agreement, or many of the mechanics of how the agreement worked. Yet such details are not required at this early stage in proceedings." (citation omitted))

when he admitted, without further explanation, that poultry processors' annual compensation meetings were "so inappropriate and improper" that Tyson stopped attending them.[21]

Other Defendant employee witnesses provided further direct evidence of the conspiracy. For example, a former Seaboard executive admitted that Seaboard was part of a "group" of "competing pork processors" that was "head[ed]" by Seaboard's Trudie Diaz-Farmer. ¶ 268. The Seaboard executive confessed that Ms. Diaz-Farmer made "weekly telephone calls" to obtain wage data from other members "to align [Seaboard's] hourly and salaried workers' compensation schedules with the compensation schedules of competing pork processors" and "*reduce and eliminate competition with those competing pork processors for labor*." ¶¶ 268-69.[22]

Moreover, a former executive of Iowa Premium admitted that its CEO and the complex manager of a JBS plant in Iowa "agreed that Iowa Premium would not recruit or poach employees from the JBS Marshalltown plant and that the JBS Marshalltown plant would not recruit or poach employees from Iowa Premium." ¶ 312. Such no-poach agreements can, and often are, part and parcel of broader conspiracies to suppress compensation. As *Animation Workers* explained it:

> Plaintiffs have alleged that Defendants systematically shared information, agreed not to solicit each other's employees, and that the purpose of the information sharing and no-poach scheme was to suppress wages. Taking these allegations as true, and drawing all reasonable inferences in favor of Plaintiffs, the Court finds that these allegations raise a plausible inference that Defendants entered into an express agreement to suppress compensation.[23]

---

[21] *Jien I*, 2020 WL 5544183, at *5.

[22] *Cf. Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 159, 162 (N.D.N.Y. 2010) (denying summary judgment on a *per se* wage fixing claim where Defendants allegedly exchanged data to "depress wages" through "softened competition").

[23] *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1214 (N.D. Cal. 2015); *see also United States v. Manahe*, 2022 WL 3161781, at *8 (D. Me. Aug. 8, 2022) ("The charged conspiracy here combines the restraints that those courts deemed per se illegal: wage-fixing and 'no-poach' or 'no-hire' agreements." (citation omitted)).

Here, Defendants' employees have admitted that they engaged in the same misconduct. Taken together, these admissions provide direct evidence of the key contours of Defendants' conspiracy to suppress compensation.[24] This is "sufficient to allow Plaintiffs' claims of a *per se* wage fixing conspiracy to clear the low 'plausibility' bar."[25]

### 2. The Complaint Contains Circumstantial Evidence of a Conspiracy.

The Complaint also contains robust circumstantial evidence that Defendants conspired to suppress Plaintiffs' compensation. This evidence—considered with the direct evidence described above or on its own—raises a plausible inference of a conspiracy.

#### a. Defendants Misstate the Types of Circumstantial Evidence that Can Support an Inference of Conspiracy.

Defendants incorrectly assert that the only type of circumstantial evidence that can support an inference of conspiracy is "parallel conduct and 'plus factors.'" Br. at 11. Courts have long recognized, however, that "while evidence of parallel conduct provides one means by which a plaintiff in a § 1 case may make a circumstantial showing of concerted activity, the case law establishes no hierarchy of the sorts of circumstantial evidence a plaintiff must produce."[26]

---

[24] *See Jien I*, 2020 WL 5544183, at *5-6 (an employee's inculpatory statements regarding *part* of a multifaceted conspiracy was sufficient direct evidence at the pleading stage).

[25] *Id.* at *6.

[26] *Cason-Merenda*, 862 F. Supp. 2d at 627-28; *see also Compass, Inc. v. Real Est. Bd. of New York, Inc.*, 2022 WL 992628, at *9 (S.D.N.Y. Mar. 31, 2022) ("[E]vidence of parallel pricing is not a prerequisite to a finding of an agreement based on circumstantial evidence."); *Boland v. Consol. Multiple Listing Serv.*, 868 F. Supp. 2d 506, 514 (D.S.C. 2011) (denying motion to dismiss where plaintiffs "do not rest their section one claims on descriptions of parallel business conduct. Instead, the Plaintiffs allege that the Defendant board members actually met and reached agreements to adopt certain by-laws and regulations."); *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 163-66 (3d Cir. 2003) (considering parallel conduct only after determining there was insufficient other circumstantial evidence of the alleged antitrust conspiracy); *In re Auto. Parts Antitrust Litig.*, 2014 WL 4209588, at *3 (E.D. Mich. Aug. 26, 2014) (denying motion to dismiss "[a]lthough Plaintiffs in this case do not allege parallel conduct").

"Rather, circumstantial evidence of any sort will do . . . ."[27] Plaintiffs have flexibility in pleading antitrust claims because "the law does not require every defendant to participate in the conspiracy by identical means throughout the entire class period."[28]

In price-fixing cases, plaintiffs often rely on parallel pricing and plus factors to establish a conspiracy, because those are the forms of circumstantial evidence that are "most likely . . . [to] manifest [themselves] to outsiders—and potential plaintiffs."[29] In wage-fixing cases, by contrast, parallel wages are less likely to be the tipoff that competitors are conspiring for at least two reasons. First, wage scales in many industries (including the red meat industry) are unavailable to the public, making it difficult for potential plaintiffs to know whether wages or wage movements are parallel. *See, e.g.*, ¶ 318 ("Defendant Processors' compensation data is not public").[30] Second, many instances of wage "fixing" do *not* involve an effort to set wages at the exact same rate; instead, competitors may agree to set wages "within a range,"[31] limit wage increases, or simply "soften[]" competition for a particular group of employees, resulting in slower wage growth but not necessarily parallel compensation.[32] Consequently, plaintiffs in wage-fixing cases can (and often do) rely on circumstantial evidence other than parallel conduct.[33]

Here, the Complaint describes parallel actions to suppress compensation and several plus factors. These plus factors are so strong that, even taken as stand-alone circumstantial evidence

---

[27] *Cason-Merenda*, 862 F. Supp. 2d at 627-28.

[28] *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 114 (S.D.N.Y. 2010) (cleaned up); *see also In re Turkey Antitrust Litig.*, 2022 WL 17093359, at *7 (N.D. Ill. Nov. 21, 2022).

[29] *Cason-Merenda*, 862 F. Supp. 2d at 626.

[30] *Fleischman*, 728 F. Supp. 2d at 137 (information about nurse wages was non-public).

[31] U.S. Dep't of Just. & Fed. Trade Comm'n, *Antitrust Guidance for Human Resource Professionals* 3 (2016), https://www.justice.gov/atr/file/903511/download ("DOJ Guidelines").

[32] *Fleischman*, 728 F. Supp. 2d at 159.

[33] *Cason-Merenda*, 862 F. Supp. 2d at 627-28; *Fleischman*, 728 F. Supp. 2d at 159.

(without parallel conduct), they would be sufficient to support an inference of a conspiracy.[34]

### b. Defendants Engaged in Parallel Conduct.

Even without the benefit of discovery, Plaintiffs have obtained significant evidence suggesting that Defendants placed parallel restraints on compensation increases. For instance, the Complaint alleges that, in 2017 and 2018, *at least* seven Defendants capped wage increases for their plants at exactly two percent. ¶¶ 319-20. Defendants claim that this evidence is insufficient to show parallel conduct because it only reflects wage data from 15% of red meat processing plants. Br. at 11-12. This argument ignores Plaintiffs' allegation that "[e]ach Defendant Processor established a pay structure to accomplish internal equity." ¶ 363. In other words, each Defendant Processor paid workers at all of their plants about the same amount for the same work.[35] ¶ 363. The Complaint also shows that, consistent with this allegation, multiple Defendants limited wage increases by the same amount for their plants *across several states*. ¶¶ 319-20. It is therefore plausible that the seven Defendants capped wage increases at 2% for *all* of their plants. *Id.*

---

[34] None of the cases cited by Defendants undermine this conclusion. In *Lifewatch Servs. Inc. v. Highmark Inc.*, the Third Circuit held that, when a plaintiff *does* rely on "allegations of parallel conduct," the plaintiff "must allege both parallel conduct and something 'more,' which we have sometimes called a 'plus factor.'" 902 F.3d 323, 333 (3d Cir. 2018) (cleaned up). Because the plaintiff in *Lifewatch* alleged parallel conduct, the court had no occasion to consider whether other types of circumstantial evidence, taken alone, can give rise to an inference of conspiracy. Similarly, in *Park Irmat* and *Cedar Shakes*, the plaintiffs relied heavily on allegations of parallel conduct, giving the court no opportunity to consider circumstantial evidence strong enough to stand on its own. *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516 (8th Cir. 2018); *In re Cedar Shakes & Shingles Antitrust Litig.*, 2020 WL 832324, at *7 (W.D. Wash. Feb. 20, 2020). Finally, while *Jien I* concluded that "parallel conduct is required" for a compensation-fixing claim resting on circumstantial evidence, its analysis on this narrow point was (a) out of step with the majority of courts addressing the issue, *supra* n. 26, and (b) based on a misapplication of Fourth Circuit law. *Jien I*, 2020 WL 5544183, at *7 n. 8 (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424 (4th Cir. 2015)). *SD3*, like the other cases cited by Defendants, concludes that, when an antitrust plaintiff relies on parallel conduct, she must plead "something more." 801 F.3d at 424 (cleaned up). *SD3*, however, had no occasion to consider the issue that *Jien I* claims it resolved—whether a plaintiff in a wage-fixing case *must* rely on allegations of parallel conduct.

[35] *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791 (N.D. Ill. 2017) ("parallel conduct need not be exactly simultaneous and identical" to infer "agreement") (cleaned up).

Defendants also fault Plaintiffs for describing parallel wage caps for 2017 and 2018 instead of the entire Class Period. Br. at 11-12. Plaintiffs, however, present *other* parallel wage and salary data from numerous other points from most of the years in the Class Period. *See, e.g.*, ¶ 321. Defendants cannot "dismember[]" Plaintiffs' parallel wage allegations and then claim that each one—taken in isolation—is insufficient to support an inference of a conspiracy.[36]

In addition to alleging parallel compensation restraints, the Complaint shows that, from 2014 to 2018, Defendants' wages became more closely aligned. ¶ 321. For example, "[i]n Dodge City, Kansas, where both National Beef and Cargill compete for workers at their beef-processing plants, the difference between the average hourly wages paid to production workers at both plants decreased from $0.53 in 2014 to $0.01 in 2017." *Id.* (collecting examples). Again, Defendants claim these allegations are too limited in geographic scope without accounting for Plaintiffs' internal equity allegations and too limited in time without accounting for Plaintiffs' other allegations of misconduct throughout the Class Period, contravening *Continental Ore*.[37]

Dismissing these robust allegations as thin "reeds," Defendants suggest that the Complaint is deficient because it does not present complete or near-complete compensation schedules from every Defendant. But such complete data is not required prior to discovery, especially where (as here) such wage data is not publicly available. ¶ 318. As *Twombly* explains, "a complaint attacked by a Rule 12(b)(6) motion to dismiss *does not need detailed factual allegations*"; plaintiffs only need "enough fact to raise a reasonable expectation that *discovery will reveal evidence* of illegal

---

[36] *Cont'l Ore*, 370 U.S. at 699.
[37] *Cont'l Ore*, 370 U.S. at 699.

agreement."[38] Plaintiffs' alleged compensation data from seven Defendants across ten states—together with the direct evidence described above and the plus factors described below[39]—is sufficient to raise a reasonable expectation that *discovery* will unearth further parallel compensation restrictions. No more is required now.[40]

Finally, Defendants ignore Plaintiffs' allegations that Defendants participated in parallel information exchanges. As Defendants themselves acknowledge, "parallel conduct" encompasses not only parallel pricing, but other "substantially similar actions taken by actors on the same level." Br. at 12 (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 296 F. Supp. 3d 442,

---

[38] *Twombly*, 550 U.S. at 545 (emphasis added); *see In re Processed Egg Prods. Antitrust Litig.*, 902 F. Supp. 2d 704, 710 (E.D. Pa. 2012) (plaintiffs need not "plead each defendant's involvement in the alleged conspiracy in elaborate detail"); *City of Philadelphia v. Bank of Am.*, 498 F. Supp. 3d 516, 527 (S.D.N.Y. 2020) ("Conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with precision.") (cleaned up).

[39] *Beltran*, 176 F. Supp. 3d at 1073-79 (considering the combined weight of direct and circumstantial evidence).

[40] *Cf. In re Broiler Chicken*, 290 F. Supp. 3d at 788 (plaintiffs plausibly alleged a conspiracy to inflate the price of chicken meat, despite a lack of "alleged details about the formation, operation, and communications constituting the conspiracy"). None of the cases cited by Defendants compel a contrary conclusion. In *Jien I*, the (then operative) complaint did "not compare the compensation offered by any of the parties *at any point*, nor d[id] [it] examine how wages changed before and after the Defendants' alleged 2009 agreement to fix employee pay." *Jien I*, 2020 WL 5544183, at *8 (emphasis added). Here Plaintiffs have done both. ¶¶ 319-20 (comparing Defendants' specific wages); ¶ 321 (explaining how wages changed after the onset of the conspiracy in 2014). In *LaFlamme*, the plaintiffs affirmatively "plead[ed] disagreement among defendants, action by only some defendants and no action by other defendants, or action by a solitary defendant." *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 151 (E.D.N.Y. 2010). Here, by contrast, Plaintiffs plead concerted action by all Defendants and no disagreement among them, and the pre-discovery evidence suggests that Defendants uniformly suppressed compensation. In *Hogan*, the Court held that allegations about one firm's production cuts did "not establish parallel conduct" absent detail about "how these [cuts] compared to competitors' cuts." *Hogan v. Pilgrim's Pride Corp.*, 2018 WL 1316979, at *7 (D. Colo. 2018). But here Plaintiffs have shown alignment of *at least seven* Defendants' compensation decisions. In *Washington County*, the court questioned the "probative force" of alleged parallel recalls that did "not occur in a predictable pattern or scale." *Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 832-36 (N.D. Ill. 2018). Here, however, Plaintiffs have alleged simultaneous, nearly identical compensation decisions. And in *Interest Rate Swaps*, the plaintiffs relied on allegations of "parallel *inaction*" that were "largely pled generally and collectively," in contrast to the Plaintiffs here, who allege simultaneous actions by specific Defendants to restrict compensation at specific plants. *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 463-65 (S.D.N.Y. 2017).

460 n. 26 (E.D.N.Y. 2017)).[41] Here, the vast majority of Defendants acted together and in parallel to design and implement the Red Meat Industry Compensation Surveys and to attend, and discuss their compensation practices at, Red Meat Industry Compensation Meetings. ¶¶ 154-266.[42] Nearly all Defendants systematically exchanged current and future compensation information with one another through phone calls and emails, ¶¶ 267-72, and the Pork Processing Defendants exchanged current and future compensation data through Agri Stats. ¶¶ 273-305. These types of exchanges are archetypally anti-competitive and show a concerted effort to suppress compensation.[43]

### c. The Complaint Alleges Several Plus Factors.

The Complaint also alleges numerous plus factors that, taken alone or with the parallel conduct described above, raise an inference that Defendants conspired.

### i. Defendants participated in highly suspect information exchanges.

Defendants systematically exchanged current and future compensation data in ways that would make no economic sense in the absence of a conspiracy.[44] First, at annual Red Meat Industry

---

[41] *See also, e.g.*, *SD3*, 801 F.3d at 427 (parallel conduct involved parallel refusals to use a particular technology).

[42] *Cf. In re Turkey*, 2022 WL 17093359, at *7 (finding parallel conduct where all defendants participated in some conspiratorial acts and "eight of the ten Defendants" allegedly participated in a particular production cut).

[43] *Jien I* held that defendants' participation in information exchanges did not constitute parallel conduct in the absence of allegations showing how "wages actually moved during the relevant period for specific [d]efendants, or how [d]efendants actually acted in concert together to set wages." 2020 WL 5544183, at *8. Unlike the then-operative complaint in *Jien*, the Complaint here presents specific wage data from specific defendants, confirming that the information exchanges caused wages for specific Defendants to move together. ¶¶ 319-21. Moreover, to the extent *Jien I* is suggesting that information exchanges cannot constitute parallel conduct because information exchanges are "neither illegal nor inherently collusive," 2020 WL 5544183, at *8, the opinion is incorrect. *Most* parallel conduct—including parallel pricing—is neither illegal nor inherently collusive. *White v. R.M. Packer Co.*, 635 F.3d 571, 577 (1st Cir. 2011). Indeed, the parallel conduct at issue in *Twombly* was "lawful." 550 U.S. at 556-57. That is why parallel conduct must be combined with plus factors to give rise to an inference of collusion. *Id.*

[44] *See, e.g., Fleischman*, 728 F. Supp. 2d at 159-62 (information exchanges can be a plus factor); *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (an information exchange "can help support an inference of" a price- or wage-fixing agreement).

Compensation Meetings, Defendants excused WMS's Jonathan Meng—the Survey consultant who, by his own admission, was hired to stay "in the room" with Defendant Processors and create an appearance of antitrust compliance—from the room so they could have complete privacy for hours-long discussions about their compensation practices. ¶¶ 10, 243. Notably, "[e]ach member of the Red Meat Survey Group paid a flat annual rate to WMS," ¶ 162, and paid for WMS's Jonathan Meng to attend "the first and/or second roundtable session to present the results" of the survey. ¶ 235. Thus, it would have cost Defendants nothing to have him attend *all* of their compensation discussions. Yet they pointedly "asked and expected him to leave" the room after his presentation "to allow for entirely private roundtable sessions to proceed." ¶ 243. This behavior is difficult to explain absent unlawful collusion.[45] The behavior is also sufficient to distinguish *Jien*, where the then-operative complaint lacked such allegations.

Prior to each such annual Meeting, Defendant Processors also exchanged highly confidential and competitively sensitive compensation data through annual Red Meat Industry Compensation Surveys. ¶¶ 180, 226. These Surveys, which were entirely designed and controlled by Defendant Processors, featured current and future compensation rates for dozens of red meat processing plant positions. ¶¶ 6-7, 154. At the same time, the Pork Processor Defendants were

---

[45] *Cf.*, *e.g.*, *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1076 (D. Kan. 2009) (inferring a conspiracy in part from the "specific measures taken by the participants to keep th[eir] meetings and communications secret"); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1265 (10th Cir. 2014) (affirming the jury's verdict for plaintiffs where plaintiffs' expert was struck by the "secrecy of [defendants'] communications"); *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 983 (N.D. Ohio 2015) ("[W]here upper level executives [with pricing authority] have *secret* conversations about price; such discussions may support an inference of conspiracy." (citing *In re Flat Glass Antitrust Litig.*, 385 F.3d 350,368-69 (3d Cir. 2004) (emphasis added)); *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 324 (2d Cir. 2010) (inferring conspiracy in part because "defendants attempted to hide their MFNs…in a secret side letter" due to "legal/antitrust reasons").

exchanging, on a monthly basis, disaggregated and decodable compensation data regarding the wages of their plant workers through Agri Stats. *See e.g.* ¶¶ 60, 301, 383.

While Defendants attempt to characterize all these information exchanges as innocuous, Br. at 14-19, those exchanges (through the meetings, surveys, emails, private phone calls, and Agri Stats reports) included current and future compensation data, much of which was non-anonymous or easily deanonymized. ¶¶ 296-299, 378. In a competitive market, if a company shares its current or future compensation data with rivals, those rivals could use it to "poach" the company's workers by offering better pay.[46] Thus, Defendants' data exchange with their rivals "is persuasive evidence that Defendants did not act independently."[47] And that evidence is particularly powerful here because Mr. Meng warned Defendant Processors "that they were improperly exchanging future compensation data in a manner that was inconsistent with federal antitrust law." ¶ 8. Yet "Defendant Processors paid his warnings no heed for years." *Id.*. Absent a conspiracy, this behavior makes little sense.[48]

### ii. Defendants' direct communications regarding compensation support the plausibility of the conspiracy.

Beyond mere allegations, the Complaint proffers evidence of improper direct communications among Defendants regarding current and future compensation. These include:

- Weekly calls from a Seaboard HR executive to HR employees of competing pork processors to obtain "pay ranges for both hourly-paid workers and salaried workers" at those processors' plants, which Seaboard then used "to align its own hourly and salaried workers' compensation schedules with the compensation schedules of competing pork

---

[46] *Fleischman*, 728 F. Supp. 2d at 162; *Cason-Merenda*, 862 F. Supp. 2d at 630.
[47] *Fleischman*, 728 F. Supp. 2d at 162; *see also Cason-Merenda*, 862 F. Supp. 2d at 630.
[48] *See Cason-Merenda*, 862 F. Supp. 2d at 630 (inferring conspiracy where, "rather than relying on such third-party surveys that fully comported with the DOJ/FTC Guidelines, the Defendant hospitals time and again sought and obtained RN wage-related information through direct contacts and surveys that fell short of the DOJ/FTC 'safety zone' criteria").

processors" and "to reduce and eliminate competition with those competing pork processors," ¶¶ 268-69;

- Group emails among executives of competing processors, including an "ad-hoc survey" regarding "Supervisor Weekend Pay & Bonus eligibility," ¶ 270;

- An April 20, 2015 email from a Tyson VP requesting that competitors provide their "projected FY16 increase percentage for hourly production non-union" wages ¶ 271;[49]

- JBS provided Iowa Premium data regarding "both current and future wages" for workers at JBS's Marshalltown processing plant, which Iowa Premium used "to help determine how much to pay and offer to pay current and future workers at Iowa Premium." ¶ 272.

Defendants contend that these communications "only describe lawful information exchanges." Br. at 19. This is nonsense. Defendants' exchange of *current and future* compensation information, as well as the exchange of it *directly* between Defendants, did not fall within the Department of Justice's ("DOJ") "Safe Harbor Guidelines,"[50] which (at the time) established an antitrust safety zone for competitors exchanging certain information.

### iii. Structural characteristics of the red meat industry are "plus factors" that facilitate collusion.

Courts have repeatedly recognized that high barriers to entry and industry concentration make an industry more conducive to collusion.[51] The Tenth Circuit agrees. In upholding the jury's

---

[49] In an effort to conceal this improper exchange of *future* compensation data, Jonathan Meng of WMS warned that Survey participants should "not formally distribute a question pertaining to 2016 increases unless it refers specifically to union contracts that are in place for 2016." *Id.*

[50] To fall within the safe harbor, information exchanges had to be managed by a third-party and include only data "more than three months old." *See* U.S. Dep't of Just. & Fed. Trade Comm'n, *Statements of Antitrust Enforcement Policy in Health Care* 45 (1996), https://www.justice.gov/atr/page/file/1197731/download. Moreover, the DOJ's "overly permissive" and "out of date" statements no longer provide safe harbor for information exchanged through a third-party or among five or more participants. https://www.justice.gov/opa/pr/justice-department-withdraws-outdated-enforcement-policy-statements.

[51] *See, e.g.*, *In re Cal. Bail Bond Antitrust Litig.*, 511 F. Supp. 3d 1031, 1045-46 (N.D. Cal. 2021) (plus factors included trade association meetings and entry barriers); *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 775 (D. Minn. 2020) (plus factors included high market concentration, entry barriers, and annual trade association meetings); *In re Blood Reagents Antitrust Litig.*, 266

verdict in the *Urethane Antitrust Litigation*, the Tenth Circuit found that the polyurethane industry was "ripe for collusion" based on plus factors including industry concentration and high barriers to entry.[52] The Complaint alleges both in detail. ¶¶ 323-324, 329.

Similarly, fungibility of labor and inelastic labor supply are "plus factors" that facilitate collusion. As a simple matter of logic, a wage-fixing conspiracy is more feasible where, as here, Defendants' plant employees are "one hundred percent" interchangeable, as a former National Beef HR director admitted here, ¶ 325, and unlikely to quit if their wages are suppressed. *See* ¶ 326. The case law, including that cited by Defendants,[53] accords with these basic economic principles.[54]

### iv.    The history of collusion in the red meat industry is relevant.

Concern regarding collusion among beef processors helped drive passage of the Sherman Act of 1890,[55] and since then the red meat industry has repeatedly been the subject of DOJ antitrust investigations and consent decrees. ¶ 327. While past collusion alone cannot prove present

---

F. Supp. 3d 750, 772 (E.D. Pa. 2017) (industry concentration and high barriers to entry "make an industry more conducive to collusion"); *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 826 (D. Md. 2013) (industry concentration and entry barriers are "plus factors").

[52] *Urethane*, 768 F.3d at 1265.

[53] *Text Messaging* and *Kleen Products* support Plaintiffs' position. While Defendants cite the inapposite summary judgment decisions in those cases, the decisions *denying* motions to dismiss those cases recognized that a market structure conducive to collusion was a plus factor militating against dismissal. *See Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1081 (N.D. Ill. 2011) (denying motions to dismiss where "the structure of the containerboard industry [including barriers to entry] provides some additional contextual support for the plausibility of a conspiracy"); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627-28 (7th Cir. 2010) (affirming denial of motions to dismiss where "an industry structure that facilitates collusion constitutes supporting evidence of collusion").

[54] *See, e.g.*, *Todd*, 275 F.3d at 211 (reversing dismissal of wage-suppression complaint where labor fungibility and inelastic labor supply made industry susceptible to collusion on wages).

[55] *See* 21 Cong. Rec. 4088, 4098 (May 1, 1890) (statement of Rep. Taylor), https://www.congress.gov/bound-congressional-record/1890/05/01/house-section.

collusion on wages, it is additional evidence that the industry is susceptible to collusion.[56] Other courts have recognized that past or concurrent government investigations can be "plus factors" that render conspiracy allegations more plausible.[57]

## v.   Opportunity to conspire is another plus factor.

Courts have repeatedly held that opportunities to conspire are a plus factor rendering conspiracy allegations more plausible.[58] In addition to the annual Red Meat Industry Compensation Meetings, Defendants' senior executives responsible for setting compensation met at numerous trade association meetings during each year of the Class Period. *See* ¶ 329(a)-(j). These meetings provided ample opportunities to conspire.[59]

---

[56] *See, e.g.*, *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1371 (2d Cir. 1988) ("Prior antitrust violations and the history of competition in a market . . . also may be admissible to establish the intent, motive and method of a conspiracy under Section 1.") (citations omitted).

[57] *See, e.g.*, *Starr*, 592 F.3d at 324 (NY AG and DOJ investigations were a plus factor making conspiracy allegations more plausible); *In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 103 n. 35 (S.D.N.Y. 2021) (NY AG investigation as plus factor); *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 363 (S.D.N.Y. 2019) (DOJ investigation bolsters plausibility of alleged conspiracy); *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 452 (E.D. Pa. 2018) (citations omitted) (same); *In re Blood Reagents*, 756 F. Supp. 2d 623, 632 (E.D. Pa. 2010) (government investigation was a plus factor); *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 723 (S.D.N.Y. 2017) (same); *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 115 (S.D.N.Y. 2011) (same).

[58] *See, e.g.*, *In re Generic Pharms.*, 338 F. Supp. 3d at 449 ("Participation in trade organizations and their meetings 'demonstrates how and when Defendants had opportunities to exchange information or make agreements.'" (quoting *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 723 (E.D. Pa. 2011)); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1242 (3d Cir. 1993) ("[W]ide range of circumstantial evidence can be used to establish needed plus factor, '[f]or example, have they attended meetings or conducted discussions at which they had the opportunity to conspire . . . .'" (quoting William C. Holmes, 1992 Antitrust Law Handbook § 1.03[3], at 154)); *In re Pork*, 495 F. Supp. 3d at 775 (citing plus factors, including opportunity to conspire, in denying motions to dismiss federal antitrust claims); *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 321 (S.D.N.Y. 2018) (opportunity to conspire is a plus factor).

[59] Defendants' cases stand only for the uncontroversial proposition that opportunity to conspire, *standing alone*, does not permit an inference of conspiracy. *See In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 391 (S.D.N.Y. 2019) ("[T]he mere opportunity to conspire does not *by itself* support the inference that such an illegal combination actually occurred." (emphasis added; citation omitted)). Here, however, Defendants' numerous opportunities to conspire are just one of many allegations that, taken together, plausibly allege collusion.

### 3. Plaintiffs' Allegations Tend to Exclude the Possibility that Defendants Acted Independently.

Despite Defendants' misleading use of the summary judgment standard, Plaintiffs' allegations here, taken as true and with all reasonable inferences, *do* tend to rule out the possibility that Defendants acted independently. Defendants play semantic games to contend that "the Complaint acknowledges that Defendants set wages and benefits independently," and that Plaintiffs admit that "Defendants did not agree on compensation schedules." Br. at 24-25. Yet, the mere fact that each Defendant had its "respective" compensation schedule does not imply that they were set independently. The gravamen of the Complaint is that they were set *collusively*.[60]

### C. Plaintiffs Have Plausibly Alleged a Rule of Reason Claim.

Plaintiffs have plausibly alleged both elements of their rule of reason claim: (1) an agreement to exchange compensation information, and (2) "anticompetitive effect[s]" flowing from it.[61] At this stage, Plaintiffs need only allege facts making it "plausible discovery will reveal" an "adverse effect on competition in general."[62] They can show such "anticompetitive effect[s]"

---

[60] The cases cited by Defendants are not to the contrary. *United States v. Suntar Roofing, Inc.*, 897 F.2d 469 (10th Cir. 1990), involved the review—and *affirmance*—of a criminal price-fixing conviction. In *DRAM*, "Plaintiffs [did] not allege facts demonstrating that Defendants actually communicated or exchanged information at these trade association meetings . . . ." *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 52 (9th Cir. 2022). Here, conversely, Plaintiffs provide highly detailed allegations regarding Defendants' exchanges of compensation information and communications about compensation. ¶¶ 154-305. Finally, Defendants cite the decision dismissing the Amended Complaint in *Jien*, but they conspicuously fail to address the decisions *denying* defendants' motions to dismiss the *Jien* plaintiffs' Second Amended Complaint, *Jien v. Perdue Farms, Inc.*, 2021 WL 927456 (D. Md. Mar. 10, 2021) ("*Jien II*"), and denying dismissal of all but one count of the Third Amended Complaint with respect to just two defendants. *Jien v. Perdue Farms, Inc.*, 2022 WL 2818950 (D. Md. July 19, 2022).

[61] *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1310 (10th Cir. 2017). *See also Jien I*, 2020 WL 5544183, at *9; *Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, 2020 WL 6134982, at *5 (N.D. Ill. Oct. 19, 2020).

[62] *Budicak, Inc. v. Lansing Trade Grp., LLC*, 452 F. Supp. 3d 1029, 1053-55 (D. Kan. 2020).

"directly" or "indirectly."[63] Direct evidence of anticompetitive effects shows "the defendant's conduct has impacted the market, such as a reduction in output or raised prices."[64] "To indirectly establish anticompetitive effects, the plaintiff 'defin[es] a relevant product and geographic market' and shows the defendant[s] possessed market power . . . ."[65]

Defendants do not dispute that Plaintiffs have adequately pled an agreement to exchange current and future compensation information, thereby satisfying the first element of Plaintiffs' rule of reason claim. Defendants contest only the second element, arguing that Plaintiffs have not shown anticompetitive effects. But Plaintiffs have adequately pled anticompetitive effects both *directly* by showing that Defendants' agreement actually depressed compensation and *indirectly* by pleading market power within the relevant market.

**1. Plaintiffs Have Directly Pled Anticompetitive Effects.**

Defendants contend that Plaintiffs' rule of reason claim should be dismissed because Plaintiffs have inadequately pled a relevant market. But Plaintiffs have directly pled anticompetitive effects, thus removing the need to define a relevant market and show market power within it. As the Supreme Court has explained in a Sherman Act § 1 case, "[s]ince the purpose of the inquiries into . . . market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as a reduction of

---

[63] *Id.* at 1053-55, 1057 (explaining plaintiffs "need not also allege direct anticompetitive effects" on top of indirect effects). *See also Law v. NCAA*, 134 F.3d 1010, 1019 (10th Cir. 1998); *Buccaneer*, 846 F.3d at 1311; *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 n. 3 (3d Cir. 2007) ("[D]irect proof of monopoly power does not require a definition of the relevant market.").

[64] *Budicak*, 452 F. Supp. 3d at 1055. In a monopsony case involving a labor market like here, depressed compensation is the functional equivalent of raised prices. *Todd*, 275 F.3d at 213-14.

[65] *Budicak*, 452 F. Supp. 3d at 1055 (citation omitted). Though Defendants imply otherwise, Br. at 25, courts do not evaluate "whether any procompetitive effects 'outweigh' any anticompetitive effects" at the pleading stage. *Davitashvili v. Grubhub, Inc.*, 2022 WL 958051, at *6 (S.D.N.Y. Mar. 30, 2022).

output,' can obviate the need for an inquiry into market power."[66] So where, as here, plaintiffs plead adverse effects from an agreement among horizontal competitors, they do "not need to precisely define the relevant market."[67] Defendants cite no case from within the Tenth Circuit involving an agreement between horizontal competitors requiring Plaintiffs to plead direct anticompetitive effects *and* a relevant market.[68]

Courts have found sufficient "direct evidence" of anticompetitive effects to include allegations that Defendants' "[s]cheme was designed to artificially move prices" or allegations that compensation was "artificially depressed."[69] Plaintiffs far surpass these low bars by alleging that

---

[66] *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-461 (1986) (quoting 7 P. Areeda, Antitrust Law ¶ 1511, p. 429 (3d ed. 1986)).

[67] *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 n. 7 (2018). *See also supra* at 21 & n. 63; *Cason-Merenda*, 862 F. Supp. 2d at 647-48 (explaining that showing that plaintiffs' wages were negatively impacted by information exchange obviated plaintiffs' need to "propound a detailed market analysis"). *Cf. Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1198 (10th Cir. 2009) (explaining this rule is "commonly associated with § 1 claims").

[68] Two of the cases cited by Defendants—*Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1230-33 (10th Cir. 2016) and *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1117-20 (10th Cir. 2008)—did not even involve claims that horizontal competitors violated the antitrust laws. Nor can Defendants rely on *Jien I* for the proposition that Plaintiffs must define a relevant market in addition to showing direct anticompetitive effects. *Jien* contradicts well-reasoned Tenth Circuit precedent that showing direct anticompetitive effects is an *alternative* to showing indirect effects. *Buccaneer*, 846 F.3d at 1310-11. Even if *Jien* were correct that market definition is only unnecessary in "quick look" cases, this is precisely the type of case in which quick-look analysis is appropriate because "the anticompetitive effect of [the] information sharing is so obvious." *Jien I*, 2020 WL 5544183, at *9; *see also In re Local TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *11 & n. 7 (N.D. Ill. Nov. 6, 2020) (explaining court "could perform a 'quick look' analysis" to information exchange claim). In fact, one Defendant executive *admitted* that part of the agreement to exchange information was enacted "to reduce and eliminate competition." ¶¶ 268-69.

[69] *Budicak*, 452 F. Supp. 3d at 1055-56; *Todd*, 275 F.3d at 214. *See also Been v. O.K. Indus., Inc.*, 398 F. App'x 382, 393 (10th Cir. 2010) (finding evidence that "practices impacted immediate resale and national prices" sufficient to directly show market power); *Lifewatch Servs.*, 902 F.3d at 340 (finding allegations that restraint "harmed consumers by reducing demand for and output of more effective devices" sufficient to plead direct anticompetitive effects); *In re Local TV*, 2020 WL 6557665, at *13 (holding that plaintiffs had pled direct anticompetitive effects where non-public data exchange "removed uncertainty" among defendants and allowed them "to keep their prices artificially high"); *Davitashvili*, 2022 WL 958051, at *10 (finding "anecdotal and survey evidence" that restraint led to higher prices sufficient); *Chase Mfg., Inc. v. Johns Manville Corp.*,

Defendants "designed" their anticompetitive "surveys, in-person meetings, direct communications between executives, [and] Agri Stats reports" in order "to suppress salaries, wages, and benefits paid to red meat processing workers." ¶¶ 330, 334. Indeed, one Defendant's former employee admitted that the information exchanges she witnessed were specifically conducted "to reduce and eliminate competition." ¶¶ 268-69. The nature of Defendants' exchange—which involved current *and* future compensation data—made it highly likely that Defendants would achieve this aim.[70]

In fact, Plaintiffs allege that Defendants were successful: their information exchange "actually suppressed" red meat worker compensation, most fundamentally by "facilitat[ing] the fixing and depression of[] wages [and] salaries." ¶¶ 154, 236, 278, 330-32, 356-63. Specifically, Defendants' agreement led to: "wages for certain [red meat] employees . . . not increas[ing] for consecutive years"; in one year, seven Defendants increasing base wages at seventeen different plants by an identical (and tiny) amount; the next year, a similar collection of Defendants doing the same thing; and, in many years, Defendants providing only cost-of-living raises that amounted to no more than 25 cents to $1. ¶¶ 319-21, 330, 331, 357, 361. These allegations that Defendants' agreement directly harmed competition more than meet the pleading standard.[71]

---

2022 WL 522345, at *9-10 (D. Colo. Feb. 22, 2022) (holding "supracompetitive price . . . *or* other harm" suffice to show direct anticompetitive effects).

[70] *Todd*, 275 F.3d at 211 (exchanges of current and future data "have greater potential to affect future prices and facilitate price conspiracies"); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, § 2111(d)(1) (2022) ("[P]rice information often serves to facilitate collusion . . . ."); U.S. Dep't of Just. & Fed. Trade Comm'n, *Antitrust Guidelines for Collaborations Among Competitor*s 15 (2000), https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf (information exchanges between competitors relating to "price, output, [or] costs" and "current operating and future business plans" may have anticompetitive effects).

[71] To the extent Defendants argue otherwise, Br. at 30, they overstate Plaintiffs' burden. Defendants cite no cases suggesting Plaintiffs must do more at the pleading stage than allege, as they have, that Defendants designed their information exchanges to depress market-wide

### 2.  Plaintiffs Have Also Indirectly Pled Anticompetitive Effects.

Even putting Plaintiffs' well-pled allegations of direct anticompetitive effects aside, Plaintiffs have also cleared the low threshold for *indirectly* pleading anticompetitive effects. To do so, Plaintiffs must plead a "relevant market" and that Defendants "had market power therein."[72] To plead a relevant market, Plaintiffs must allege a product market and a geographic market.[73] And to plead market power, Plaintiffs must allege that Defendants had sufficient market share in the relevant market or that structural factors support a finding of market power.[74] While Defendants argue that Plaintiffs have inadequately alleged a relevant labor market (the market for employment at red meat processing plants), ¶ 352, they do not dispute that Plaintiffs can show market power within that market.[75]

---

compensation and achieved that goal. *See Allergy Rsch. Grp. LLC v. Rez Candles Inc.*, 2022 WL 1004214, at *7-9 (D. Utah Apr. 4, 2022) (plaintiffs failed to "allege anything, general or specific, suggesting why" challenged restraint would harm competition); *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118-19 (2d Cir. 2021) (plaintiffs failed to proffer sufficient empirical evidence *at trial* to show direct anticompetitive effects); *Buccaneer*, 846 F.3d at 1312 (plaintiffs failed to show direct anticompetitive effects *at summary judgment* because output *increased* following the relevant restraint); *Rock v. NCAA*, 928 F. Supp. 2d 1010, 1023-24 (S.D. Ind. 2013) (plaintiffs failed to "cite to *any allegations*" that relevant restraint harmed market-wide competition (emphasis added)). Plaintiffs provide *more* detail than necessary by further alleging that specific plants capped their wages in parallel and that Defendants aligned workers' wages—they need not also specifically compare wages to outside benchmarks. *See Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012) (rejecting need for benchmark comparison in complaint). And Defendants' argument that Plaintiffs have not alleged that the information exchanges could or did harm salaried workers, Br. at 31, is simply wrong. *See* ¶¶ 7, 15, 171 (Defendants exchanged current and future salary data "to reduce and eliminate competition"); ¶ 363 ("Defendants' anticompetitive agreement commonly impacted *all* workers at red meat processing plants . . . ." (emphasis added)).

[72] *Budicak*, 452 F. Supp. 3d at 1056.

[73] *Buccaneer*, 846 F.3d at 1311.

[74] *Accord Todd*, 275 F.3d at 207-213 (explaining that plaintiffs can show market power within a relevant market by showing significant market share or that the structure of the market is susceptible to market power).

[75] In other words, Defendants concede that Plaintiffs have pled sufficiently high collective market share and that the market is susceptible to collusion. ¶¶ 281, 302, 323-326, 355, 377, 420.

Plaintiffs' labor market is plausible. Because market definition is a "deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."[76] So long as the "pleadings amount to 'more than a cursory mention of a relevant product . . . market," courts deny motions to dismiss.[77]

One way to evaluate whether Plaintiffs' labor market is plausible is to ask whether their market definition may plausibly pass the hypothetical monopsonist test.[78] That test asks what would happen if a single hypothetical firm controlling all red meat processing plants in the U.S. decided to implement a small but significant non-transitory decrease in compensation ("SSNDC") for all workers.[79] If it is plausible that enough workers would stay in their red meat jobs—despite

---

[76] *Christou v. Beatport, LLC*, 849 F. Supp. 2d 1055, 1066 (D. Colo. 2012). *See also Nat'l Inst. of First Assisting, Inc. v. Ass'n of Operating Room Nurses, Inc.*, 2020 WL 8189594, at *7 (D. Colo. Sept. 11, 2020); *Budicak*, 452 F. Supp. 3d at 1056; *Black v. Occidental Petroleum Corp.*, 2020 WL 10573279, at *9 (D. Wyo. May 28, 2020); *Suture Exp.*, 963 F. Supp. 2d at 1222; *Todd*, 275 F.3d at 199-200; *Jien I*, 2020 WL 5544183, at *10-11 ("[O]nly a bare minimum level of specificity is required at [the motion to dismiss] stage of the proceedings" to plausibly plead a relevant market.).

[77] *Christou*, 849 F. Supp. 2d at 1066. *See also Suture Exp.*, 963 F. Supp. 2d at 1222 (refusing to dismiss claim because relevant market was not "flawed on its face").

[78] *See SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 966 (10th Cir. 1994) ("To define a market in product and geographic terms is to say that if prices were appreciably raised or volume appreciably curtailed for the product within a given area, while demand held constant, supply from other sources could not be expected to enter promptly enough and in large enough amounts to restore the old price and volume." (citation omitted)); *Thompson v. 1-800 Contacts, Inc.*, 2018 WL 2271024, at *8 (D. Utah May 17, 2018) (applying hypothetical monopolist test at pleading stage); *see also Todd,* 275 F.3d at 202 ("[T]he inquiry is whether a 'hypothetical cartel' would be 'substantially constrain[ed]' from increasing prices by the ability of customers to switch to other producers" and noting that inquiry is "*reversed* in the context of a buyer-side conspiracy" or in the "monopsony context" as is present here); *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008) (applying hypothetical monopolist test); *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008) (applying hypothetical monopolist test); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 536 (4th and 5th eds. 2018-2022) (explaining hypothetical monopolist test is appropriate way to define a relevant market).

[79] *See In re Se. Milk Antitrust Litig.*, 2010 WL 8228839, at *1-2 (E.D. Tenn. Dec. 8, 2010); U.S. Dep't of Just. & F.T.C., Horizontal Merger Guidelines § 4.1.2 (2010).

slightly lower pay—to make the small pay decrease profitable for the hypothetical monopsonist, Plaintiffs have adequately plead a relevant antitrust market. ¶ 352.

Plaintiffs plead myriad facts suggesting that, in the face of a SSNDC, many red meat workers would be unable to find equal or better paying work in another industry; in other words, they have plausibly alleged that a SSNDC would be profitable. First, workers at red meat processing plants have specific skills that cannot easily be transferred to other jobs outside the red meat industry.[80] Those skills are very valuable to red meat processors; in fact some Defendants "would only recruit from other red meat processing plants and would never recruit from poultry-processing plants." ¶ 342.[81] Thus, employers pay red meat processing plant workers a premium for their skills; red meat workers cannot collect that premium from employers in other industries, making non-red meat jobs inadequate substitutes. ¶¶ 135-36, 341-42, 347.[82] Second, work at red meat processing plants is extremely dangerous, and those that choose to work there do so for extra pay that cannot be attained from safer, alternative work. ¶¶ 143, 346.[83] Third, red meat processing plant workers often have limited education and language skills that would make it difficult for them to obtain alternative jobs that provide comparable compensation. ¶¶ 145-46, 348-49.[84] Finally, Defendants' own anticompetitive behavior suggests red meat processing plant jobs are a

---

[80] ¶ 135 (detailing specific skills gained at red meat processing plants, such as "deboning cattle or swine"); ¶ 341 (workers learn "deboning, trimming, and cutting"); ¶ 345 (explaining "[s]alaried red meat processing workers require . . . training and skills specific to red meat processing").

[81] *See Jien I*, 2020 WL 5544183, at *11 (finding that relevant workers had "developed industry-specific skills . . . would make transitioning to other jobs an imperfect substitute").

[82] *See Todd*, 275 F.3d at 203 (it is "hardly counter-intuitive" that "employees' industry-specific experience may cause them to suffer a pay cut if forced to switch industries").

[83] *See Reed v. Advoc. Health Care*, 268 F.R.D. 573, 589 (N.D. Ill. 2009) (relevant market sufficient where there was "insufficient capacity" to employ workers if they left their jobs).

[84] *Jien I*, 2020 WL 5544183, at *11 (crediting Plaintiffs' allegation that "limited education and language skills make it difficult for poultry processing workers to transition to other jobs").

relevant labor market. That "[D]efendants have gone to considerable lengths to compile" compensation data limited to red meat jobs suggests that market is distinct because "economic actors usually have accurate perceptions of economic realities."[85] If Defendants thought the relevant labor market for red meat processing plant employees was broader than Plaintiffs have defined it, they would not have compiled and paid for current and future compensation data limited to red meat processing jobs and flown to secret, in-person meetings to discuss it.[86]

Defendants offer two internally contradictory arguments in response, both unpersuasive. First, Defendants argue that Plaintiffs' alleged market is *too narrow* because, they claim, the Complaint fails to adequately allege that *all* Class Members could not seek employment outside of red meat processing jobs. That is, Defendants argue that Plaintiffs have not alleged that the "whole class" fails to speak fluent English and lacks formal education, or has untransferable skills like deboning, and thus was reasonably limited to red meat processing plant jobs. Br. at 28-29.

As a threshold matter, Plaintiffs *have* pled that *all* Class Members (including hourly and salaried employees) gain red meat specific skills that would make employment in another market an unreasonable substitute. ¶¶ 135-36, 341-42, 345. More fundamentally, the hypothetical monopsonist test can be satisfied even if *some* workers would change jobs in response to a decrease

---

[85] *Todd*, 275 F.3d at 205; *Jien I*, 2020 WL 5544183, at *11 (similar allegations "plausibly suggest that Defendants themselves see poultry labor as a distinct, nationwide unit").

[86] Defendants appear to argue that *even if* Plaintiffs have pled a plausible relevant market, they have not separately pled anticompetitive harm. Br. at 30. But even assuming Plaintiffs must plead anticompetitive harm to the market in addition to showing a relevant market and market power therein, Plaintiffs' direct evidence of anticompetitive effects, detailed above, is more than sufficient to make that showing. *See supra* at 21-23; *see also Jien I*, 2020 WL 5544183, at *12; *In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 300 (D.R.I. 2019) ([W]here direct and indirect evidence are instructive . . . the factfinder should evaluate both.").

in compensation as long as *enough would stay put to make the decrease profitable*.[87] For that reason, courts have rejected Defendants' exact arguments. The *Jien* court, for instance, credited the allegations that "*some*" poultry workers "developed industry-specific skills" and that *some* poultry processing workers had "limited education and language skills" in upholding "a singular poultry labor market"—expressly rejecting the argument that the relevant market was implausible because certain workers may not have gained industry-specific skills.[88] Plaintiffs' allegations that Defendants were able to profitably suppress compensation for red meat processing workers demonstrate that, even if (as Defendants contend) some jobs outside of the relevant market are reasonably substitutable for some *subset* of the class, that is not true for *enough* workers to make wage suppression unprofitable. It is precisely for that reason that, at the pleading stage, "Plaintiffs need not disprove alternative relevant markets proposed by the Defendant or explain with fine detail how each . . . processing job is different to similar jobs in other industries."[89]

Second, Defendants argue that Plaintiffs' relevant market is *too broad* because it "lump[s]" together different types of jobs, such as hourly and salaried employees. Br. at 27-28. But Defendants "misapprehend[] the purpose in antitrust law of market definition."[90] When seeking to prove indirect anticompetitive effects, the relevant market inquiry determines whether Defendants had "sufficient market power within the market for their information sharing to restrain

---

[87] *See* Areeda & Hovenkamp, *supra*, at ¶ 536 (explaining that even if some workers would leave the market in response to a compensation decrease, a market can pass the hypothetical monopsonist test so long as "the incremental revenue from nonshifting [workers]" would offset the loss).

[88] *Jien I*, 2020 WL 5544183, at *11; *Jien II*, 2021 WL 927456, at *3.

[89] *Jien I*, 2020 WL 5544183, at *11 (citations omitted); *see also In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 946 (E.D. Tenn. 2008) (at the motion to dismiss stage, "that other relevant markets may likewise exist is of no consequence").

[90] *Law*, 134 F.3d at 1020.

competition."[91] Alleging an "overbroad market" is not an issue, because it creates "no risk of . . . an illusion of market power" and makes Plaintiffs' burden of showing market power *more* difficult by *understating* Defendants' market share.[92]

Similarly, Defendants' focus on whether the *employees* in the relevant market are seen by the *employers* as substitutable is misplaced. As Defendants admit, in monopsony cases "the relevant market comprises *employers* 'who are seen by [*employees*] as being reasonably good substitutes." Br. at 26-27 (citation omitted) (emphases added). As a result, relevant markets can include different types of workers because "[t]he question is not the interchangeability of, for example, lawyers with engineers. At issue is the interchangeability, from the perspective of a [salaried or hourly processing plant] employee, of a job opportunity in the [red meat] industry with, for example, one in the pharmaceutical industry."[93] So even though some hourly and salaried red meat employees may not be fungible with each other, all that matters it that a sufficient number of them would be confined to red meat jobs in the face of an SSNDC. It is therefore plausible that Plaintiffs' relevant market will pass the hypothetical monopsonist test.[94]

---

[91] *Jien I*, 2020 WL 5544183, at *10.

[92] *Id.*; *See also PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. Of Pharmacy*, 530 F. Supp. 3d 301, 348 (S.D.N.Y. 2021) (explaining that "[w]here complaints are dismissed on the pleadings, it is typically because the alleged market is too narrow"). For this reason, while the hypothetical monopsonist test "ensures that markets are not defined too narrowly . . . it does not lead to a single relevant market," and "any relevant market satisfying the test" can be used. U.S. Dep't of Just. & F.T.C., Horizontal Merger Guidelines § 4.1.1 (2010).

[93] *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1135 (10th Cir. 2002) (quoting *Todd*, 275 F.3d at 202). *See also Jien I*, 2020 WL 5544183, at *11 (finding market that "lump[ed] together a broad range of poultry processing jobs" plausible); *Todd*, 275 F.3d at 201 (permitting wage-fixing claim for market including accountants, lawyers, and engineers); *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 275, 277 (N.D. Cal. 2016) (certifying class of "artists and engineers" with different positions and pay).

[94] Defendants' cases do not support the proposition that all Class Members must be wholly fungible with each other. In several, the plaintiffs "never clearly identifie[d] the product market" at all. *Vital Pharms., Inc. v. Berlin Packaging LLC*, 2022 WL 4552094, at *4 (N.D. Ill. Sept. 29,

**D.  Plaintiffs' Claims Are Not Time Barred.**

Plaintiffs' claims are not time barred. The statute of limitations was tolled until at the earliest August 2021 because Defendants fraudulently concealed their conspiracy to depress compensation. Additionally, the Complaint alleges new and independent conspiratorial acts within the limitations period, warranting application of the continuing conspiracy exception.

**1.  Plaintiffs Adequately Plead Allegations of Fraudulent Concealment, and It Is Procedurally Inappropriate to Reject Them at the Motion-to-Dismiss Stage.**

Plaintiffs can seek damages incurred since the onset of the compensation-fixing conspiracy because Defendants fraudulently concealed their illegal agreement,[95] and the statute of limitations did not begin to run until Plaintiffs discovered it.[96] Defendants' arguments to the contrary are both procedurally premature and factually inaccurate.

Defendants correctly state that to assert fraudulent concealment, Plaintiffs must show "(1) the use of fraudulent means by the [defendant] . . . ; (2) successful concealment from the injured party; and (3) that the party claiming fraudulent concealment did not know or by the

---

2022); *see also Brooklyn Downtown Hotel LLC v. N.Y. Hotel & Motel Trades Council, AFL-CIO*, 2017 WL 1192179, at *6 (S.D.N.Y. Mar. 29, 2017) (finding complaint "completely devoid of any allegation" that anyone actually provided the cluster of labor services used to define the market); *In re Comp. of Managerial, Pro. & Tech. Emps. Antitrust Litig.*, 2008 WL 3887619, at *7 (D.N.J. Aug. 20, 2008) (individual plaintiffs "decline[d] to pursue the traditional method of demonstrating market power" by defining a relevant market); *Allergy Rsch.*, 2022 WL 1004214, at *6 ("[Party] does not provide any description, explanation, analysis, or legal theory to support its one sentence definition of the relevant market . . . ."); *Uhlig LLC v. CoreLogic, Inc.*, 2022 WL 4597858, at *5 (D. Kan. Sept. 30, 2022) (party effectively "admit[ted]" that it "impermissibly reduce[d] the scope" of the relevant market). And the court in *Rock v. NCAA*, 928 F. Supp. 2d 1010 (S.D. Ind. 2013), was "bound" by "Seventh Circuit precedent" requiring it to consider the substitutability of laborers in a monopsony claim, *In re Blue Cross Blue Shield Antitrust Litig.*, 2017 WL 2797267, at *10 n.6 (N.D. Ala. June 28, 2017), that is directly at odds with Tenth Circuit precedent. *See Telecor*, 305 F.3d at 1135; *see also Todd*, 275 F.3d at 202.

[95] *Farmers & Merchs. Nat'l Bank v. Bryan*, 902 F.2d 1520, 1522 (10th Cir. 1990).
[96] *See Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 (10th Cir. 1980) ("[T]he limitations period begins to run when the aggrieved party discovers, or should have discovered by the exercise of reasonable diligence, the facts constituting the fraud.")

exercise of due diligence could not have known that he might have a cause of action."[97] Yet Defendants ignore a key component of the applicable law: it is procedurally inappropriate to resolve disputes regarding the adequacy of Plaintiffs' fraudulent concealment allegations at the motion-to-dismiss stage. Rather, "where there is a dispute as to the existence of fraudulent concealment, the question is one for the jury."[98] Courts in the Tenth Circuit have repeatedly recognized that "in the antitrust conspiracy context, it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly where the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators."[99] That law is reason enough to reject Defendants' arguments.

    In any event, the Complaint satisfactorily alleges each element of fraudulent concealment.

### a.  Defendants Used Fraudulent Means to Conceal the Conspiracy.

    The first element of fraudulent concealment is "the use of fraudulent means by the" Defendants. This element is adequately pled when plaintiffs allege a violation of law which is, by its nature, self-concealing.[100] As the Tenth Circuit has observed, antitrust conspiracies are by

---

[97] *King & King Enters. v. Champlin Petroleum Co.*, 657 F.2d 1147, 1154 (10th Cir. 1981). Plaintiffs' pleadings must meet the requirements of Rule 9(b), but at the pleading stage, courts impose a "relaxed standard" for "allegations of concealment." *KPH Healthcare Servs., Inc. v. Mylan N.V.*, 2022 WL 3153687, at *11 (D. Kan. Aug. 8, 2022) (citations omitted).

[98] *King & King Enters.*, 657 F.2d at 1156; *see also Aldrich*, 627 F.2d at 1042 (the "question of whether a plaintiff should have discovered the basis of his suit under the doctrine of equitable tolling does not lend itself to determination as a matter of law").

[99] *Thompson*, 2018 WL 2271024, at *10-11 (quoting *In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007)); *see also KPH Healthcare Servs.*, 2022 WL 3153687, at *10.

[100] *See King & King Enters.*, 657 F.2d at 1156; *State of Colo. ex rel. Woodard v. Asphalt Paving Co.*, 1987 WL 10189, at *1 (D. Colo. Feb. 11, 1987) ("[T]he better interpretation of *King and King* is that the presence of fraudulent concealment, the first prong of that test, can be met by activity which by its nature is self-concealing."); *Catron v. Colt Energy, Inc.*, 2014 WL 7246804, at *5 (D. Kan. Dec. 17, 2014) (finding claims tolled when plaintiffs pled fraudulent concealment based on the "self-concealing nature of Defendants' wrongful conspiracy, arrangement, agreement, trust, and/or combination").

"reason of [their] fraudulent nature, . . . inherently self-concealing."[101] Accordingly, Plaintiffs have satisfied the first prong of the fraudulent concealment test by pleading an antitrust conspiracy.

Ignoring this precedent, Defendants argue that Plaintiffs can only satisfy the first prong if they pled "specific, identifiable, affirmative acts of concealment." Br. at 35. But the Complaint comfortably meets that standard with allegations that Defendants: (a) held secret meetings; (b) concealed data exchanges through WMS and Agri Stats, and (c) misrepresented their wages and benefits as "competitive." ¶¶ 366-85. Moreover, any Defendant's "affirmative acts of concealment . . . can be imputed to [its] co-conspirators for purposes of tolling the statute of limitations."[102] Consequently, Plaintiffs may establish each Defendant's fraudulent concealment "through the acts of co-conspirators."[103]

### i.  Defendants concealed Red Meat Industry Compensation Meetings.

Contrary to Defendants' assertions, Br. at 35, the Complaint crisply alleges that specific Defendants attended—and took affirmative steps to conceal—conspiratorial meetings. For example, the Complaint repeatedly alleges that the annual Red Meat Industry Compensation

---

[101] *King & King Enters.*, 657 F.2d at 1156; *accord In re Animation Workers*, 123 F. Supp. 3d at 1196 (citing *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 123 (4th Cir. 1995)) ("[T]he mere existence of a secret conspiracy is enough to prove fraudulent concealment.").

[102] *Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480, 1493 (D.C. Cir. 1989); *see also* "*Acad. Of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*, 998 F.3d 190, 198-99 (5th Cir. 2021); *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 447 n.8 (6th Cir. 2012); *United States v. Upton*, 559 F.3d 3, 14 (1st Cir. 2009); *Davis v. Grusemeyer*, 996 F.2d 617, 624 n.13 (3d Cir. 1993); *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1085 (2d Cir. 1988); *In re Refrigerant Compressors Antitrust Litig.*, 92 F. Supp. 3d 652, 669 (E.D. Mich. 2015) ("[T]he Court is to consider the alleged wrongful concealment by any of the alleged []co-conspirators because those acts can be imputed to [another defendant].");* In re Magnesium Oxide Antitrust Litig.*, 2012 WL 1150123, at *7 (D.N.J. Apr. 5, 2012) ("To require a plaintiff to plead affirmative acts of concealment by each co-conspirator would be overly burdensome . . . .").

[103] *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 538 (6th Cir. 2008).

Meetings were "secret." ¶¶ 6, 9, 366, 371. "Only Defendants' executives and top-ranking corporate HR managers" were invited to attend them, and all non-conspirators were excluded. ¶ 379.

Defendant Processors even excused WMS's Jonathan Meng from most roundtable sessions at these Meetings, allowing them to hold "entirely private" discussions. ¶ 243. Mr. Meng believes he was excused so that Defendant Processors could share their compensation practices without his oversight. ¶¶ 243-51, 380. On at least one occasion, Mr. Meng admonished Defendants that they should only discuss their specific compensation practices in this private setting: "[Defendants should] not ask specific questions or convey any details about their plans in an open session. . . . Anything other than general questions should be undertaken in a *private* session." ¶ 255.

Plaintiffs have also pled that Defendant Processors required in-person attendance at the Meetings, rather than permitting remote communication and exchange of data, to ensure that attendees discussed and fixed compensation in a confidential setting without leaving a paper trail. ¶ 13. For example, on June 12, 2018, JBS's Brad Sievers emailed other Defendant Processors that "regular attendance at the meeting is required to participate in the survey." ¶ 165.

Plaintiffs have pleaded these affirmative acts with adequate particularity. The Complaint specifies that a number of Defendant Processors' key executives ("who") attended *secret* annual Meetings ("what"), in April or May of each year ("when"), held most frequently in Kansas City, Missouri ("where"), to implement and conceal their conspiracy ("why"). ¶¶ 29-116, 229.

Defendants argue these allegations are too vague to constitute affirmative acts of concealment, citing two out-of-circuit cases that are readily distinguishable. In *In re Pork*, the court initially dismissed the complaint, finding plaintiffs' allegations of "secret meetings" and "surreptitious communications" too "vague" because they lacked the "who, what, when, where,

and how" that Rule 9(b) requires.[104] The *Pork* court also noted that allegations of fraudulent concealment were inconsistent with allegations that defendants had conducted the conspiracy via public statements.[105] In stark contrast, Plaintiffs' conspiracy allegations here are detailed with sufficient particularity and were derived solely from *nonpublic* information, including firsthand witness testimony and Defendants' emails. ¶¶ 29-116, 229, 251. And in *Garrison*, the plaintiffs' allegations of fraudulent concealment failed because, unlike here, the alleged misconduct was shared openly with non-conspirators.[106]

### ii. Defendants concealed Red Meat Industry Compensation Surveys.

The existence and contents of the Red Meat Industry Compensation Surveys, as well as Defendants' control over them, were carefully concealed from Plaintiffs and the public. WMS only released the Survey results via email to a "limited number of Defendant Processor executives," and Defendant Processors were strictly prohibited from "shar[ing] survey results outside the Red Meat Survey Group." ¶ 377. When, for example, an Agri Beef executive requested permission to share a Survey Report with an outside organization, Meng informed the Director that "the [Red Meat Survey] group . . . absolutely do[es] not want you to share the report with anyone outside the company." ¶ 377. Such instructions "requiring the contracting parties to keep the terms of that allegedly anti-competitive agreement private" are plainly "affirmative act[s] to conceal."[107]

---

[104] *In re Pork*, 495 F. Supp. 3d at 773-74.

[105] *See* Direct Purchaser Plaintiffs 3d Am. and Consolidated Class Action Compl. at ¶¶ 100, 105, 107, 116, *In re Pork Antitrust Litig.*, No. 18-cv-01776 (D. Minn. Jan. 15, 2020), ECF No. 431.

[106] *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1076 (N.D. Cal. 2016).

[107] *Thompson*, 2018 WL 2271024, at *12; *see also King & King Enters.*, 657 F.2d at 1155 (concluding that defendants' maintenance of a list of "talk/no talk" contacts, which separated "the names of the reliable people from the names of those who were unreliable, in that they could not keep a confidence," constituted concealment).

Plaintiffs have also pled that Defendants employed sham data-anonymization techniques in the Surveys to conceal their exchange of non-anonymous compensation information. For example, when WMS circulated the results of the annual survey, "the names of Defendant Processors were replaced by a randomly assigned letter, yet attendees at the Meetings could readily ascertain which red meat processor had reported which compensation data when they discussed the survey results at the Red Meat Industry Compensation Meetings." ¶ 378. Courts have routinely held that such efforts to camouflage illicit activity constitute affirmative acts of concealment.[108]

Finally, Defendant Processors hired WMS to conceal their control over the Survey. As the Complaint explains, "WMS was retained to impart a veneer of legality to Defendant Processors' illicit exchange of compensation data." ¶ 376. Despite hiring WMS to implement the Survey, Defendant Processors "developed every facet of" the Survey and "maintained full control over its administration." *Id.* WMS merely followed Defendants Processors' instructions. ¶¶ 176-81.

Plaintiffs have pleaded these affirmative acts with adequate particularity. They allege that Defendant Processors ("who") secretly exchanged compensation data through Surveys they fully controlled, while creating the illusion that those Surveys were anonymized and controlled by a third party ("what"), in April or May of each year ("when"), through electronic communications ("where"), to implement and conceal their conspiracy ("why"). ¶¶ 29-116, 229.

### iii. Defendants concealed their data exchanges through Agri Stats.

As the Complaint details, the Pork Processing Defendants concealed their exchange of compensation data through Agri Stats in multiple ways. First, Agri Stats itself "concealed its work

---

[108] *See, e.g.*, *Carrier Corp.*, 673 F.3d at 447-48 (concluding that using a coding-system to hide the identity of the producers in defendant documents related to price-fixing scheme constituted an affirmative act of concealment); *Jien I*, 2020 WL 5544183, at *13.

on behalf of the red meat industry." ¶ 381. In 2009, the President of Agri Stats, Blair Snyder, noted: "There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do." ¶ 381. Second, Pork Processing Defendants restricted access to Agri Stats' compensation data: Only pork processors "willing to upload their own detailed and disaggregated compensation data" and "pay millions of dollars in fees to Agri Stats" could see the data. ¶ 382. Third, Agri Stats employed sham data anonymization to conceal the data exchanges. It falsely and publicly denied that the data it exchanged between pork processors could be reverse-engineered by those companies' executives. For example, according to a *Guardian* article, Agri Stats denied that "the data in its reports were identifiable to industry insiders" and could "be used by competitors in an anti-competitive manner." ¶ 384. But the data was, in fact, sufficiently granular and disaggregated that executives of Pork Processor Defendants did match the data to specific Defendants in specific regions. ¶ 383.

Plaintiffs alleged these affirmative acts with adequate particularity. Each Pork Processor Defendant subscribed to Agri Stats ("who"); through which they exchanged facially anonymized, but readily decodable compensation data ("what"); at their corporate headquarters and individual plants ("where"); during each month of the Class Period ("when"); for the purpose of implementing and concealing the conspiracy ("why"). *See* ¶¶ 217-303.[109]

---

[109] Defendants rely solely on *In re Pork* to argue that Plaintiffs' allegations regarding Agri Stats are "too vague" to constitute fraudulent acts. Br. at 35. Yet, unlike in *In re Pork*, Plaintiffs have included detailed allegations about the "sham anonymization" techniques Agri Stats used to create an illusion of legality, of the sort courts have held plainly constitute an affirmative act to conceal. ¶¶ 295-330, 355, 383.

#### iv. Defendant Processors made misstatements about "competitive" pay.

The Complaint alleges that Defendant Processors affirmatively concealed their scheme by publicly misstating that they provided "competitive" pay to employees. Each Defendant Processor advertised to potential and current plant employees that it paid "competitive" wages and "competitive" benefits. ¶ 373. These advertisements falsely indicated that Defendants' compensation of plant workers was "determined through genuine competition in the labor market with other Defendant Processors." ¶ 374. Contrary to Defendants' arguments,[110] courts have held that such public misstatements are affirmative acts that toll statutes of limitations.[111]

#### b.   Defendants Successfully Concealed the Conspiracy from Plaintiffs.

The Complaint alleges that, due to Defendants' affirmative acts of concealment, "[n]o facts were revealed publicly or to Plaintiffs that would have put them or the Class on inquiry notice that they were the victims of a conspiracy to depress compensation paid to workers in red meat processing plants."[112] ¶ 366.

---

[110] Defendants rely on two out-of-circuit cases that are readily distinguishable. Again, Plaintiffs' allegations differ substantially from those in *In re Pork*. *Supra* at 33-34. And in *Garrison*, the court followed Ninth Circuit law to find that plaintiffs needed to allege reliance. 159 F. Supp. 3d at 1078. But Tenth Circuit courts have held that "the elements of [the fraudulent concealment] doctrine do not include reliance." *In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1164 (D. Kan. 2012). *Garrison* furthermore recognized that plaintiffs may plead a "combination" of "misleading, pretextual statements" and "affirmative efforts" to "keep the conspiracies secret." 159 F. Supp. 3d at 1079 (quoting *In re Animation Workers*, 123 F. Supp. 3d at 1200). Plaintiffs have done so here.

[111] *In re Animation Workers*, 123 F. Supp. 3d at 1199-200.

[112] Plaintiffs did not, and could not have known through an exercise of reasonable diligence, about the existence of Defendants' conspiracy to depress compensation of workers in red meat processing plants until at the earliest August 2021, when a coconspirator's internal email revealing the existence of a Red Meat Survey Group was disclosed.

### c. Plaintiffs Were Not on Inquiry Notice and Could Not Have Known of the Conspiracy by Exercising Reasonable Diligence.

In the Tenth Circuit, "[i]t is settled law . . . that the issue of when a plaintiff knew or with reasonable diligence should have known of a cause of action is a question of fact for the jury."[113] Defendants' focus on Plaintiffs' alleged lack of diligence is thus inappropriate at this stage and should be rejected on that basis alone. *See* Br. at 36-37.

Nonetheless, Defendants argue that Plaintiffs failed to demonstrate due diligence because they were on "inquiry" notice of the alleged conspiracy. They cite to the filing of two other cases involving different underlying conduct (price-fixing of products), different markets (poultry and pork commercial meat markets), and different parties. But Tenth Circuit courts have recognized that the "mere filing of a lawsuit 'is not as a matter of law tantamount to actual or constructive know[ledge]'" of a claim.[114] Instead, "[c]lass members cannot be charged with knowledge of a potential claim 'unless they are aware of some evidence tending to support it.'"[115]

Critically, the *Broilers* and *Pork* lawsuits Defendants cite include no allegations related to the depression of compensation or, more specifically, the existence of the Red Meat Survey Group or its Survey or Meetings.[116] Because those key "material" facts were never been made public, Plaintiffs could not have been on inquiry notice.[117] Accordingly, Plaintiffs have adequately pled

---

[113] *Maughan v. SW Servicing, Inc*., 758 F.2d 1381, 1387 (10th Cir. 1985).

[114] *KPH Healthcare Servs*., 2022 WL 3153687, at *9 (alteration in original) (quoting *United Nat'l Recs., Inc. v. MCA, Inc.*, 609 F. Supp. 33, 37 (N.D. Ill. 1984)); *Thompson*, 2018 WL 2271024, at *12-13.

[115] *KPH Healthcare Servs*., 2022 WL 3153687, at *9 (alteration in original) (quoting *United Nat'l Recs.*, 609 F. Supp. at 37).

[116] The filing of the *Jien* case, which involved different defendants in a different industry, did not put Plaintiffs on inquiry notice of the present conspiracy in the red meat industry either. But even if the Court were to find that Plaintiffs were on inquiry notice when the *Jien* case was filed in August 2019, Plaintiffs' claims remain well within the four-year statute of limitations.

[117] *See id.* at *8-11 (finding no inquiry notice when defendants did not disclose "material" facts).

they "did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint."[118] ¶ 366.

### d.  As in *Jien,* Plaintiffs Have Adequately Alleged Fraudulent Concealment.

Courts in the Tenth Circuit have adopted the Fourth Circuit's analysis of the requirements for pleading fraudulent concealment.[119] In a court in the Fourth Circuit, the plaintiffs in *Jien* recently prevailed with very similar fraudulent concealment allegations. They alleged that defendants in the poultry industry had engaged in secret wage-fixing meetings, maintained strict confidentiality of data exchanges through WMS and Agri Stats, and created an "illusion of anonymity" in their data exchanges.[120] There, the court held that "[a]ll of these alleged techniques plausibly constitute[d] affirmative acts of concealment, hiding the wage compensation discussions at the core of Plaintiffs' collusion claims." *Id.* Plaintiffs here have alleged the same, ¶¶ 370-85, and this Court should find Plaintiffs' claims timely as well.

### 2.  Plaintiffs Have Adequately Pleaded a Continuing Conspiracy.

For the "continuing conspiracy exception" to the statute of limitations to apply, a plaintiff must allege that a defendant committed an overt act during the four years before the Complaint was filed that is "(1) 'a new and independent act that is not merely a reaffirmation of a previous act'; and (2) [that] 'inflict[s] new and accumulating injury on the plaintiff.'"[121] Notably, the Tenth

---

[118] Defendants' authorities are inapposite. In *Sterlin v. Biomune Systems*, the underlying cause of action was securities fraud, the plaintiffs had not even alleged fraudulent concealment, and critical elements of the alleged fraud were also covered in public outlets prior to the complaint. 154 F.3d 1191, 1203-04 (10th Cir. 1998). And in *Kreek v. Wells Fargo & Co.,* an "identical" complaint was filed three years prior to the complaint at issue when the cause of action had a two-year statute of limitations. 652 F. Supp. 2d 1053, 1060 (N.D. Cal. 2009).

[119] *In re Urethane*, 913 F. Supp. 2d at 1160.

[120] *Jien I*, 2020 WL 5544183, at *13.

[121] *Auraria*, 843 F.3d at 1248 (quoting *Kaw Valley Elec. Coop. Co., Inc. v. Kan. Elec. Power Coop., Inc.*, 872 F.2d 931, 933 (10th Cir. 1989)).

Circuit has specifically held that when a conspiracy "require[s] ongoing enforcement efforts" that inflict accumulating injuries, the continuing conspiracy exception applies.[122]

As described below, the Complaint details new and independent overt acts by Defendants within the limitations period, including enforcement actions, each of which inflicted accumulating injuries on Plaintiffs. While those types of overt acts began prior to the limitations period, the conspiracy "*did* require further action[s]" after that period.[123] Defendants "did not simply sit back and watch as the 'unabated inertial consequences' of their . . . anticompetitive agreement harmed" Class Members; rather, their multiple conspiratorial "actions within the limitations period 'manifest[ed] a commitment to renewing' and enforcing that agreement."[124]

### a. Defendants Participated in the 2019 Red Meat Industry Survey.

Plaintiffs allege that "[v]arious Defendant Processors designed, paid for, and participated in an annual Red Meat Industry Compensation Survey each year from 2014 through 2019." ¶¶ 6, 155, 159, 180. The Surveys allowed Defendant Processors to illicitly exchange compensation information and facilitated in-person meetings to fix and depress Class Members' compensation. ¶ 187. Therefore, each Survey—including the 2019 survey circulated within the limitations period—was a new and independent act that inflicted a new and accumulating injury on Plaintiffs. And the Complaint alleges that Defendant Processors Agri Beef, Cargill, JBS, National Beef, Perdue, Seaboard, and Tyson each participated in the 2019 survey. ¶¶ 34, 38, 41-45, 54, 58.

---

[122] *Auraria*, 843 F.3d at 1248 (citing *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1089-90 (10th Cir. 2006)).
[123] *Champagne Metals*, 458 F.3d at 1089.
[124] *Id.* (second alteration in original) (first quoting *Kaw Valley*, 872 F.2d at 933; then quoting II Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* 210 (2d ed. 2003)).

Defendants argue that because the exchange of *future* salary information ended with the 2017 Survey, Defendant Processors' participation in the 2019 Survey could not have constituted new and independent conspiratorial acts. Br. at 33. But that conclusion misconstrues the allegations and misapplies the Tenth Circuit's standard. While the 2019 Survey omitted data regarding salary increases in *future* years, it did contain a large amount of carefully selected data regarding *current* compensation rates. ¶¶ 101, 171-72, 179, 188-91, 193-94, 198-200, 202-06. Thus, Defendant Processors' exchange of competitively sensitive compensation data in the 2019 Survey furthered the conspiracy and warrants application of the continuing conspiracy exception.

### b.  Defendants Participated in the 2019 Red Meat Industry Meeting.

Plaintiffs allege that Defendant Processors conducted regular, in-person Red Meat Industry Compensation Meetings at which they discussed, exchanged confidential information about, and fixed Class Members' compensation. ¶¶ 226-55. Like the 2019 Survey, the 2019 Meeting held during the limitations period manifested a commitment to renewing and enforcing the conspiracy, thereby inflicting accumulating injuries on Plaintiffs.

Defendant Processors contend that because Meng attended the 2019 Meeting and would have "halted" any conspiratorial discussions that took place "in his presence," the 2019 Meeting could not have comprised an overt act. Br. at 33 (quoting ¶ 248). Yet Meng's presence at the 2019 Meeting did not prevent Defendants from exchanging sensitive compensation information in furtherance of the conspiracy. Indeed, Plaintiffs allege that at the 2019 Meeting, Meng himself gave a PowerPoint presentation summarizing the results of the 2019 Survey, including current compensation rates for hourly-paid and salaried red meat processing workers. ¶¶ 235-41.

### c. Defendants Exchanged Compensation Data through Agri Stats.

Defendants argue that the Court should disregard Plaintiffs' detailed allegations concerning Defendants' monthly exchange of compensation data through Agri Stats. ¶¶ 273-305. Specifically, Defendants argue that these allegations do not support applying the continued conspiracy exception because the alleged misconduct "took place at unidentified times 'during the Class Period.'" Br. at 34 (quoting ¶¶ 29-62, 273-305). Defendants cite *Garrison*, in which "*all* of [the] allegations" about unlawful agreements were undated or predated the limitations period.[125]

Defendants' analogy is inapt. The Complaint alleges that "*[e]very month during the Class Period*, Agri Stats distributed disaggregated compilations of data to each of the subscribing Pork Processor Defendants." ¶ 286 (emphasis added). It further alleges that as a result of those Agri Stats reports, "*during each month of the Class Period*, each Pork Processor Defendant knew how much each subscribing Defendant was currently paying in compensation to Class Members at their red meat processing plants." ¶ 301 (emphasis added). It even alleges that Defendant Pork Processors "would send data to Agri Stats on the 18th of every month." ¶ 284. Given these allegations of actions within the limitations period, the continuing conspiracy exception applies.

### d. Defendants Paid Depressed Wages During the Class Period.

The Supreme Court has long held that in "a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' *e.g.,* each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier

---

[125] 159 F. Supp. 3d at 1071 (emphasis added); *see* Br. at 34.

times."[126] Because Plaintiffs allege a wage-fixing conspiracy, "each time plaintiff[s were] paid a depressed wage for [their] labor, [they were] injured and the four-year statute of limitations for that injury began."[127] Plaintiffs allege that Defendant Processors paid suppressed wages throughout the Class Period, including the limitations period. ¶¶ 21, 224-27, 330-31, 364-65. Thus, the continuing conspiracy exception applies based on these payments alone, and Plaintiffs' claims for damages that accrued during the four years before the filing of the Complaint are timely.

### E.   The Named Plaintiffs Have Standing to Assert Claims for All Class Members.

Defendants argue that the Named Plaintiffs, who were paid hourly wages, lack standing to bring claims on behalf of salaried Class Members.[128] Br. at 37-40. In a well-reasoned opinion, *Jien II* rejected precisely this argument, holding that in an antitrust case, named plaintiffs can bring claims on behalf of absent class members who were affected by the same anticompetitive conduct, even if there are some differences between the named plaintiffs and the absent class members:[129]

> Requiring that the claims of the class representative be in all respects identical to those of each class member . . . [to establish standing] would render superfluous the Rule 23 commonality and predominance requirements because any case that survived such a strict Article III analysis would by definition present only common issues. So the question of standing is not: Are there differences between the claims of the class members and those of the class representative? Rather, the pertinent question is: Are the differences that do exist the type that leave the class representative with an insufficient personal stake in the adjudication of the class members' claims?"[130]

---

[126] *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (quoting 2 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 338b, p. 145 (rev. ed. 1995)); *see also, e.g.*, *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1064 (8th Cir. 2017) (en banc).

[127] *Turner v. McDonald's USA, LLC*, 2020 WL 3044086, at *4 (N.D. Ill. Apr. 24, 2020).

[128] Defendants do *not* dispute the Named Plaintiffs' standing to bring claims for themselves or other hourly-paid workers. Nor could they. The Complaint alleges the Named Plaintiffs suffered an "injury in fact" (lower compensation) that is "fairly traceable" to Defendants' conduct (the conspiracy to suppress compensation) and is "likely to be redressed by a favorable judicial decision" (an award of damages). *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

[129] *Jien II*, 2021 WL 927456, at *3.

[130] *Id.* (quoting *In re Asacol Antitrust Litigation*, 907 F.3d 42, 49 (1st Cir. 2018)); *see also Abraham v. WPX Prod. Prods., LLC*, 184 F. Supp. 3d 1150, 1199 (D.N.M. 2016) ("As long as the

Applying that test, the Named Plaintiffs clearly have a sufficient personal stake in the adjudication of all absent Class Members' claims to bring suit on their behalf. The Complaint alleges that both hourly and salaried workers were harmed by the same anticompetitive conduct: Red Meat Industry Compensation Surveys and Meetings, inter-Defendant communications regarding compensation, extensive data sharing through Agri Stats, and no-poach agreements. *See, e.g.*, ¶¶ 6-19. These allegations, "consistent across all members of the class, named and otherwise[,] constitute the heart of the case and suggest that . . . the named plaintiffs have a sufficient personal stake in the adjudication of the class members' claims to establish standing, even for those class members from slightly different backgrounds."[131]

The cases relied on by Defendants do not support a different result. Br. at 37, 39-40. *Pearson v. Target Corp.*, where the court held that the named plaintiff could not bring claims on behalf of absent class members who purchased a different dietary supplement, is both

---

named Plaintiffs can demonstrate that they have standing to assert the claims they have alleged, whether the named Plaintiffs can represent certain proposed class members is better addressed at the class certification stage."); *Singh v. Lenovo (United States) Inc.*, 510 F. Supp. 3d 310, 320 (D. Md. 2021) ("the plaintiffs have standing to pursue their claims" involving multiple product models and "arguments, which concern the appropriate scope of the action rather than whether the plaintiffs have standing, are best resolved at the class certification stage"); *Texas Hill Country Landscaping, Inc. v. Caterpillar, Inc.*, 522 F. Supp. 3d 402, 409 (N.D. Ill. 2021) (rejecting "efforts to inject class certification issues into the standing inquiry"); *In re Broiler Chicken*, 290 F. Supp. 3d at 809-10 ("Here, Plaintiffs plausibly allege an injury in fact by alleging that they paid inflated prices, which can be fairly traced to Defendants' price-fixing scheme…. For the time being— meaning at the pleading stage and prior to analysis of the class allegations under Rule 23—this analysis suffices to establish the named plaintiffs' standing to assert the claims of class members in other states."); *cf. Colorado Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1216 (10th Cir. 2014) (affirming named plaintiffs' right to represent nationwide class at class certification and rejecting defendants' contention that named plaintiff lacks standing because the "argument conflates standing and the ability to represent a class under Rule 23").

[131] *Jien II*, 2021 WL 927456, at *3; *see also Giuliano v. SanDisk Corp.*, 2014 WL 4685012, at *3 (N.D. Cal. Sept. 19, 2014) ("any concerns about the material differences between the products are better addressed at the class certification stage" because "injury to purchasers of both raw and finished NAND flash memory products is predicated on the same alleged wrongful conduct").

distinguishable and succeeded by a long line of cases declining to follow it.[132] The *Pearson* plaintiff brought claims under the Illinois Consumer Fraud Act, and therefore had to show that they relied on Defendants' deceptive acts.[133] The court held that plaintiffs harmed by one misleading statement about one product could not sue on behalf of individuals harmed by a *different* misleading statement about a *different* product. But all Plaintiffs here were harmed by the same conspiracy. Likewise, Defendants cite to *In re AIG Advisor Group Securities Litigation*,[134] but a more recent case from the same district recognizes the "'better' approach to be that plaintiffs may proceed to the class certification stage for products that they did not purchase."[135] In sum, Defendants have not offered any compelling reason why the Named Plaintiffs cannot bring claims on behalf of salaried workers before the class certification stage of this litigation.

## V.   CONCLUSION

The Court should deny the Defendants' joint motion to dismiss.

---

[132] 2012 WL 7761986 (N.D. Ill. Nov. 9, 2012). *See also Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 542 (S.D.N.Y. 2013) (declining to follow *Pearson*); *Gabriele v. ConAgra Foods, Inc.*, 2015 WL 3904386, at *9-10 (W.D. Ark. June 25, 2015) (same); *Hawes v. Macy's Inc.*, 346 F. Supp. 3d 1086, 1091 (S.D. Ohio 2018) (same); *Geske v. PNY Techs., Inc.*, 503 F. Supp. 3d 687, 699 (N.D. Ill. 2020) (same because "a growing majority of courts apply a different standard: a class representative who purchased product X has standing to represent a class member who purchased product Y if the injuries are 'substantially similar.'").

[133] *Pearson*, 2012 WL 7761986 at *1.

[134] 2007 WL 1213395 (E.D.N.Y. Apr. 25, 2007).

[135] *Mosely v. Vitalize Labs, LLC*, 2015 WL 5022635, at *7 (E.D.N.Y. Aug. 24, 2015)*; see also In re Mut. Funds Inv. Litig.*, 519 F. Supp. 2d 580, 583 (D. Md. 2007) (declining to follow *AIG* because "[t]raditionally, courts bifurcate[] the inquiries required by Article III and Federal Rule of Civil Procedure 23"). *Blum v. Yaretsky*, 457 U.S. 991, 1001 (1982), is inapposite because the plaintiffs merely asked the court to render an advisory opinion on administrative regulations that did not apply to them. *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537 (10th Cir. 2016), assessed standing for individual plaintiffs to bring claims under state firearm statutes on behalf of themselves, not a class, after trial. And *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 44 (1976), dismissed for lack of standing where a plaintiff failed to allege an injury and failed to allege Defendants' conduct caused such injury.

Dated: March 24, 2023                    Respectfully submitted,

                                         */s/ Brent W. Johnson*
                                         Brent W. Johnson
                                         Benjamin D. Brown
                                         Daniel H. Silverman
                                         Alison S. Deich
                                         Zachary Glubiak
                                         Zachary I. Krowitz
                                         COHEN MILSTEIN SELLERS & TOLL PLLC
                                         1100 New York Avenue NW, 5th Floor
                                         Washington, DC 20005
                                         Telephone: (202) 408-4600
                                         Facsimile: (202) 408-4699
                                         bjohnson@cohenmilstein.com
                                         bbrown@cohenmilstein.com
                                         dsilverman@cohenmilstein.com
                                         adeich@cohenmilstein.com
                                         zglubiak@cohenmilstein.com
                                         zkrowitz@cohenmilstein.com

                                         */s/ Shana E. Scarlett*
                                         Shana E. Scarlett
                                         Rio S. Pierce
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                         715 Hearst Avenue, Suite 202
                                         Berkeley, CA 94710
                                         Telephone: (510) 725-3000
                                         Facsimile: (510) 725-3001
                                         shanas@hbsslaw.com
                                         riop@hbsslaw.com

                                         Steve W. Berman
                                         Breanna Van Engelen
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                         1301 Second Avenue, Suite 2000
                                         Seattle, WA 98101
                                         Telephone: (206) 623-7292
                                         steve@hbsslaw.com
                                         breannav@hbsslaw.com

                                         Elaine T. Byszewski

Abigail D. Pershing
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, CA 91101
Tel: (213) 330-7150
elaine@hbsslaw.com
abigailp@hbsslaw.com

*/s/ George F. Farah*
George F. Farah
Rebecca P. Chang
Nicholas J. Jackson
HANDLEY FARAH & ANDERSON PLLC
33 Irving Place
New York, NY 10003
Telephone: (212) 477-8090
gfarah@hfajustice.com
rchang@hfajustice.com
njackson@hfajustice.com

William H. Anderson (Co. Bar 45960)
HANDLEY FARAH & ANDERSON PLLC
4730 Table Mesa Drive, Suite G-200
Boulder, CO 80305
Telephone: (202) 559-2433
wanderson@hfajustice.com

Matthew K. Handley
Rachel E. Nadas
HANDLEY FARAH & ANDERSON PLLC
200 Massachusetts Avenue, NW, Seventh Floor
Washington, DC 20001
Telephone: (202) 559-2433
mhandley@hfajustice.com
rnadas@hfajustice.com

Simon Wiener
HANDLEY FARAH & ANDERSON PLLC
68 Harrison Avenue, Suite 604
Boston, MA 02111
Telephone: (202) 921-4567
swiener@hfajustice.com

Martha E. Guarnieri

HANDLEY FARAH & ANDERSON PLLC
1727 Snyder Avenue
Philadelphia, PA 19145
Telephone: (215) 422-3478
mguarnieri@hfajustice.com

*Proposed Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

Brian D. Clark
Stephen J. Teti
Eura Chang
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
bdclark@locklaw.com
sjteti@locklaw.com
echang@locklaw.com

Eric L. Cramer
Candice J. Enders
Julia R. McGrath
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA19103
Telephone: (215) 875-3000
ecramer@bm.net
cenders@bm.net
jmcgrath@bm.net

*Additional Counsel for Plaintiffs and the Proposed Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 24, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice to counsel for all parties that have appeared in this case.

*/s/ Brent W. Johnson*
Brent W. Johnson