# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| RON BROWN, MINKA GARMON, and JESSIE CROFT, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| JBS USA FOOD COMPANY; TYSON FOODS, INC., CARGILL, INC., CARGILL MEAT SOLUTIONS CORP.; HORMEL FOODS CORP.; AMERICAN FOODS GROUP, LLC; TRIUMPH FOODS, LLC; SEABOARD FOODS, LLC; NATIONAL BEEF PACKING CO., LLC; IOWA PREMIUM LLC; SMITHFIELD FOODS INC.; SMITHFIELD PACKAGED MEATS CORP.; AGRI BEEF CO.; WASHINGTON BEEF, LLC; PERDUE FARMS, INC.; AGRI STATS, INC.; and WEBBER, MENG, SAHL AND COMPANY, INC. d/b/a WMS & COMPANY, INC., | Civil Action No. 1:22-cv-02946-PAB-STV |
| Defendants. | |

## DEFENDANTS' JOINT REPLY IN SUPPORT OF MOTION TO DISMISS

Named Plaintiffs' ("NPs") Opposition to Defendants' Joint Motion to Dismiss (ECF No. 179, "Opp.") brings them no closer to stating a plausible claim for relief under the Sherman Act. In 45 pages and 135 footnotes, NPs misstate the law, posit new theories and unpleaded facts, paper over their delay in filing the Complaint, and attempt to refashion their patchwork of allegations into a plausible nine-year, nationwide conspiracy that encompasses the beef- and pork-processing industries. But NPs cannot speculate their way into a viable antitrust claim. The Court should grant Defendants' Motion to Dismiss (ECF No. 164, "Mot.").

# ARGUMENT

## I.   NPs' Arguments Cannot Rehabilitate Their *Per Se* Wage-Fixing Claim.

NPs never remedy the disconnect between their factual allegations and the vast conspiracy they posit. They misapply governing law, confuse direct and circumstantial evidence, and fail to advance their *per se* claim over the plausibility threshold.

### A.   NPs Misstate the Legal Standard That Applies to Their Conspiracy Claims.

NPs start by accusing Defendants of applying the wrong legal standard to their *per se* conspiracy claim. Opp. 5. NPs assert that antitrust conspiracy plaintiffs do not have to plead facts that "'tend to exclude the possibility'" of independent decision-making, but "need only allege 'plausible grounds to infer an agreement.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-56 (2007)).[1] NPs misunderstand the law.

Tenth Circuit precedent is clear: plaintiffs who rely on circumstantial evidence to plead a conspiracy must allege facts that "'tend to exclude the possibility' of independent action." *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1179 (10th Cir. 2019) (quoting *Twombly*, 550 U.S. at 554). Without that, there is no plausible basis to infer a conspiracy. *See id.* at 1179-80. NPs insist that "tends to exclude" describes the summary-judgment standard. Opp. 5. But *Llacua* is a pleading-stage decision and never mentions summary judgment. In fact, *Llacua* cites *Twombly*— the leading decision on pleading antitrust conspiracies—each time it invokes the "tends to exclude" standard, emphasizing that this rule is "applicable to every § 1 case." 930 F.3d at 1179-80 (quoting *Twombly*, 550 U.S. at 554). This is no surprise; the *Twombly* Court itself affirmed

---

[1] Unless noted, all emphasis is added; internal quotations, citations, and alterations omitted.

the dismissal of antitrust conspiracy claims where the allegations were just as consistent with "natural, unilateral" conduct as with collusion. 550 U.S. at 566.[2]

Regardless of how NPs characterize the standard, they do not meet it. The Complaint does not plead plausible direct or circumstantial evidence of a nearly-decade-long wage-fixing conspiracy that spanned the continental United States and two distinct protein industries.

**B.      NPs Do Not Allege Direct Evidence of a *Per Se* Wage-Fixing Agreement.**

Direct evidence in a Section 1 case "is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Llacua*, 930 F.3d at 1177. NPs acknowledge this rule, but insist that they plead smoking-gun evidence in the form of "statements from Defendants' employees that establish an unlawful agreement." Opp. 7. Because NPs allege that every Defendant entered into a sweeping conspiracy "to fix and depress the compensation paid to employees at red meat processing plants," Compl. ¶ 1, direct evidence here would take the form of an admission that Defendants entered into *that* conspiracy. *See Llacua*, 930 F.3d at 1177 (direct evidence in wage-fixing case must "directly establish an agreement to fix wages"). NPs' "direct evidence" does not come close to meeting that requirement.

NPs rely primarily on an allegation that WMS survey administrator Jonathan Meng warned Defendant Processors that they were "improperly exchang[ing] future compensation data in a manner that was inconsistent with federal antitrust law." Opp. 7 (citing Compl. ¶ 8). This is not direct evidence of "an agreement to fix wages." *See Llacua*, 930 F.3d at 1177. Meng does not

---

[2] In *Twombly*, the Supreme Court also quoted approvingly from the district court, which "understood that . . . plaintiffs must allege additional facts that 'ten[d] to exclude independent self-interested conduct as an explanation for defendants' parallel behavior.'" 550 U.S. at 552 (quoting *Twombly v. Bell Atl. Corp.*, 313 F. Supp. 2d 174, 183 (S.D.N.Y. 2003)).

aver that Defendants agreed to fix employee wages, nor is exchanging information *per se* unlawful. Mot. 25. Meng's legal opinion is not direct evidence of a wage-fixing conspiracy.

Next, NPs point to the allegation that a Seaboard HR manager called counterparts at other unnamed pork processors, ostensibly to discuss pay ranges. Opp. 8. NPs contend that Seaboard, but not other pork or beef processors, used this data to "reduce and eliminate competition with those competing pork processors for labor" and to "reduce worker turnover." Compl. ¶ 269. Again, allegations describing *ad hoc* information exchanges and one Defendant's use of that information do not qualify as direct evidence of an agreement to fix wages, let alone one that involved 15 processors, spanned the entire country, and lasted nearly a decade.

Finally, NPs allege a discrete no-poach agreement between plant managers at Iowa Premium's Tama, Iowa and JBS's Marshalltown, Iowa facilities. Opp. 8. NPs urge the Court to *infer* the existence of a sweeping conspiracy to fix wages from an allegation that managers at two plants agreed not to poach each other's employees. *See id.* But, as NPs admit, direct evidence does not require the fact finder to draw inferences to establish facts. Opp. 7 (citing *Llacua*, 930 F.3d at 1177). NPs' self-defeating argument rests on multiple inferences, and implausible ones at that. The allegation of a single no-poach agreement between two plants in an isolated geography does not suggest a nationwide conspiracy. *See In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 975 (N.D. Iowa 2011) (allegations of "certain bilateral agreements" did not support "inferences of a wider conspiracy"). NPs never identify allegations that directly establish a nationwide wage-fixing conspiracy.

**C.   NPs' Circumstantial Allegations Do Not Plausibly Suggest a Nine-Year, Nationwide Agreement to Fix Pork and Beef Workers' Wages.**

NPs' pivot from direct evidence to circumstantial conspiracy allegations does not advance their cause: NPs cannot identify factual allegations that lay a plausible foundation for the sweeping wage-fixing conspiracy they ask the Court to infer.

**1.   NPs Misunderstand Their Burden to Plead Circumstantial Evidence of Conspiracy.**

NPs begin by standing up a straw man—that "Defendants incorrectly assert that the 'whole' of the Complaint cannot be 'greater than the sum of its parts.'" Opp. 6. There is no dispute: NPs' pleadings "must be evaluated holistically to determine whether they state a conspiracy claim." *See In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 53 (9th Cir. 2022). The issue here is that the "whole" of NPs' Complaint "*is not* greater than the sum of its parts." Mot. 1. Why? Because "[n]one of NPs' allegations, considered individually or together, 'raises a suggestion of a preceding agreement' among all Defendants." *Id.* at 1-2 (quoting *Twombly*, 550 U.S. at 557); *see In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1260-62 (W.D. Wash. 2009) ("In this case, the whole is not more than the sum of the parts"; dismissing conspiracy claim).

NPs also assert that they need not plead parallel conduct to state a circumstantial conspiracy claim. Opp. 9-10. They are mistaken: plausible allegations showing parallel conduct are necessary (but not sufficient) to plead an unlawful conspiracy based on circumstantial evidence. *See, e.g.*, *Twombly*, 550 U.S. at 557 ("A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim[.]"). The weight of authority requires plaintiffs to allege parallel conduct and "plus

factors" to state a circumstantial-evidence claim.[3] This case proves the wisdom of the majority rule: NPs cannot plausibly allege a sweeping wage-fixing conspiracy without adequately pleading that Defendants set wages in parallel. They have not done so.

### 2.     NPs Do Not Plausibly Allege Parallel Conduct.

NPs' attempted recasting of various allegations as "parallel restraints on compensation increases," Opp. 11, stretches their pleadings past the breaking point. For example, in their Opposition, NPs contend that in 2017 and 2018, "at least seven Defendants capped wage increases for their plants at exactly two percent." *Id*. They also argue for the first time that because each Defendant allegedly sought to compensate similarly situated employees similarly, these increases probably applied to "*all* of their plants." *Id.* NPs do not merely ask the Court to infer a conspiracy from parallel conduct, they ask the Court to infer the parallel conduct itself.

NPs' argument cannot substitute for well-pleaded factual allegations, and their pleadings do not support this inferential leap. At best, the Complaint alleges that a handful of processing plants raised wages by two percent in 2017 and a slightly different handful of plants raised wages by two percent in 2018. Compl. ¶¶ 319-20. Alleging that managers at these plants increased base

---

[3] *See, e.g.*, *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018) (absent plausibly pleaded parallel conduct, "no discussion of any plus factors is necessary"); *Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017) ("Bona Fide's references to 'plus factors' fail to save its Section 1 claims from dismissal. 'Plus factors' are relevant only if the complaint adequately alleges parallel conduct among the defendants."); *In re Eur. Gov't Bonds Antitrust Litig.*, 2022 WL 768680, at *23 (S.D.N.Y. 2022) ("To survive a motion to dismiss, adequately alleging parallel conduct is the first prerequisite for an antitrust plaintiff lacking direct evidence."); *Jien v. Perdue Farms, Inc.* ("*Jien I*"), 2020 WL 5544183, at *9 (D. Md. 2020) ("Given Plaintiffs' failure to plausibly allege the requisite parallel conduct, their collusion *per se* claims based on circumstantial evidence fail, and no discussion of 'plus factors' is required."). *But see, e.g.*, *Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 627-28 (E.D. Mich. 2012).

wages by two percent is not the same as saying they "capped wage increases" at exactly two percent for every plant. But even taken at face value, NPs' argument does not demonstrate parallel conduct. The allegation applies to just seven of 15 Defendant Processors in only two of the nine years of the alleged conspiracy; it says nothing about the conduct of more than half of the Defendants or most of the alleged conspiracy period.

Perhaps recognizing these problems, NPs also assert that average wages across a handful of beef plants "became more closely aligned" between 2014 and 2018. Opp. 12 (citing Compl. ¶ 321). This limited allegation touches only four Defendants, six plants, and three isolated geographies. Mot. 13. NPs' use of *average* wages is even more problematic: it eliminates Defendant-by-Defendant variation, precluding any inference of parallel conduct. *See* David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, *in* Reference Manual on Scientific Evidence 211, 239 (Fed. Judicial Ctr., 3d ed. 2011) ("The location of the center of a batch of numbers reveals nothing about the variation exhibited by these numbers.").

Finally, NPs imply that information exchanges constitute parallel business conduct. NPs cite no authority supporting this proposition. The circumstantial-evidence inquiry asks whether "plus factors" support an inference that parallel conduct resulted from an agreement. Mot. 11-12. The parallel conduct must align with the object of the alleged conspiracy; to allege wage-fixing through circumstantial evidence, NPs must allege parallel wage-setting. That is why courts reject attempts to infer price- or wage-fixing agreements from information exchanges. *See, e.g.*, *Jien I*, 2020 WL 5544183, at *8 (rejecting plaintiffs' "theory of parallel conduct" that "center[ed] on information exchanges" because "it is not enough to simply show that companies were acting similarly in *any* limited way"); *Eur. Gov't Bonds*, 2022 WL 768680, at *23 (chat transcripts

"reflect[ing] only a sharing of information" did not demonstrate "conscious parallelism"). NPs' information-sharing allegations do not support a claim of parallel conduct absent allegations demonstrating parallel wage outcomes. *See City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117, 132 (D.D.C. 2006) ("Without evidence of actual prices charged by these defendants, the plaintiff cannot show that the defendants' behavior was in fact parallel[.]").

> ### 3.   NPs' Plus-Factor Allegations Do Not Support a Plausible Inference of Conspiracy.

Because NPs do not "plausibly allege[] any parallel conduct among the defendants," their "'plus factors' are . . . irrelevant to determining whether the complaint made out a viable Section 1 claim." *See Bona Fide Conglomerate*, 691 F. App'x at 391. In any event, considered individually or holistically, NPs' plus-factor allegations do not suggest a nine-year, nationwide wage-fixing conspiracy spanning the pork- and beef-processing industries.

***Red Meat Compensation Survey.*** NPs take issue with two aspects of the Red Meat Industry Compensation Survey: participants' submission of certain future compensation data to consultant WMS, and their attendance at private roundtable sessions following WMS presentations in 2014, 2015, and 2017. Opp. 14-16; *see also* Compl. ¶ 243.

With respect to the former, NPs argue that it "ma[de] little sense" for participants to share future wage data in the absence of a conspiracy because others could use that data to "poach" a sharer's employees. Opp. 15-16. But NPs allege that survey participants could *not* deanonymize the survey data without Jonathan Meng's assistance. *See* Compl. ¶ 225.[4] And they never allege

---

[4] NPs assert that Defendants shared data that were "non-anonymous or easily deanonymized." Opp. 16. But most allegations NPs cite for support relate to Agri Stats, which NPs admit was not available to beef producers. *See id.* (citing Compl. ¶¶ 296-99); *infra* 10. They also cite a

that Meng provided that assistance. NPs' real issue is with alleged "[d]ata-gathering and information sharing," but those are "perfectly legitimate objectives of trade associations." *See Jones v. Micron Tech., Inc.*, 400 F. Supp. 3d 897, 918 (N.D. Cal. 2019); *see also Jien I*, 2020 WL 5544183, at *8 ("[T]he fact that companies all used the same benchmarking companies' data to inform their wages is insufficient to permit a circumstantial inference of collusion.").

Trying another angle, NPs suggest that Defendants must have conspired during private roundtable sessions from which they excused Jonathan Meng. Opp. 15. Why excuse Meng, NPs wonder, when it would have cost participants nothing for him to stay? *Id.* NPs undermine that premise: they allege that participants paid a flat annual rate to WMS "to participate in the annual Red Meat Industry Compensation Survey and receive the Survey Results Report," Compl. ¶ 162, but they do *not* allege that the flat fee compensated Meng for his time at meetings. Nor do NPs grapple with an obvious alternative explanation for Meng's departure: his role was to deliver the survey results, and he left after completing that task. That appears to be Meng's reading of the situation: despite their conclusory allegations about activity "inconsistent with federal antitrust law," *id.* ¶ 8, NPs do not allege that Meng ever raised concerns about these private roundtables or offered to remain in an antitrust-policeman capacity. Ultimately, it was the participants themselves who allegedly asked Meng to assume that responsibility. *Id.* ¶ 260.[5]

---

conclusory assertion that WMS surveys "employed sham data anonymization techniques," *see* Opp. 16 (citing Compl. ¶ 378), but they later contravene that claim when they allege that Defendants could not deanonymize the data without Meng's assistance, s*ee* Compl. ¶ 225.

[5] NPs argue in parallel that Meng's attendance at the roundtable sessions and his absence from them are evidence of wrongdoing. They say it is "difficult to explain" why Defendants would ask Meng to leave "absent unlawful collusion," Opp. 15, but also allege that Defendants asked Meng to attend the meetings beginning in 2018 as a ruse "to avoid the appearance of collusion,"

At bottom, NPs' argument is that these roundtable sessions presented survey participants with an opportunity to collude. *See* Compl. ¶ 246. But "[m]ere conspiratorial opportunity is routinely and correctly held insufficient to support a conspiracy finding." *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1270 (11th Cir. 2019) (quoting Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1417b (2003 ed.)). "[D]eeming opportunity to be prima facie proof of conspiracy would lead to widespread condemnation of procompetitive collaborations." *Id.*

**Participation in Agri Stats.** NPs say strikingly little in defense of their claim that Defendants exchanged conspiratorial communications through Agri Stats. They neither dispute that only pork processors participated nor "attempt to establish a plausible nexus between Agri Stats reports and the beef processors who never received them." Mot. 18. They never address or correct their misstatement that "most" beef processors "also process pork," Compl. ¶ 303; Mot. 7, and they never explain why it is reasonable to equate some Defendants' use of a benchmarking service with participation in a nationwide conspiracy to fix wages. *See Jien I*, 2020 WL 5544183, at *8 ("[T]he fact that companies all used the same benchmarking companies' data to inform their wages is insufficient to permit a circumstantial inference of collusion.").

**One-off communications.** NPs reel off four allegations describing *ad hoc* contacts between a subset of different Defendants, about different topics, at different times. Opp. 16-17. NPs never explain how this handful of contacts can support the weight of an alleged nine-year,

---

Compl. ¶ 260. This inconsistency underscores the implausibility of NPs' allegations: they simply recharacterize Meng's role at the roundtable meetings based the inference they want to draw.

nationwide wage-fixing conspiracy spanning the pork- and beef-processing industries. The Complaint never links these few allegations to the "larger picture" of the overarching conspiracy NPs allege. *See Dahl v. Bain Cap. Partners, LLC*, 937 F. Supp. 2d 119, 137 (D. Mass. 2013) (evidence of isolated transactions and specific communications "fails to connect to a larger picture of an overarching conspiracy").

Rather, NPs characterize these sporadic contacts as illicit because they allegedly did not comport with the Department of Justice's since-withdrawn Health Care Guidelines. Opp. 17. But the Department itself rejected the suggestion that conduct inconsistent with the Guidelines is necessarily unlawful. *See* U.S. Dep't Just., Statements of Antitrust Enforcement Policy in Health Care 5-6 (1996) (the "view" that the Guidelines "defin[e] the limits of joint conduct that is permissible under the antitrust laws . . . is incorrect"). This category of information-exchange allegations is no more probative than the first two. Individually or taken together, they do not suggest a nine-year, nationwide wage-fixing conspiracy across the pork and beef industries.

***Industry characteristics.*** NPs offer no real defense of their allegations that "industry characteristics" render the pork- and beef-processing industries susceptible to collusion. *See* Opp. 18-19. NPs still fail to offer specific factual allegations demonstrating the characteristics they ascribe to these industries. *See* Mot. 21-22. In any event, these alleged characteristics make it *more* likely that any parallel conduct was the product of an interdependent market rather than unlawful agreement. *See, e.g.*, *DRAM*, 28 F.4th at 52 (high barriers to entry and concentration make it "more likely" that firms will engage in conscious parallelism—imitating one another without prior agreement); *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 823-24 (N.D.

Ill. 2017) (in markets characterized by product interchangeability and inelasticity of demand, competitors may be incentivized not to compete on price absent unlawful agreement).

Similarly, NPs mount an indifferent defense of their contention that opportunities to collude and a history of government investigations support an inference of conspiracy. *See* Opp. 18-19. Neither argument works here. In the absence of more specific factual allegations suggesting the existence of an antitrust conspiracy, "mere opportunity to conspire is not enough to plead antitrust liability." *Snyder v. ACORD Corp.*, 2016 WL 192270, at *10 (D. Colo. 2016). And NPs' stale and vague allegations of past investigations in the pork- and beef-processing industries do not support an inference of a contemporary conspiracy. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (rejecting claim that "if it happened there, it could have happened here"); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (mere existence of government investigation "carries no weight in pleading an antitrust conspiracy claim").

Taken together, NPs' allegations do not support a plausible inference that Defendants conspired for nearly a decade to fix wages at 140 beef- and pork-processing plants around the country. At most, NPs plead that Defendant Processors used market data from various sources to "analyze and benchmark their salaries and benefits"—while independently "mak[ing] decisions" about compensation at their "respective" plants. Compl. ¶¶ 218-19. That is not a "semantic game[]," Opp. 20; it is a conclusion that logically flows from the Complaint, and it is the reason why this Court should dismiss NPs' *per se* wage-fixing claim. The allegations do not tend to exclude the possibility that Defendants made independent decisions about wages and benefits.

II.     **The Court Should Dismiss NPs' Rule-of-Reason Claim.**

NPs' arguments in support of their second claim for relief tread familiar ground: they sidestep the fundamental pleading defects that Defendants exposed, mischaracterize Defendants' arguments, and distort governing law. The Court should dismiss NPs' rule-of-reason claim.

A.     **NPs Do Not Allege Facts Describing a Plausible Relevant Market.**

NPs start by trying to move the goalposts: they assert that they need not establish the contours of a plausible relevant antitrust market because they have alleged "[d]irect evidence of anticompetitive effects." Opp. 21. That is wrong. Regardless of how NPs seek to prove anticompetitive effects, they must plausibly "define the relevant market" in which those effects manifested. Mot. 26; *see Ohio v. Am. Express Co.* ("*Amex*"), 138 S. Ct. 2274, 2284-85 (2018) (without market definition "there is no way to measure [the defendant's] ability to lessen or destroy competition"); *Tarabishi v. McAlester Reg'l Hosp.*, 951 F.2d 1558, 1569 n.15 (10th Cir. 1991) (requiring relevant-market allegations so "impact on *competition* can be evaluated").

NPs read *Amex* as relieving them of their obligation to "precisely define the relevant market." Opp. 22 (quoting *Amex*, 138 S. Ct. at 2285 n.7). But *Amex* carved out that exception for "agreements between competitors not to compete in some way," 138 S. Ct. at 2285 n.7, referring to cases in which such agreements required "no elaborate industry analysis . . . to demonstrate [their] anticompetitive character," *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986). Agreements to exchange information are not "agreements . . . not to compete," such that a court can forego "defin[ing] the relevant market to conclude that these agreements [a]re anticompetitive." *See Amex*, 138 S. Ct. at 2285 n.7; *see also* Mot. 25; *Jien I*, 2020 WL 5544183, at *9. NPs must satisfy the "threshold requirement" for their rule-of-reason claim: plausibly

"defining the product and geographic market." *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1244 (10th Cir. 2016).

On the substance, NPs characterize the critiques of their relevant-market allegations as "internally contradictory." Opp. 27. There is no contradiction: NPs' relevant-market allegations are too broad in some respects and too narrow in others. NPs' proposed market is too narrow because it excludes reasonably interchangeable employment opportunities for putative class members outside beef- and pork-processing plants. It is too broad because NPs define that market *collectively* for employees like engineers, medical staff, and custodians, who possess different skills and qualifications and pursue different types of jobs. This is not a case in which an "overbroad market" suffices at the pleading stage because it "understat[es]" Defendants' market power. *Id.* at 28-29. Rather, NPs overstate market power for *each* of what should be several distinct markets by lumping them all together and sanding away their differences.

NPs do not dispute that reasonably interchangeable employment opportunities turn on the qualifications and experience of the employees, or that their proposed market encompasses entry-level, hourly-wage custodial staff *and* the most senior, salaried supervisors. Indeed, NPs list a series of traits that highlight the diversity of this group (*e.g.*, educational attainment, English language skills).[6] Nevertheless, NPs ask the Court to treat this diverse labor pool

---

[6] NPs do not seriously contend that three of these characteristics—lack of education, limited English fluency, and dangerous workplace conditions—apply to all the employee groups they cram into their single market definition. Instead, NPs argue—referring to one methodology for defining relevant markets (the "SSNDC" test)—that it is sufficient if wage suppression would be profitable because "enough" employees would not change jobs. Opp. 29. That argument assumes (incorrectly) that it is appropriate to run an "SSNDC" test across all types of employees. Regardless, NPs point to nothing in the Complaint plausibly suggesting that these characteristics constrain "enough" of the 150,000 employees at issue.

monolithically on the basis of a bare assertion that "*all* Class Members . . . gain red meat specific skills." Opp. 27. NPs' only support—a claim that *some* workers develop red-meat-specific "deboning" and "trimming" skills, *id.* at 26—proves Defendants' point. That allegation is irrelevant to janitors, mechanics, supervisors, and countless other positions NPs do not address.

Finally, NPs invoke *Jien I*, in which the court accepted relevant-market allegations at the pleading stage. 2020 WL 5544183, at *11. The *Jien* court characterized the plaintiffs' allegations as "thin" and warned that "significant questions" remained about their viability. *Id.* This Court should not apply such an admittedly "low bar," *id.*, especially given *Twombly*'s admonition that "[i]t is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out" through costly discovery. 550 U.S. at 559. *Twombly*'s proviso applies with even greater force here—where the Complaint spans the pork and beef industries—than it did in *Jien*, which concerns only the poultry industry.

**B.     NPs Fail to Plead Direct Anticompetitive Effects.**

Despite arguing that anticompetitive-effects allegations relieve them of their obligation to allege a plausible relevant antitrust market, NPs neglect to plead the former. Remarkably, they do not dispute that they have failed to allege any *actual*, *market-wide* anticompetitive effects— NPs reference only a handful of isolated allegations about certain hourly wages at a small fraction of Defendants' plants over a discrete portion of the relevant period. Opp. 23.

NPs attempt to buttress these paltry allegations in two ways. First, NPs include conclusory allegations of broader market-wide effects. *See id.* Those assertions are insufficient as a matter of law. *See Giordano v. Saks Inc.*, 2023 WL 1451534, at *19 (E.D.N.Y. 2023) ("Even at the pleading stage, without supporting facts, such conclusory statements [of market-wide

anticompetitive effects] are insufficient.").[7] Second, relying on a misreading of *Budicak, Inc. v. Lansing Trade Group, LLC*, 452 F. Supp. 3d 1029 (D. Kan. 2020), NPs claim to have alleged "direct evidence" of "anticompetitive effect" by asserting that Defendants "designed" information exchanges to suppress wages. Opp. 22-23. NPs cannot allege anticompetitive effects by claiming that Defendants intended to suppress wages. *See SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 969-70 (10th Cir. 1994) (anticompetitive "intent . . . is not an objective basis upon which section 1 liability may be found"). *Budicak* is not to the contrary. That case refers to "direct evidence *of conversations*" as part of a conspiracy claim; it did not address direct evidence of *anticompetitive effects*. 452 F. Supp. 3d at 1055, 1057 ("Because Plaintiffs have alleged the existence of indirect evidence [of anticompetitive effects], they need not also allege direct anticompetitive effects.").

## III.     The Court Should Dismiss NPs' Claims Because They Are Time-Barred.

In an effort to save their untimely claims, NPs distort their allegations and the relevant legal standards for tolling the statute of limitations. Neither strategy excuses their delay.

### A.     NPs Fail To Adequately Plead Fraudulent Concealment.

To start, NPs' assertion that fraudulent-concealment allegations can never be resolved on a motion to dismiss is wrong. Opp. 31. A district court should dismiss an untimely claim where

---

[7] None of NPs' cases approve of similarly threadbare allegations. *See Todd v. Exxon Corp.*, 275 F.3d 191, 214 (2d Cir. 2001) (complaint included quantitative detail showing "market-wide" effects on salaries); *Been v. O.K. Indus., Inc.*, 398 F. App'x 382, 386 (10th Cir. 2010) (expert testimony showed defendant's practices "impacted immediate resale and national prices"); *Chase Mfg., Inc. v. Johns Manville Corp.*, 2022 WL 522345, at *5-7, 10 (D. Colo. 2022) (describing evidence of market-wide supracompetitive pricing). In *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278 (4th Cir. 2012), the court concluded that in light of well-founded market power allegations, allegations of anticompetitive effects were "economically plausible." *Id.* at 290-91. Here, NPs have not even adequately alleged a relevant market in which to assess market power.

"the facts underlying the allegation of fraudulent concealment are so tenuous, vague, or insufficiently established that the claim fails as a matter of law." *Bistline v. Parker*, 918 F.3d 849, 880 (10th Cir. 2019).[8] That is the case here.

*NPs do not plead any affirmative acts of concealment.* NPs incorrectly claim they can satisfy the first element of fraudulent concealment by alleging a self-concealing antitrust violation. Opp. 31. "The Tenth Circuit has *never* applied the self-concealing standard, and . . . has consistently required proof of an affirmative act to support a claim of fraudulent concealment to toll the statute of limitations." *In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1160 (D. Kan. 2012). The Complaint is bereft of allegations describing affirmative acts of concealment. NPs implicitly concede as much: they never address the series of legal deficiencies and contradictions that Defendants identified in their Motion.[9]

*NPs were on inquiry notice.* NPs' argument that the Court cannot decide the diligence element of fraudulent concealment on a motion to dismiss, Opp. 38, is also wrong. *See, e.g.*, *Ballen v. Prudential Bache Sec., Inc.*, 23 F.3d 335, 337 (10th Cir. 1994) (evaluating all elements of fraudulent concealment at the pleading stage and affirming dismissal). The prior lawsuits that NPs rely upon as purported evidence of Defendants' anticompetitive conduct show that NPs

---

[8] The cases that NPs cite in footnotes do not hold otherwise. *See, e.g.*, *King & King Enters. v. Champlin Petroleum Co.*, 657 F.2d 1147, 1154 (10th Cir. 1981) (discussing fraudulent concealment on appeal from a jury verdict, not at the motion-to-dismiss stage).

[9] *See, e.g.*, Mot. 35 (explaining that courts routinely reject conclusory allegations of "secret" meetings); *id.* (showing how NPs' contradictory allegations demonstrate that Defendants' employees openly discussed "secret" meetings and surveys); *id.* at 35-36 (citing other courts that have considered and rejected as legally insufficient the generic, public statements NPs attribute to Agri Stats); *id.* at 36 (characterizing vague allegations that Defendants misrepresented their wages as fair and competitive as legally insufficient).

have been on inquiry notice since at least as early as September 2016, when *Broilers* was filed. Mot. 36-37. Inquiry notice does not require identical claims; similarity suffices. *See Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1203-04 (10th Cir. 1998) (public disclosures "need not discuss each and every aspect of the alleged [illegal] activity" to provide inquiry notice); *see also 421-A Tenants Ass'n, Inc. v. 125 Ct. St. LLC*, 760 F. App'x 44, 49 (2d Cir. 2019) (filing of a lawsuit "against one of the same defendants" that is "in sum and substance similar to the" alleged claims is sufficient to put plaintiffs on inquiry notice). Here, NPs have been on notice of Agri Stats as an alleged source of information-sharing for years, and the prior lawsuits concerned the same parties (*Broilers* included Agri Stats, Perdue and Tyson, Compl. ¶ 256; and *Pork* included Agri Stats and the Pork Processor Defendants, *id.* ¶ 328); the same markets (the pork- and beef-processing markets, *id.* ¶ 328); and the same allegations of wage-fixing and information exchanges (*Jien* alleged a poultry-plant wage-suppression conspiracy via surveys and meetings, *id.* ¶ 261). Indeed, the same plaintiffs' counsel who filed this case also filed the *Jien* action. *See* No. 1:19-cv-02521 (D. Md.).

### B.    NPs Do Not Adequately Plead a Continuing Violation.

NPs' arguments in support of their claims of a continuing violation are similarly unavailing. First, NPs try to recast allegations regarding the Red Meat Surveys and Red Meat Meeting in 2019 as overt acts within the limitations period (*i.e.*, after November 11, 2018, four years before the Complaint's filing). Opp. 40-41. But this argument runs headlong into allegations in the Complaint showing that any supposedly unlawful conduct *ended* before that date. NPs allege that the exchange of future compensation data facilitated the alleged wage-fixing conspiracy. Compl. ¶ 187 ("Defendant Processors unlawfully designed the survey in a

manner to *exchange future compensation data*.”). But they admit that the 2019 survey “omitted data regarding salary increases in *future* years.” Opp. 41. As for the 2019 Red Meat Meeting, NPs suggest that Meng’s attendance at that meeting did not halt Defendants’ allegedly unlawful conduct; yet the Complaint concedes that Meng would have “halted” any conspiratorial discussions “in his presence.” Compl. ¶ 248. NPs cannot have it both ways.

Second, NPs rely entirely on the conclusory allegation that “[e]very month during the Class Period, Agri Stats distributed disaggregated compilations of data to each of the subscribing Pork Processor Defendants.” Opp. 42 (citing Compl. ¶ 286). At most, this allegation relates only to the Pork Processor Defendants. Moreover, the allegations are largely undated, and the only ones with a specific date relate to data collected in 2017. These pleadings cannot establish a continuing violation here. *See* Mot. 34.[10]

Finally, NPs point to allegations of continuing wage payments. In a case alleging wage-fixing, continuing wage payments do not support a finding of a continuing conspiracy. *See In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1212 (N.D. Cal. 2015) (refusing to apply the “price-fixing analogy” to a wage-fixing claim and rejecting allegations that “[p]laintiffs received artificially depressed compensation” every time they were paid during the class period as new and independent overt acts); *Giordano*, 2023 WL 1451534, at *8 (rejecting similar arguments and distinguishing wage-fixing claims from price-fixing claims); Mot. 32-33. NPs simply ignore this distinction and instead point to inapposite price-fixing cases. Opp. 42-43; *see Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189-90 (1997) (analogizing accrual principles under

---

[10] NPs do not dispute the insufficiency of their bilateral-communication allegations given that their own pleadings do not allege any bilateral communications after 2016. *See* Mot. 33-34.

civil RICO to a price-fixing theory). NPs' wage-payment assertions are just like those that *Animation Workers* rejected, and they do not suffice to allege a continuing conspiracy.

## IV.    NPs Do Not Have Standing to Assert Claims on Behalf of Salaried Employees.

NPs are hourly employees. Any injuries they allegedly suffered do not afford them standing to pursue claims for salaried employees. NPs' arguments to the contrary fail.

NPs' reliance on *Jien v. Perdue Farms, Inc.* ("*Jien II*"), 2021 WL 927456 (D. Md. 2021) is misplaced. That court had "already determined that plaintiffs ha[d] sufficiently pled the existence of a singular poultry labor market, irrespective of whether the workers [we]re salaried or hourly." *Id.* at *3. It was against this inapplicable backdrop that the *Jien II* court determined that named plaintiffs could pursue claims on behalf of absent class members. Here, NPs have not sufficiently pleaded (and cannot plausibly plead) a single red-meat processing labor market, *see* Mot. 26-30; *supra* 13-15. *Jien II* is inapposite.

NPs also ignore Defendants' discussion of *Kjessler v. Zaappaaz, Inc.*, 2019 WL 3017132 (S.D. Tex. 2019). The *Kjessler* court rejected the named plaintiffs' argument that they had standing to pursue claims on behalf of class members whose injuries flowed from purchasing allegedly price-fixed products that were different from those that the named plaintiffs purchased. The same reasoning applies here: it is undisputed that NPs worked in hourly positions and not salaried positions like many of the absent class members. NPs do not "possess the same interest and suffer the same injury" as those absent class members. *Id.* at *6. The Court should dismiss NPs' claims seeking redress on behalf of salaried employees.

## CONCLUSION

For the foregoing reasons, the Court should dismiss NPs' Complaint.

Dated: April 21, 2023                          Respectfully submitted,

/s/ Michael F. Tubach
Michael F. Tubach
Margaret P. Tomlinson
O'MELVENY & MYERS LLP
Two Embarcadero Center
San Francisco, California 94111
Telephone: 415-984-8700
Fax: 415-984-8701
Email: mtubach@omm.com
Email: mtomlinson@omm.com

Stephen J. McIntyre
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
Telephone: 213-430-6000
Fax: 213-430-6407
Email: smcintyre@omm.com

Benjamin G. Bradshaw
Brian P. Quinn
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
Telephone: 202-383-5300
Fax: 202-383-5414
Email: bbradshaw@omm.com
Email: bquinn@omm.com

*Counsel for National Beef Packing Company, LLC*

/s/ Jennifer Milici
Jennifer Milici
WILMER CUTLER PICKERING HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: 202-663-6000
Fax: 202-663-6363
Email: Jennifer.Milici@wilmerhale.com

Mark Ford
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: 617-526-6000
Fax: 617-526-5000
Email: Mark.Ford@wilmerhale.com

John Walsh
WILMER CUTLER PICKERING HALE AND DORR LLP
1225 Seventeenth St., Suite 2600
Denver, Colorado 80202
Telephone: 720-274-3135
Fax: 720-274-3133
Email: John.Walsh@wilmerhale.com

Nana Wilberforce
WILMER CUTLER PICKERING HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: 213-443-5300
Fax: 213-443-5400
Email: Nana.wilberforce@wilmerhale.com

*Counsel for Cargill, Inc. and Cargill Meat Solutions Corp.*

/s/ Timothy R. Beyer
Timothy R. Beyer
Adam B. Stern
BRYAN CAVE LEIGHTON PAISNER LLP
1700 Lincoln Street, #4100
Denver, Colorado 80203
Telephone: 303-866-7000
Email: tim.beyer@bclplaw.com
Email: adam.stern@bclplaw.com

*Counsel for Agri Beef Co. and Washington Beef, LLC*

/s/ Richard B. Benenson
Richard B. Benenson, #32566
Emily R. Garnett, #45047
BROWNSTEIN HYATT FARBER SCHRECK, LLP
410 Seventeenth Street, Suite 2200
Denver, Colorado 80202-4432
Telephone: 303-223-1100
Fax: 303-223-1111
Email: rbenenson@bhfs.com
Email: egarnett@bhfs.com

David L. Hashmall, #138162
FELHABER LARSON
220 South Sixth Street, Suite 2200
Minneapolis, Minnesota 55402
Telephone: 612-339-6321
Fax: 612-338-0535
Email: dhashmall@felhaber.com

*Counsel for American Foods Group, LLC*

/s/ William L. Monts III
William L. Monts III
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Tel.: 202-637-5600
Fax: 202-637-5910
Email: william.monts@hoganlovells.com

/s/ Peter H. Walsh
Peter H. Walsh
HOGAN LOVELLS US LLP
80 South Eighth Street, Suite 1225
Minneapolis, Minnesota 55402
Tel.: 612-402-3017
Fax: 612-339-5167
Email: peter.walsh@hoganlovells.com

*Counsel for Agri Stats, Inc.*

/s/ John F. Terzaken
John F. Terzaken
Abigail W. Williams
Laurel Fresquez
Jonathan R. Myers
SIMPSON THACHER & BARTLETT LLP
900 G Street, N.W.
Washington, DC 20001
Telephone: 202-636-5858
Fax: 202-636-5502
Email: john.terzaken@stblaw.com
Email: abigail.williams@stblaw.com
Email: laurel.fresquez@stblaw.com
Email: jonathan.myers@stblaw.com

*Counsel for Tyson Foods, Inc.*

/s/ Desmonne A. Bennett
Desmonne A. Bennett
FAEGRE DRINKER BIDDLE & REATH LLP
1144 Fifteenth Street, Suite 3400
Denver, Colorado 80202
Phone: 303-607-3500
Fax: 303-607-3600
Email: desmonne.bennett@faegredrinker.com

Craig S. Coleman
Emily E. Chow
Anderson C. Tuggle
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Phone: 612-766-7000
Fax: 612-766-1600
Email: craig.coleman@faegredrinker.com
Email: emily.chow@faegredrinker.com
Email: anderson.tuggle@faegredrinker.com

Kathryn E. Bettini
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, N.W., Suite 1100
Washington, D.C. 20005-1209
Phone: 202-230-5823
Fax: 202-842-8465
Email: kathryn.bettini@faegredrinker.com

Jacob D. Bylund
Robert C. Gallup
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Avenue, 33rd Floor
Des Moines, Iowa 50309
Phone: 515-248-4733
Fax: 515-248-9010
Email: jacob.bylund@faegredrinker.com
Email: robert.gallup@faegredrinker.com

*Counsel for Hormel Foods Corporation*

/s/ Brian Byrne
Brian Byrne
CLEARY GOTTLIEB STEEN & HAMILTON LLP
1841 Page Mill Road
Palo Alto, California 94304
Telephone: 650-815-4110
Fax: 650-815-4199
Email: bbyrne@cgsh.com

Carl Lawrence Malm
Blair Kuykendall
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Ave., NW
Washington, DC 20037
Telephone: 202-974-1500
Fax: 202-974-1999
Email: lmalm@cgsh.com
Email: bkuykendall@cgsh.com

*Counsel for Iowa Premium, LLC*

*/s/* Marc E. Kasowitz
Marc E. Kasowitz
Daniel J. Fetterman
Kenneth R. David
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Telephone: 212-506-1700
Fax: 212-506-1800
Email: MKasowitz@kasowitz.com
Email: DFetterman@kasowitz.com
Email: KDavid@kasowitz.com

Jonathon Watson
Joseph Hunt
SPENCER FANE LLP
1700 Lincoln Street, Suite 2000
Denver, Colorado 80203
Telephone: 303-839-3800
Fax: 303-839-3838
Email: jmwatson@spencerfane.com
Email: jhunt@spencerfane.com

*Counsel for JBS USA Food Company*

*/s/* Amy B. Manning
Amy B. Manning
Sarah A. Zielinski
Kali M. Yallourakis
MCGUIREWOODS LLP
77 West Wacker Drive, Suite 4100
Chicago, Illinois 60601-1818
Telephone: 312-849-8100
Email: amanning@mcguirewoods.com
Email: szielinski@mcguirewoods.com
Email: kyallourakis@mcguirewoods.com

*Counsel for Smithfield Foods, Inc. and Smithfield Packaged Meats Corp.*

/s/ Andrew K. Glenn
Andrew K. Glenn, #45018
A. James Spung*
HUSCH BLACKWELL LLP
1801 Wewatta Street, Suite 1000
Denver, Colorado 80202
Tel: 303-749-7200
Fax: 303-749-7272
Email: andrew.glenn@huschblackwell.com
Email: james.spung@huschblackwell.com
*Admitted to practice pending admission.

Christopher Smith
Sarah Zimmerman
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63105
Tel: 314-480-1500
Fax: 314-480-1505
Email: Chris.smith@huschblackwell.com
Email: Sarah.zimmerman@huschblackwell.com

*Counsel for Triumph Foods, LLC*

/s/ Chad D. Williams
Chad D. Williams
DAVIS, GRAHAM & STUBBS LLC
1550 17th Street, Suite 500
Denver, Colorado 80202
Telephone: 303-892-7474
Email: chad.williams@dgslaw.com

*Counsel for Seaboard Foods, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2023, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

*s/ Michael F. Tubach*
Michael F. Tubach