UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| RON BROWN, *et al.*,<br><br>         Plaintiffs,<br><br>v.<br><br>JBS USA FOOD COMPANY, *et al.*,<br><br>         Defendants. | CIVIL ACTION NO. 1:22-CV-02946-PAB-STV |

**PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT WITH WEBBER, MENG, SAHL AND COMPANY, INC., CERTIFICATION OF SETTLEMENT CLASS, AND APPOINTMENT OF SETTLEMENT CLASS COUNSEL**

### I. INTRODUCTION

Plaintiffs Ron Brown, Minka Garmon, and Jessie Croft (collectively "Plaintiffs") have reached a significant settlement ("Settlement Agreement") with Webber, Meng, Sahl and Company, Inc., d/b/a WMS and Company, Inc. ("WMS"). The Settlement Agreement, which is attached to the Farah Declaration as **Exhibit A**, provides for extraordinary cooperation with Plaintiffs in the litigation, including a 73-page sworn declaration from WMS President Jonathan Meng ("Meng Decl."). Mr. Meng's declaration, which is attached to the Farah Declaration as **Exhibit B**, confirms and builds on the Complaint's description of Defendants' conspiracy to suppress red meat processing workers' compensation. Among other crucial insights, Mr. Meng's declaration explains that:

- Defendant Processors and coconspirators referred to themselves as the "Red Meat Industry Survey Group," and the Group reached out to WMS in 2013 to retain its services. Meng Decl. ¶¶ 14-15.

- Each year from 2014 to 2019, WMS conducted a compensation survey on behalf of Red Meat Industry Survey Group, which included detailed compensation data—wages, salaries, benefits, and bonuses—for dozens of positions at red meat processing plants. *Id.* ¶ 16.

- Defendant Processors and Coconspirators (not WMS) collectively designed, controlled and managed the survey conducted for the Red Meat Industry Survey Group.

-1-

- The surveys conducted by WMS for the Red Meat Industry Survey Group contained information about future salary merits increases and salary range movements. *Id.* ¶¶ 19-21.

- Defendant Processors and Coconspirators discussed the survey results at in-person compensation meetings that were often held on an annual basis and excluded to WMS.

- The President of WMS, Mr. Meng, believes that at these annual compensation meetings, executives of Defendant Processors and Coconspirators discussed and shared compensation information. *Id.* ¶ 22.

This is the third settlement reached in this case. Plaintiffs first settled with Perdue Farms, Inc. for $1,250,000 and cooperation (ECF No. 170), and then settled with Seaboard Foods, LLC and Triumph Foods, LLC for $10,000,000 and cooperation (ECF No. 205).

Plaintiffs respectfully request that the Court enter an order: (1) preliminarily approving the Settlement Agreement; (2) certifying the Settlement Class defined below; (3) appointing Interim Co-Lead Counsel as Settlement Class Counsel; (4) appointing Plaintiffs as Settlement Class Representatives; (5) deferring notice of the Settlement Agreement to the Settlement Class until an appropriate future date; and (6) ordering a stay of all proceedings against WMS except those proceedings provided for or required by the Settlement Agreement.

## II.   SUMMARY OF SETTLEMENT AGREEMENT

Given the deep experience of Co-Lead Counsel for the class in antitrust cases, and specifically cases alleging wage suppression, the settlement discussions with WMS were undertaken with an especially deep understanding of the strengths and weaknesses of the case.

### A.   Class Definition

The proposed Settlement Class is co-extensive with the class in the operative complaint, with the exception of the Class Period: "[a]ll persons employed by Defendant Processors, their

-2-

subsidiaries, and/or related entities at beef-processing or pork-processing plants in the continental United States from January 1, 2014, until the Date of Preliminary Approval."[1]

**B.      WMS Settlement Consideration**

Settlement discussions between Plaintiffs and WMS began in the fall of 2022. Over several months, the parties negotiated the terms of their written settlement agreement, including the details and scope of the cooperation required of WMS in the litigation against the remaining Defendants. Farah Decl., ¶ 6. On June 20, 2023, Plaintiffs and WMS executed the Settlement Agreement.

As a part of the cooperation process, counsel for WMS and Mr. Meng met with Plaintiffs' counsel on several occasions and proffered extensive facts about, and responded to questions regarding, the scope and implementation of the conspiracy and its operations. Farah Decl., ¶ 6. Plaintiffs were able to test the veracity of Mr. Meng's statements by reviewing and analyzing thousands of documents that WMS subsequently shared from the files of WMS's three employees (Jonathan Meng, Scott Ramsey, and Cynthia Porter). *Id*.

As a part of WMS's cooperation obligations, Mr. Meng executed and provided a 73-page declaration to Plaintiffs detailing the scope and breadth of WMS's role in the alleged conspiracy to depress compensation. *Id*. ¶ 8. The statements in that declaration, confirmed by Plaintiffs' document review, provided significant insight into the scope and implementation of the conspiracy, including that: (1) in 2013, a group of red meat processors retained WMS to conduct annual compensation surveys of the group's membership; (2) each year from 2014 through 2019, multiple red meat processors participated in those annual compensation surveys administered by WMS; and (3) from 2014 through 2019 (with the exception of 2016), red meat processors held

---

[1] Farah Decl., **Exhibit A** at § II(E)(3). The following persons and entities are excluded from the Settlement Class: "plant managers; human-resources managers and staff; clerical staff; guards, watchmen, and salesmen; Defendants, co-conspirators, and any of their subsidiaries, predecessors, officers, or directors; and federal, state or local governmental entities." *Id.*

private roundtable meetings to discuss both the results of compensation surveys and their compensation practices. *Id.*

The Settlement Agreement obligates WMS to provide additional cooperation to Plaintiffs as they prosecute their claims against the non-settling Defendants, including: (i) the depositions of all three of WMS's current or former employees: Mr. Meng, Scott Ramsey, and Cynthia Porter; (ii) the participation of those three employees as witnesses at trial; and (iii) the authentication of documents that WMS produces in this action. *Id.* ¶ 9.

This cooperation against the remaining Defendants, which each remain jointly and severally liable for all damages caused by the members of the alleged conspiracy, has been, and will continue to be, invaluable to the Settlement Class. *Id.* ¶ 10.

### C. Release of Liability

In exchange for WMS's cooperation, upon entry of a final judgment approving the Settlement Agreement, Plaintiffs and the Settlement Class will release and discharge WMS from any and all claims arising out of or relating to "an alleged or actual conspiracy or agreement between Defendants relating to reducing competition for the hiring and retaining of, or to fixing, depressing, restraining, exchanging information about, or otherwise reducing the Compensation paid or provided to," the Settlement Class. Farah Decl., **Exhibit A** at § II(B)(2).

The Settlement Agreement, however, does not abrogate the rights of any member of the Settlement Class to recover from any other Defendant. The Settlement Agreement also expressly excludes from this release "any claims wholly unrelated to the allegations or underlying conduct alleged in the Action that are based on personal injury, bailment, failure to deliver lost goods, damaged or delayed goods, product defect, discrimination, COVID-19 safety protocols, failure to comply with wage-and-hour laws unrelated to anticompetitive conduct, or securities claims." *Id.*

-4-

### III. ARGUMENT

Settlement is strongly favored as a method for resolving disputes, particularly in complex class actions.[2] Under Federal Rule of Civil Procedure 23(e), at the preliminary approval stage, the Court looks to whether the settlement is "fair, reasonable, and adequate."[3] The review at this stage is not "as stringent as [that] applied for final approval,"[4] because "[p]reliminary approval of a class action settlement is a provisional step."[5] At preliminary approval, the Court is tasked with determining whether there is "any reason not to notify the class members of the proposed settlement and to proceed with a fairness hearing."[6] "A proposed settlement of a class action should therefore be preliminarily approved where it appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, and does not improperly grant preferential treatment to class representatives."[7]

"[T]he standards used in the [final approval] stage inform the Court's preliminary inquiry. Therefore, it is appropriate to review those standards." *Id.* Final approval will be granted if a settlement is "'fair, reasonable, and adequate'" under the Rule 23(e)(2) factors.[8] In the Tenth Circuit, these factors include whether "(1) the settlement was fairly and honestly negotiated,

---

[2] *See Sears v. Atchison, Topeka & Santa Fe Ry., Co.*, 749 F.2d 1451, 1455 (10th Cir. 1984). *See also Acevedo v. Sw. Airlines Co.*, No. 1:16-cv-00024-MV-LF, 2019 WL 6712298, at *2 (D.N.M. Dec. 10, 2019) (internal citations omitted) (in complex class actions, settlement "minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources"), *report and recommendation adopted*, 2020 WL 85132 (D.N.M. Jan. 7, 2020).

[3] Fed. R. Civ. P. 23(e)(2).

[4] *Ross v. Convergent Outsourcing, Inc.*, 323 F.R.D. 656, 659 (D. Colo. 2018) (quoting *In re Motor Fuel Temperature Sales Pracs. Litig.*, 286 F.R.D. 488, 492 (D. Kan. 2012)).

[5] *Blanco v. Xtreme Drilling & Coil Servs., Inc.*, No. 16-cv-00249-PAB-SKC, 2020 WL 3833412, at *1 (D. Colo. Mar. 8, 2020).

[6] *Id.* (quoting *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 693 (D. Colo. 2006)).

[7] *In re Molycorp, Inc. Sec. Litig.*, No. 12-cv-00292-RM-KMT, 2017 WL 4333997, at *3 (D. Colo. Feb. 15, 2017) (quotation and alteration marks omitted), *report and recommendation adopted*, 2017 WL 4333998 (D. Colo. Mar. 6, 2017).

[8] *Paulson v. McKowen*, No. 19-CV-02639-PAB-NYW, 2022 WL 168708, at *3 (D. Colo. Jan. 19, 2022) (citing Fed. R. Civ. P. 23(e)(2)).

(2) serious legal and factual questions placed the litigation's outcome in doubt, (3) the immediate recovery was more valuable than the mere possibility of a more favorable outcome after further litigation, and (4) [the parties] believed the settlement was fair and reasonable."[9] "If the settling parties can establish these factors, courts usually presume that the proposed settlement is fair and reasonable."[10] Plaintiffs address both the Rule 23 factors and the unique Tenth Circuit factors,[11] which each support preliminary approval.

### 1. The Settlement Agreement Was Fairly and Honestly Negotiated at Arm's Length

This factor requires courts to look for "indicia that the settlement negotiations in this case have been fair, honest and at arm's length."[12] Here, all parties are represented by sophisticated counsel who have played active roles in many antitrust cases across the country. The negotiations between counsel lasted for months, with multiple calls between counsel for WMS and counsel for Plaintiffs. The parties undertook a robust discussion of the strengths and weaknesses of the case. The negotiations were adversarial throughout and at no time was there any collusion which might compromise the interests of the Settlement Class. *See* Farah Decl., ¶¶ 4, 11. The fact that the parties—advised by sophisticated counsel with expertise on complex antitrust class actions—engaged in good faith negotiations "support[s] the integrity of the parties' settlement."[13]

---

[9] *Tennille v. W. Union Co.*, 785 F.3d 422, 434 (10th Cir. 2015) (quoting *Weinman v. Fid. Capital Appreciation Fund*, 354 F.3d 1246, 1266 (10th Cir. 2004)).
[10] *Martinez v. Reams*, No. 20-CV-00977-PAB-SKC, 2020 WL 7319081, at *7 (D. Colo. Dec. 11, 2020) (citing *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004)).
[11] *Rodriguez v. Hermes Landscaping, Inc.*, No. 17-2142-JWB-KGG, 2020 WL 3288059, at *2 (D. Kan. June 18, 2020).
[12] *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 693 (D. Colo. 2006).
[13] *Acevedo*, 2019 WL 6712298, at *2; *see also In re Urethane Antitrust Litig.*, No. 04-MD-1616-JWL, 2006 WL 2983047, at *1 (D. Kan. Oct. 17, 2006) (finding the settlement "fairly and honestly negotiated" when it results from "negotiations which were undertaken in good faith by counsel with significant experience litigating antitrust class actions").

### 2. The Settlement Agreement Is Adequate

The analysis under Rule 23(e)(2)(C) looks at whether "the relief provided for the class is adequate." The Tenth Circuit's factors regarding "whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt" and "whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation" both "largely overlap" with Rule 23(e)(2)(C)(i), the first subfactor of this analysis, and thus these analyses are combined and subsumed into the analysis below.[14]

First, "the parties could reasonably conclude that there are serious questions of law and fact that exist such that they could significantly impact this case if it were litigated."[15] For example, there is serious disagreement by the parties about whether the Defendants, including WMS, illegally conspired to depress workers' compensation. And, as in most antitrust cases, Defendants are sure to quarrel with the economic models that Plaintiffs will use to show the impact of the conspiracy on Class Members. Because the serious, disputed legal issues here render the outcome of the litigation uncertain, this factor weighs heavily in favor of settlement.[16]

In addition, WMS's extraordinary cooperation pursuant to the Settlement Agreement will help Plaintiffs resolve these disputed legal issues in their favor.[17] Indeed, the Declaration of Mr. Meng and the more than one million pages of documents produced by WMS have already strengthened Plaintiffs' claims. The value of WMS's immediate cooperation outweighs the mere

---

[14] *See Rodriguez*, 2020 WL 3288059, at *3 (citation omitted).
[15] *Lucas*, 234 F.R.D. at 693-94.
[16] *See Tennille*, 785 F.3d at 435 (affirming final approval of settlement where "serious disputed legal issues" rendered "the outcome of th[e] litigation … uncertain and further litigation would have been costly").
[17] *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 625 F. Supp. 2d 1133, 1138 (D. Colo. 2009) (finding the presence of serious legal and factual questions concerning the outcome of the Litigation to weigh heavily in favor of settlement, "because settlement creates a certainty of some recovery, and eliminates doubt, meaning the possibility of no recovery after long and expensive litigation").

possibility of future relief after protracted and expensive litigation. If the claims against WMS "were to be litigated, in all probability it would be many years before it was resolved." It is inherently difficult to prove a complex antitrust class action, and there are "significant risks associated with continued litigation."[18] The immediate and forthcoming cooperation from WMS mitigates these risks.

In addition, "[a]n evaluation of the benefits of the settlement also must be tempered by the recognition that any compromise involves concessions on the part of the parties."[19] Here, the parties reached agreements that necessitated compromise by both sides. *See* Farah Decl. ¶ 5. Accordingly, there is more than probable cause that the Settlement Agreement is adequate under Rule 23(e)(2)(C) and Tenth Circuit law.

### 3. Counsel for the Parties Believe the Settlement Is Fair and Reasonable

"Counsels' judgment as to the fairness of the agreement is entitled to considerable weight."[20] Here, counsel—attorneys with substantial experience in complex class action and antitrust litigation—unanimously support this settlement.[21] In analyzing this factor, courts recognize that "the recommendation of a settlement by experienced plaintiff[s'] counsel is entitled to great weight."[22] Under the Settlement Agreement, WMS has and will continue to provide substantial cooperation that will be invaluable to the Settlement Class. The Settlement Agreement

---

[18] *Temp. Servs., Inc. v. Am. Int'l Grp., Inc.*, No. 3:08-cv-00271-JFA, 2012 WL 2370523, at *12 (D.S.C. June 22, 2012). "Experience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict, particularly in complex antitrust litigation." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003).
[19] *Acevedo*, 2019 WL 6712298, at *3.
[20] *Lucas*, 234 F.R.D. at 695.
[21] *See e.g., id.* at 695 (finding unanimous approval by experienced counsel supports settlement approval).
[22] *O'Dowd v. Anthem, Inc.*, No. 14-cv-02787-KLM-NYW, 2019 WL 4279123, at *14 (D. Colo. Sept. 9, 2019).

allows Plaintiffs to secure key evidence—in the form of documents, deposition testimony, and trial testimony—from WMS.[23]

In sum, the proposed Settlement Agreement is fair, reasonable, and adequate in light of the strength of the claims and the risks and expense of continued litigation. Accordingly, preliminary approval should be granted.

## IV. THE COURT SHOULD CERTIFY THE PROPOSED SETTLEMENT CLASS

Plaintiffs request that the Court certify the proposed Settlement Class to receive the benefits of the Settlement Agreement. Specifically, Plaintiffs seek certification of a Settlement Class consisting of "[a]ll persons employed by Defendant Processors, their subsidiaries, and/or related entities at beef-processing or pork-processing plants in the continental United States from January 1, 2014, until the Date of Preliminary Approval." Farah Decl., **Exhibit A** at § II(E)(3).

"A party seeking class certification must show first show the existence of the four threshold requirements of Rule 23(a)."[24] "Once a plaintiff has met the Rule 23(a) threshold requirements, she must then show the action falls within one of the three categories of suits set forth under Rule 23(b)."[25] This proposed Settlement Class meets the prerequisites of Rule 23(a) and Rule 23(b)(3).

### A. The Settlement Class Satisfies Rule 23(a)

#### 1. Numerosity

Rule 23(a)(1) requires that the class membership be sufficiently large to warrant a class action because the alternative of joinder is impracticable.[26] In general, the Tenth Circuit has noted

---

[23] *See In re Ampicillin Antitrust Litig.*, 82 F.R.D. 652, 654 (D.D.C. 1979) (approving settlement in light of settling defendant's "assistance in the case against [a non-settling defendant]"); *see generally In re IPO Sec. Litig.*, 226 F.R.D. 186, 198-99 (S.D.N.Y. 2005) (recognizing the value of cooperating defendants in complex class action litigation).

[24] *Murray v. Tips, Inc.*, No. 18-CV-00937-RM-KLM, 2020 WL 1852382, at *3 (D. Colo. Apr. 13, 2020); *Shook v. El Paso Cnty.*, 386 F.3d 963, 971 (10th Cir. 2004).

[25] *Murray*, 2020 WL 1852382, at *3.

[26] Fed. R. Civ. P. 23(a)(1).

-9-

that classes are viable with as few as 17 to 20 persons.[27] Here, the precise number of Settlement Class members is unknown, but it is likely to number in the tens of thousands.

### 2. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."[28] Plaintiffs must show that resolution of an issue of fact or law "is central to the validity of each" Settlement Class member's claim; "[e]ven a single [common] question will" satisfy the commonality requirement.[29] "In the antitrust context, courts have generally held that an alleged conspiracy or monopoly is a common issue that will satisfy Rule 23(a)(2) as the singular question of whether defendants conspired to harm plaintiffs will likely prevail."[30] Here, common questions abound, including whether Defendants agreed to exchange information about or restrain wages, whether the agreements had an impact on Settlement Class members, what the relevant market is for Plaintiffs' claim under the rule of reason analysis, and what the amount of damages are. Proof for all of these questions is common to the Settlement Class.

### 3. Typicality

Rule 23(a)(3) requires that the class representatives' claims be "typical" of class members' claims. Fed. R. Civ. P. 23(a)(3). "The typicality requirement ensures that the absent class members are adequately represented by the lead plaintiff such that the interests of the class will be fairly and adequately protected in their absence."[31] "Differing fact situations of class members do not defeat

---

[27] *Rex v. Owens ex rel. Okla.*, 585 F.2d 432, 436 (10th Cir. 1978).

[28] Fed. R. Civ. P. 23(a)(2).

[29] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 359 (2011) (quotation omitted); *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 914 (10th Cir. 2018) ("A finding of commonality requires only a single question of law or fact common to the entire class." (citation omitted)).

[30] *D&M Farms v. Birdsong Corp.*, No. 2:19-CV-463, 2020 WL 7074140, at *3 (E.D. Va. Dec. 2, 2020); *see also In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1256 (10th Cir. 2014) (affirming trial court's certification of class in price-fixing case where "two common questions … could yield common answers at trial: the existence of a conspiracy and the existence of impact").

[31] *Paulson*, 2022 WL 168708, at *5 (referencing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)).

typicality … so long as the claims of the class representative and class members are based on the same legal or remedial theory."[32] In antitrust class action cases, typicality is established by plaintiffs and all class members alleging the same antitrust violations by defendants.[33] Here, typicality is satisfied because both Plaintiffs' claims and Settlement Class members' claims arise out of the same alleged antirust conspiracy—each member suffered the same harm by receiving compensation that was depressed by Defendants' misconduct. As such, Rule 23(a)(3) is satisfied.

4. **Adequacy**

Rule 23(a)(4) requires that, for a case to proceed as a class action, the court must find that "the representative parties will fairly and adequately protect the interests of the class."[34] This requires that the named plaintiffs and their counsel: (1) do not have any conflicts of interest with other class members and (2) will prosecute the action vigorously. Fed. R. Civ. P. 23(a)(4). Here, the adequacy requirement is met. The named Plaintiffs have no material conflict with other Settlement Class members—each suffered harm by Defendants' suppression of their wages. Each named Plaintiff, like all Settlement Class members, share an overriding interest in establishing Defendants' liability and maximizing class-wide damages.[35] And the named Plaintiffs and their counsel have, and will continue to, prosecute the action vigorously on behalf of the Settlement Class. Counsel have extensive experience and expertise in prosecuting complex antitrust litigation cases and representing antitrust plaintiffs. Interim co-lead counsel have represented victims of

---

[32] *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1216 (10th Cir. 2014) (quotations and alteration omitted).

[33] *See In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 447 (D. Kan. 2006), *stay granted in part*, 2006 WL 3021126 (D. Kan. Oct. 23, 2006).

[34] Fed. R. Civ. P. 23(a)(4).

[35] *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.").

-11-

antitrust conspiracies across the country, and will continue to vigorously represent the Settlement Class here. Farah Decl. ¶¶ 1-2.

**B.     The Requirements of Rule 23(b)(3) Are Satisfied**

Under Rule 23(b)(3), plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Both of these requirements are satisfied here.

**1.     Predominance of Common Issues**

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."[36] It is a "test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.'"[37] To prevail in an antitrust case, Plaintiffs must prove three elements: (1) a violation of the antitrust laws; (2) impact of the unlawful activity; and (3) measurable damages.[38] Common evidence supports each of these elements.

**a.     Violation of the Antitrust Laws**

Courts have found that the existence and scope of an antitrust conspiracy are common issues because proof of the conspiracy is a common question that is thought to predominate over the other issues of the case.[39] Here, proof of Defendants' antitrust violations is a common issue of sufficient importance that it alone causes common issues to predominate in this case.[40] Plaintiffs' allegations regarding the fixing of compensation and the exchange of compensation information

---

[36] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).
[37] *Paulson*, 2022 WL 168708, at *7 (citing *Amchem*, 521 U.S. at 625).
[38] *In re Urethane*, 237 F.R.D. at 449.
[39] *Id*.
[40] *Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 796 (10th Cir. 1970) ("[W]here the question of basic liability [in antitrust cases] can be established readily by common issues, then it is apparent that the case is appropriate for class action.").

focus on the actions of the Defendants and involve evidence common to all Settlement Class members.

### b.  Impact of the Unlawful Activity

Evidence common to the Settlement Class supports a finding of impact here. Defendant Processors and co-conspirators collectively possess market power in the alleged market for employment at red meat processing plants in the continental United States. Class Action Compl. ¶ 409, ECF No. 1. Decisions regarding "the compensation of workers at red meat processing plants owned by Defendant Processors, their subsidiaries, and related entities were made by and at each Defendant Processor's corporate headquarters during the Class Period." *Id.* ¶ 138. And the alleged conspiracy "commonly impacted all workers at red meat processing plants" because "Defendant Processors valued internal equity, the idea that similarly situated employees should be compensated similarly." *Id.* ¶ 363. Finally, in its absence, Defendants would have vigorously "competed with each other for labor during the Class Period by offering higher wages, higher salaries and superior benefits to Class Members." *Id.* ¶ 153. This evidence is common to the Settlement Class and supports certification.

### c.  Measurable Damages

No precise damages formula is required at this stage. Rather, if "plaintiffs can establish that the defendants conspired" to engage in wage-fixing, then "even where there are individual variations in damages, the requirements of Rule 23(b)(3) are satisfied."[41] Plaintiffs can do so here.

### d.  Superiority of a Class Action

In addition to the predominance of common questions, Rule 23(b)(3) requires a finding that "a class action is superior to other available methods for fairly and efficiently adjudicating of

---

[41] *In re Urethane*, 768 F.3d at 1255 (quotation and alterations omitted); *See In re Urethane*, 237 F.R.D. at 452 (holding that a regression analysis is a viable method for calculating damages using common evidence).

the controversy." In this case, settlement of this action "is a superior method for resolving this dispute" as it "avoids duplicative litigation, saving both plaintiffs and defendants significant time and legal costs to adjudicate common legal and factual issues."[42] Additionally, no other potential class members have filed an analogous antitrust claim against WMS. Thus, the absent class members "to date have shown no interest in controlling the litigation of separate actions."[43] Further, proceeding as a class action, rather than a host of separate individual trials, would provide significant economies in time, effort, and expense, and permit Settlement Class members to seek damages that would otherwise be too costly to pursue.[44]

Finally, the Supreme Court has found that when certifying a settlement class "a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. R. Civ. P. 23(b)(3)(D), for the proposal is that there be no trial."[45] Such is the case here. If approved, the Settlement Agreement would obviate the need for a trial against WMS, and thus questions concerning that trial's manageability are irrelevant. Accordingly, the Court should certify the Settlement Class.

## V.  DEFERRING CLASS NOTICE IS APPROPRIATE IN THIS CASE

Rule 23(e) requires that, prior to final approval of a settlement, notice of that settlement must be distributed to all class members who would be bound by it. Rule 23(c)(2)(B) requires that notice of a settlement be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Here, Plaintiffs respectfully request that the Court agree to defer formal notice of the Settlement Agreement to the

---

[42] *In re Crocs, Inc. Secs. Litig.*, 306 F.R.D. 672, 689-90 (D. Colo. 2014).
[43] *Pliego v. Los Arcos Mexican Restaurants, Inc*., 313 F.R.D. 117, 127 (D. Colo. 2016).
[44] *Id.* ("Courts in this District have repeatedly recognized that a class action is superior where the small claims of parties with limited resources are otherwise unlikely to be pursued.").
[45] *Amchem*, 521 U.S. at 620.

-14-

Settlement Class until a later date. As discovery has not yet started, Plaintiffs do not have Defendants' data that contain Settlement Class members' addresses, emails and phone numbers to be able to contact them. Farah Decl. ¶ 14. Deferring may also save the Class's money in that Plaintiffs could provide notice of multiple settlements at one time. After the data production, Plaintiffs will file a motion to direct notice with the Court.

## VI. CONCLUSION

Plaintiffs respectfully request that the Court enter an order: (1) preliminarily approving the Settlement Agreement with WMS, (2) certifying the Settlement Class, (3) appointing Interim Co-Lead Counsel as Settlement Class Counsel, (4) appointing Plaintiffs as Settlement Class Representatives, (5) deferring notice until a later date, and (6) ordering a stay of all proceedings against WMS except those proceedings provided for or required by the Settlement Agreement.

Dated: September 6, 2023

| | | |
|---|---|---|
| */s/ George F. Farah* | */s/ Shana E. Scarlett* | */s/ Brent W. Johnson* |
| HANDLEY FARAH & ANDERSON PLLC | HAGENS BERMAN SOBOL SHAPIRO LLP | COHEN MILSTEIN SELLERS & TOLL PLLC |
| 33 Irving Pl. | 715 Hearst Ave., Ste. 300 | 1100 New York Ave. NW, Fl. 5 |
| New York, NY 10003 | Berkeley, CA 94710 | Washington, DC 20005 |
| Tel: (212) 477-8090 | Tel: (510) 725-3000 | Tel: (202) 408-4600 |
| gfarah@hfajustice.com | shanas@hbsslaw.com | bjohnson@cohenmilstein.com |

-15-

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice to counsel for all parties that have appeared in this case.

*/s/ Shana E. Scarlett*
SHANA E. SCARLETT

-16-

011035-11/2321180 V1