IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 22-cv-02946-PAB-STV

RON BROWN,
MINKA GARMON, and
JESSIE CROFT, individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

JBS USA FOOD COMPANY,
TYSON FOODS, INC.,[1]
CARGILL, INC.,
CARGILL MEAT SOLUTIONS CORP.,
HORMEL FOODS CORP.,
AMERICAN FOODS GROUP, LLC,
TRIUMPH FOODS, LLC,
SEABOARD FOODS, LLC,
NATIONAL BEEF PACKING CO., LLC,
IOWA PREMIUM LLC,
SMITHFIELD FOODS INC.,
SMITHFIELD PACKAGED MEATS CORP.,
AGRI BEEF CO.,
WASHINGTON BEEF, LLC,
PERDUE FARMS, INC.,
AGRI STATS, INC., and
WEBBER, MENG, SAHL AND COMPANY, INC. d/b/a/ WMS & Company,

      Defendants.

_____

**ORDER**

_____

---

[1] The joint motion and plaintiffs' response to the motion alter the caption to add Tyson Foods. Inc., Docket No. 164 at 1; Docket No. 179 at 1, which plaintiffs had inadvertently omitted from the caption of the complaint. *See* Docket No. 23. Such a correction should properly be done through a motion. However, given the obvious error and the defendants' use of a corrected caption, the Court hereby orders that the caption be so amended.

This matter is before the Court on Defendants' Joint Motion to Dismiss [Docket No. 164] on behalf of the "moving defendants," namely, every defendant in this case except Perdue Farms, Inc. ("Perdue") and Webber, Meng, Sahl & Company ("WMS").[2]  *Id.* at 2 n.1.  The moving defendants move to dismiss both of plaintiffs' claims under Federal Rule of Civil Procedure 12(b).  *Id.* at 1-2.  Plaintiffs oppose the moving defendants' motion.  Docket No. 179.  The moving defendants filed a reply.  Docket No. 195.

## I. BACKGROUND

### A. The Parties

Plaintiffs Ron Brown, Minka Garmon, and Jessie Croft bring claims on behalf of themselves and on behalf of a class (the "Class") "consisting of all persons employed by Defendants, their subsidiaries, and related entities at beef- and pork-processing plants in the continental United States from January 1, 2014, to the present day (the 'Class Period')."  Docket No. 1 at 6 (footnote omitted).

Defendants include eleven red meat processors[3] and several of their subsidiaries (the "Processor Defendants"), namely, Agri Beef Co.; Washington Beef, LLC;[4] American Foods Group, LLC; Cargill, Inc.; Cargill Meat Solutions Corp.;[5] Hormel Foods Corp. ("Hormel"); Iowa Premium LLC ("Iowa Premium"); JBS USA Food Co. ("JBS"); National Beef Packing Co., LLC ("National Beef"); Perdue; Seaboard Foods, LLC ("Seaboard");

---

[2] The portion of defendants' motion brought on behalf of defendants Seaboard Foods, LLC and Triumph Foods, LLC is denied as moot based on their request for entry of a preliminary settlement order based on a cooperation agreement between Triumph and plaintiffs.  *See* Docket No. 205 at 1.

[3] Plaintiffs define red meat as beef and pork.  Docket No. 1 at 6.

[4] Agri Beef Co. and Washington Beef, LLC will be collectively referred to as "Agri Beef."

[5] Cargill, Inc. and Cargill Meat Solutions Corp. will be collectively referred to as "Cargill."

Smithfield Foods Inc.; Smithfield Packaged Meats Corp.;[6] Triumph Foods, LLC ("Triumph"); and Tyson Foods, Inc. ("Tyson").  *Id.*, ¶ 2.  A subset of Processor Defendants are the "Pork Processor Defendants," namely, Hormel, JBS, Seaboard, Smithfield Foods Inc., Triumph, and Tyson.  *Id.* at 11, ¶ 16.  In addition to the Processor Defendants, the complaint names two consulting companies as defendants, Agri Stats, Inc. ("Agri Stats") and WMS.  *Id.* at 6, ¶ 2.

### B. Facts[7]

Processor Defendants collectively produce approximately 80 percent of the red meat that is sold in the United States.  *Id.*  Processor Defendants own and operate approximately 140 red meat processing plants in the continental United States.  *Id.* at 6-7, ¶ 3.  Plaintiffs Ron Brown, Minka Garmon, and Jessie Croft were hourly employees of "Smithfield Farms Inc.," National Beef, and Iowa Premium respectively during the Class Period.  *Id.* at 14, ¶¶ 26-28.

Processor Defendants employed hundreds of thousands of the members of the Class during the Class Period in various positions and compensated these employees with benefits and either hourly wages or an annual salary.  *Id.* at 6-7, ¶¶ 3-4.  During the Class Period, senior executives for each Processor Defendant set and approved compensation schedules for hourly wage rates, annual salaries, and employee benefits at corporate headquarters for their respective companies.  *Id.* at 7, ¶ 4.  Local plant

---

[6] Smithfield Foods Inc. and Smithfield Packaged Meats Corp. will be collectively referred to as "Smithfield."

[7] The Court assumes that the well-pleaded allegations in plaintiffs' complaint are true in considering the motion to dismiss.  *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

managers working for Processor Defendants were allowed to make recommendations for wage adjustments, but the ultimate decision on compensation schedules was made at the corporate headquarters of each Processor Defendant. *Id.* at 46, ¶ 138. Each Processor Defendant determined the compensation for hourly-paid positions at their red meat processing plants with compensation schedules that accounted for workers' skill and experience and which aligned with the compensation schedules that other Processor Defendants had established for the same position. *Id.* at 45, ¶ 135. Each Processor Defendant did the same for salaried positions. *Id.*, ¶ 136.

From 2014 to 2019, different groups of Processor Defendants designed and participated in an annual "Red Meat Industry Compensation Survey" in which they exchanged detailed current and future information about wages, salaries, and benefits provided to their workers at red meat processing facilities. *Id.* at 51, ¶¶ 154-55. To participate in the Red Meat Industry Compensation Survey, Processor Defendants annually completed a survey questionnaire and then received and reviewed a report on the results of the survey. *Id.* at 51-52, ¶ 155. Different groups of Processor Defendants participated in the Red Meat Industry Compensation Survey each year from 2014 to 2019. *Id.* Participants referred to themselves as the "Red Meat Survey Group." *Id.* at 53, ¶ 160. Processor Defendants designed the initial surveys in late 2013 through in-person and telephonic conversations without the assistance of WMS. *Id.* at 55, ¶¶ 170, 172. On September 16, 2013, Javen Xu, the compensation and benefits analyst at JBS, *id.* at 56, ¶ 173, emailed Jonathan Meng, WMS's president and the administrator of the Red Meat Industry Compensation Surveys, *id.* at 8, ¶ 8, to inform him that nine companies, including JBS, had confirmed their participation in the Red Meat Industry

Compensation Survey.  *Id.* at 56, ¶ 173.  Meng responded, confirming that Processor Defendants held final decision-making power over which employee positions the survey would cover and over the information the survey would collect.  *Id.*

WMS distributed survey questionnaires to the participating Processor Defendants, compiled survey results reports, and distributed those reports to participants each year. *Id.* at 52, ¶ 156.  The Processor Defendants, however, collectively managed and controlled the annual Red Meat Industry Compensation Surveys and determined who could join the Red Meat Survey Group.  *Id.* at 53-55, ¶¶ 159, 166-67.

In 2014, when the first Red Meat Industry Compensation Survey was administered, Meng directed questions from survey participants to Renee DeBar, head of compensation and benefits at JBS.  *Id.* at 56, 58, ¶¶ 176, 181-182.  On October 21, 2014, after a meeting between the Red Meat Survey Group without Meng, DeBar provided Meng with specific modifications for the 2015 survey from the Red Meat Survey Group.  *Id.* at 58, ¶ 183.

On December 8, 2016, Brad Sievers the compensation manager at JBS, informed Meng that he met with the assistant vice president of labor at Cargill and told Meng they had discussed the Red Meat Survey Group, were reaching out to companies to gauge interest in participating in the survey, and that the Red Meat Survey Group would hold a call without Meng to "ensure everyone is on the same page."  *Id.* at 58-59, ¶ 184.  The Red Meat Survey Group held a call in January 2017 and made decisions about the scope of the survey.  *Id.* at 59, ¶ 185.

Each year of the Class Period the Red Meat Industry Compensation Surveys covered between 33 and 38 salaried positions.  *Id.* at 60, ¶ 188.  In 2014 and 2015, the surveys

covered four hourly positions, and in 2016 and 2017, the surveys covered seven hourly positions.  *Id.* at 61, ¶ 195.  The Red Meat Industry Compensation Surveys that were distributed from 2014 to 2017 included data on future salary increases Processor Defendants planned.  *Id.* at 63, ¶ 206.

Throughout the Class Period, representatives from Processor Defendants attended and participated in annual in-person "Red Meat Industry Compensation Meetings."  *Id.* at 69, ¶¶ 227-228.  The meetings were held each year from 2014-2019, except in 2016.  *Id.*, ¶ 227.  The meetings were usually held in April or May and most frequently held in Kansas City, Missouri.  *Id.*, ¶ 229.  The Red Meat Survey Group determined the location, schedule, and agenda for each Red Meat Industry Compensation Meeting.  *Id.*  Red Meat Survey Group members were required to attend the annual Red Meat Industry Compensation Meetings to remain as members of the group.  *Id.* at 54, ¶¶ 163, 165.  Each Red Meat Survey Group member sent one to three executives to the Red Meat Industry Compensation Meetings.  *Id.* at 69, ¶ 228.  The meetings consisted of multiple roundtable sessions during which executives from the Red Meat Survey Group would discuss the results of that year's Red Meat Industry Compensation Survey as well as current and future compensation practices at their respective firms.  *Id.* at 70, ¶ 233.  The Red Meat Industry Compensation Meetings were accompanied by "off-the-books dinners and other activities that preceded the Meetings themselves."  *Id.* at 74, ¶ 252.  For example, at the 2014 meeting, a Seaboard executive arranged a dinner for the Red Meat Survey Group on the evening before that year's meeting with executives from Tyson, JBS, and Seaboard, *id.*, ¶ 253; in 2015, the same Seaboard executive arranged a dinner for the Red Meat Survey Group the night before the annual meeting

with a "quick discussion" before the dinner between members of the group, *id.* at 75, ¶ 254; in connection with the 2019 meeting, an executive from Pittman Farms offered to host a happy hour and dinner alongside the meeting. *Id.*, ¶ 255.

After the 2016 Red Meat Industry Compensation Survey, the Red Meat Survey Group formed a "steering committee" to aid with communication and organization and to serve as Meng's main point of contact. *Id.* at 55, ¶ 168. Executives from Tyson, JBS, and Cargill were on the steering committee. *Id.*

At the Red Meat Industry Compensation Meetings, Meng was invited to attend one or both of the first two sessions; during those sessions, Meng presented a summary of the results of the Red Meat Industry Compensation Survey. *Id.* at 70-71, ¶¶ 235-237. In 2014, 2015, and 2017, after presenting the survey results, Meng left and the remaining sessions proceeded without him. *Id.* at 72, ¶¶ 244-45. In the sessions without Meng, plaintiffs allege that executives from Processor Defendants agreed upon and suppressed the wages, salaries, bonuses, and benefits they would provide to employees at red meat processing plants. *Id.*, ¶ 244. The steering committee prepared written agendas for the Red Meat Industry Compensation Meetings which concealed the contents of the roundtable sessions that excluded WMS and Meng, listing items such a "group discussion topics" and "outstanding items" and observing that firms would "share relevant updates" in the sessions. *Id.* at 74, ¶ 251.

In 2016, an antitrust action (the "*Broilers* lawsuit") was filed against several Processor Defendants alleging price-fixing by leading poultry producers. *Id.* at 75, ¶ 256. The *Broilers* lawsuit generated concerns about the Red Meat Industry Compensation Surveys and Meetings and, in response, questions and survey results containing future

compensation data were eliminated from the surveys and the survey results reports.  *Id.* at 76, ¶¶ 257-59.  Starting with the 2018 Red Meat Compensation Industry Meeting, Meng was instructed to stay for all the sessions.  *Id.*, ¶ 260.

In 2019, a lawsuit was filed ("*Jien v. Perdue*") alleging that certain poultry processors, including several Processor Defendants, "had unlawfully conspired to depress the compensation of their poultry-plant workers by, among other things, exchanging their wage data through annual WMS surveys and conducting in-person meetings to discuss the survey results and their compensation practices."  *Id.* at 77, ¶ 261.  Based on concerns of antitrust liability arising from *Jien v. Perdue* and the *Broilers* lawsuit, the Red Meat Survey Group decided to cease the Red Meat Industry Compensation Survey in 2020.  *Id.*  On January 3, 2020, Meng asked the Red Meat Survey Group if they were interested in continuing the survey.  *Id.*, ¶ 262.  On the same day, Hormel, Agri Beef, Seaboard, and Kraft Heinz Corporation[8] responded by declining to participate in a survey in 2020.  *Id.*, ¶ 263.

On January 16, 2020, Meng informed Katie Mason, the compensation lead at Cargill, that there would not be a survey in 2020 based on a lack of interest, and Mason responded "she was 'hearing similarly internally.'"  *Id.*, ¶ 264.

Throughout the Class Period, senior executives of Processor Defendants who had the authority to determine or influence compensation of members of the Class contacted one another in order to align their current and future compensation practices.  *Id.* at 78, ¶ 267.  As examples, a Seaboard executive made weekly calls to competing

---

[8] Kraft Heinz Company is alleged to be a co-conspirator with Processor Defendants. *Id.* at 38-39, ¶¶ 100-102.

pork processors requesting pay ranges for salaried and hourly workers at competing pork processing plants, *id.*, ¶ 268; on May 6, 2015, the compensation and retirement manager at JBS emailed executives at Agri Beef, Cargill, Hormel, National Beef, Seaboard, Smithfield, Triumph, and Tyson an "ad-hoc survey" covering "Supervisor Weekend Pay & Bonus Eligibility," for which the results would be anonymized and shared with all respondents, *id.* at 79, ¶ 270; on April 20, 2015, Linda Wray an executive at Tyson, informed Meng and executives at Seaboard and JBS that she intended to send a survey to Red Meat Survey Group members asking for their projected increase non-union hourly production in fiscal year 2016, *id.*, ¶ 271; in response to Wray's email, Seaboard and JBS immediately signed off on her request to send a survey, but Meng wrote that she should not formally distribute a question on 2016 compensation increases, *id.* at 79-80, ¶ 271; JBS provided compensation data to Iowa Premium on what it would pay its processing plant workers in Marshalltown, Iowa, where Iowa Premium has a red meat processing plant 23 miles away in Tama, Iowa. *Id.* at 80, 91, ¶¶ 272, 310.

Agri Stats describes itself as a "management and benchmarking company" that "provides consultation on data analysis, action plan development and management practices of participating companies," with a mission to "[i]mprove the bottom line profitability for our participants by providing accurate and timely comparative data while preserving confidentiality of individual companies." *Id.* at 81, ¶ 277. Agri Stats facilitates the exchange of recent and current competitively sensitive information between competitors. *Id.* at 82, ¶ 280. To maintain secrecy, Agri Stats requires that its subscribers share their own data in order to receive data on their competitors and does

not sell its data to the public.  *Id.*, ¶¶ 280-81.  Subscribers to Agri Stats performed an initial data intake and then provided monthly reports of data on the 18th of each subsequent month.  *Id.* at 83, ¶ 284.  Agri Stats reported the data it collected monthly to its subscribers two weeks after receiving it.  *Id.*

The Pork Processor Defendants exchanged detailed and competitively sensitive compensation data each month by way of a subscription to Agri Stats.  *Id.* at 80, ¶ 273. During the Class Period Cargill, Clemens Food Group, LLC, the Clemens Family Corporation, Hormel, Indiana Packers Corporation, JBS, Seaboard, Smithfield, and Tyson exchanged wage information through Agri Stats.  *Id.* at 81, ¶ 276.

Agri Stats was to anonymize data it received, but the reports it provided were detailed enough that competitors could identify each other's data.  *Id.* at 87, ¶ 296.  Each report identified which competitors participated; in some reports, competitors were identifiable because so few producers participated and, in other reports, the data that was provided was so specific it could be deanonymized with public records.  *Id.* at 87-88, ¶¶ 297-99. The Pork Processor Defendants used the data from Agri Stats to suppress compensation and to confirm that no conspirator deviated from the compensation-fixing conspiracy.  *Id.* at 88-89, ¶ 301.

Two Processor Defendants entered into an illegal agreement not to recruit or solicit each other's employees, such agreements are known as "no poach" agreements.  *Id.* at 90, ¶¶ 306-07.  As an example, in January 2016, Iowa Premium and JBS entered into a no poach agreement covering JBS' Marshalltown plant and Iowa Premium's Tama plant.  *Id.* at 90-93, ¶¶ 307-15.  The Marshalltown and Tama plants are both in Iowa and

would compete with one another for employees in the absence of an agreement.  *Id.* at 91, ¶ 310.

As a result of the conspiracy to depress wages, Processor Defendants simultaneously and in parallel limited annual wage increases to members of the Class. *Id.* at 93, ¶ 317.  Wages were lower than they would have been in the absence of a conspiracy.  *Id.*  As examples, in 2017, base wages were increased by only 2% at 17 plants operated by Cargill, National Beef, JBS, Smithfield, Tyson, Triumph, and Seaboard.  *Id.* at 94, ¶ 319.  In 2018, base wages were increased by only 2% in 17 plants operated by several Processor Defendants, including some of the plants that only received a 2% increase in base wages in 2017.  *Id.*, ¶¶ 319-20.  In 2017 and 2018, at plants operated by different Processor Defendants, the difference in average wages between plants in the same areas including Dodge City, Kansas; the Oklahoma and Texas panhandles; and south-central Nebraska decreased, bringing the difference in wages between closely located plants within $0.07 or less.  *Id.* at 95, ¶ 321.

## II.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible."  *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)).  Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair

notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted).  However, a plaintiff still must provide "supporting factual averments" with his allegations.  *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009) ("conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based" (citation omitted)).  The court need not accept conclusory allegations.  *Moffet v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).  An affirmative defense, such as the statute of limitations, may be considered on a motion to dismiss under Rule 12(b)(6) only when a plaintiff admits every element of the affirmative defense in the complaint.  *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018) (citing *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004)).

## III.  ANALYSIS

Plaintiffs' first claim for relief is brought against every defendant except Agri Stats and alleges that Processor Defendants, and other co-conspirator such as WMS, entered into an agreement to fix, depress, maintain, and stabilize the compensation paid to workers, both hourly and salaried, at their red meat processing facilities in violation of the Sherman Act, 15 U.S.C. § 1.  Docket No. 1 at 121-23, ¶¶ 400-405.  Plaintiffs allege that this agreement began on January 1, 2014 and continues to the present.  *Id.* at 121, ¶ 401.  Plaintiffs' second claim for relief is brought against every defendant and alleges defendants and several co-conspirators "engaged in a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information about the compensation being paid or to be paid to their employees at red meat processing plants" beginning on January 1, 2014 and continuing to the present.  *Id.* at 123, ¶ 407.

The moving defendants argue that plaintiffs' claims are implausible and speculative. Docket No. 164 at 1.  The moving defendants seek dismissal of plaintiffs' claims for four reasons: (1) plaintiffs do not plausibly allege a necessary element of their first claim, namely, an unlawful agreement to depress wages; (2) plaintiffs do not adequately plead an essential element of their second claim, namely, an anticompetitive agreement to share compensation information; (3) both of plaintiffs' claims are barred by the statute of limitations; and (4), as hourly workers, plaintiffs cannot establish standing on behalf of salaried workers.  *Id.* at 2-3.  Plaintiffs respond arguing that defendants overlook important allegations on an agreement between the defendants for their first and second claims, that the statute of limitations was tolled for their claims making them

13

both timely, and that plaintiffs have standing to assert claims on behalf of salaried workers because salaried and hourly workers were harmed by the same anticompetitive conduct.  Docket No. 179 at 2.

## A. Standing

The moving defendants seek to dismiss the portion of plaintiffs' claims brought on behalf of salaried employees for plaintiffs' lack of Article III standing.  Docket No. 164 at 38.  Based on the jurisdictional nature of the moving defendants' argument, the Court will address standing first.

Although the moving defendants do not mention it, an argument that a plaintiff lacks standing to assert a claim is properly determined pursuant to Rule 12(b)(1) because such argument attacks the court's subject matter jurisdiction.  *See Colo. Env't Coalition v. Wenker*, 353 F.3d 1221, 1227 (10th Cir. 2004) (standing is jurisdictional).  Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)).  Ultimately, plaintiff has the "burden of establishing subject matter jurisdiction" because it is "the party asserting jurisdiction."  *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir. 2008).

"The standing inquiry ensures that a plaintiff has a sufficient personal stake in a dispute to ensure the existence of a live case or controversy which renders judicial

resolution appropriate." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004).

To establish Article III standing, a plaintiff must meet three elements:

> First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted).  "Injury in fact is a constitutional requirement, and '[i]t is settled that Congress cannot erase Article III's standing requirements by granting the right to sue to a plaintiff who would not otherwise have standing.'"  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016). An injury is particularized if it affects "the plaintiff in a personal and individual way."  *Id.* at 1548.  "A 'concrete' injury must be 'de facto'; that is, it must actually exist;" it must be "real," not "abstract."  *Id.*  "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

   The moving defendants argue that the named plaintiffs, who were hourly workers, lack standing to pursue claims on behalf of salaried employees because they suffered different injuries.  Docket No. 164 at 37-38.  The moving defendants claim that plaintiffs allege salaried and hourly workers perform distinct functions, their jobs require different qualifications, and that "they are compensated in fundamentally different ways."  *Id.* at 38.  The moving defendants assert that plaintiffs' allegations of one singular conspiracy

between defendants cannot overcome the differences between hourly and salaried workers.  *Id.*

Plaintiffs respond that the "named plaintiffs can bring claims on behalf of absent class members who were affected by the same anticompetitive conduct, even if there are some differences between the named plaintiffs and the absent class members."  Docket No. 179 at 43.  Plaintiffs argue that the test for determining standing in a class action case is not whether "differences between the claims of the class members and those of the class representative" exist, but rather whether "the differences that do exist [are] the type that leave the class representative with an insufficient personal stake in the adjudication of the class members' claims."  *Id.* (quoting *Jien v. Perdue Farms, Inc.*, 2021 WL 927456, at *3 (D. Md. Mar. 10, 2021)).

"There cannot be a disjuncture between the harm that the plaintiff suffered and the relief that she seeks."  1 Newberg & Rubenstein on Class Actions § 2:6 (6th ed. 2023). Courts approach this "disjuncture" in two ways, either as an issue of standing or as an issue for class certification.  *Id.*  Under the class certification method, "once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met."  *Id.*  Under the standing method, a plaintiff who faces a disparate harm lacks standing to bring claims on behalf of a class.  *Id.*  However, under both methods, where "the disjuncture between the representative's claims and those of the class is more a matter of description than reality," no disjuncture issue exists.  *Id.*

The moving defendants rely on the standing method, *see* Docket No. 164 at 37-39 (citing *Kjessler v. Zaappaaz, Inc.*, 2019 WL 3017132 (S.D. Tex. Apr. 24, 2019)), while plaintiffs argue the Court should follow the class certification method.  Docket No. 179 at 43-45 (citing *Jien*, 2021 WL 927456, at *3).  The Court, however, need not resolve which method applies because plaintiffs' claims, as alleged, do not raise a disjuncture issue and therefore plaintiffs have standing under either test.  The complaint alleges "[e]ach [Processor Defendant] has established a schedule for hourly wage rates, annual salaries, and employment benefits based on the specific position and years of experience of the Class Members," Docket No. 1 at 7, ¶ 4; Processor Defendants' senior executives determined the hourly wages, annual salaries, bonuses, and employment benefits for Class Members across the country in a formulaic way," *id.* at 46, ¶ 139; the Red Meat Survey Group carefully designed the Red Meat Industry Compensation Survey to ensure that each salaried position, category of hourly rate, and benefit substantially matched across each participating processor's compensation structure," *id.* at 55, ¶ 171; Processor Defendants reached agreements to "fix, depress, maintain, and stabilize the compensation paid to workers at their red meat processing plants," *id.* at 122, ¶ 402(a); and aligned their compensation schedules "with compensation schedules that other [Processor Defendants] had established for the same positions" for both hourly and salaried employees.  *Id.* at 45, ¶¶ 135-36.

Plaintiffs allege that the same harm, namely, the suppression of wages across the compensation schedules each Processor Defendant created, occurred by the result of the same process, a conspiracy to fix and depress compensation for both hourly and salaried employees.  The fact that the specifics of the harm between hourly and salaried

employees may differ does not obviate the allegation that the named plaintiffs share the same harm through getting paid less as a result of the conspiracy.  "[A]ccept[ing] as true all material allegations of the complaint," *Warth*, 422 U.S. at 501, the Court finds the plaintiffs have met their burden of establishing standing at the motion to dismiss stage to bring claims on behalf of salaried workers by demonstrating that all the proposed Class faced the same essential harm.

## B. Sherman Act

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  "While the text of the Sherman Act could perhaps be interpreted to proscribe all contracts, the Supreme Court has repeated time and again that § 1 outlaw[s] only unreasonable restraints of trade."  *United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1272 (10th Cir. 2018) (internal quotations marks omitted).  Certain restraints are unreasonable per se "because they 'always or almost always tend to restrict competition and decrease output.'"  *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (quoting *Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723 (1988)).  Horizontal restraints "imposed by agreement between competitors" qualify as "unreasonable per se."  *Id*. at 2284 (quoting *Sharp*, 485 U.S. at 730).  "Restraints that are not unreasonable per se are judged under the rule of reason" which "requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition."  *Id*. (internal citations, quotations, and alterations omitted).

"The essence of a claim of a violation of Section 1 of the Sherman Act is the agreement itself." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556); *see also Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1179 n.28 (10th Cir. 2019) (observing that it is erroneous to use a probability standard to assess allegations in a Sherman Act claim). An agreement can be shown through direct or indirect evidence. *Champagne Metals*, 458 F.3d at 1082. "Direct facts are explicit and require no inferences. Direct evidence of a § 1 agreement may take the form of a written contract or agreement, such as association rules, or admissions of an agreement. In contrast, circumstantial facts require inferences to show that an anti-competitive agreement exists." *Llacua*, 930 F.3d at 1174 n.24 (internal citations, quotations, and alterations omitted). *Twombly* provides a rule for determining whether plaintiff has sufficiently pled a claim of an agreement in violation of the Sherman Act with circumstantial evidence, namely that "mere allegations of parallel conduct, absent additional contextual facts, fail to state a plausible conspiracy claim." *See id.* at 1174-75 (quoting *Twombly*, 550 U.S. at 556-57).

### 1.  Claim One: Wage Depression

The parties agree that plaintiffs' first claim alleges a per se violation of the Sherman Act, namely, a horizontal agreement to depress wages. *See* Docket No. 164 at 10; Docket No. 179 at 6. The moving defendants argue that plaintiffs' first claim fails because plaintiffs fail to show either direct or circumstantial evidence of an agreement

to depress wages and because plaintiffs' allegations support defendants' independent decision-making as opposed to conspiratorial action.  Docket No. 164 at 9-25.

### a. Direct Evidence

The moving defendants argue that plaintiffs' first claim lacks direct evidence of an agreement to depress wages, *id.* at 10-11, such as an admission by an employee or conspirator, evidence of agreement on explicit terms, or evidence "tantamount to an acknowledgement of guilt" that relate to the agreement in question as is required for a claim of direct evidence of a conspiracy.  *Id.* (quoting *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002)).

Plaintiffs' response argues that the complaint alleges direct evidence of the conspiracy in the form of employee statements from several of defendants' employees. Docket No. 179 at 7-9.  Plaintiffs cite three statements as examples: (1) Meng warned Processor Defendants that they were "improperly exchanging future compensation data in a manner that was inconsistent with federal antitrust law," Docket No. 1 at 8, ¶ 8; (2) a former corporate HR employee at Seaboard stated a Seaboard executive participated in weekly phone calls with competing pork processors during which she requested and provided detailed compensation information like pay ranges for hourly and salaried workers and Seaboard used the information its executive gathered to align its compensation schedules with those of competing pork-processors to reduce and eliminate competition between pork processors, *id.* at 78-79, ¶¶ 268-69; and (3) a former executive of Iowa Premium stated that in early 2016 the CEO of Iowa Premium and the complex manager of the JBS Marshalltown plant agreed that their plants would not poach each other's employees.  *Id.* at 91-92, ¶ 312.

20

"Direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted. . . . [W]ith direct evidence the fact finder is not required to make inferences to establish facts." *Champagne Metals*, 458 F.3d at 1084 (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999)).  Direct evidence is rare in an antitrust case, especially at the motion to dismiss stage.  *See Llacua*, 930 F.3d at 1178.

Here, each of plaintiffs' examples of direct evidence require an inference to establish an agreement.  Plaintiffs point to evidence that two defendants agreed not to poach employees, other defendants agreed to share future compensation information, and that Seaboard changed its wages based on the information it received from other pork processors, but for each of these allegations, there is still an inferential step required to establish any agreement between the Processor Defendants to depress wages.  The allegations plaintiffs point to are more appropriately categorized as circumstantial, and the Court will consider them as such.

### b.  Circumstantial Evidence

Next, the moving defendants argue that plaintiffs' circumstantial allegations fail to plausibly allege a violation of the Sherman Act.  Docket No. 164 at 11.  The moving defendants state that, to allege a violation of the Sherman Act, plaintiffs must allege that defendants engaged in parallel conduct and something more, a "plus factor," that permits an inference the parallel conduct was the product of an illegal agreement.  *Id.* Plaintiffs respond that requiring allegations of parallel conduct that would be appropriate for a price-fixing case is not appropriate in wage-fixing cases and that plaintiffs'

allegations of plus factors alone are enough to support a claim of a violation of the Sherman Act.  Docket No. 179 at 9-11.

Where a complaint alleges only circumstantial evidence of an agreement in violation of the Sherman Act, "mere allegations of parallel conduct, absent additional contextual facts, fail to state a plausible conspiracy claim" and "the conspiracy is not plausible if in light of common economic experience[,] the alleged conduct is equally likely to result from independent action."  *Llacua*, 930 F.3d at 1174-75 (citing *Twombly*, 550 U.S. at 556-57, 567-68).  A plaintiff must also allege "plus factors" which allow a factfinder to infer a conspiracy.  *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 296 F. Supp. 3d 442, 460-61 (E.D.N.Y. 2017).  Examples of plus factors include: "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications."  *Id.* (quoting *Mayor of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)).

### i. Parallel Conduct

Defendants argue that an absence of parallel conduct dooms plaintiffs' first claim.[9] Docket No. 164 at 14.  Plaintiffs respond that the complaint alleges parallel conduct,

---

[9] The Court disagrees with the moving defendants' characterization of *Twombly* as holding that parallel conduct is "necessary (but not sufficient) to plead an unlawful conspiracy based on circumstantial evidence."  Docket No. 195 at 5.  *Twombly* observed that, "[w]hile a showing of parallel 'business behavior is admissible circumstantial evidence from which the fact finder may infer agreement,' it falls short of 'conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense.'"  550 U.S. at 553 (quoting *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 540-41 (1954)).  The Court, however, need not resolve whether parallel conduct is required to survive a motion to dismiss because the Court finds plaintiffs have sufficiently alleged parallel conduct.

22

and in any event, that allegations of parallel conduct are not required at the motion to dismiss stage.  Docket No 179 at 9-14.

The moving defendants claim that plaintiffs do not allege defendants set the same or substantially similar wages.  Docket No. 164 at 11-14.  They argue that the only instances of parallel conduct alleged in the complaint are "an alleged 2% year-over-year increase in base wages at certain plants, owned by some but not all Defendants; and [] the gradual clustering of hourly wages at a few plants in three geographies."  *Id.* at 12.  They also maintain that plaintiffs' allegations only address some employees at some plants for some of the class period and therefore fail to show parallel conduct of all the defendants.[10]  *Id.* at 12-13.

Plaintiffs respond that the complaint identifies "significant evidence suggesting that Defendants placed parallel restraints on compensation increases."  Docket No. 179 at 11.  Plaintiffs refer to allegations that "*at least* seven Defendants capped wage increases for their plants at exactly two percent," arguing that this allegation supports the broader allegation that "[e]ach [Processor Defendant] established a pay structure to accomplish internal equity" and that it is "plausible that the seven Defendants capped wage increases at 2% for *all* of their plants."  *Id.* (quoting Docket No. 1 at 94, 110 ¶¶ 319-320, 363).

---

[10] The cases defendants cite do not support the proposition that plaintiffs must allege specific facts relating to every instance of parallel conduct.  Instead, the cases observe either that a plaintiff must allege some specific facts to support broad allegations of parallel conduct, *see Hogan v. Pilgrim's Pride Corp.*, 2018 WL 1316979, at *7 (D. Colo. Mar. 14, 2018), or observe that substantial differences in action defendants are alleged to have do not show parallel conduct.  *See Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516-17 (8th Cir. 2018).

Additionally, the complaint alleges each Processor Defendant set an internal compensation schedule based on job title and relevant experience.  Docket No. 1 at 8, 45, ¶¶ 7, 135-36.  The complaint alleges each Processor Defendant set wages in accordance with the other Processor Defendants across the Class Period for similar positions.  *Id.*  Despite the moving defendants' argument that plaintiffs do not make allegations regarding wages at each plant, the Court is unpersuaded that plaintiffs fail to allege parallel conduct.  The moving defendants ask the Court to ignore plaintiffs' broad allegations of depressed wages across companies because plaintiffs do not allege enough specific examples.  To require plaintiffs to address each plant would require allegations in excess of those required to infer an unlawful agreement at the motion to dismiss stage.  Here, plaintiffs sufficiently allege defendants engaged in parallel conduct by providing specific factual examples of wage depression that support their claim of broader wage depression.

### ii.  **Plus Factors**

Where a plaintiff alleges parallel conduct, *Twombly* required that a plaintiff allege additional factual circumstances ("plus factors") that make a conspiracy claim plausible, such as "behavior that would probably not result from chance, coincidence, independent response to common stimuli, or mere interdependence unaided by an advance understanding among the parties" or "conduct that indicate[s] the sort of restricted freedom of action and sense of obligation that one generally associates with agreement."  *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 790 (N.D. Ill. 2017) (quoting *Twombly*, 550 U.S. at 556 n.4).

The moving defendants argue that plaintiffs' allegations of plus factors supporting a conspiracy "fail because they are 'just as consistent with unilateral action as with concerted action.'"  Docket No. 164 at 14 (quoting *Llacua*, 930 F.3d at 1180).  The moving defendants do not make any other argument addressing the plus factors plaintiffs allege collectively and instead argue why each factor in isolation is insufficient to allege a conspiracy.  *See id.* at 14-24.  Like the court in *In re Broiler Chicken Litig.*, the Court rejects the moving defendants' analysis to the extent it evaluates each plus factor as a separate part without examining the allegations as a whole.  *See* 290 F. Supp. 3d at 797.  The Court will evaluate the alleged plus factors "in light of the underlying premise of Plaintiffs' claims," namely, that defendants fixed compensation for similar positions during the Class Period.  *Id.*

First, the moving defendants admit that plaintiffs allege that defendants exchanged aggregated anonymous compensation information, but argue that exchanging data is permissible and market surveys are commonplace.  Docket No. 164 at 14-15.  "Information exchange can help support an inference of a price-fixing agreement." *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 709 (7th Cir. 2011) (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d. Cir. 2005)).  The moving defendants, however, correctly identify that, "[w]ithout additional evidence of an unlawful agreement, information-exchange allegations do not support a plausible inference of a sweeping wage-fixing conspiracy."  Docket No. 164 at 15 (citing *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999) (price-fixing)); *see also U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can

in certain circumstances increase economic efficiency and render markets more, rather than less, competitive.").

The moving defendants argue that participating in third-party survey groups and considering the information provided in the survey to independently set prices is permissible and that any allegations of more than a lawful exchange are speculation. Docket No. 164 at 14-19.  Specifically, the moving defendants argue plaintiffs' allegation that the WMS data was deanonymized is pure speculation.  *Id*. at 16.  The complaint, however, alleges that each defendant could identify its own data and through discussion of the data, at the Red Meat Industry Compensation Meetings, Processor Defendants were able to deanonymize the data provided by WMS.  Docket No. 1 at 70, 115-16, ¶¶ 233-34, 378.  Allegations that defendants directly communicated and deanonymized the data distinguish plaintiffs' allegations from cases involving aggregate data. *Compare In re Local TV Advertising Antitrust Litig.*, 2022 WL 3716202, at *7 (N.D. Ill. Aug. 29, 2022) (observing that reports with aggregate data belonging to tens or hundreds of companies standing alone could not support an inference of a conspiracy). Plaintiffs' allegations that defendants controlled the WMS survey and deanonymized the results at in-person meetings are enough to support an inference of an agreement based on improper information exchanges.

Next, the moving defendants argue that plaintiffs' allegations of interfirm communications only describe lawful exchanges of information.  Docket No. 164 at 19-20.  "Mere exchanges of information, . . . are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange."  *Mitchael*, 179 F.3d at 859.  The complaint

alleges that defendants shared future wage information directly, in addition to the data shared in the Red Meat Industry Compensation Surveys through private roundtable sessions where the topics of discussion were intentionally concealed from Meng and through phone calls.  *See, e.g.*, Docket No. 1 at 78-80, ¶¶ 268-272.  Senior executives for the Processor Defendants communicated in group emails to align compensation practices and through bilateral emails to create time-sensitive plans for future compensation, *id.* at 10, ¶ 14; the annual survey questionnaires from 2014-2017 were designed to exchange future compensation data on salary merit increases and salary range movement, *id.* at 63, ¶ 206; sought data on projected salary increases and the timing of those increases, *id.* at 8, ¶ 7; and included data on future benefits Processor Defendants planned to award, *id.* at 66, ¶ 214.  As one example, in 2015, Meng's PowerPoint presentation "highlighted that the salary 'merit increase' would be three percent for 2015 among participating companies, and that there would be a 'salary structure increase' of '2.0% for 2015.,'" *id.* at 71, ¶ 239; Meng warned the Processor Defendants that exchanging data on future compensation was inconsistent with federal antitrust law, *id.* at 8, ¶ 8, but the warnings went unheeded until the *Broilers* lawsuit was filed.  *Id.* at 76, ¶ 259.  The exchange of data on future wages allowed the Processor Defendants to assess how and when competitors would increase wages and, in turn, to benchmark their salaries and benefits in comparison to their competitors.  *Id.* at 67, ¶¶ 217-18.

Exchanging data on future compensation as opposed to exchanging data limited to current wages supports a plausible inference of an agreement to fix compensation.  *See Levitch v. Columbia Broad. Sys., Inc.*, 495 F. Supp. 649, 674 (S.D.N.Y. 1980) ("plus

27

factors' [ ] tend to indicate either a commitment to adhere to a uniform standard of behavior or that assurance is being given by the alleged co-conspirators as to what their conduct will be in the future").  Exchanging data about future compensation is indicative of anti-competitive behavior and is "behavior that would probably not result from . . . mere interdependence unaided by an advance understanding among the parties." *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 790 (quoting *Twombly*, 550 U.S. at 556 n.4); *see also Cty. of Phila. v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 529 (S.D.N.Y. 2020) (considering allegations of exchanging future rates as evidence supporting an inference of a conspiracy to fix prices); *In re Med. X-Ray Film Antitrust Litig.*, 946 F. Supp. 209, 219 (E.D.N.Y. 1996) ("As additional circumstantial evidence supporting the existence of a conspiracy or agreement, plaintiffs offer proof that defendants had advance notice of each other's future price increases.").

The exclusion, and later inclusion, of Meng at the roundtable sessions adds support for plaintiffs' allegations that the interfirm communications were not lawful.  The Processor Defendants hired WMS to administer the Red Meat Industry Compensation Survey, Docket No. 1 at 8, ¶ 8, but plaintiffs allege WMS and Meng were excluded from important parts of administering the Red Meat Industry Compensation Survey.  On October 28, 2013, several Processor Defendants held the first Red Meat Survey Group meeting to finalize the survey questionnaire without Meng, *id.* at 56, ¶ 174; in 2014 and 2016, Processor Defendants met without Meng to prepare the next year's survey, *id.* at 58, ¶¶ 183-84; from 2014-2017, after Meng presented a summary of the year's survey results at the Red Meat Industry Compensation Meetings, Processor Defendants excused Meng from the room to have "multiple, hours-long, 'roundtable' discussions" at

the Red Meat Industry Compensation Meetings, *id.* at 8-9, 72, ¶¶ 10, 243; Meng warned Processor Defendants sharing future compensation did not align with federal antitrust law, but his warnings were ignored until the *Broilers* lawsuit, *id.* at 76, ¶ 259; after the *Broilers* lawsuit was filed, Meng was instructed to stay for all the roundtable sessions. *Id.*, ¶ 260.  Excluding Meng under these circumstances supports an inference of information sharing beyond the lawful exchanges allowed between competitors and strengthens plaintiffs' allegations of high level interfirm communications as a plus factor.

Plaintiffs have sufficiently plead at least two plus factors,[11] information exchanges and high-level interfirm communications, sufficient to "nudge[] their claim[] across the line from conceivable to plausible" and to permit an inference of an unlawful agreement.[12]  *Twombly*, 550 U.S. at 570.  The moving defendants fail to show plaintiffs' first claim has not sufficiently alleged a per se violation of the Sherman Act, and the Court will decline to dismiss plaintiffs' first claim.

---

[11] The moving defendants argue plaintiffs' claim fails because it fails to allege any plus factors, Docket No. 164 at 14-25.  Having found plaintiffs allege two, the Court need not address any other plus factors as defendants have not established two plus factors are not enough.

[12] The moving defendants argue that plaintiffs' claim fails to exclude the possibility of independent action because it admits that each Processor Defendant set wages individually.  Docket No. 164 at 24-25.  Acting independently means acting in the absence of an illegal agreement, engaging in "independent self-interested conduct," not that defendants took action related to the agreement individually.  *See Twombly*, 550 U.S. at 552 (quotations omitted).  Plaintiffs' claim is that defendants agreed to depress wages and that each defendant independently set wages in accordance with the agreement.  Allegations that each Processor Defendant individually set a compensation schedule do not support defendants' "independent action" in a way that makes plaintiffs' claim less plausible.

### 2. Claim Two: Compensation Information

Plaintiffs' second claim alleges that "Defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information about the compensation being paid or to be paid to their employees at red meat processing plants in the continental United States" resulting in an unreasonable restraint of trade in violation of the Sherman Act.  Docket No. 1 at 123, ¶ 407.  The parties agree that plaintiffs' second claim should be evaluated under the rule of reason and not as a per se violation of the Sherman Act.  *See* Docket No. 164 at 25; Docket No. 179 at 20.  The moving defendants move to dismiss plaintiffs' second claim for a failure to adequately plead a relevant market and anti-competitive effects.  Docket No. 164 at 25-31.

To establish a claim for a violation under the Sherman Act, plaintiffs must allege an agreement that illegally restrains trade.  *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1359-60 (10th Cir. 1989).  Agreements "may be illegal if (1) their purpose or effect is to create an *unreasonable* restraint of trade, *or* (2) they constitute a *per se* violation of the statute."  *Id.*  Where a per se violation does not exist, "[t]he rule of reason calls for a holistic assessment of the parties' evidence aimed, ultimately, at discerning whether a challenged practice restrains trade unreasonably and so should be prohibited under § 1 of the Sherman Act."  *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1310 (10th Cir. 2017).  Courts in the Tenth Circuit apply a burden shifting test to evaluate claims under the rule of reason.  *Id.*  Plaintiff has the burden to show an agreement had a substantially adverse effect on competition; defendant must show procompetitive virtues of the alleged wrongful

conduct; and plaintiff must prove the conduct is not necessary to achieve legitimate objectives, resulting in a balancing of the harms and benefits of the alleged wrongful conduct.  *Id.*  To carry their initial burden, plaintiffs must allege "that an alleged restraint has or is likely to have a significant anticompetitive effect."  *Id.*  Plaintiffs can accomplish this goal in three ways:

> First, under an abbreviated, quick look rule-of-reason analysis, courts sometimes simply assume the existence of anticompetitive effect where the conduct at issue amounts to a naked and effective restraint on price or output that carries obvious anticompetitive consequences.  Under quick-look analysis, the burden in effect immediately shifts to the defendant to demonstrate countervailing procompetitive effects.  Second, a plaintiff may directly establish anticompetitive effect by showing, for example, that the defendant has actually reduced output or raised prices.  And third, a plaintiff may attempt to indirectly establish anticompetitive effect by defining a relevant product and geographic market and showing the defendant possesses market power in that market.

*Id.* at 1311 (footnotes, internal citations, and quotations omitted).  At the motion-to-dismiss stage, the plaintiff is only required to show "more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.

The moving defendants do not argue that plaintiffs fail to allege an agreement; rather, the moving defendants argue plaintiffs fail to allege a plausible product market and fail to allege any anti-competitive effect on the market as a whole.  Docket No. 164 at 25-31.  Plaintiffs respond that they have sufficiently pled direct evidence of anticompetitive effects, for which a definition of the relevant market is not required,[13] and alternatively,

---

[13] The Court need not resolve the issue of whether plaintiffs' direct evidence claim requires a definition of the relevant market because the Court finds plaintiffs have successfully alleged the relevant market to support a claim with circumstantial evidence. *See, e.g., Budicak, Inc. v. Lansing Trade Group, LLC*, 452 F. Supp. 3d 1029, 1056 (D. Kan. 2020).

that they have alleged enough indirect evidence of anticompetitive effects to survive a motion to dismiss.  Docket No. 179 at 20-29.

To establish an unlawful restraint of trade with indirect evidence, plaintiffs must allege "Defendants 'possess[ ] market power in the relevant market where the alleged anticompetitive activity occurs.'"  *Buccaneer Energy*, 846 F.3d at 1312 (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 965 (10th Cir. 1994)).  To establish market power, plaintiffs must "identify[] a relevant market in terms of both product and geographic area."  *Id.*  Plaintiffs allege the relevant market for their second claim is "the labor market for employment at red meat processing plants in the continental United States."  Docket No. 1 at 123, ¶ 408.  The moving defendants argue that plaintiffs fail to allege a relevant product market.[14]  Docket No. 164 at 26-30.

The relevant product market in a traditional price-fixing case is "composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered."  *Buccaneer Energy*, 846 F.3d at 1313 (quoting *SCFC ILC*, 36 F.3d at 966).  In a wage suppression case where the alleged conspirators are buyers, as opposed to sellers, "[t]he proper focus is . . . the commonality and interchangeability of the buyers, not the commonality or interchangeability of the sellers," and courts should not inspect whether employers consider their employees interchangeable but instead inspect whether employees would consider employment with a job in the relevant industry as interchangeable with a job in another industry.  *Todd*, 275 F.3d at 202 (citation omitted).  "Because market definition

---

[14] The moving defendants do not challenge plaintiffs' geographical market.  *See* Docket No. 164 at 26-30.

is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market. . . .   There is, however, no absolute rule against the dismissal of antitrust claims for failure to allege a relevant product market." *Id.* at 199-200.  Cases warranting dismissal on the pleadings "frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way." *Id.* at 200 (footnotes omitted).

First, the moving defendants argue plaintiffs' identification of a market with employees working in a variety of different positions, including salaried and hourly workers, union and non-union workers, and beef and pork workers is overinclusive and prevents the Court from analyzing potential substitutes.  Docket No. 164 at 26-27.  The moving defendants opine that "one would not expect workers pursuing an hourly 'deboning' position and workers pursuing a salaried cattle buying position to view these job opportunities as interchangeable" as a reason the Court cannot address interchangeability.  *Id.* at 28.  This argument fails to acknowledge the reasoning in *Todd* that the relevant question is whether an employee in the red meat industry would find a similar job in another industry to be the same.  *See* 275 F.3d at 202 ("The question is not the interchangeability of, for example, lawyers with engineers.  At issue is the interchangeability, from the perspective of an [ ] employee, of a job opportunity in the oil industry with, for example, one in the pharmaceutical industry.").  Here, a deboning hourly worker should be compared to a similar job in another industry, not to a salaried

cattle buyer position.  The differences between workers within plants is not a reason to find plaintiffs fail to allege a plausible product market.

Next, the moving defendants argue that plaintiffs' identification of some industry specific characteristics of the employees and jobs in the red meat industry that make it difficult to transfer to a new industry fail to show a plausible product market because plaintiffs do not identify how those characteristics apply to every employee.  Docket No. 164 at 28-29.  The moving defendants argue that "it cannot be the case that all 'entry-level' employees or all salaried employees develop deboning or meat-cutting skills."  *Id.* at 29.  The moving defendants are correct that jobs that are less technical "tend to involve skills that are not as industry-specific, creating greater cross-elasticity for these employees."  *Todd*, 275 F.3d at 203.  However, "it is not implausible that less technical [] employees develop industry-specific expertise that affects their value in the labor market" and determining the extent to which industry-specific experience is relevant "involves a question of fact not resolvable on a Rule 12(b)(6) motion."  *Id.*  The moving defendants' arguments that plaintiffs fail to specifically examine industry specific qualities in each category of workers or for each job position in the red meat industry goes beyond plaintiffs' pleading requirements,[15] and defendants have not shown dismissal is warranted on this basis.

---

[15] The cases the moving defendants cite to argue dismissal is appropriate do not require a different result.  *See* Docket No. 164 at 28.  In *Vital Pharms., Inc. v. Berlin Packaging LLC*, 632 F. Supp. 3d 780, 786-87 (N.D. Ill. 2022), plaintiff failed to allege a plausible product market because it alleged different inconsistent definitions of the relevant product.  *In re Comp. of Managerial, Pro., & Tech. Emps. Antitrust Litig.*, 2008 WL 3887619, at *9 (D.N.J. Aug. 20, 2008), analyzed a claim at summary judgment.  In *Uhlig LLC v. CoreLogic, Inc.*, 2022 WL 4597858, at *4-7 (D. Kan. Sept. 30, 2022), plaintiff excluded specific competitive substitutes the court identified.  In *Allergy Rsch. Grp. LLC v. Rez Candles Inc.*, 2022 WL 1004214, at *6 (D. Utah Apr. 4, 2022), plaintiff's

Next, the moving defendants argue that plaintiffs' second claim fails because plaintiffs "do not plausibly allege anticompetitive effects."  Docket No. 164 at 30.  The moving defendants argue that plaintiffs fail to allege anticompetitive effects which impacted the market as a whole.  *Id.* at 30-31.  Plaintiffs are required to demonstrate that anticompetitive behavior harms competition, *see Buccaneer Energy*, 846 F.3d at 1310 (citing *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1205 (10th Cir. 2006)), and when using indirect evidence, plaintiffs must demonstrate defendants have market power, meaning defendants have the power to control prices or exclude competition in the market.  *Id.* at 1312 (citing *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 966 (10th Cir. 1990)).  The moving defendants fail to identify how plaintiffs fail to state a claim under either standard.  To the extent that the moving defendants' argument can be construed as an argument that plaintiffs fail to show direct evidence of anticompetitive effects to the market plaintiffs identify, for the reasons discussed above, plaintiffs' allegations of specific wage suppression provide sufficient support at the pleading stage for plaintiffs' broader claims of industry-wide wage suppression.  The moving defendants have not shown that plaintiffs fail to allege an element of plaintiffs' second claim for information exchange in violation of the Sherman Act, and therefore the Court will decline to dismiss plaintiffs' second claim.

## C. Statute of Limitations

The moving defendants argue that both of plaintiffs' claims are time-barred because the four-year statute of limitations began to run on plaintiffs' claim on January 1, 2014,

---

allegations on the relevant market consisted of one sentence with no discussion of interchangeability or cross-elasticity.

almost nine years before plaintiffs filed their complaint, and has now expired.  Docket No. 164 at 31.  The complaint alleges plaintiffs' claims are timely because the alleged conspiracy during the Class Period constitutes a continuing violation and because defendants fraudulently concealed their actions.  Docket No. 1 at 110-118, ¶¶ 364-85.

### 1.  *Continuing Violation*

Under the Clayton Act, 15 U.S.C. § 15b, a claim under the Sherman Act "shall be forever barred unless commenced within four years after the cause of action accrued." *Auraria Student Housing at the Regency, LLC, v. Campus Village Apartments, LLC*, 843 F.3d 1225, 1247 (10th Cir. 2016) (quoting 15 U.S.C. § 15b).  "[A]n overt act will restart the statute of limitations under the continuing conspiracy exception when the act is (1) 'a new and independent act that is not merely a reaffirmation of a previous act'; and (2) the act 'inflict[s] new and accumulating injury on the plaintiff.'"  *Id.* at 1248 (quoting *Kaw Valley Elec. Coop. Co. v. Kansas Elec. Power Coop., Inc.*, 872 F.2d 931, 933 (10th Cir. 1989)).

Plaintiffs argue that there are four events that occurred in the four years before plaintiffs filed their complaint that count as overt acts sufficient to trigger the continuing violations doctrine: (1) defendants' participation in the 2019 Red Meat Industry Compensation Survey, (2) defendants' participation in the 2019 Red Meat Industry Compensation Meeting, (3) defendants' exchange of compensation data through Agri Stats, and (4) defendants' payment of depressed wages.  Docket No. 179 at 39-43.

The moving defendants argue that participation by some defendants in the Red Meat Industry Compensation Surveys and Meetings in 2018 and 2019 does not constitute an overt act because plaintiffs allege that sharing future salary information stopped in 2017

and that, starting in 2018, Meng was present at all meeting sessions and therefore any conspiratorial discussions would not have occurred.  Docket No. 164 at 33-34.

Contrary to the moving defendant's characterization, Docket No. 164 at 33-34, the complaint does not allege the Processor Defendants ceased conspiratorial acts in 2018; instead, it alleges that they took steps to conceal antitrust violations.  The complaint alleges that Meng was invited to sessions to avoid the appearance of collusion, Docket No. 1 at 76, ¶ 260, and that Processor Defendants "often participated in off-the-books dinners and other activities that preceded the [Red Meat Industry Compensation] Meetings themselves" and provides one example of a "happy hour/dinner" that was offered alongside the Red Meat Industry Compensation Meeting in 2019.  *Id.* at 74-75, ¶¶ 252, 255.  These allegations show that the Processor Defendants continued to depress wages, and attempted to conceal their actions to do so, not that their conspiratorial efforts ceased.

A conspiracy is not final for statute of limitations purposes where the agreement "require[s] ongoing enforcement efforts, which inflict[ ] 'new and accumulating injury,'" as opposed to an agreement enforced through a decision by a single entity that does not require ongoing enforcement efforts. *Auraria Student Housing*, 843 F.3d at 1248 (quoting *Champagne Metals*, 458 F.3d at 1089-90) (distinguishing *Kaw Valley*, 872 F.3d at 934-35).  First, the complaint alleges that defendants were engaging in continuous enforcement efforts in support their agreement to depress wages by maintaining strict rules for joining and maintaining membership in the Red Meat Survey Group, Docket No. 1 at 54, ¶ 163, such as requiring in person attendance at the Red Meat Industry Compensation Meetings, *id.*, ¶ 165, by "exert[ing] full control over the implementation

and modification of that Survey during the entire six-year duration of its use," *id.* at 57,

¶ 179, and by directly exchanging information outside of the survey to depress

compensation.  *Id.* at 10, ¶ 14.  Second, the complaint alleges new and accumulating

injury because new employers and employees were included in the conspiracy

throughout the Class Period.  Allowing the Red Meat Survey Group to determine who

could join the group, *id.* at 54, ¶ 166, gave them the opportunity to broaden the

conspiracy to more companies and more employees, which they took.  In 2013, the Red

Meat Survey Group included JBS, Tyson, Seaboard, Agri Beef, American Foods,

Cargill, Hormel, National Beef, and Smithfield, *id.* at 57, ¶ 177, but by the end of the

Class Period every Processor Defendant or one of its affiliates had participated in the

group.  *Id.* at 53, ¶ 161.  Like in *Auraria Student Housing*, plaintiffs' allegations of

ongoing enforcement efforts and a broadening of the conspiracy inflicting new and

accumulating injury is enough to constitute an overt act.  843 F.3d at 1248 (finding new

injury where a conspiracy impacted more people and was broadened each year).

Unlike *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1212 (N.D. Cal.

2015), upon which the moving defendants rely, Docket No. 164 at 33-34, where

plaintiffs failed to allege "any new or independent actions taken by the Defendants"

during the limitations period, here plaintiffs specifically identify the 2019 Red Meat

Industry Compensation Meeting and the preparation for the meeting as an overt act

within the limitations period.  Because the ongoing agreement resulted in an

accumulating injury, namely, depressed wages, plaintiffs have alleged a continuing

violation sufficient to recover damages occurring during the limitations period.  *See*

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189-90 (1997).

### 2. *Fraudulent Concealment*

In addition to the continuing violations doctrine, plaintiffs' complaint alleges their claims are timely because the doctrine of fraudulent concealment tolls the statute of limitations.  Docket No. 1 at 118, ¶ 385.  Moving defendants argue that plaintiffs have not met the heightened pleading standard required for claims of fraudulent concealment required under Federal Rule of Civil Procedure 9(b).  Docket No. 164 at 34-35.

Fraudulent concealment is an equitable doctrine "read into every federal statute of limitation."  *In re Credit Default Swaps Auctions Litig.*, 2023 WL 3821337, at *20 (D.N.M. June 5, 2023) (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946)).

> The Tenth Circuit requires plaintiffs to show "(1) the use of fraudulent means by the party who raises the ban of the statute [of limitations]; (2) successful concealment from the injured party; and (3) that the party claiming fraudulent concealment did not know or by the exercise of due diligence could not have known that he might have a cause of action."

*Id.* (quoting *Ballen v. Prudential Bache Securities, Inc.*, 23 F.3d 335, 336-37 (10th Cir. 1994)).  "The question of whether [] claims were fraudulently concealed is typically factual and not amenable to resolution on a motion to dismiss." *Thompson*, 2018 WL 2271024, at *10.  In an antitrust conspiracy case, this is generally true where the proof of concealment is in the hands of the defendant. *Id.*; *see also In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007) (collecting cases).

Because a claim of fraudulent concealment is based on fraud, the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies.  *Thompson*, 2018 WL 2271024, at *10 (citing *In re: Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000)).  Rule 9(b) of the Federal Rules of Civil Procedure requires that, in a pleading alleging fraud, the circumstances constituting fraud or

mistake must be stated with particularity. *Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006); Fed. R. Civ. P. 9(b). The purpose of the requirement "is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based," to "safeguard[] defendant's reputation and goodwill from improvident charges of wrongdoing," and "to inhibit the institution of strike suits." *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 987 (10th Cir. 1992) (citation omitted). A complaint alleging fraud must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (citing *Lawrence Nat'l Bank v. Edmonds*, 924 F.2d 176, 180 (10th Cir. 1991)). "Allegations of fraud may be based on information and belief when the facts in question are peculiarly within the opposing party's knowledge and the complaint sets forth the factual basis for the plaintiff's belief." *Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir. 1992).

To claim fraudulent concealment, first, plaintiffs must allege the use of fraudulent means by defendants. *Ballen*, 23 F.3d at 336-37. Plaintiffs must show an affirmative act of fraudulent concealment.[16] *In re Urethane Antitrust*

---

[16] Courts have applied three different standards to fraudulent concealment antitrust claims, namely, "the 'self-concealing' standard, the 'separate and apart' standard, and the intermediate, 'affirmative acts' standard." *In re Urethane Antitrust Litig.*, 913 F. Supp. 2d at 1158 (quoting *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir.1995)). Moving defendants urge the Court to use the "affirmative acts" standard to evaluate the first prong of fraudulent concealment. Docket No. 164 at 35. Plaintiffs argue the self-concealing standard applies. Docket No. 179 at 31. Neither party identifies controlling Tenth Circuit precedent. The Court however need not identify which standard applies because, even under the more stringent affirmative acts

*Litig.*, 913 F. Supp. 2d 1145, 1159 (D. Kan. Dec. 18, 2012).  Actions to maintain secrecy surrounding an antitrust conspiracy can show affirmative actions.  *See id.* at 1161-1162.  The moving defendants argue that plaintiffs have not sufficiently alleged fraudulent means because their allegations of concealment in secret meetings and surrounding Agri Stats are too vague.  Docket No. 164 at 35.

Moving defendants argue that "[c]ourts routinely reject generalized allegations of 'secret' meetings" citing *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 773-74 (D. Minn. 2020).  Docket No. 164 at 35.  In that case, the court ruled that allegations that a conspiracy was concealed with "secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint communications on documents, communicating competitively sensitive data to one another . . . and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators" failed to allege an affirmative act of fraudulent concealment.  *In re Pork Antitrust Litig.*, 495 F. Supp. 3d at 773.  The court observed that plaintiffs failed "provide any information regarding the 'who, what, when, where, and how' that could lead the Court to plausibly assume that the Defendants engaged in a fraudulent concealment campaign."  *Id.* at 774.

---

standard, plaintiffs have sufficiently alleged fraudulent means at this stage of the case.

Here, in contrast to *In re Pork Antitrust Litig.*, plaintiffs identify actions taken to conceal the conspiracy with specificity on "who, what, when, where, and how." Plaintiffs make several allegations about the Red Meat Industry Compensation Meetings that have the specificity required by Rule 9(b).  Plaintiffs allege the Red Meat Industry Compensation Meetings were held in 2014, 2015, 2017, 2018, and 2019, Docket No. 1 at 69, ¶ 227; at the 2014, 2015, and 2017 Red Meat Industry Compensation meetings, Meng was excluded from roundtable sessions after his presentation in order to facilitate wage-fixing, *id.* at 72, ¶¶ 243-45; agendas for roundtable sessions were kept vague, concealing the specifically discussed topics with descriptions like "group discussion topics" and "outstanding items," *id.* at 74, ¶ 251; attendees were required to go to the meetings in person every year, *id.* at 10, ¶ 13; and at the 2018 and 2019 Red Meat Industry Compensation Meetings, in response to the *Broilers* lawsuit, Meng was included in all roundtable sessions, *id.* at 76, ¶ 260, but Meng was not invited to dinners and meetings outside of the roundtable sessions in any year, *id.* at 74-75, ¶¶ 252-255.  Processor Defendants sent one to three executives to the Red Meat Industry Compensation Meetings that were typically high-ranking human resources corporate executives, *id.* at 69, ¶ 228, limiting the content of these meetings to high levels within each firm.  Considering these allegations, collectively, plaintiffs have made sufficient allegations of affirmative acts of concealment to allege fraudulent means such as limiting information to high-level executives, maintaining secrecy around their meetings, and changing their practices in response to antitrust litigation to survive the motion to dismiss stage.

Next, the moving defendants argue plaintiffs fail to allege due diligence as necessary to toll the statute of limitations.  Docket No. 164 at 36-37.  The moving defendants assert plaintiffs have been on inquiry notice of their claims since September 2016 based on the *Broilers* lawsuit and *Jien v. Perdue*.  *Id.*  Plaintiffs respond that this issue is not appropriately decided on a motion to dismiss.[17] Docket No. 179 at 36-37.

The *Broiler* lawsuit and *Jien v. Perdue* involved different conduct by different actors, different markets, and different parties.  *See* Docket No. 179 at 36-37. Neither relates to compensation in the red meat industry.  Without pointing to any alleged information that would put plaintiffs on notice of wage fixing in the red meat industry, moving defendants have not shown plaintiffs had a "reasonable basis to begin investigating their antitrust claims" sufficient to dismiss this case at the pleading stage.  *Thompson*, 2018 WL 2271024, at *13.  Defendants have not shown plaintiffs fail to plausibly allege due diligence and, therefore, fail to show plaintiffs do not plausibly allege that fraudulent concealment tolls the statute of limitations for plaintiffs' claims.

## IV. CONCLUSION

For the foregoing reasons, it is

---

[17] Moving defendants' reply states plaintiffs' "argument that the Court cannot decide the diligence element of fraudulent concealment on a motion to dismiss, [ ] is also wrong," citing *Ballen*, 23 F.3d at 337, as analyzing all three steps of a fraudulent concealment claim.  Docket No. 195 at 17.  In *Ballen*, the court observed that, because it could affirm the district court's ruling based on the first element of a fraudulent concealment claim, it was unnecessary to evaluate the second and third elements of fraudulent concealment.  23 F.3d at 337 & n.2.

   **ORDERED** that the portion of Defendants' Joint Motion to Dismiss [Docket No.

164] brought on behalf of Seaboard Foods, LLC and Triumph Foods, LLC is

**DENIED as moot**.  It is further

   **ORDERED** that Defendants' Joint Motion to Dismiss [Docket No. 164] is

**DENIED**.


   DATED September 27, 2023.

                                        BY THE COURT:


                                        PHILIP A. BRIMMER
                                        Chief United States District Judge