IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 22-cv-02946-PAB-STV

RON BROWN,
MINKA GARMON, and
JESSIE CROFT, individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

JBS USA FOOD COMPANY,
TYSON FOODS, INC.,[1]
CARGILL, INC.,
CARGILL MEAT SOLUTIONS CORP.,
HORMEL FOODS CORP.,
AMERICAN FOODS GROUP, LLC,
TRIUMPH FOODS, LLC,
SEABOARD FOODS, LLC,
NATIONAL BEEF PACKING CO., LLC,
IOWA PREMIUM LLC,
SMITHFIELD FOODS INC.,
SMITHFIELD PACKAGED MEATS CORP.,
AGRI BEEF CO.,
WASHINGTON BEEF, LLC,
PERDUE FARMS, INC.,
AGRI STATS, INC., and
WEBBER, MENG, SAHL AND COMPANY, INC. d/b/a/ WMS & Company,

      Defendants.

_____

**ORDER**
_____

    This matter is before the Court on Defendant Hormel Foods Corporation's Rule

12(b)(6) Motion to Dismiss the Complaint [Docket No. 159], Defendant Iowa Premium,

---

[1] The Court notes the caption of the complaint has been corrected to include Tyson Foods, Inc.  *See* Docket No. 219 at 1 n.1.

LLC's Motion to Dismiss [Docket No. 160], Defendant Triumph Foods, LLC's Motion to Dismiss [Docket No. 161],[2] Agri Stats, Inc.'s Motion to Dismiss [Docket No. 162], Defendants Agri Beef Co. and Washington Beef, LLC's Motion to Dismiss [Docket No. 163], Motion to Dismiss by Defendants Smithfield Foods, Inc. and Smithfield Packaged Meats Corp. [Docket No. 165], and Defendant American Foods Group, LLC's Motion to Dismiss Plaintiffs' Class Action Complaint and Jury Demand [Docket No. 166].  Plaintiffs filed a response opposing each motion, Docket Nos. 185, 183, 186, 184, 180, 182, and 181, respectively.  Defendants filed replies in support of each motion, Docket Nos. 188, 192, 190, 193, 189, 194, and 191, respectively.

## I.  BACKGROUND[3]

### A. The Parties

Plaintiffs Ron Brown, Minka Garmon, and Jessie Croft bring claims on behalf of themselves and on behalf of a class (the "Class") "consisting of all persons employed by Defendants, their subsidiaries, and related entities at beef- and pork-processing plants in the continental United States from January 1, 2014, to the present day (the 'Class Period')."  Docket No. 1 at 6 (footnote omitted).

Defendants include eleven red meat processors[4] and several of their subsidiaries (the "Processor Defendants"), namely, Agri Beef Co.; Washington Beef, LLC;[5] American

---

[2] The Court will deny Triumph's motion as moot based on Triumph's request for entry of a preliminary settlement order based on a cooperation agreement between Triumph and plaintiffs.  *See* Docket No. 205 at 1.  Triumph may refile its motion to dismiss if the Court denies its motion for preliminary approval of settlement.

[3] The following facts are reproduced from the Court's order on Defendants' Joint Motion to Dismiss [Docket No. 164].  *See* Docket No. 219 at 3-11.

[4] Plaintiffs define red meat as beef and pork.  Docket No. 1 at 6.

[5] Agri Beef Co. and Washington Beef, LLC will be collectively referred to as "Agri Beef."

Foods Group, LLC ("American Foods"); Cargill, Inc.; Cargill Meat Solutions Corp.;[6] Hormel Foods Corp. ("Hormel"); Iowa Premium LLC ("Iowa Premium"); JBS USA Food Co. ("JBS"); National Beef Packing Co., LLC ("National Beef"); Perdue Farms, Inc. ("Perdue"); Seaboard Foods, LLC ("Seaboard"); Smithfield Foods, Inc.; Smithfield Packaged Meats Corp.;[7] Triumph Foods, LLC ("Triumph"); and Tyson Foods, Inc. ("Tyson").  *Id.*, ¶ 2.  A subset of Processor Defendants are the "Pork Processor Defendants," namely, Hormel, JBS, Seaboard, Smithfield Foods, Inc., Triumph, and Tyson.  *Id.* at 11, ¶ 16.  In addition to the Processor Defendants, the complaint names two consulting companies as defendants, Agri Stats, Inc. ("Agri Stats") and Webber Meng Sahl and Company Inc. ("WMS").  *Id.* at 6, ¶ 2.

**B. Facts**[8]

Processor Defendants collectively produce approximately 80 percent of the red meat that is sold in the United States.  *Id.*  Processor Defendants own and operate approximately 140 red meat processing plants in the continental United States.  *Id.* at 6-7, ¶ 3.  Plaintiffs Ron Brown, Minka Garmon, and Jessie Croft were hourly employees of "Smithfield Farms Inc.," National Beef, and Iowa Premium respectively during the Class Period.  *Id.* at 14, ¶¶ 26-28.

---

[6] Cargill Inc. and Cargill Meat Solutions Corp. will be collectively referred to as "Cargill."

[7] Smithfield Foods, Inc. and Smithfield Packaged Meats Corp. will be collectively referred to as "Smithfield."

[8] The Court assumes that the well-pleaded allegations in plaintiffs' complaint are true in considering the motion to dismiss.  *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

Processor Defendants employed hundreds of thousands of the members of the Class during the Class Period in various positions and compensated these employees with benefits and either hourly wages or an annual salary.  *Id.* at 6-7, ¶¶ 3-4.  During the Class Period, senior executives for each Processor Defendant set and approved compensation schedules for hourly wage rates, annual salaries, and employee benefits at corporate headquarters for their respective companies.  *Id.* at 7, ¶ 4.  Local plant managers working for Processor Defendants were allowed to make recommendations for wage adjustments, but the ultimate decision on compensation schedules was made at the corporate headquarters of each Processor Defendant.  *Id.* at 46, ¶ 138.  Each Processor Defendant determined the compensation for hourly-paid positions at their red meat processing plants with compensation schedules that accounted for workers' skill and experience and which aligned with the compensation schedules that other Processor Defendants had established for the same position.  *Id.* at 45, ¶ 135.  Each Processor Defendant did the same for salaried positions.  *Id.*, ¶ 136.

From 2014 to 2019, different groups of Processor Defendants designed and participated in an annual "Red Meat Industry Compensation Survey" in which they exchanged detailed current and future information about wages, salaries, and benefits provided to their workers at red meat processing facilities.  *Id.* at 51, ¶¶ 154-55.  To participate in the Red Meat Industry Compensation Survey, Processor Defendants annually completed a survey questionnaire and then received and reviewed a report on the results of the survey.  *Id.* at 51-52, ¶ 155.  Different groups of Processor Defendants participated in the Red Meat Industry Compensation Survey each year from 2014 to 2019.  *Id.*  Participants referred to themselves as the "Red Meat Survey Group."  *Id.* at

53, ¶ 160.  Processor Defendants designed the initial surveys in late 2013 through in-person and telephonic conversations without the assistance of WMS.  *Id.* at 55, ¶¶ 170, 172.  On September 16, 2013, Javen Xu, the compensation and benefits analyst at JBS, *id.* at 56, ¶ 173, emailed Jonathan Meng, WMS's president and the administrator of the Red Meat Industry Compensation Surveys, *id.* at 8, ¶ 8, to inform him that nine companies, including JBS, had confirmed their participation in the Red Meat Industry Compensation Survey.  *Id.* at 56, ¶ 173.  Meng responded, confirming that Processor Defendants held final decision-making power over which employee positions the survey would cover and over the information the survey would collect.  *Id.*

WMS distributed survey questionnaires to the participating Processor Defendants, compiled survey results reports, and distributed those reports to participants each year. *Id.* at 52, ¶ 156.  The Processor Defendants, however, collectively managed and controlled the annual Red Meat Industry Compensation Surveys and determined who could join the Red Meat Survey Group.  *Id.* at 53-55, ¶¶ 159, 166-67.

In 2014, when the first Red Meat Industry Compensation Survey was administered, Meng directed questions from survey participants to Renee DeBar, head of compensation and benefits at JBS.  *Id.* at 56, 58, ¶¶ 176, 181-182.  On October 21, 2014, after a meeting between the Red Meat Survey Group without Meng, DeBar provided Meng with specific modifications for the 2015 survey from the Red Meat Survey Group.  *Id.* at 58, ¶ 183.

On December 8, 2016, Brad Sievers the compensation manager at JBS, informed Meng that he met with the assistant vice president of labor at Cargill and told Meng they had discussed the Red Meat Survey Group, were reaching out to companies to gauge

interest in participating in the survey, and that the Red Meat Survey Group would hold a call without Meng to "ensure everyone is on the same page." *Id.* at 58-59, ¶ 184.  The Red Meat Survey Group held a call in January 2017 and made decisions about the scope of the survey.  *Id.* at 59, ¶ 185.

Each year of the Class Period the Red Meat Industry Compensation Surveys covered between 33 and 38 salaried positions.  *Id.* at 60, ¶ 188.  In 2014 and 2015, the surveys covered four hourly positions, and in 2016 and 2017, the surveys covered seven hourly positions.  *Id.* at 61, ¶ 195.  The Red Meat Industry Compensation Surveys that were distributed from 2014 to 2017 included data on future salary increases Processor Defendants planned.  *Id.* at 63, ¶ 206.

Throughout the Class Period, representatives from Processor Defendants attended and participated in annual in-person "Red Meat Industry Compensation Meetings." *Id.* at 69, ¶¶ 227-228.  The meetings were held each year from 2014-2019, except in 2016. *Id.*, ¶ 227.  The meetings were usually held in April or May and most frequently held in Kansas City, Missouri.  *Id.*, ¶ 229.  The Red Meat Survey Group determined the location, schedule, and agenda for each Red Meat Industry Compensation Meeting.  *Id.* Red Meat Survey Group members were required to attend the annual Red Meat Industry Compensation Meetings to remain as members of the group.  *Id.* at 54, ¶¶ 163, 165.  Each Red Meat Survey Group member sent one to three executives to the Red Meat Industry Compensation Meetings.  *Id.* at 69, ¶ 228.  The meetings consisted of multiple roundtable sessions during which executives from the Red Meat Survey Group would discuss the results of that year's Red Meat Industry Compensation Survey as well as current and future compensation practices at their respective firms.  *Id.* at 70,

¶ 233.  The Red Meat Industry Compensation Meetings were accompanied by "off-the-books dinners and other activities that preceded the Meetings themselves."  *Id.* at 74, ¶ 252.  For example, at the 2014 meeting, a Seaboard executive arranged a dinner for the Red Meat Survey Group on the evening before that year's meeting with executives from Tyson, JBS, and Seaboard, *id.*, ¶ 253; in 2015, the same Seaboard executive arranged a dinner for the Red Meat Survey Group the night before the annual meeting with a "quick discussion" before the dinner between members of the group, *id.* at 75, ¶ 254; in connection with the 2019 meeting, an executive from Pittman Farms offered to host a happy hour and dinner alongside the meeting.  *Id.*, ¶ 255.

After the 2016 Red Meat Industry Compensation Survey, the Red Meat Survey Group formed a "steering committee" to aid with communication and organization and to serve as Meng's main point of contact.  *Id.* at 55, ¶ 168.  Executives from Tyson, JBS, and Cargill were on the steering committee.  *Id.*

At the Red Meat Industry Compensation Meetings, Meng was invited to attend one or both of the first two sessions; during those sessions, Meng presented a summary of the results of the Red Meat Industry Compensation Survey.  *Id.* at 70-71, ¶¶ 235-237.  In 2014, 2015, and 2017, after presenting the survey results, Meng left and the remaining sessions proceeded without him.  *Id.* at 72, ¶¶ 244-45.  In the sessions without Meng, plaintiffs allege that executives from Processor Defendants agreed upon and suppressed the wages, salaries, bonuses, and benefits they would provide to employees at red meat processing plants.  *Id.*, ¶ 244.  The steering committee prepared written agendas for the Red Meat Industry Compensation Meetings which concealed the contents of the roundtable sessions that excluded WMS and Meng, listing items

such a "group discussion topics" and "outstanding items" and observing that firms would "share relevant updates" in the sessions.  *Id.* at 74, ¶ 251.

In 2016, an antitrust action (the "*Broilers* lawsuit") was filed against several Processor Defendants alleging price-fixing by leading poultry producers.  *Id.* at 75, ¶ 256.  The *Broilers* lawsuit generated concerns about the Red Meat Industry Compensation Surveys and Meetings and, in response, questions and survey results containing future compensation data were eliminated from the surveys and the survey results reports.  *Id.* at 76, ¶¶ 257-59.  Starting with the 2018 Red Meat Compensation Industry Meeting, Meng was instructed to stay for all the sessions.  *Id.*, ¶ 260.

In 2019, a lawsuit was filed ("*Jien v. Perdue*") alleging that certain poultry processors, including several Processor Defendants, "had unlawfully conspired to depress the compensation of their poultry-plant workers by, among other things, exchanging their wage data through annual WMS surveys and conducting in-person meetings to discuss the survey results and their compensation practices."  *Id.* at 77, ¶ 261.  Based on concerns of antitrust liability arising from *Jien v. Perdue* and the *Broilers* lawsuit, the Red Meat Survey Group decided to cease the Red Meat Industry Compensation Survey in 2020.  *Id.*  On January 3, 2020, Meng asked the Red Meat Survey Group if they were interested in continuing the survey.  *Id.*, ¶ 262.  On the same day, Hormel, Agri Beef, Seaboard, and Kraft Heinz Corporation[9] responded by declining to participate in a survey in 2020.  *Id.*, ¶ 263.

On January 16, 2020, Meng informed Katie Mason, the compensation lead at Cargill,

---

[9] Kraft Heinz Company is alleged to be a co-conspirator with Processor Defendants. *Id.* at 38-39, ¶¶ 100-102.

that there would not be a survey in 2020 based on a lack of interest, and Mason responded "she was 'hearing similarly internally.'"  *Id.*, ¶ 264.

Throughout the Class Period, senior executives of Processor Defendants who had the authority to determine or influence compensation of members of the Class contacted one another in order to align their current and future compensation practices. *Id.* at 78, ¶ 267.  As examples, a Seaboard executive made weekly calls to competing pork processors requesting pay ranges for salaried and hourly workers at competing pork processing plants, *id.*, ¶ 268; on May 6, 2015, the compensation and retirement manager at JBS emailed executives at Agri Beef, Cargill, Hormel, National Beef, Seaboard, Smithfield, Triumph, and Tyson an "ad-hoc survey" covering "Supervisor Weekend Pay & Bonus Eligibility," for which the results would be anonymized and shared with all respondents, *id.* at 79, ¶ 270; on April 20, 2015, Linda Wray an executive at Tyson, informed Meng and executives at Seaboard and JBS that she intended to send a survey to Red Meat Survey Group members asking for their projected increase non-union hourly production in fiscal year 2016, *id.*, ¶ 271; in response to Wray's email, Seaboard and JBS immediately signed off on her request to send a survey, but Meng wrote that she should not formally distribute a question on 2016 compensation increases, *id.* at 79-80, ¶ 271; JBS provided compensation data to Iowa Premium on what it would pay its processing plant workers in Marshalltown, Iowa, where Iowa Premium has a red meat processing plant 23 miles away in Tama, Iowa.  *Id.* at 80, 91, ¶¶ 272, 310.

Agri Stats describes itself as a "management and benchmarking company" that "provides consultation on data analysis, action plan development and management

practices of participating companies," with a mission to "But its stated mission is to "[i]mprove the bottom line profitability for our participants by providing accurate and timely comparative data while preserving confidentiality of individual companies."  *Id.* at 81, ¶ 277.  Agri Stat facilitates the exchange of recent and current competitively sensitive information between competitors.  *Id.* at 82, ¶ 280.  To maintain secrecy, Agri Stats requires that its subscribers share their own data in order to receive data on their competitors and does not sell its data to the public.  *Id.*, ¶¶ 280-81.  Subscribers to Agri Stats performed an initial data intake and then provided monthly reports of data on the 18th of each subsequent month.  *Id.* at 83, ¶ 284.  Agri Stats reported the data it collected monthly to its subscribers two weeks after receiving it.  *Id.*

The Pork Processor Defendants exchanged detailed and competitively sensitive compensation data each month by way of a subscription to Agri Stats.  *Id.* at 80, ¶ 273. During the Class Period Cargill, Clemens Food Group, LLC, the Clemens Family Corporation, Hormel, Indiana Packers Corporation, JBS, Seaboard, Smithfield and Tyson exchanged wage information through Agri Stats.  *Id.* at 81, ¶ 276.

Agri Stats was to anonymize data it received, but the reports it provided were detailed enough that competitors could identify each other's data.  *Id.* at 87, ¶ 296.  Each report identified which competitors participated; in some reports, competitors were identifiable because so few producers participated and, in other reports, the data that was provided was so specific it could be deanonymized with public records.  *Id.* at 87-88, ¶¶ 297-99. The Pork Processor Defendants used the data from Agri Stats to suppress compensation and to confirm that no conspirator deviated from the compensation-fixing conspiracy.  *Id.* at 88-89, ¶ 301.

Two Processor Defendants entered into an illegal agreement not to recruit or solicit each other's employees, such agreements are known as "no poach" agreements.  *Id.* at 90, ¶¶ 306-07.  As an example, in January 2016, Iowa Premium and JBS entered into a no poach agreement covering JBS' Marshalltown plant and Iowa Premium's Tama plant.  *Id.* at 90-93, ¶¶ 307-15.  The Marshalltown and Tama plants are both in Iowa and would compete with one another for employees in the absence of an agreement.  *Id.* at 91, ¶ 310.

As a result of the conspiracy to depress wages, Processor Defendants simultaneously and in parallel limited annual wage increases to members of the Class. *Id.* at 93, ¶ 317.  Wages were lower than they would have been in the absence of a conspiracy.  *Id.*  As examples, in 2017, base wages were increased by only 2% at 17 plants operated by Cargill, National Beef, JBS, Smithfield, Tyson, Triumph, and Seaboard.  *Id.* at 94, ¶ 319.  In 2018, base wages were increased by only 2% in 17 plants operated by several Processor Defendants, including some of the plants that only received a 2% increase in base wages in 2017.  *Id.*, ¶¶ 319-20.  In 2017 and 2018, at plants operated by different Processor Defendants, the difference in average wages between plants in the same areas including Dodge City, Kansas; the Oklahoma and Texas panhandles; and south-central Nebraska decreased, bringing the difference in wages between closely located plants within $0.07 or less.  *Id.* at 95, ¶ 321.

## II.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible."  *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)).  Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted).  However, a plaintiff still must provide "supporting factual averments" with his allegations.  *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009) ("conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based" (citation omitted)).  The court need not accept conclusory allegations.  *Moffet v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at

1286 (alterations omitted).  An affirmative defense, such as the statute of limitations, may be considered on a motion to dismiss under Rule 12(b)(6) only when a plaintiff admits every element of the affirmative defense in the complaint.  *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018) (citing *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004)).

## III.  ANALYSIS

Plaintiffs' first claim for relief is brought against every defendant except Agri Stats and alleges that Processor Defendants, and other co-conspirator such as WMS, entered into an agreement to fix, depress, maintain, and stabilize the compensation paid to workers, both hourly and salaried, at their red meat processing facilities in violation of the Sherman Act, 15 U.S.C. § 1.  Docket No. 1 at 121-23, ¶¶ 400-405.  Plaintiffs allege that this agreement began on January 1, 2014 and continues to the present.  *Id.* at 121, ¶ 401.  Plaintiffs' second claim for relief is brought against every defendant and alleges defendants and several co-conspirators "engaged in a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information about the compensation being paid or to be paid to their employees at red meat processing plants" beginning on January 1, 2014 and continuing to the present.  *Id.* at 123, ¶ 407.

Each motion to dismiss joins Defendants' Joint Motion to Dismiss [Docket No. 164].  Docket Nos. 159 at 1; 160 at 1-2; 162 at 2 n.1; 163 at 1; 165 at 1; 166 at 1.  The Court denies the portions of each motion incorporating the joint motion to dismiss for the same reasons the Court denied the joint motion to dismiss.  *See* Docket No. 219.  The Court will analyze the remaining arguments in the individual motions to dismiss separately.

### A. <u>Sherman Act</u>

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "While the text of the Sherman Act could perhaps be interpreted to proscribe all contracts, the Supreme Court has repeated time and again that § 1 outlaw[s] only unreasonable restraints of trade." *United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1272 (10th Cir. 2018) (internal quotations marks omitted). Certain restraints are unreasonable per se "because they 'always or almost always tend to restrict competition and decrease output.'" *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (quoting *Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723 (1988)). Horizontal restraints "imposed by agreement between competitors" qualify as "unreasonable per se." *Id.* at 2284 (quoting *Sharp*, 485 U.S. at 730). "Restraints that are not unreasonable per se are judged under the rule of reason" which "requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition." *Id.* (internal citations, quotations, and alterations omitted).

"The essence of a claim of a violation of Section 1 of the Sherman Act is the agreement itself." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556); *see also Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1179 n.28 (10th Cir. 2019) (observing that it is erroneous to use a probability standard to assess allegations in a Sherman Act claim). An agreement can

be shown through direct or indirect evidence.  *Champagne Metals*, 458 F.3d at 1082.

"Direct facts are explicit and require no inferences.  Direct evidence of a § 1 agreement

may take the form of a written contract or agreement, such as association rules, or

admissions of an agreement.  In contrast, circumstantial facts require inferences to

show that an anti-competitive agreement exists."  *Llacua*, 930 F.3d at 1174 n.24

(internal citations, quotations, and alterations omitted).  *Twombly* provides a rule for

determining whether plaintiff has sufficiently pled a claim of an agreement in violation of

the Sherman Act with circumstantial evidence, namely that "mere allegations of parallel

conduct, absent additional contextual facts, fail to state a plausible conspiracy claim."

*See id.* at 1174-75 (quoting *Twombly*, 550 U.S. at 556-57).

### B.  <u>Statute of Limitations</u>

Under the Clayton Act, 15 U.S.C. § 15b, a claim under the Sherman Act "'shall be

forever barred unless commenced within four years after the cause of action accrued.'"

*Auraria Student Housing at the Regency, LLC, v. Campus Village Apartments LLC*, 843

F.3d 1225, 1247 (10th Cir. 2016) (quoting 15 U.S.C. § 15b).  Although the statute of

limitations is an affirmative defense that a defendant must raise, where the dates in a

complaint make clear that the claim has accrued, a statute of limitations defense may

be resolved on a motion to dismiss.  *Herrera v. City of Espanola*, 32 F.4th 980, 991

(10th Cir. 2022) (citing *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir.

2018)).  Where a plaintiff's claim accrued before filing, "plaintiff has the burden of

establishing a factual basis for tolling the statute."  *Aldrich v. McCulloch Props. Inc.*, 627

F.2d 1036, 1041 n.4 (10th Cir. 1980).

One exception to the statute of limitations is the continuing violations doctrine. *Herrera*, 32 F.4th at 993.  "[A]n overt act will restart the statute of limitation under the continuing conspiracy exception when the act is (1) 'a new and independent act that is not merely a reaffirmation of a previous act'; and (2) the act 'inflict[s] new and accumulating injury on the plaintiff.'"  *Auraria Student Housing*, 843 F.3d at 1248 (quoting *Kaw Valley Elec. Coop. Co. v. Kansas Elec. Power Coop., Inc.*, 872 F.2d 931, 933 (10th Cir. 1989)).

Another exception to the statute of limitations is fraudulent concealment.  *Ballen v. Prudential Bache Securities, Inc.*, 23 F.3d 335, 336-37 (10th Cir. 1994).  Fraudulent concealment is an equitable doctrine "read into every federal statute of limitation."  *In re Credit Default Swaps Auctions Litigation*, 2023 WL 3821337, at *20 (D.N.M. June 5, 2023) (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946)).

> The Tenth Circuit requires plaintiffs to show "(1) the use of fraudulent means by the party who raises the ban of the statute [of limitations]; (2) successful concealment from the injured party; and (3) that the party claiming fraudulent concealment did not know or by the exercise of due diligence could not have known that he might have a cause of action."

*Id.* (quoting *Ballen*, 23 F.3d at 336-37).  "The question of whether [] claims were fraudulently concealed is typically factual and not amenable to resolution on a motion to dismiss."  *Thompson v. 1-800 Contacts, Inc.*, 2018 WL 2271024, at *10 (D. Utah May 17, 2018).

In an antitrust conspiracy case, it is generally true that a fraudulent concealment claim is not resolvable on a motion to dismiss where the proof of concealment is in the hands of the defendant.  *Id.* at *10-11; *see also In re Rubber Chemicals Antitrust Litigation*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007) (collecting cases).  Where a plaintiff "make[s] specific factual allegations with

respect to each Defendant's alleged participation in the scheme as a whole," conspirators may be held liable for co-conspirators acts of fraudulent concealment for the purposes of tolling the statute of limitations. *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1211 (N.D. Cal. 2015); *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 538 (6th Cir. 2008) ("Fraudulent concealment, however, may be established through the acts of co-conspirators."); *Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480, 1493 (D.C.Cir. 1989) ("affirmative acts of concealment by one or more of the conspirators can be imputed to their co-conspirators for purposes of tolling the statute of limitations")

Because a claim of fraudulent concealment is based on fraud, the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies. *Thompson*, 2018 WL 2271024, at *10 (citing *In re: Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000)).  Rule 9(b) of the Federal Rules of Civil Procedure requires that, in a pleading alleging fraud, the circumstances constituting fraud or mistake must be stated with particularity. *Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006); Fed. R. Civ. P. 9(b).  "Allegations of fraud may be based on information and belief when the facts in question are peculiarly within the opposing party's knowledge and the complaint sets forth the factual basis for the plaintiff's belief." *Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir. 1992).

## C. Hormel Foods

Hormel moves to dismiss both claims against it based on the statute of limitations for Sherman Act claims.  Docket No. 159 at 1-2.  Hormel argues that, "just as with the other

Defendants, Plaintiffs fail to plausibly plead either the 'continuing conspiracy' or 'fraudulent concealment' exceptions to the statute of limitations" and that plaintiffs' claims fall especially short with regard to Hormel because plaintiffs do not allege Hormel took any action after 2016.  *Id.* at 1.

Hormel states that plaintiffs' claim accrued in January 2014.  *Id.* at 4.  Hormel argues that fraudulent concealment does not apply to toll the statute of limitations for plaintiffs' claims against Hormel because the "vague, undated allegation" that Hormel made a statement about competitive wages is insufficient to plead fraudulent concealment.  *Id.* at 7.  Hormel, however, fails to cite any authority to support its proposition that plaintiffs must demonstrate Hormel, as opposed to its co-conspirators, engaged in fraudulent concealment.[10]  Hormel does not argue that plaintiffs fail to allege its "participation in the scheme as a whole," *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d at 1208, and so a failure of plaintiffs to plead that Hormel specifically engaged in concealing the conspiracy is unnecessary.  The Court will decline to dismiss plaintiffs' claims against Hormel on this basis.

Next, Hormel argues plaintiffs were on inquiry notice of their claims beginning in June 2018 based on an antitrust case filed against Hormel and others that the complaint references.  Docket No. 159 at 7 (citing Docket No. 1 at 97, ¶ 328).  The Court denied this argument in its ruling on defendants' joint motion to dismiss.  *See* Docket No. 219 at

---

[10] Hormel cites *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044 (N.D. Cal. 2016), to argue plaintiffs do not sufficiently allege Hormel's fraudulent concealment.  *See* Docket No. 159 at 7.  In *Garrison*, the court observed plaintiffs had not shown a basis to hold a conspirator liable for their overt acts under the continuing violations doctrine.  159 F. Supp. 3d at 1072.  *Garrison* ruled plaintiffs did not plead affirmative acts to establish fraudulent concealment without examining the actions of any co-conspirators.  *Id.* at 1073-74.

43.  Even though another antitrust lawsuit named Hormel as a defendant, because that case focused on price-fixing as opposed to wage-fixing or depression, Hormel has not identified a failure to plead due diligence.  Given that Hormel fails to show plaintiffs have not sufficiently alleged facts to show the statute of limitations was tolled on both of their claims based on the doctrine of fraudulent concealment, the Court will deny Hormel's motion.[11]

### D. Iowa Premium

Defendant Iowa Premium moves to dismiss both of plaintiffs' claims against it for a failure to plausibly allege Iowa Premium's participation in any conspiracy.  Docket No. 160 at 2.  Iowa Premium states that the complaint does not allege Iowa Premium attended any of the Red Meat Industry Compensation Meetings, participated in any of the Red Meat Industry Compensation Surveys, participated in any trade association meetings, or "otherwise took any allegedly conspiratorial action beyond the alleged bilateral, two-plant, intrastate, non-solicitation agreement."  *Id.* at 2-3.

Relevant allegations from the complaint include: Iowa Premium and JBS entered into a no poach agreement covering JBS' Marshalltown plant and Iowa Premium's Tama plant, the Marshalltown and Tama plants are both in Iowa, and both plants would compete with one another for employees in the absence of an agreement.  Docket No. 1 at 90-93, ¶¶ 307-15.  Additionally, the complaint alleges that

> A former human-resources executive of Iowa Premium explained that JBS provided Iowa Premium with data about "both current and future wages" that JBS's plant in Marshalltown, Iowa, would pay its processing plant workers.  Specifically, managers of the JBS Marshalltown plant provided

---

[11] The Court need not reach Hormel's argument on the continuing violations doctrine because it finds plaintiffs have sufficiently alleged the doctrine of fraudulent concealment applies.

> compensation data to executives of Iowa Premium that showed how much the JBS Marshalltown plant was and would be paying its various categories of processing plant workers.  The former Iowa Premium executive explained that "[t]his information was used by Iowa Premium to help determine how much to pay and offer to pay current and future workers at Iowa Premium."

*Id.* at 80, ¶ 272.

First, Iowa Premium argues that plaintiffs fail to allege with direct evidence that Iowa Premium joined a national conspiracy to depress wages sufficient to allege its involvement in plaintiffs' first claim with direct evidence.  Docket No. 160 at 4-6. Specifically, Iowa Premium argues that the evidence it participated in a no poach agreement with JBS for two Iowa plants is not direct evidence of Iowa Premium joining a national conspiracy to depress wages.  *Id.* at 4.  Plaintiffs respond that Iowa Premium's no poach agreement is direct evidence of collusion.  Docket No. 183 at 4. However, because direct evidence of a conspiracy "requires no inferences to establish the proposition or conclusion being asserted," *Champagne Metals*, 458 F.3d at 1084 (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999)), even evidence of collusion in a no poach agreement is not direct evidence of an agreement to depress wages.  Plaintiffs must therefore rely on circumstantial evidence to link Iowa Premium to their first claim.

Next, Iowa Premium argues that plaintiffs fail to link Iowa Premium to its allegation of a nationwide agreement to depress wages with circumstantial evidence.  Docket No. 160 at 4-6.  Iowa Premium argues that a bilateral local agreement, like the alleged no poach agreement between JBS and Iowa Premium, is not enough to link Iowa Premium to a nationwide conspiracy because it does not show a commitment to a common scheme.  *Id.* at 4-5.

A plaintiff must allege enough facts "to suggest an agreement was made" and a plaintiff shows such an agreement with "evidence that the conspiring parties 'had a conscious commitment to a common scheme designed to achieve an unlawful objective'" *Kissing Camels Surgery Center, LLC v. Centura Health Corp.*, No. 12-cv-03012-WJM-BNB, 2014 WL 560462, at *4 (D. Colo. Feb. 13, 2014) (quoting *Twombly*, 550 U.S. at 553; *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). No poach agreements can constitute a part of a conspiracy to depress wages. *See, e.g.*, *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d at 1209.

Iowa Premium relies on cases where allegations of smaller agreements could not support allegations of a larger conspiracy. *See* Docket No. 160 at 4-5 (citing *In re Iowa Read-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 975 (N.D. Iowa 2011) (ruling plaintiffs failed to plausibly allege an overarching conspiracy); *In re Auto. Parts Antitrust Litig.*, 2016 WL 8200512, at *4 (E.D. Mich. Apr. 13, 2016) (observing "the mere overlap of some of the defendants in some of the transactions is, on its own, insufficient to establish an overarching agreement")). Although here a larger conspiracy has been sufficiently pled, the alleged agreement between Iowa Premium and JBS involves acts of a different character than the larger conspiracy without overlap and therefore does not support the theory of an overarching conspiracy or Iowa Premium's connection to it.

Plaintiffs fail to link Iowa Premium's no poach agreement to the broader agreement that is alleged as the basis of the complaint. Plaintiffs allege that Iowa Premium and JBS entered into a no poach agreement for plants that would otherwise be competitive. Docket No. 1 at 90-93, ¶¶ 307-15. Unlike *In re Animation Workers Antitrust Litig.*, there is no allegation that all the defendants joined in no poach agreements as part of the

wage-fixing conspiracy.  *See* 123 F. Supp. 3d at 1209.  Plaintiffs fail to connect Iowa Premium to any defendant except JBS and fail to allege that Iowa Premium's contact with JBS related to national wage-fixing as opposed to competition between two local plants.  For example, there are no allegations that JBS shared information obtained from Iowa Premium with other members of the larger conspiracy or that Iowa Premium attended meetings with the other co-conspirators or obtained any information about the co-conspirators' compensation apart from JBS' information.

Additionally, Iowa Premium argues that plaintiffs cannot rely on allegations against its parent company, National Beef, because National Beef was separate from Iowa Premium until 2019, and additionally, plaintiffs do not allege specific evidence of coordinated conduct between the two entities.  Docket No. 160 at 5-6.  Plaintiffs respond that "National Beef, which acquired Iowa Premium in March 2019, participated in Red Meat Industry Compensation Meetings and Surveys in 2018 and 2019—during its acquisition negotiations with Iowa Premium (when confidential information would have been shared), and after the transaction closed (when Iowa Premium was National Beef's subsidiary)."  Docket No. 183 at 3.

"Antitrust law doesn't recognize guilt by mere association, imputing corporate liability to any affiliate company unlucky enough to be a bystander to its sister company's alleged misdeeds."  *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 423 (4th Cir. 2015).  "In the absence of any specific evidence of coordinated activity," a company should not be included in a Sherman Act claim only because it is owned by a participant.  *See Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999)

(declining to consider a subsidiary as an insurance company only because its parent company owned other subsidiary insurance companies).

The complaint alleges that Iowa Premium was acquired by National Beef on March 11, 2019.  Docket No. 1 at 19, ¶ 40.  The complaint does not mention the two companies exchanging information in the acquisition process or any facts that connect the two entities before March 11, 2019.  *See id.*  Plaintiffs respond that National Beef and Iowa Premium engaged in coordinated action as part of an acquisition process, but no such allegations are contained in the complaint.  *See* Docket No. 183 at 3.  Plaintiffs may not add allegations in their response to a motion to dismiss.  *See In re Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d 1178, 1203 (D. Colo. 2004) ("The plaintiffs may not effectively amend their Complaint by alleging new facts in their response to a motion to dismiss.").  Because plaintiffs fail to allege any coordinated action between Iowa Premium and National Beef, the Court agrees with Iowa Premium that plaintiffs may not rely on allegations about National Beef to state a claim against Iowa Premium.  Plaintiffs have not plausibly alleged Iowa Premium's participation in the conspiracy alleged in their first claim.  Because plaintiffs fail to plausibly allege evidence indicating Iowa Premium was committed to the common scheme, plaintiffs fail to sufficiently allege Iowa Premium's participation in the alleged conspiracy in plaintiffs' first claim.

Iowa Premium argues that plaintiffs' second claim, based on an agreement to exchange compensation information, fails because plaintiffs do not allege Iowa Premium participated in the Red Meat Industry Compensation Surveys and Meetings or subscribed to Agri Stats.  Docket No. 160 at 6-7.  Plaintiffs' second claim alleges defendants agreed to "regularly exchange detailed, timely, competitively sensitive, and

non-public information about the compensation being paid or to be paid to their employees at red meat processing plants in the continental United States" through the Red Meat Industry Compensation Meetings and Surveys, Agri Stats subscriptions, and through "[r]egular email and telephonic exchanges directly between [Processor Defendants'] executives regarding compensation practices and plans." Docket No. 1 at 123-25, ¶¶ 407, 413(c). Plaintiffs allege that Iowa Premium participated in the exchange of compensation information with JBS and that Iowa Premium used the information from JBS to set current and future wages. *Id.* at 80, ¶ 272.

Iowa Premium argues that this allegation is only relevant to an agreement between a JBS plant and an Iowa Premium plant, not to a national conspiracy to exchange wage information. Docket No. 160 at 6-7. Here, too, plaintiffs fail to plausibly allege that Iowa Premium agreed to join the larger conspiracy. Plaintiffs allege that JBS provided Iowa Premium with wage data, Docket No. 1 at 80, ¶ 272, but do not allege that Iowa Premium agreed to share its wage data with any other company, much less with the entire group alleged to have been part of the conspiracy. Plaintiffs have not sufficiently alleged that Iowa Premium participated in an agreement to share wage information with Processor Defendants as part of the alleged conspiracy and, therefore, fail to state a claim against Iowa Premium under the rule of reason. The Court will grant Iowa Premium's motion to dismiss and dismiss both of plaintiffs' claims against Iowa Premium.

### E. Agri Stats

Defendant Agri Stats moves to dismiss plaintiffs' rule of reason claim against it because Agri Stats does not offer beef benchmarking services and because plaintiffs do

not allege Agri Stats' reports affected wages for pork processing employees.  Docket No. 162 at 4-7.  The complaint alleges Agri Stats helped facilitate the exchange of "detailed, competitively sensitive, and non-public information about current and future compensation to workers at red meat processing plants," Docket No. 1 at 124, ¶ 413, by providing information on current compensation for workers at pork processing plants operated by some Processor Defendants, *id.* at 125, ¶ 413, and that the information exchanged through Agri Stats was provided by each Processor Defendant in order to receive compensation information from other firms.  *Id.*, ¶ 415.

First, Agri Stats argues that, because it only provided statistics on pork processors, any employee harmed by the statistics it provided could switch to a job at a beef processing facility instead, "where there would be no possible effect of Agri Stats benchmarking on wages."  Docket No. 162 at 5.  Agri Stats argues it cannot have harmed an industry that it does not participate in, and plaintiffs' allegation that exchanging information about the pork industry affected the beef industry because companies that process beef also process pork is conclusory.  *Id.* at 5-6.

Rule of reason claims "call[] for a holistic assessment of the parties' evidence aimed, ultimately, at discerning whether a challenged practice restrains trade unreasonably and so should be prohibited under § 1 of the Sherman Act."  *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1310 (10th Cir. 2017).  It does not make sense that each conspirator would need to affect the entire market with their actions. Plaintiffs are required to show "an agreement had a substantially adverse effect on competition."  *Budicak, Inc. v. Lansing Trade Group, LLC*, 452 F. Supp. 3d 1029, 1054

(D. Kan. 2020) (quoting *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1205 (10th Cir. 2006)).

Here, plaintiffs allege an agreement to "exchange detailed, timely, competitively sensitive, and non-public information about the compensation being paid or to be paid to their employees at red meat processing plants" that resulted in "suppress[ed] compensation paid to workers at red meat processing plants in the continental United States below competitive levels." Docket No. 1 at 123-24, ¶¶ 407, 410. Plaintiffs allege Agri Stats shared information on pork processors' current compensation, *id.* at 125, ¶ 413(d), and information on compensation for beef processors was shared in other ways, like the Red Meat Industry Compensation Meetings and Surveys. *Id.* at 124-25, ¶¶ 413-14. Without "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each," *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962), Agri Stats fails to show plaintiffs fail to state a claim against Agri Stats because Agri Stats did not, on its own, affect the entire red meat industry.

Next, Agri Stats argues plaintiffs fail to show Agri Stats reports affected wages for pork processing employees. Docket No. 162 at 6-7. Agri Stats argues that "Plaintiffs do not plausibly allege facts showing that pork processors used Agri Stats data to actually make employment compensation decisions, and rely instead on vague accusations." *Id.* at 6. This argument essentially attacks plaintiffs' showing of an anticompetitive effect in their rule of reason claim. For a rule of reason claim, a plaintiff must allege "that an alleged restraint has or is likely to have a significant anticompetitive effect." *Buccaneer Energy (USA) Inc*, 846 F.3d at 1310. In its order on the joint motion to dismiss, the

Court ruled that, by defining a relevant product and a geographic market, plaintiffs produced sufficient indirect evidence to show an anticompetitive effect, wage suppression, from an agreement to exchange compensation information.  Docket No. 219 at 35.  Agri Stats' argument amounts to a claim that plaintiffs cannot "directly establish anticompetitive effect[s]" of an agreement.  However, because plaintiffs plausibly allege through indirect evidence an anticompetitive effect, they need not use allegations of direct evidence to establish anticompetitive effects.  Agri Stats provides no reason why plaintiffs' claim should be analyzed differently for Agri Stats than the claim is analyzed as a whole, and Agri Stats' argument fails for the same reason the joint motion to dismiss fails.  Agri Stats has not demonstrated a reason why plaintiffs' claim against Agri Stats fails,[12] and the Court will deny Agri Stats' motion to dismiss.

### F.  Agri Beef

Agri Beef moves to dismiss plaintiffs' claims against defendants Agri Beef Co. and Washington Beef, LLC for failure to plausibly allege an agreement and for failure to plausibly allege a relevant market.  Docket No. 163 at 1-2.  Relevant allegations from the complaint include: Washington Beef, LLC is a subsidiary of Agri Beef Co., Docket No. 1 at 27, ¶ 56; Agri Beef Co. employees attended Red Meat Industry Compensation Meetings in 2014, 2015, 2017, and 2018, *id.*, ¶ 58; Washington Beef, LLC employees attended the Red Meat Industry Compensation Meeting in 2019.  *Id.*

---

[12] The Court will not consider Agri Stats argument, raised for the first time in its reply, that plaintiffs fail to allege Agri Stats entered an agreement with the other defendants. Docket No. 193 at 2.  *See Gutierrez v. Cobos*, 841 F.3d 895, 902 (10th Cir. 2016) ("a party waives issues and arguments raised for the first time in a reply brief" (quoting *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011)).

First, Agri Beef argues that plaintiffs fail to allege direct evidence that Agri Beef joined an agreement to depress wages.  Docket No. 163 at 4.  Agri Beef also argues that plaintiffs fail to allege parallel conduct, namely, that Agri Beef coordinated wages with other defendants sufficient to state a claim against Agri Beef.  *Id.* at 4-6.  Plaintiffs argue that where, as here, plaintiff successfully pleads a conspiracy claim, plaintiff only needs to allege that Agri Beef joined the conspiracy and played a role in it, not that Agri Beef individually engaged in parallel conduct sufficient to state a claim based on circumstantial evidence.  Docket No. 180 at 2-5.

The Court agrees with plaintiffs, that "in a case involving an alleged conspiracy among multiple actors and multiple acts[] 'plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.  The character and effect of a conspiracy are not to be judged by dismembering it as a whole.'" *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 527 F. Supp. 2d 1257, 1293 (D. Kan. 2007) (quoting *Continental Ore Co.*, 370 U.S. at 699).  Here, plaintiffs state enough specific facts to plausibly allege that Agri Beef participated in the broader conspiracy.

Plaintiffs' first claim relies on allegations of wage coordination between defendants that occurred in part at the Red Meat Industry Compensation Meetings.  Agri Beef's cited authority does not support its argument that plaintiffs must provide specific wage information for each defendant.  In *Jien v. Perdue Farms, Inc.* ("*Jien I*"), 2020 WL 5544183, at *5-8 (D. Md. Sept. 16, 2020), the court analyzed whether plaintiffs sufficiently alleged with direct evidence each defendant's connection to a wage fixing conspiracy or sufficiently alleged with circumstantial evidence each defendant's

connection.  *Jien I* did not rule that specific wage information was a necessary part of plaintiffs' claim for each defendant, rather, *Jien I* ruled, given that plaintiff alleged no direct evidence linking some defendants to the alleged conspiracy, that plaintiffs' claim against those defendants could not rest solely on circumstantial evidence of parallel conduct without specific factual allegations on the wages that particular defendant set. *Id*.  Here, although the Red Meat Industry Compensation Meetings are circumstantial evidence, not direct evidence, plaintiffs link Agri Beef Co and Washington Beef, LLC to these meetings at which conspiratorial agreements are alleged to have taken place. Unlike in *Jien I* where the complaint lacked allegations on "how Defendants actually acted in concert together to set wages," 2020 WL 5544183, at *8, plaintiffs' allegations regarding in-person meetings provide enough facts to infer an unlawful agreement between Agri Beef and the other defendants.  The Court will deny the portion of Agri Beef's motion seeking dismissal of plaintiffs' first claim.

Agri Beef argues that plaintiffs' second claim fails to state a plausible geographic market as is necessary for a rule of reason claim.  Docket No. 163 at 6-7.  The complaint alleges that "[t]he relevant geographic market is the continental United States."  Docket No. 1 at 107, ¶ 352.  Agri Beef argues that plaintiffs' market is overbroad in geography and too narrow in the employers it includes.  Docket No. 163 at 6-7.  A geographic market specifies "which territories are found to constitute the terrain in which competition takes place."  *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1071 (10th Cir. 2013).

Agri Beef provides no authority for its assertion plaintiffs' claim can be dismissed at the motion to dismiss stage for pleading an overbroad geographic market.  In *Jien I*, the court observed:

> Plaintiffs must outline a relevant market so that they can then allege that Defendants have sufficient market power within the market for their information sharing to restrain competition.  It is therefore problematic to allege too *narrow* a geographic market, because it could create the illusion of market power where no market power exists, via the exclusion of nearby alternative employment opportunities (what the Fourth Circuit called the "gerrymandering" of the geographic market).  The same concern does not exist for a broad geographic market, because many alternative employment opportunities are included in the allegedly overbroad market, so there is no risk of creating an illusion of market power.  In fact, by alleging a broad geographic market spanning the entire country, Plaintiffs are making it *harder* to prove their case, because the level of market power necessary to control wages across the entire country is much greater.

2020 WL 5544183, at *10 (internal citations omitted).  The Court finds this reasoning persuasive and will decline to dismiss plaintiffs' claim for alleging a geographic market that is too broad.

Agri Beef also argues plaintiffs' geographic market definition is too narrow because it excludes competitors in other industries located near Agri Beef's facility.  Docket No. 163 at 7.  This argument does not actually attack plaintiffs' definition of a geographic market.  Agri Beef is arguing that other industries that could employ class members should be included in plaintiffs' market definition.  Agri Beef is attacking plaintiffs' definition of its product market, not its geographic market.  That argument fails for the same reasons defendants' joint motion to dismiss fails.  Agri Beef has not demonstrated any reason why plaintiffs fail to plausibly allege their second claim.  The Court will deny Agri Beef's motion.

### G. **Smithfield**

Smithfield moves to dismiss plaintiffs' claims against Smithfield Foods, Inc. and Smithfield Packaged Meats Corp. for failure to allege that Smithfield joined a conspiracy, for failure to identify individual actions of each Smithfield defendant, and for being untimely.  Docket No. 165 at 1-2.  The complaint alleges Smithfield Packaged Meats Corp. is a subsidiary of Smithfield Foods, Inc., Docket No. 1 at 23, ¶ 47; Smithfield was a part of the Red Meat Survey Group in 2013 and was consulted for feedback on the first Red Meat Industry Compensation Survey, *id.* at 57, ¶ 177; Smithfield employees attended the Red Meat Industry Compensation Meeting on April 15, 2014 in Kansas City, Missouri, *id.* at 23, 69, ¶¶ 50, 230; the 2014 meeting included roundtable sessions where Meng was asked to leave, *id.* at 72, ¶¶ 243-45; Smithfield Packing Company, Inc.[13] submitted a Red Meat Industry Compensation Survey in 2014 containing future compensation data, *id.* at 24-25, ¶ 50; Smithfield Foods, Inc. subscribed to Agri Stats during the Class Period, *id.*; Smithfield established compensation schedules at depressed and fixed rates, *id.*; in 2015, an executive at JBS reached out to several other Processor Defendant executives, including executives from Smithfield, to request participation in an "ad-hoc survey" on supervisor weekend pay and bonus eligibility, *id.* at 79, ¶ 270; in 2017, Smithfield's plants in Crete, Nebraska; Denison, Iowa; and Sioux Falls, South Dakota only increased base wages by 2%, *id.* at 94, ¶ 319; in 2018, the same Smithfield plants only increased base wages by 2%, *id.*, ¶ 320; two executives from Smithfield served on the National Pork Producers Council, which hosts annual meetings, *id.* at 98-99, ¶ 329(a)-(b); Smithfield executives have

---

[13] A predecessor of Smithfield Packaged Meats Corp.  Docket No. 1 at 23, ¶ 48.

presented at the National Pork Industry Conference, "the largest annual conference in the US that is held for the swine industry," which takes place in July.  *Id.*, ¶ 329(b).

First, Smithfield argues that Smithfield Packaging Company, Inc.'s attendance at one Red Meat Industry Compensation Meeting and Smithfield Foods, Inc. subscribing to Agri Stats are not sufficient to allege that either joined a conspiracy.  Docket No. 165 at 3.  In support, Smithfield cites *Jien v. Perdue Farms, Inc.* ("*Jien II*"), 2022 WL 2818950, at *13 (D. Md. July 19, 2022) and *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1173–75 (D. Idaho 2011).  Docket No. 165 at 3-4.

In *Jien II*, the court dismissed the per se conspiracy claim against certain defendants who attended one meeting two years after a conspiracy was alleged to have begun and who were not alleged to have "maintained close personal relationships with other [Processor Defendants'] executives."  2022 WL 2818950, at *12-13.  In *In re Fresh & Process Potatoes Antitrust Litig.*, the court dismissed a defendant who was alleged to have attended one meeting after a conspiracy was formed because plaintiffs merely alleged that defendant "had an opportunity to join the conspiracy."  834 F. Supp. 2d at 1174-75.

While one meeting on its own may not be enough to allege any defendant joined a conspiracy, the details surrounding plaintiffs' allegations about Smithfield's role in the 2014 meeting within the context of the larger conspiracy distinguish this case from *Jien II* or *In re Fresh & Process Potatoes Antitrust Litig.* because plaintiffs allege more than an opportunity to join the conspiracy.  Plaintiffs allege Smithfield was an active part of crafting the survey in the first Red Meat Survey Group, that Smithfield participated in the 2014 survey, which collected future compensation data, and that Smithfield was part of

the group that held roundtable sessions specifically excluding Meng, not just that Smithfield attended one meeting.  The allegations surrounding the meeting Smithfield attended are enough to suggest an agreement with other Processor Defendants. Additionally, the actions Smithfield took after joining the conspiracy need not show an agreement to join the conspiracy.[14]  Smithfield has not shown plaintiffs fail to connect Smithfield to the larger conspiracy claim, and the Court will decline to dismiss plaintiffs' claims on that basis.

Next, Smithfield argues that plaintiffs fail to distinguish actions taken by specific Smithfield entities and a failure to do so warrants dismissal.  Docket No. 165 at 5. Plaintiffs may not rely on "broad allegations against a large and mostly anonymous group of people," such that a court "cannot 'draw the reasonable inference that the defendant is liable for the misconduct alleged,' because [it] cannot tell which defendant is alleged to have done what, nor can we tell what the misconduct was."  *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1240 (10th Cir. 2013) (quoting *Twombly*, 550 U.S. 663) (alteration omitted).  "The fact that two separate legal entities may have a corporate affiliation does not alter the pleading requirement to separately identify each defendant's involvement in the conspiracy."  *SD3, LLC*, 801 F.3d at 423 (internal quotations, alterations, and citation omitted).

---

[14] To the extent that Smithfield's statement that it stopped attending meetings and participating in surveys, Docket No. 165 at 4, can be construed as an argument that Smithfield withdrew from the conspiracy, this argument fails.  "A defendant's membership in a conspiracy is presumed to continue until he withdraws from the conspiracy by affirmative action."  *Jien II*, 2022 WL 2818950, at *11 (quoting *United States v. West*, 877 F.2d 281, 289 (4th Cir. 1989)).  Withdrawal is an affirmative defense a defendant must show.  *Id.*  Smithfield does not argue that it withdrew from the conspiracy.

In arguing that plaintiffs fail to meet their burden to allege what the Smithfield entities have each done, Smithfield relies on *Jien I*.  Docket No. 165 at 5.  In *Jien I*, plaintiffs named an entity with ten different subsidiaries and did not distinguish which named defendant subsidiaries were involved in wage decisions or which executives attended meetings.  2020 WL 5544183, at *4.  The court observed that some named subsidiaries possibly "played no role in fixing compensation."  *Id*.  Here, the complaint names Smithfield Foods, Inc. and one subsidiary, Smithfield Packaged Meats Corp., as defendants.  Docket No. 1 at 1, 22-23, ¶¶ 46-49.  The complaint identifies several subsidiaries of Smithfield Foods, Inc. that it alleges are co-conspirators of Smithfield, *id.* at 36-37, ¶¶ 92-94, but these subsidiaries are not included in plaintiffs' definition of "Smithfield," *id.* at 23, ¶ 49, and they are not named defendants.  *Id.* at 1.  When the complaint alleges that a Smithfield executive took an action, *see, e.g., id.* at 69, 79, 99, ¶¶ 230, 270, 329(b), it is possible to infer the executive is either from Smithfield Packaged Meats Corp. or Smithfield Foods, Inc., or both.  Plaintiffs specifically identify that Smithfield Packing Co., Inc. participated in the 2014 Red Meat Industry Compensation Survey.  *Id.* at 23-24, ¶ 50.  Unlike in *Jien I*, this is not a situation where a named subsidiary did not participate at all or where there is implausible ambiguity from referring at times to "Smithfield" collectively.  The Court will decline to dismiss plaintiffs' claims against Smithfield Packaged Meats Corp. and Smithfield Foods, Inc. on this basis.

Finally, Smithfield argues that plaintiffs' claims against Smithfield are untimely.  Docket No. 165 at 6-7.  Smithfield argues that plaintiffs fail to allege a continuing

violation,[15] fail to allege fraudulent concealment, and are on inquiry notice based on a similar lawsuit filed against Smithfield about Agri Stats.  *Id.*  Smithfield's motion does not argue that plaintiffs fail to allege its "participation in the scheme as a whole," *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d at 1208, and so its argument that plaintiff does not allege fraudulent concealment fails for the same reasons Hormel's identical argument that the Court discussed above in Section II.C. fails; a failure to plead Smithfield specifically engaged in concealing the conspiracy is unnecessary to allege fraudulent concealment sufficient to toll the statute of limitations on plaintiffs' claim.[16]  Smithfield fails to show plaintiffs' claims should be dismissed, and the Court will deny Smithfield's motion.

### H.  <u>American Foods</u>

American Foods moves to dismiss plaintiffs' claims against it for failure to state a claim against American Foods and for being untimely.  Docket No. 166 at 2.  The complaint alleges American Foods employees participated as a member of the Red Meat Survey Group in 2013, Docket No. 1 at 57, ¶ 177; that the Red Meat Survey Group designed and controlled the initial Red Meat Industry Compensation Survey, *id.*, ¶¶ 178-79; American Foods attended the first Red Meat Industry Compensation Meeting in 2014, *id.* at 15, ¶ 30; the 2014 meeting included roundtable sessions where Meng was asked to leave, *id.* at 72, ¶¶ 243-45; American Foods submitted a Red Meat

---

[15] Because the Court finds plaintiffs sufficiently plead the statute of limitations is tolled based on fraudulent concealment, the Court need not reach Smithfield's argument that plaintiffs fail to allege a continuing violation.

[16] Smithfield's argument that plaintiffs were on inquiry notice relies on the same lawsuit Hormel cites, see Docket No. 165 at 7; Docket No. 159 at 7, and that argument fails for the same reason.

Industry Compensation Survey in 2014, which included detailed data on future compensation, *id.* at 15, ¶ 30; and in January 2014, the vice president of human resources for American Foods expressed concern that the Red Meat Industry Compensation Survey would not include detailed bonus information. *Id.* at 73, ¶ 249.

American Foods argues that allegations that American Foods participated in one meeting and one survey are insufficient to allege its participation in a wage-fixing conspiracy. Docket No. 166 at 5. Like the allegations against Smithfield, plaintiffs allegations that American Foods actively participated in constructing the Red Meat Industry Compensation Survey and that American Foods participated in the first Red Meat Industry Compensation Meeting at the inception of the alleged conspiracy are enough to infer American Foods joined the conspiracy and "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co.*, 465 U.S. at 764.

Next, American Foods argues the statute of limitations bars plaintiffs claims against American Foods. Docket No. 166 at 6-7. American Foods argues that plaintiffs fail to allege fraudulent concealment because the complaint "contains no particularized allegations with respect to any false representation made by [American Foods], and none of the general allegations purportedly demonstrating fraudulent concealment are applicable to [American Foods]." *Id.* at 7. Because American Foods, like Hormel and Smithfield, relies on the assumption plaintiffs must allege that American Foods specifically engaged in fraudulent concealment, American Foods fails to show plaintiffs' claim against American Foods is not timely. Because American Foods provides no

reason to dismiss plaintiffs' claims against it, the Court will deny American Food's motion.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant Triumph Foods, LLC's Motion to Dismiss [Docket No. 161] is **DENIED as moot**.  It is further

**ORDERED** that Defendant Hormel Foods Corporation's Rule 12(b)(6) Motion to Dismiss the Complaint [Docket No. 159], Agri Stats, Inc.'s Motion to Dismiss [Docket No. 162], Defendants Agri Beef Co. and Washington Beef, LLC's Motion to Dismiss [Docket No. 163], Motion to Dismiss by Defendants Smithfield Foods, Inc. and Smithfield Packaged Meats Corp. [Docket No. 165], and Defendant American Foods Group, LLC's Motion to Dismiss Plaintiffs' Class Action Complaint and Jury Demand [Docket No. 166] are **DENIED**.  It is further

**ORDERED** that Defendant Iowa Premium, LLC's Motion to Dismiss [Docket No. 160] is **GRANTED**.  It is further

**ORDERED** that plaintiffs' claims against Iowa Premium are **DISMISSED without prejudice**.

DATED September 27, 2023.

BY THE COURT:

_____

PHILIP A. BRIMMER
Chief United States District Judge