IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 22-cv-02946-PAB-STV

RON BROWN, and
MINKA GARMON, individually and on behalf of all others similarly situated,

      Plaintiffs,

      v.

JBS USA FOOD COMPANY,
TYSON FOODS, INC.,
CARGILL, INC.,
CARGILL MEAT SOLUTIONS CORP.,
HORMEL FOODS CORP.,
ROCHELLE FOODS, LLC,
AMERICAN FOODS GROUP, LLC,
TRIUMPH FOODS, LLC,
SEABOARD FOODS, LLC,
NATIONAL BEEF PACKING CO., LLC,
SMITHFIELD FOODS INC.,
SMITHFIELD PACKAGED MEATS CORP.,
AGRI BEEF CO.,
WASHINGTON BEEF, LLC,
PERDUE FARMS, INC.,
GREATER OMAHA PACKING CO., INC.,
INDIANA PACKERS CORPORATION,
QUALITY PORK PROCESSORS, INC.,
AGRI STATS, INC., and
WEBBER, MENG, SAHL AND COMPANY, INC., d/b/a/ WMS & Company, Inc.,

      Defendants.

_____

# ORDER
_____

    This matter is before the Court on Defendants' Joint Motion to Dismiss the

Amended Complaint for Failure to State a Claim [Docket No. 337] filed on behalf of all

defendants.[1]  Defendants move to dismiss both of plaintiffs' claims under Federal Rule

of Civil Procedure 12(b)(6) to the extent they are based on the allegations added in

plaintiffs' amended complaint.  *Id.* at 1–3, 7–8; Docket No. 353 at 20.  Plaintiffs oppose

defendants' motion.  Docket No. 351.  Defendants filed a reply.  Docket No. 353.

I.    **BACKGROUND**

A.    **Procedural Background**

This case arises out of claims that defendants suppressed the wages of

employees at beef- and pork-processing plants across the United States from 2000 to

the present day.  *See* Docket No. 260 at 7.  On November 11, 2022, plaintiffs, on behalf

---

[1] On February 6, 2024, Magistrate Judge Scott Varholak granted a motion to file a joint motion to dismiss on behalf of all of the defendants except (1) JBS USA Food Company, Perdue Farms, Inc., Seaboard Foods, LLC, Triumph Foods, LLC, and Webber, Meng, Sahl and Company, Inc., who all had reached settlement agreements with plaintiffs, and (2) Greater Omaha Packing Co., who, at that time, had not appeared in the case.  Docket No. 286; Docket No. 283 at 2 nn.1, 2.  Since that time, the Court has preliminarily approved settlement agreements with defendants Perdue Farms, Inc., Seaboard Foods, LLC, Triumph Foods, LLC, Webber, Meng, Sahl and Company, Inc., JBS USA Food Company, Tyson Foods, Inc., American Foods Group, LLC, National Beef Packing Co., LLC, Cargill, Inc., Cargill Meat Solutions Corp., Hormel Foods Corp., Rochelle Foods, LLC, and Quality Pork Processors, Inc.  *See* Docket Nos. 306, 382.  On April 5, 2024, defendant Greater Omaha Packing Co., Inc. filed a separate motion to dismiss.  Docket No. 338.  However, in its motion to dismiss, defendant Greater Omaha Packing Co., Inc. states that it "joins in full" the joint motion to dismiss.  *Id.* at 1.  Plaintiffs responded to defendant Greater Omaha Packing Co., Inc.'s motion to dismiss and did not oppose its joining the joint motion to dismiss.  *See* Docket No. 346.  Also on April 5, 2024, defendants Agri Beef Co. and Washington Beef, LLC filed a notice stating that they join "in Defendants' Joint Motion to Dismiss the Amended Complaint for Failure to State a Claim, ECF No. 337, as if the arguments were fully set forth and pleaded by Agri Beef, and seek dismissal as set forth in the Motion."  Docket No. 342.  Plaintiffs did not respond to defendants Agri Beef Co.'s and Washington Beef, LLC's notice.  Given that plaintiffs do not oppose defendants Greater Omaha Packing Co., Inc., Agri Beef Co., and Washington Beef, LLC joining the joint motion to dismiss, the Court deems the joint motion to be filed on behalf of the defendants who have not settled, namely, defendants Smithfield Foods Inc., Smithfield Packaged Meets Corp., Agri Beef Co., Washington Beef, LLC, Greater Omaha Packing Co., Inc., Indiana Packers Corporation, and Agri Stats, Inc. ("the defendants").

of themselves and a class composed of the individuals employed at defendants' beef-
and pork-processing plants, filed their original complaint. Docket No. 1. On February
17, 2023, defendants filed a joint motion to dismiss, arguing that plaintiffs had failed to
state plausible claims for relief and that plaintiffs' claims were barred by the statute of
limitations. *See* Docket No. 164 at 9–40. On February 17, 2023, defendants also filed
individualized supplemental motions to dismiss. Docket Nos. 159, 160, 161, 162, 163,
165, 166. On September 27, 2023, the Court ruled on the motions to dismiss. Docket
Nos. 219, 220. The Court found that plaintiffs' claims were not time-barred and that
plaintiffs had plausibly stated their first and second claims as to every defendant except
defendant Iowa Premium, LLC, who the Court dismissed from the case. *See* Docket
Nos. 219, 220.

On January 11, 2024, the parties filed a stipulated motion to grant plaintiffs leave
to amend their complaint. Docket No. 257 at 2, ¶ 3 ("In an effort to achieve judicial
efficiency, the Parties, through their counsel, have conferred in good faith, and
Defendants do not oppose Plaintiffs' motion for leave to file an amended complaint.").
On January 12, 2024, plaintiffs filed an amended complaint. Docket No. 260. Most of
the allegations in the amended complaint are identical to those in the original complaint.
*Compare* Docket No. 1, *with* Docket No. 260. However, the amended complaint alleges
new means by which defendants suppressed their employees' wages, expands the
period covered by plaintiffs' claims, and adds five new defendants. *See* Docket No. 260
at 7–10, ¶¶ 1–9, 7 n.1.

On April 5, 2024, defendants filed the joint motion to dismiss, which argues that the portion of plaintiffs' claims expanded by the new allegations in the amended complaint should be dismissed.  Docket No. 337 at 7.

### B. Allegations From the Original Complaint[2]

The Court recites only those factual allegations in the amended complaint that were part of the original complaint to the extent they are relevant to the joint motion to dismiss.  A more complete recitation of plaintiffs' allegations is found in the Court's order on the first joint motion to dismiss.  *See* Docket No. 219 at 3–11.

Plaintiffs Ron Brown and Minka Garmon bring claims on behalf of themselves individually and on behalf of a class consisting of all individuals employed by defendants, their subsidiaries, and related entities at beef- and pork-processing plants in the continental United States from January 1, 2000 to the present day (the "class period").  Docket No. 260 at 7.  Defendants include fifteen red meat processors[3] and several of their subsidiaries (the "processor defendants"), which include the following defendants named in both the original and amended complaints: Agri Beef Co.; Washington Beef, LLC;  American Foods Group, LLC ("American Foods"); Cargill, Inc.; Cargill Meat Solutions Corp.;[4] Hormel Foods Corp.; JBS USA Food Co. ("JBS"); National Beef Packing Co., LLC ("National Beef"); Perdue Farms, Inc.; Seaboard Foods, LLC ("Seaboard"); Smithfield Foods, Inc.; Smithfield Packaged Meats Corp.;[5] Triumph

---

[2] The Court assumes that the well-pleaded allegations in plaintiffs' complaint are true in considering the motion to dismiss.  *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

[3] Plaintiffs define red meat as beef and pork.  Docket No. 260 at 7.

[4] Cargill Inc. and Cargill Meat Solutions Corp. will be collectively referred to as "Cargill."

[5] Smithfield Foods, Inc. and Smithfield Packaged Meats Corp. will be collectively referred to as "Smithfield."

Foods, LLC ("Triumph"); and Tyson Foods, Inc. ("Tyson").  *Id.* at 7–8, ¶ 2.  In addition to the processor defendants, the amended complaint names two consulting companies as defendants, Agri Stats, Inc. ("Agri Stats") and Webber, Meng, Sahl and Company, Inc. ("WMS").  *Id.*

Processor defendants collectively produce approximately 80 percent of the red meat that is sold in the United States.  *Id.*  Processor defendants own and operate approximately 140 red meat processing plants in the continental United States.  *Id.* at 8, ¶ 3.  Processor defendants employed hundreds of thousands of the members of the class during the class period in various positions and compensated these employees with benefits and either hourly wages or an annual salary.  *Id.*, ¶¶ 3–4.

From 2014 to 2019, processor defendants designed and participated in an annual "Red Meat Industry Compensation Survey" in which they exchanged detailed current and future information about wages, salaries, and benefits provided to their workers at red meat processing facilities.  *Id.* at 69, ¶¶ 188–89.  To participate in the Red Meat Industry Compensation Survey, processor defendants annually completed a survey questionnaire and then received and reviewed a report on the results of the survey.  *Id.*, ¶ 189.  Various processor defendants participated in the Red Meat Industry Compensation Survey each year from 2014 to 2019.  *Id.*  Participants referred to themselves as the "Red Meat Survey Group."  *Id.* at 71, ¶ 193.

WMS participated in the Red Meat Industry Compensation Survey by distributing survey questionnaires to the participating processor defendants, compiling survey results reports, and distributing those reports to participants each year.  *Id.* at 69–70, ¶ 190.  Processor defendants, however, collectively managed and controlled the annual

Red Meat Industry Compensation Surveys and determined who could join the Red Meat Survey Group. *Id.* at 71–72, ¶¶ 193, 200–01. The Red Meat Industry Compensation Survey provided data on base salary, the bonuses paid across all survey participants, total compensation, target opportunity percent, maximum opportunity percent, and base salary policy. *Id.* at 77–78, ¶ 222. The Red Meat Industry Compensation Surveys that were distributed from 2014 to 2017 included data on planned future salary increases by processor defendants. *Id.* at 81, ¶ 239.

Representatives from processor defendants attended and participated in annual in-person "Red Meat Industry Compensation Meetings." *Id.* at 86–87, ¶¶ 259–61. The meetings were held each year from 2014 to 2019, except in 2016. *Id.* at 87, ¶ 260. Red Meat Survey Group members were required to attend the annual Red Meat Industry Compensation Meetings to remain as members of the group. *Id.* at 71–72, ¶¶ 197, 199. Each Red Meat Survey Group member sent one to three executives to the Red Meat Industry Compensation Meetings. *Id.* at 87, ¶ 261. The meetings consisted of multiple roundtable sessions during which executives from the Red Meat Survey Group would discuss the results of that year's Red Meat Industry Compensation Survey as well as current and future compensation practices at their respective firms. *Id.* at 88, ¶ 266. The Red Meat Industry Compensation Meetings were accompanied by "off-the-books dinners and other activities that preceded the Meetings themselves." *Id.* at 92, ¶ 285.

At the Red Meat Industry Compensation Meetings, Jonathan Meng, president of WMS, was invited to attend one or both of the first two sessions and, during those sessions, he presented a summary of the results of the Red Meat Industry Compensation Survey. *Id.* at 69–70, 88, ¶¶ 190, 268–69. In 2014, 2015, and 2017,

after presenting the survey results, Meng left, and the remaining sessions proceeded without him.  *Id.* at 90, ¶¶ 278–79.  In the sessions without Meng, plaintiffs allege that executives from processor defendants agreed upon and suppressed the wages, salaries, bonuses, and benefits they would provide to employees at red meat processing plants.  *Id.*, ¶ 278.

Throughout the class period,[6] senior executives of processor defendants who had the authority to determine or influence the compensation of members of the class contacted one another in order to align their current and future compensation practices.  *Id.* at 96, ¶ 300.

Agri Stats describes itself as a "management and benchmarking company" that "provides consultation on data analysis, action plan development and management practices of participating companies," with a mission to "[i]mprove the bottom line profitability for our participants by providing accurate and timely comparative data while preserving confidentiality of individual companies."  *Id.* at 99–100, ¶ 312.  Agri Stats facilitates the exchange of recent and current competitively sensitive information between competitors.  *Id.* at 100, ¶ 315.  To maintain secrecy, Agri Stats requires that its subscribers share their own data in order to receive data on their competitors and does not sell its data to the public.  *Id.* 100–01, ¶¶ 316–17.  The processor defendants in the pork industry exchanged detailed and competitively sensitive compensation data each month by way of a subscription to Agri Stats.  *Id.* at 99, ¶ 309.  Agri Stats was

---

[6] Although this allegation is identical to an allegation in the original complaint, Docket No. 1 at 78, ¶ 267, because the amended complaint has expanded the class period, the amended complaint alleges that executives directly contacted each other from 2000 to the present day.  Docket No. 260 at 96, ¶ 300.

supposed to anonymize data it received, but the reports it provided were detailed enough that competitors could identify each other's data. *Id.* at 105, ¶ 331. Each report identified which competitors participated; in some reports, competitors were identifiable because so few producers participated and, in other reports, the data that was provided was so specific it could be deanonymized with public records. *Id.*, ¶¶ 332–33. The processor defendants in the pork industry used the data from Agri Stats to suppress compensation and to confirm that no conspirator deviated from the compensation-fixing conspiracy. *Id.* at 107, ¶ 337.

As a result of the conspiracy to depress wages, processor defendants simultaneously and in parallel limited annual wage increases to members of the class. *Id.* at 108, ¶ 341. Wages were lower than they would have been in the absence of a conspiracy. *Id.* For example, in 2017, base wages were increased by only 2% at 17 plants operated by Cargill, National Beef, JBS, Smithfield, Tyson, Triumph, and Seaboard. *Id.* at 108–09, ¶ 343. In 2018, base wages were increased by only 2% in 17 plants operated by several processor defendants, including some of the plants that only received a 2% increase in base wages in 2017. *Id.* at 109, ¶ 344. In 2017 and 2018, at plants operated by different processor defendants, the difference in average wages between plants in the same areas, including Dodge City, Kansas; the Oklahoma and Texas panhandles; and south-central Nebraska, decreased, bringing the difference in wages between closely located plants within $0.07 or less. *Id.* at 109–10, ¶ 345.

### C. Amended Allegations

As part of the amended complaint, plaintiffs include the following new allegations. From 2000 to 2019, defendant processors directly exchanged sensitive compensation data, including the amount and dates of planned future hourly wage increases, through

compensation surveys.  *Id.* at 8–9, ¶ 6.  The surveys were called the "Beef Industry

Wage Indexes" ("BIWI") and "Pork Industry Wage Indexes" ("PIWI") (collectively the

"BIWI/PIWI surveys") and were conducted by Tyson.  *Id.*

Participating processor defendants provided their sensitive compensation

information directly to Tyson in private communications for the purpose of assembling

the BIWI/PIWI surveys.  *Id.* at 130, ¶ 401.   Such data was often transmitted by

telephone rather than by written communication.  *Id.*  Each BIWI and PIWI was labeled

"CONFIDENTIAL," and processor defendants agreed not to share the compensation

data beyond those processors that participated in the surveys.  *Id.* at 64, ¶ 176.

The BIWI/PIWI surveys provided fully disaggregated compensation data to

participating processor defendants.  *Id.* at 9, ¶ 7.  The BIWI/PIWI surveys identified how

much each participating defendant processor was currently paying and would be paying

in the future to hourly-paid workers at each of the processor defendant's red meat

processing plants.  *Id.*  Each version of the BIWI and PIWI included a calculated

weighted average for base wages and reported future wages.  *Id.* at 65, ¶¶ 180–81.

Processor defendants employ rigid compensation structures "that key off the 'base' rate,

depending on the workers' duration of experience," such that "if the 'base' rate for a

Defendant Processor's red meat plant is artificially suppressed, then all hourly wages

paid to processing workers in that plant are artificially suppressed."  *Id.* at 68, ¶ 187.

The BIWI/PIWI surveys were conducted on at least an annual basis during every

year within the class period, sometimes as many as four times a year.  *Id.* at 9–10, ¶ 9.

The surveys were initiated by a processor defendant's request for an updated survey,

which coincided with that processor defendant's upcoming union negotiation or annual

compensation review. *Id.* Processor defendants used the two indices both when they were conducting internal wage reviews to modify their compensation schedules and when negotiating with unions to establish wage schedules in collective bargaining agreements. *Id.* at 68, ¶ 186.

The amended complaint alleges that each of the processor defendants named in the original complaint, except American Foods and Agri Beef, participated in either the BIWI or PIWI surveys during the class period. *Id.* at 28–30, 65–67, ¶¶ 57, 183–84. Moreover, the amended complaint identifies five new defendants who participated in either the BIWI or PIWI surveys, namely, Greater Omaha Packing Co., Inc., Nebraska Beef, Ltd.,[7] Indiana Packers Corporation, Rochelle Foods, LLC, and Quality Pork Processors, Inc. *Id.* at 19–20, 34–39, ¶¶ 39, 42, 66–75.

Plaintiffs allege that processor defendants relied on these indices to set their hourly wages at their red meat processing plants, harmonize their wages with competitors' wages, and ensure that the industry as a whole paid materially lower hourly wages than would have been paid in a competitive market. *Id.* at 9, ¶ 7.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163,

---

[7] Plaintiffs voluntarily dismissed Nebraska Brief, Ltd. from this case on December 2, 2024. Docket No. 375.

1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)).

Generally, "[s]pecific facts are not necessary; the statement need only 'give the

defendant fair notice of what the claim is and the grounds upon which it rests.'"

*Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at

555) (alterations omitted).  However, a plaintiff still must provide "supporting factual

averments" with his allegations.  *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir.

2009) ("conclusory allegations without supporting factual averments are insufficient to

state a claim on which relief can be based" (citation omitted)).  The court need not

accept conclusory allegations.  *Moffet v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227,

1232 (10th Cir. 2002).  "[W]here the well-pleaded facts do not permit the court to infer

more than the mere possibility of misconduct, the complaint has alleged – but it has not

shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679

(2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A

plaintiff must nudge [his] claims across the line from conceivable to plausible in order to

survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's

allegations are "so general that they encompass a wide swath of conduct, much of it

innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191

(quotations omitted).  Thus, even though modern rules of pleading are somewhat

forgiving, "a complaint still must contain either direct or inferential allegations respecting

all the material elements necessary to sustain a recovery under some viable legal

theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).  An affirmative defense, such

as the statute of limitations, may be considered on a motion to dismiss under Rule

12(b)(6) only when a plaintiff admits every element of the affirmative defense in the

complaint.  *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018)

(citing *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004)).

## III.   ANALYSIS

Plaintiffs' first claim for relief is brought against every defendant except Agri Stats

and alleges that processor defendants, and other co-conspirators, such as WMS,

entered into an agreement to fix, depress, maintain, and stabilize the compensation

paid to workers at their red meat processing facilities in violation of the Sherman Act, 15

U.S.C. § 1.  Docket No. 260 at 138–40, ¶¶ 430–35.  Plaintiffs allege that this agreement

began on January 1, 2000, and continues to the present.  *Id.* at 138, ¶ 431.  Plaintiffs'

second claim for relief is brought against every defendant and alleges defendants and

several co-conspirators "engaged in a continuing agreement to regularly exchange

detailed, timely, competitively sensitive, and non-public information about the

compensation being paid or to be paid to their employees at red meat processing

plants" beginning on January 1, 2000 and continuing to the present.  *Id.* at 140, ¶ 437.

Defendants argue that plaintiffs do not plead facts that plausibly support a claim

for relief based on the newly alleged conduct in the amended complaint and that

plaintiffs have failed to plausibly allege the existence of the wage fixing conspiracy from

2000 to the present day.  Docket No. 337 at 2–3.  Defendants also maintain that, to the

extent plaintiffs' claims rely on the new allegations, the claims are barred by the statute

of limitations.  *Id.* at 2.  Plaintiffs respond that the Court has already found that plaintiffs

plausibly state their claims for relief.  Docket No. 351 at 4–6.  Plaintiffs maintain that the

new allegations build on the allegations in the original complaint and that they relate

back to the original complaint such that they are not barred by the statute of limitations.

*Id.*

Defendants assert that plaintiffs' BIWI/PIWI allegations constitute a separate
conspiracy. Docket No. 337 at 8–9. They argue that plaintiffs fail to connect the new
allegations regarding processor defendants' use of the BIWI/PIWI surveys "to the
purported conspiracy centered around WMS and Agri Stats that they described in the
original complaint." *Id.* at 2. Defendants maintain that plaintiffs' BIWI/PIWI allegations,
standing alone, do not plausibly allege violations of the Sherman Act. *Id.* at 8–9.
Plaintiffs respond that the complaint alleges a single conspiracy to fix and depress the
compensation paid to employees of processor defendants, "accomplished via multiple
methods of information exchange, including annual compensation surveys, annual
compensation meetings, direct communications among Defendants, and monthly
exchanges of compensation data via Agri Stats." Docket No. 351 at 4. Because the
issue of whether plaintiffs have alleged a single conspiracy is relevant to both the
Court's Rule 12(b)(6) analysis and the issue of whether plaintiffs' claims are timely, the
Court will address that issue first.

### A. Whether Plaintiffs Allege a Single Conspiracy

The parties dispute whether the Court must consider the allegations regarding
the BIWI/PIWI surveys separately to determine if they plausibly allege violations of the
Sherman Act or whether the Court can consider the allegations regarding WMS and the
BIWI/PIWI surveys together in analyzing the sufficiency of plaintiffs' pleading.
Defendants argue that "[t]he mere fact that Plaintiffs present their new BIWI and PIWI
information exchange allegations as part of the same two counts included in their initial
complaint does not shield these new allegations from scrutiny under *Twombly*." Docket
No. 337 at 8 (citing *loanDepot.com v. CrossCountry Mortg., Inc.*, 399 F. Supp. 3d 226,
236 (D.N.J. 2019) ("I do not agree that bundling of good and bad claims should shield

inadequate allegations from scrutiny and permit them to go forward despite the pleading standards of Rule 8")).  Defendants assert that "[t]he Amended Complaint makes clear that the BIWI and PIWI information exchanges are distinct from the information exchanges through WMS and Agri Stats – they involve different actors, timeframes, and information."  *Id*.  Moreover, defendants maintain that plaintiffs should not be permitted to "rely on their allegations from the original complaint related to WMS and Agri Stats to save the conclusory and unsupported allegations related to BIWI and PIWI, or, conversely, use BIWI and PIWI to reach back another fourteen years on claims related to WMS or Agri Stats."  *Id.*

Plaintiffs respond that the amended complaint alleges a single overarching conspiracy to fix and depress wages.  Docket No. 351 at 13.  Plaintiffs contend that the original complaint alleges that defendants carried out the conspiracy through mutually reinforcing acts, "including annual compensation surveys, annual in-person compensation meetings, direct communications among Defendants, and monthly exchanges of compensation data via Agri Stats."  *Id.* (citing Docket No. 1 at 50–51, ¶ 152).  Plaintiffs argue that they are masters of their complaint and that defendants are impermissibly reshaping the allegations to suit their arguments.  *Id.* at 14 (citing *Pirotte v. HCP Prairie Vill. KS OPCO LLC*, 580 F. Supp. 3d 1012, 1025 (D. Kan. 2022)).  Instead, plaintiffs maintain that the allegations in the complaint, including the allegations regarding the BIWI/PIWI surveys, WMS, and Agri Stats, must be viewed as a whole because "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."  *Id.* at 15 (quoting *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1212

(N.D. Cal. 2015) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S.
690, 699 (1962) (alteration in original)).  Plaintiffs assert that the amended complaint
alleges the same conspiracy, but "also alleges additional 'mutually reinforcing overt
acts' of exchanging hourly wage data through the BIWI and PIWI indices."  *Id.* at 13
(citing Docket No. 260 at 61–62, ¶¶ 170–71).

Defendants argue that, to plead a single conspiracy, plaintiffs must allege facts
that demonstrate defendants shared "a single, common and continuing objective."[8]

---

[8] Plaintiffs challenge defendants' reliance on criminal cases in the Tenth Circuit.
*See* Docket No. 351 at 17 ("Defendants rely on a line of Tenth Circuit cases involving
*criminal* convictions following evidentiary findings by the trier of fact and having nothing
to do with pleading requirements").  Courts, however, apply general principles of
conspiracy law in both civil antitrust and criminal cases.  *See*, *e.g.*, *In re Payment Card
Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 1014159, at *20 n.29
(E.D.N.Y. Mar. 8, 2024) ("Courts routinely draw from case law regarding withdrawal
from criminal conspiracies when assessing withdrawal from an antitrust conspiracy."); *In
re GSE Bonds Antitrust Litig.*, 2019 WL 5791793, at *5 (S.D.N.Y. Oct. 15, 2019) ("This
last argument, however, ignores general principles of conspiracy law.  It is well
established that where it has been shown that a conspiracy existed and that a given
defendant was a member of it, [that defendant's] membership is presumed to continue
until the last overt act by any of the coconspirators, unless the defendant proves that the
conspiracy was terminated or that he took affirmative steps to withdraw.  Courts have
applied this principle in the antitrust conspiracy context." (citations and quotations
omitted)) (citing criminal cases; *see also Cont'l Ore*, 370 U.S. at 699 ("[t]he character
and effect of a conspiracy are not to be judged by dismembering it and viewing its
separate parts, but only by looking at it as a whole" (quoting *United States v. Patten*,
226 U.S. 525, 544 (1913) (criminal case)); *In re Vitamins Antitrust Litig.*, 320 F. Supp.
2d 1, 15 (D.D.C. 2004) (citing *United States v. Tarantino*, 846 F.2d 1384, 1392 (D.C.
Cir. 1988) (criminal case)).  Moreover, although plaintiffs claim that defendants use the
wrong standard for assessing the sufficiency of pleading a single conspiracy, plaintiffs
never identify what they believe the proper standard to be.  *See* Docket No. 351 at 17.
Instead, plaintiffs attempt to prove that, even if the Court uses defendants' standard,
plaintiffs have plausibly alleged a single conspiracy.  *See id.* at 14 ("Defendants'
arguments are premised on an incorrect standard of review at this stage: even so, their
own authority indicates a common objective is all that is needed to show a single

Docket No. 337 at 11 (quoting *United States v. Wilshire Oil Co. of Tex.*, 427 F.2d 969, 976 (10th Cir. 1970); citing *United States v. Brewer*, 630 F.2d 795, 799 (10th Cir. 1980)); Docket No. 351 at 18; *see also United States v. Beachner Const. Co.*, 555 F. Supp. 1273, 1276 (D. Kan. 1983), *aff'd*, 729 F.2d 1278 (10th Cir. 1984) ("Essentially, one test known by two names developed within the courts for determining whether one or multiple conspiracies exist.  In the Tenth Circuit Court of Appeals, the test is known as the 'common objective' test, and is based upon whether or not there is a common, continuing objective among the conspirators to fix, maintain and establish prices to suppress and eliminate competition.") (applying "common objective" test for criminal violations of the Sherman Act); *Frasier v. Evans*, 992 F.3d 1003, 1024–25 (10th Cir. 2021) ("The participants in the conspiracy must share the general conspiratorial objective . . . .  To demonstrate the existence of a conspiratorial agreement it simply must be shown that there was a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences." (citation and quotation omitted)).

Defendants contend that, in scrutinizing whether a complaint alleges an overarching conspiracy, courts consider whether the conduct is "connected by common actors, methods and goals."[9]  Docket No. 337 at 11 (quoting *Precision Assocs., Inc. v.*

---

conspiracy, which Plaintiffs have readily shown here.").  As such, the Court will evaluate defendants' arguments using the standard they provide.

[9] Defendants cite no Tenth Circuit cases that focus on a conspiracy's actors, methods, and goals to determine whether a complaint has alleged a single conspiracy under 15 U.S.C. § 1.  Whether this is the proper test appears to be an open question. *See*, *e.g.*, *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 n.12 (4th Cir. 2002) ("A single criminal conspiracy generally is demonstrated by an 'overlap of key actors, methods, and goals.'  Because Gravity does not argue that its allegations are sufficient to demonstrate this type of overlap but instead only advocates our adopting the concept of

*Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *27 (E.D.N.Y. Jan 4.

2011), *report and recommendation adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 13,

2012)).  Defendants argue that plaintiffs have not alleged a single conspiracy because

(1) the two conspiracies involve different actors, (2) the two conspiracies involve

different methods, and (3) the goal of the alleged BIWI/PIWI conspiracy is different from

the goal of the WMS and Agri Stats conspiracy.  *Id.* at 12–16.

As to whether the new allegations regarding the BIWI/PIWI surveys involved

different actors, the complaint alleges a significant amount of overlap between actors

who participated in the BIWI/PIWI surveys, Red Meat Industry Compensation Surveys,

and Agri Stats, as well as other circumstantial evidence, that supports the plausibility of

a single conspiracy.  To plausibly allege a conspiracy, "it is not necessary that every

defendant participate in every transaction"; however, "the mere overlap of some of the

defendants in some of the transactions is, on its own, insufficient to establish an

overarching agreement."  *Dahl*, 937 F. Supp. 2d at 135 (citation omitted).  Rather, in

determining whether there is a single conspiracy, courts consider whether the

allegations "go beyond overlapping parties."  *In re Auto. Parts Antitrust Litig.*, 2018 WL

---

a rimless wheel conspiracy, we need not decide whether the same test that applies to
demonstrate a single criminal conspiracy would apply in the context of the Sherman
Act." (citations omitted)); *but see Dahl v. Bain Cap. Partners, LLC*, 937 F. Supp. 2d 119,
135 (D. Mass. 2013) (in determining whether such a "larger picture" exists, courts, in
other contexts, have looked for "(1) a common goal, (2) interdependence among the
participants, and (3) overlap among the participants.") (applying test to Sherman Act
claims).  The Court need not resolve the issue because the plausibility of plaintiffs'
claims turns on an issue distinct from the alleged commonality between the
conspiracies' actors and methodology.  Instead, for the reasons discussed below, the
Court finds that plaintiffs have failed to allege a "single, common and continuing
objective."  *Wilshire Oil*, 427 F.2d at 976.

1138422, at *4 (E.D. Mich. Jan. 16, 2018); *In re Generic Pharms. Pricing Antitrust Litig.*,
394 F. Supp. 3d 509, 531 (E.D. Pa. 2019).

Defendants argue that plaintiffs have alleged two separate conspiracies because
there is insufficient overlap between the processor defendants who exchanged
compensation data via the BIWI/PIWI surveys and the processor defendants who
exchanged compensation information through WMS and Agri Stats.  Docket No. 337 at
12–14.  Defendants contend that "a majority of the alleged WMS participants did not
participate in BIWI, and a quarter did not participate in either BIWI or PIWI."  *Id.* at 13.
They claim that only six of the fifteen defendants engaged in each type of information
exchange – i.e. that only six defendants received wage information through BIWI
surveys, PIWI surveys, Agri Stats., and Red Meat Industry Compensation Surveys.
Docket No. 353 at 8.  Defendants maintain that plaintiffs cannot demonstrate overlap by
"pointing to a few Defendants who allegedly participated in some or all of the four
information exchanges, because mere overlap among a handful of actors is 'insufficient
to establish an overarching conspiracy.'"  Docket No. 337 at 13 (quoting *In re
Automotive Parts Antitrust Litig.*, 2016 WL 8200512, at *3).

First, defendants have not shown why, at the motion to dismiss stage, the
overlap of six of the fifteen defendants is insufficient to plausibly allege a single
conspiracy.  *See In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 531
(finding single conspiracy despite only one defendant participating in every part of
conspiracy).  Second, the allegations in the amended complaint go beyond mere
overlapping defendants.  "The 'overlap' requirement can be satisfied by the pervasive
involvement of a single 'core conspirator,' a hub character."  *Dahl*, 937 F. Supp. 2d at

135 (quoting *United States v. Portela*, 167 F.3d 687, 695 (1st Cir. 1999)). The amended

complaint alleges that Tyson served a primary role in both the BIWI/PIWI surveys,

where it collected data and distributed surveys, and in the Red Meat Survey Group,

where it served on the steering committee. Docket No. 260 at 9–10, 72, ¶¶ 9, 201.

Plaintiffs rely on more than mere overlap between defendants, and their allegations

regarding Tyson add plausibility to their claim that the defendants engaged in a single

conspiracy.

Next, defendants overstate the differences between the BIWI/PIWI surveys, the

Red Meat Industry Compensation Surveys, and Agri Stats as information-sharing

mechanisms used to depress wages. Defendants claim that

> the information that the BIWI and PIWI participants allegedly exchanged differs
> from the information that WMS or Agri Stats allegedly canvassed in their surveys.
> The information BIWI and PIWI reported was extremely narrow; it was limited to
> weighted averages of base wages for hourly workers, information that would
> have been known to members of the class already through their own
> compensation and the expected annual union wage increase. In contrast, WMS
> and Agri Stats each allegedly facilitated broader exchanges of varied
> compensation information, such as annual salaries, bonuses, and benefits
> information.

Docket No. 337 at 15 (citations omitted). Although the BIWI/PIWI surveys may have

contained a narrower set of data than the information defendants shared through WMS

and Agri Stats, the amended complaint alleges that each source of information

contained publicly unavailable compensation data as to each of the processor

defendants. Docket No. 260 at 8, 14, 80, 81, ¶¶ 6, 22, 235, 240. Moreover, the

amended complaint alleges that both the BIWI/PIWI surveys and the Red Meat Industry

Compensation Surveys contained information regarding future compensation. *Id.* at 68,

81, ¶¶ 185, 239. The amended complaint alleges that the BIWI/PIWI survey data was

not anonymized. *Id.* at 9, ¶ 7. It also alleges that Agri Stats information was

intentionally poorly anonymized such that the participants would identify the data

corresponding to each processor defendant and that the data in the Red Meat Industry

Compensation Survey was accompanied by in-person meetings during which processor

defendants disclosed their own pay practices. *Id.* at 70–71, 106, ¶¶ 192, 334. As such,

plaintiffs allege similar methods of price fixing through the sharing of nonpublic present

and future compensation data among competitors.

Finally, defendants are incorrect that the complaint alleges that defendants who

participated in the BIWI/PIWI surveys had a different goal from defendants who

participated in WMS and Agri Stats. Defendants contend that the amended complaint

alleges that the goal of the conspiracy to exchange data through the BIWI/PIWI surveys

was for processor defendants to "harmonize their wages with competitors' wages" and

to use the information in the surveys during negotiations with labor unions. Docket No.

337 at 15 (citing Docket No. 260 at 9, 68, ¶¶ 7, 186). Moreover, defendants maintain

that, because the BIWI/PIWI surveys contained only hourly wage information, the

conspiracy was limited to hourly employees. *Id.* at 16. Defendants assert that the

purpose of the exchange of information through WMS and Agri Stats was to "'reduce

labor costs as a whole," which included the labor costs associated with salaried

employees and the costs of benefits. *Id.*

The complaint plausibly alleges that the defendants had the same goal in sharing

sensitive compensation data through BIWI/PIWI surveys, WMS, and Agri Stats. The

amended complaint alleges that defendants "conspired and combined to fix and

depress the compensation paid to employees at red meat processing plants." Docket

No. 260 at 7, ¶ 1.  It alleges that, from 2000 to 2019, processor defendants exchanged sensitive compensation data via hourly wage indexes, *id.* at 8–9, ¶ 6; that, from 2014 to 2019, processor defendants exchanged sensitive compensation data through a Red Meat Industry Compensation Survey that compared hourly wages, annual salaries, and employment benefits, *id.* at 10, ¶¶ 11–12; and that processor defendants in the pork industry monthly exchanged detailed, non-public compensation information via Agri Stats.  *Id.* at 14, ¶ 22.  The amended complaint alleges that, as a result of these information exchanges, processor defendants collectively limited annual wage increases and depressed wages below what they would have been in the absence of a conspiracy and that it was the defendants' intent to depress wages.  *Id.* at 7, 108, ¶¶ 1, 341.  Thus, the complaint alleges that the goal of defendants who were engaged in each method of exchanging compensation data was the same, namely, to use the competitively sensitive information exchanged between participating defendants to suppress wages at processor defendants' plants.  *See Dahl*, 937 F. Supp. 2d at 135.

Nevertheless, considering the allegations in the amended complaint as a whole, *Cont'l Ore Co.*, 370 U.S. at 699, the Court finds that plaintiffs have failed to plausibly allege a single conspiracy.  The "scope of the agreement actually made always measures the conspiracy."  *In re Auto. Parts Antitrust Litig.*, 2016 WL 8200512, at *4 (E.D. Mich. Apr. 13, 2016) (quoting *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 998 (N.D. Ohio 2015) (quoting *United States v. Andolschek*, 142 F.2d 503, 507 (2d Cir. 1977))); *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at *13 (N.D. Cal. Jan. 21, 2014) ("at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it").  A single conspiracy exists

21

where all the participants share "a single, common and continuing objective." *Wilshire*

*Oil*, 427 F.2d at 976; *Frasier v. Evans*, 992 F.3d 1003, 1024 (10th Cir. 2021) ("The

participants in the conspiracy must share the general conspiratorial objective.").  A

"common goal" exists where there is "one objective, or set of objectives, or an overall

objective to be achieved by multiple actions." *Dahl*, 937 F. Supp. 2d at 135 (quoting

*United States v. Richerson*, 833 F.2d 1147, 1153 (5th Cir. 1987)).  "What is required is a

*shared,* single . . . objective, not just similar or parallel objectives between similarly

situated people." *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005) (citation

omitted).

The Court finds Tenth Circuit precedent on interdependence instructive on

whether plaintiffs have plausibly alleged "a single, common and continuing objective."

*Wilshire Oil*, 427 F.2d at 976.  In the Tenth Circuit, interdependence is an element of a

criminal conspiracy.[10]  *See United States v. Pickel*, 863 F.3d 1240, 1252 (10th Cir.

2017) (interdependence is "the fourth conspiracy element" (citing *United States v.*

*Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009)).  "Interdependence is the focal point for

determining whether a single conspiracy existed." *United States v. Hopkins*, 608 F.

App'x 637, 641 (10th Cir. 2015) (unpublished) (citing *Caldwell*, 589 F.3d at 1329).  It

---

[10] "The Tenth Circuit is unique, at least among federal jurisdictions, in requiring
the inclusion of 'interdependence' between or among conspirators as an essential
element of conspiracies charged under 18 U.S.C. § 371 and 21 U.S.C. § 846." *United*
*States v. Kirby*, 2024 WL 4906114, at *1 (N.D. Okla. Nov. 27, 2024) (quoting Tenth
Circuit Criminal Pattern Jury Instructions, § 2.19 cmt., at 111–12 (2021)).
"Interdependence is related to the concern of whether the evidence shows a single
conspiracy or multiple conspiracies."  Tenth Circuit Criminal Pattern Jury Instructions,
§ 2.87 cmt., at 285–87 (2025) (citing *Small*, 423 F.3d at 1182).  The Court does not
consider interdependence to be an element of a conspiracy under 15 U.S.C. § 1, but
instead uses Tenth Circuit cases discussing interdependence as a way to help
determine whether plaintiffs allege a single or multiple conspiracies.

"requires that a defendant's actions 'facilitate the endeavors of other alleged coconspirators or facilitate the venture as a whole.'" *United States v. Serrato*, 742 F.3d 461, 467 (10th Cir. 2014) (quoting *United States v. Carnagie*, 533 F.3d 1231, 1238 (10th Cir. 2008) (quoting *United States v. Evans,* 970 F.2d 663, 670 (10th Cir. 1992))). "Interdependence also requires 'proof that the conspirators intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy." *Id.* (quoting *United States v. Heckard,* 238 F.3d 1222, 1231 (10th Cir. 2001) (internal quotation marks omitted)).

The Court finds that plaintiffs have failed to allege a single conspiracy because, although plaintiffs have plausibly alleged that the goal of each conspiracy was the same, the complaint fails to plausibly allege that this was a shared goal, i.e. that the conspiracies were interdependent and that defendants "act[ed] together for their shared mutual benefit within the scope of the conspiracy." *Id.* (emphasis omitted); *see also Carnagie*, 533 F.3d at 1239 (A "common goal, however, is not by itself enough to establish interdependence: 'What is required is a *shared,* single criminal objective.'" (quoting *Evans,* 970 F.2d at 671)).

The amended complaint alleges that, "[t]o conduct the BIWI and PIWI, Tyson regularly collected hourly wage data directly from each of the participating processors and circulated confidential survey reports containing that data exclusively to those participants." Docket No. 260 at 8–9, ¶ 6. Plaintiffs allege that "[e]ach BIWI and PIWI was labeled 'CONFIDENTIAL,' and Defendant Processors kept this data confidential and private to just those participating Defendant Processors." *Id.* at 64, ¶ 176. "Indeed, only participating red meat processors that shared their compensation data through the

BIWI and/or PIWI were allowed to receive those indices, and Defendant Processors agreed to and understood not to share the compensation data beyond those processors that participated in the surveys." *Id.*

Plaintiffs also allege that participants in the Red Meat Survey Group "consisted exclusively of red meat processors that the Group recruited after ensuring that they met the Group's membership criteria", including "that a prospective member needed to have a red meat slaughter facility, a case-ready plant, or a red meat cook plant." *Id.* at 71, ¶¶ 193, 197. The Red Meat Survey Group "developed strict rules for a red meat processor's admission into and continued membership" in the group. *Id.*, ¶ 196. To have access to the compensation information circulated through the Red Meat Industry Compensation Surveys, processor defendants had to become members of the group, pay an annual due, and attend in-person meetings to discuss the results. *Id.* at 71–72, ¶¶ 195, 198.

The Court finds that it is not plausible that participants in the Red Meat Survey Group who agreed to internally exchange compensation information as a means of suppressing wages (the "WMS conspiracy") also had a shared, single objective to fix wages with non-Red Meat Survey Group members who exchanged compensation information through the BIWI/PIWI surveys (the "BIWI/PIWI conspiracy"). *See In re Auto. Parts Antitrust Litig.*, 2016 WL 8200512, at *4 (the "scope of the agreement actually made always measures the conspiracy"). Each group kept its membership exclusive and its compensation data confidential. The complaint does not allege that the participants in the BIWI/PIWI surveys who were not "recruited" to join the Red Meat Survey Group were aware that the "secret group" existed, Docket No. 260 at 10, ¶ 11,

or that Red Meat Survey Group members who did not receive BIWI/PIWI surveys were aware of the "secret BIWI and PIWI reports."  *Id.* at 9, ¶ 7; *see Carnagie*, 533 F.3d at 1239 (finding separate conspiracies for fraud and money laundering because "Mr. Hilaire did not even know Ms. Carnagie or Mr. Wesson, much less interact with them. Likewise, Ms. Carnagie never completed a transaction with Mr. Williams, and she did not know Mr. Hilaire.  Moreover, the record does not show that, besides those individuals with whom they completed transactions, Ms. Carnagie or Mr. Hilaire knew about other loan officers and real estate agents with whom Mr. Wesson and Mr. Williams were completing similar transactions.").

The fact that there were overlapping participants in the two conspiracies does not prove that there was a "single, common and continuing objective," *Wilshire Oil*, 427 F.2d at 976, among all the defendants rather than two conspiracies with the same objective because "one can certainly enter two conspiracies to commit the same type of crime." *United States v. Kennedy*, 743 F. App'x 649, 654 (6th Cir. 2018) (unpublished) (quoting *United States v. Wheeler*, 535 F.3d 446, 456 (6th Cir. 2008)); *United States v. El-Mezain*, 664 F.3d 467, 548 (5th Cir. 2011), *as revised* (Dec. 27, 2011) (it "is possible to have two different conspiracies to commit exactly the same type of crime").  "It is true that a party to a conspiracy need not know the identity, or even the number, of his confederates; when he embarks upon a criminal venture of indefinite outline, he takes his chances as to its content and membership."  *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d at 998 (citation omitted).  Here, however, as alleged in the amended complaint, the scope and membership of both the BIWI/PIWI conspiracy and WMS conspiracy were definite and exclusive.  The fact that some defendants

participated in both conspiracies is irrelevant to the scope of each conspiracy.  *See id.*

("the scope of the agreement actually made always measures the conspiracy, and the

fact that Hickory Springs engages in a conspiracy with others is as irrelevant to the

scope of Mohawk's agreement as that [Hickory Springs] engages in any other crime"

(alterations omitted)).  The two conspiracies were not interdependent and there is

nothing in the complaint that plausibly alleges that the members of the separate

conspiracies acted together for the two groups' mutual benefit.  *Serrato*, 742 F.3d at

467.  Rather, the conspiracies hindered each other's operation by refusing to share

compensation data with non-members of each conspiracy.  *See United States v.*

*Harrison*, 942 F.2d 751, 757 (10th Cir. 1991) ("Thus, while the objectives of the

conspiracies were *identical,* they were not *in common.*  Rather than establishing that the

infusion of cocaine to Seelye from one source was necessary or advantageous to the

other sources, the evidence shows that each source was in direct competition with the

one preceding it.  The activities of each source therefore were not advantageous to the

success of the other sources nor were they 'essential and integral steps toward the

realization of a *common* illicit goal.'" (quoting *United States v. Esparsen*, 930 F.2d 1461,

1472 (10th Cir. 1991)).

Finally, in reaching this conclusion, the Court has not impermissibly judged the

complaint by dismembering it and viewing its separate parts.  *See In re Animation*

*Workers Antitrust Litig.*, 123 F. Supp. 3d at 1212.  Instead, it is only by considering the

allegations in the complaint as a whole that it is clear that the exclusive nature of both

conspiracies makes them distinct.[11]  Therefore, the Court finds that plaintiffs' amended

complaint adds a new conspiracy as a separate basis for its first and second claims.  As

such, the Court will consider whether plaintiffs have plausibly stated their claims against

defendants based on their BIWI/PIWI survey allegations.

**B.  Whether Plaintiffs Plausibly State Their First and Second Claims for Relief**

As defendants point out, "courts routinely dismiss aspects of antitrust claims to

the extent they are implausible or unrelated to actionable conduct."  Docket No. 353 at

4; *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at *12 (N.D. Cal. Jan. 21,

2014).  Defendants argue that plaintiffs have failed to state their Sherman Act claims

based on the BIWI/PIWI surveys and that those portions of the complaint based on the

BIWI/PIWI surveys should be dismissed.  Docket 337 at 16, 26.

---

[11] *In re Animation Workers Antitrust Litig.* does not require a different result.  In that case, the court found that defendants' attempt "to re-cast Plaintiffs' allegations as supporting the existence of two separate conspiracies does not change the fact that Plaintiffs have alleged the existence of a single conspiracy, involving a single group of conspirators, that allegedly engaged in the same anticompetitive behavior."  *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d at 1212.  The court rejected defendants' arguments that the defendants had engaged in "a no-poaching conspiracy and a wage-suppression conspiracy."  *Id.* at 1211.  Instead, the court found that the plaintiffs had "alleged that each Defendant entered into the agreement to suppress compensation of class members, including (i) entering the non-solicitation scheme; and (ii) engaging in direct communications regarding compensation ranges."  *Id.* at 1212–13.  The case involves the same group of defendants using multiple means to achieve the shared goal to depress wages.  Nothing in the court's order suggests that the defendants were excluded from using one method or the other, and the court found that the defendants had a shared, rather than parallel, goal.  *See id.*; *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 607 (N.D. Cal. 2010), *amended in part*, 2011 WL 3268649 (N.D. Cal. July 28, 2011) (rejecting defendant's attempts to recharacterize plaintiff's allegations when plaintiff argued that "defendants have not provided any evidence that is inconsistent with, or that forecloses the possibility of, a single conspiracy").  Here, the exclusive nature of the BIWI/PIWI surveys and the Red Meat Industry Compensation Surveys make *In re Animation Workers Antitrust Litig.* distinguishable.

### 1. Sherman Act

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "While the text of the Sherman Act could perhaps be interpreted to proscribe all contracts, the Supreme Court has repeated time and again that § 1 outlaw[s] only unreasonable restraints of trade." *United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1272 (10th Cir. 2018) (internal quotations marks omitted). Certain restraints are unreasonable per se "because they 'always or almost always tend to restrict competition and decrease output.'" *See Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (quoting *Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723 (1988)). Horizontal restraints "imposed by agreement between competitors" qualify as "unreasonable per se." *Id.* at 2284 (quoting *Sharp*, 485 U.S. at 730). "Restraints that are not unreasonable per se are judged under the rule of reason" which "requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition." *Id.* (internal citations, quotations, and alterations omitted).

"The essence of a claim of a violation of Section 1 of the Sherman Act is the agreement itself." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556); *see also Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1179 n.28 (10th Cir. 2019) (observing that it is erroneous to use a probability standard to assess allegations in a Sherman Act claim). An agreement can be shown through direct or indirect evidence. *Champagne Metals*, 458 F.3d at 1082.

28

"Direct facts are explicit and require no inferences. Direct evidence of a § 1 agreement may take the form of a written contract or agreement, such as association rules, or admissions of an agreement. In contrast, circumstantial facts require inferences to show that an anti-competitive agreement exists." *Llacua*, 930 F.3d at 1174 n.24 (internal citations, quotations, and alterations omitted). *Twombly* provides a rule for determining whether plaintiff has sufficiently pled a claim of an agreement in violation of the Sherman Act with circumstantial evidence, namely, that "mere allegations of parallel conduct, absent additional contextual facts, fail to state a plausible conspiracy claim." *See id.* at 1174–75 (quoting *Twombly*, 550 U.S. at 556–57).

### 2. Claim One: Wage Depression

#### a. Parallel Conduct

Plaintiffs' first claim alleges a per se violation of the Sherman Act, namely, a horizontal agreement to depress wages. *See* Docket No. 219 at 19. Defendants argue that plaintiffs' amended complaint fails to plausibly allege a per se violation of the Sherman Act because it fails to plausibly allege parallel conduct between the defendants.[12] Docket No 260 at 18–19. In the Court's order on the first joint motion to dismiss, the Court found that plaintiffs' complaint plausibly alleged parallel conduct. Docket No. 219 at 24. The Court relied on the allegations in the complaint that (1) each processor defendant set an internal compensation schedule based on job title and relevant experience, (2) that each processor defendant set wages in accordance with

---

[12] Defendants also argue that plaintiffs fail to plausibly allege direct evidence to support their per se violation claim. *See* Docket 337 at 18. In the Court's prior order, the Court found that plaintiffs had failed to allege direct evidence to support the claim, Docket No. 219 at 20–21, and plaintiffs do not contest that the amended complaint does not contain allegations regarding direct evidence of a per se violation of the Sherman Act. *See* Docket No. 351 at 24–28.

the other processor defendants across the class period for similar positions, and (3) that at least seven processor defendants capped wage increases for their plants at exactly two percent for a period of years.  *Id.* at 23–24.  The Court stated that "defendants ask the Court to ignore plaintiffs' broad allegations of depressed wages across companies because plaintiffs do not allege enough specific examples."  *Id.* at 24.  However, the Court found that "[t]o require plaintiffs to address each plant would require allegations in excess of those required to infer an unlawful agreement at the motion to dismiss stage."  *Id.*

Defendants argue that "[p]laintiffs fail to adequately plead parallel conduct related to BIWI and PIWI, foreclosing their ability to plead a wage-fixing agreement with circumstantial evidence."[13]  Docket No. 337 at 20.  Defendants argue that, to plausibly allege parallel conduct, plaintiffs must identify "substantially similar and temporally proximate acts undertaken by multiple defendants."  *Id.* (citing *Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, 714 F. Supp. 3d 209, 220 (W.D.N.Y. 2024) ("where the alleged conspirators engaged in divergent conduct at significantly different times, a plaintiffs' allegations fall far short of demonstrating parallel behavior" (quotation marks omitted))); *see also In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d at 441 (parallel conduct must be "reasonably proximate in time and value") (collecting cases)).  Moreover, defendants maintain that "[w]ell-pleaded allegations of parallel conduct must involve some factual specificity regarding the allegedly parallel behavior."

_____

[13] Defendants again advance the argument that plaintiffs must allege parallel conduct in order to plausibly state a claim for a per se violation of the Sherman Act. *See* Docket No. 337 at 19–20.  As with the Court's prior order, the Court finds that it is unnecessary to resolve the issue of whether parallel conduct must be alleged, because here plaintiffs have plausibly alleged parallel conduct.  *See* Docket No. 219 at 22 n.9.

Docket No. 337 at 21 (citing Docket No. 219 at 22; *In re Pork Antitrust Litig.*, 2019 WL

3752497, at *8 (D. Minn. Aug. 8, 2019); *In re Cattle Antitrust Litig.*, 2020 WL 5884676,

at *6 (D. Minn. Sept. 29, 2020)).  Defendants assert that "[t]he Amended Complaint

simply repeats the allegation that certain Defendants increased base wages by 2% at

certain plants in 2017 and 2018 as a result of the other previously alleged forms of

conduct" and that plaintiffs "added no similar claims about the purported impact of BIWI

and PIWI on wages."  *Id.* at 22.

Defendants are incorrect; the specific allegations in the amended complaint

regarding defendants' suppression of wage increases to 2% a year are not attributed

only to the exchange of information through WMS and Agri Stats.  *E. J. Delaney*, 525

F.2d at 301 (courts must view the allegations in the complaint as a whole); *Cont'l Ore*,

370 U.S. at 699.  Rather, the amended complaint alleges that, "[a]s a direct

consequence of their conspiracy to depress compensation, the Defendant Processors

simultaneously and in parallel limited their annual wage increases to Class Members

employed at their red meat processing plants."  Docket No. 260 at 108, ¶ 341.  The

amended complaint alleges that this conspiracy was effectuated "through a series of

overt acts" including the use of "Secret Wage Indexes," the "Red Meat Industry

Compensation Survey," "Secret Annual Compensation Meetings," "Direct

Communications among Executives," and "Exchanging Compensation Data through

Agri Stats."  *Id.* at 8–11, 13, 14, ¶¶ 5–6,10, 15, 20–21.  While the amended complaint

does attribute the harmonizing of wages at specific plants only to defendants'

participation in the Red Meat Industry Compensation Survey, *id.* at 109, ¶ 345, the

remaining general allegations regarding defendants' harmonizing their wage practices,

as well as the specific allegations regarding the multiyear 2% wage increases, are
alleged to be the product of defendants' conspiracies, including sharing information
through the BIWI/PIWI surveys.  *See id.* at 108–09, ¶¶ 341–44.  The fact that the Court
has found plaintiffs have alleged two conspiracies to depress wages does not alter the
Court's analysis.  Both conspiracies to depress wages are alleged to have been
effective.  *See id.* at 108, ¶ 341.  Defendants provide no support for the proposition that
allegations regarding wage suppression across the industry must be attributed to only
one conspiracy, rather than the consequence of two conspiracies working towards the
same goal.

Defendants argue that "the alleged parallel wage increases in 2017 and 2018
cannot possibly stem from BIWI or PIWI because Plaintiffs do not allege that any
particular Defendant exchanged either index from 2015 to 2019, let alone in 2017 or
2018 specifically."  Docket No. 337 at 22.  The amended complaint contains detailed
allegations regarding which defendants or their subsidiaries participated in the BIWI or
PIWI surveys in 2000, 2002, 2004 through 2009, 2011 through 2014, and 2019.  Docket
No. 260 at 65–67, ¶¶ 183–84.  The amended complaint also alleges that the "BIWI and
PIWI surveys were conducted on at least an annual basis during every year within the
Class Period, sometimes as many as four times a year."  *Id.* at 9, 63, ¶¶ 9, 175.

Defendants appear to argue that the Court can infer that, because the last
BIWI/PIWI survey specifically identified was in 2019, this survey was the last actually
exchanged by the defendants.  Defendants' argument applies the wrong standard on a
motion to dismiss.  *See Swint v. Dish Network*, 2023 WL 8074820, at *1 (10th Cir. Nov.
21, 2023) (courts must "[a]ccept all well-pleaded facts as true, view them in the light

most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's

favor"); *Berryman v. Niceta*, No. 23-cv-00285-CNS-NRN, 2023 WL 4847583, at *4 n.4

(D. Colo. July 28, 2023) ("At best, this argument invites the Court to draw inferences

against the Complaint, which the Court cannot and will not do, and at worst simply

ignores Plaintiffs' numerous and well-pleaded allegations").  Rather, "[a] court

considering a motion to dismiss may begin by identifying allegations that, because they

are mere conclusions, are not entitled to the assumption of truth."  *Iqbal*, 556 U.S. at

664.  However, "[w]hen there are well-pleaded factual allegations, a court should

assume their veracity and then determine whether they plausibly give rise to an

entitlement to relief."  *Id.*

Defendants provide no support for the proposition that the Court must ignore the

general allegations on the grounds that plaintiffs provide more detailed allegations about

certain years.  Plaintiffs' allegation that BIWI/PIWI surveys were exchanged at least

annually from 2000 to the present day is not a mere conclusion.  The allegation is

supported by more specific allegations regarding the dates and participants in surveys

in 2000, 2002, 2004 through 2009, 2011 through 2014, and 2019.  Docket No. 260 at

65–67, ¶¶ 183–84.  The allegations regarding specific BIWI/PIWI surveys show that the

surveys were conducted regularly over a period of two decades and included surveys

exchanged as recently as 2019.  The specific allegations make plausible plaintiffs'

allegation that the surveys were carried out annually and that they have continued to the

present day, including from 2015 to 2019.  As such, defendants' argument fails.

Finally, regarding defendants' argument that plaintiffs have failed to plausibly

allege parallel conduct because the amended complaint does not identify temporally

proximate parallel conduct, the Court disagrees.  Defendants appear to be arguing that

the exchange of BIWI/PIWI surveys before 2014 is not reasonably proximate to

processor defendants capping wages and that the complaint, therefore, does not

plausibly allege parallel conduct.  Docket No. 353 at 24–25.  However, as discussed in

the Court's prior order, the amended complaint identifies parallel conduct by at least

seven defendants in which each capped its wage increases to 2% in 2017 and 2018.

Docket No. 219 at 23.  Defendants have not shown why this allegedly simultaneous and

continuous conduct of capping wage increases is not "reasonably proximate in time and

value."  *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d at 441.  The fact

that this conduct was not close in time to the earliest alleged BIWI/PIWI surveys does

not undermine the allegations in the complaint that defendants' minimal and equivalent

wage increases occurred at the same time.  Considering the allegations in plaintiffs'

amended complaint as a whole, the Court finds that they plausibly allege sufficient

parallel conduct to support plaintiffs' claim for a per se violation of the Sherman Act.

### b.  Plus Factors

Defendants argue that the Court should dismiss plaintiffs' first claim for relief "to

the extent that it seeks relief . . . for the time period prior to 2014."  Docket No. 337 at

24.  Defendants maintain that plaintiffs "must adequately plead an *agreement* – and

they cannot do so by resting solely on allegations of mere information exchanges."  *Id*.

at 17.  Defendants contend that plaintiffs fail to allege circumstantial evidence of a

conspiracy to fix wages and that plaintiffs instead "ask the Court to infer an agreement

to fix wages from the mere existence of two benchmarking surveys without any specific

allegations as to whether or how any of the Defendants actually used BIWI or PIWI to

determine wages for their employees."  *Id.*  Defendants assert that "[t]here is nothing

unlawful about BIWI or PIWI, and certainly nothing *per se* unlawful."  *Id.*  The Court

understands defendants to argue that, because plaintiffs have not shown that the

BIWI/PIWI surveys were unlawful, in order for plaintiffs to plausibly allege their per se

claim based on the BIWI/PIWI conspiracy, plaintiffs must allege that defendants agreed

to use the BIWI/PIWI surveys to fix wages.

Plaintiffs respond that there is "sufficient parallel conduct alleged in the Amended

Complaint – when combined with the plus factors discussed in Plaintiffs' opposition to

the first joint motion to dismiss and this Court's order – to support a plausible inference

of an agreement to depress compensation."  Docket No. 351 at 27–28 (footnotes

omitted).

In the Court's order on the first joint motion to dismiss, the Court found that

plaintiffs had pled at "least two plus factors, information exchanges and high-level

interfirm communications, sufficient to nudge their claim across the line from

conceivable to plausible and to permit an inference of an unlawful agreement."  Docket

No. 219 at 29 (citation, quotations, footnotes, and alterations omitted).  Regarding the

information exchanges, the Court stated that "[m]ere exchanges of information . . . are

not necessarily illegal, in the absence of additional evidence that an agreement to

engage in unlawful conduct resulted from, or was a part of, the information exchange."

*Id.* at 26 (quoting *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999)).

However, the Court found that "[e]xchanging data on future compensation as opposed

to exchanging data limited to current wages supports a plausible inference of an

agreement to fix compensation."  *Id.* at 27 (citing *Levitch v. Columbia Broad. Sys., Inc.*,

495 F. Supp. 649, 674 (S.D.N.Y. 1980)).  Moreover, the Court found that "[e]xchanging

data about future compensation is indicative of anti-competitive behavior and is

'behavior that would probably not result from . . . mere interdependence unaided by an

advance understanding among the parties." *Id.* (quoting *In re Broiler Chicken Antitrust*

*Litig.*, 290 F. Supp. 3d 772, 790 (N.D. Ill. 2017)). The Court also found it significant that

the complaint plausibly alleged that the processor defendants were able to

deanonymize the compensation data provided through WMS because the allegation

that "defendants directly communicated and deanonymized the data distinguish

plaintiffs' allegations from cases involving aggregate data." *Id.* at 26.

In addition, the Court found that the complaint alleged high-level interfirm

communications conducted through group emails to align compensation practices and

through bilateral emails to create time-sensitive plans for future compensation. *Id.* at

27. Specifically, the Court found that the complaint alleged high-level interfirm

communication occurred during the private roundtable sessions during the Red Meat

Industry Compensation Meetings. *Id.* at 27–28. The Court also found that "[t]he

exclusion, and later inclusion, of Meng at the roundtable sessions adds support for

plaintiffs' allegations that the interfirm communications were not lawful." *Id.* at 28.

Nevertheless, the Court finds that plaintiffs cannot rely on the plus factors

identified in the Court's previous order because those plus factors arise from allegations

limited to WMS and Agri Stats. *Id.* at 26–29. The amended complaint does not include

allegations of high-level interfirm communications about the results of the BIWI/PIWI

surveys at events like the Red Meat Industry Compensation Meetings. *See* Docket No.

216. Instead, plaintiffs rely on the allegations that defendants exchanged non-public

present and future compensation data and that defendants agreed to keep this

information confidential to support the inference that defendants engaged in a conspiracy to depress wages starting in 2000.  *Id.* at 9, 64, 65, 130, ¶¶ 7, 176, 180–81, 401.

"In considering whether a Plaintiff has alleged sufficient circumstantial evidence of conspiracy, the Court considers the allegations as a whole."  *Beltran v. InterExchange, Inc.*, 176 F. Supp. 3d 1066, 1073 (D. Colo. 2016).  Plus factors must "raise a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *In re Credit Default Swaps Auctions Litig.*, 710 F. Supp. 3d 895, 943 (D.N.M. 2023) (quoting *Twombly*, 550 U.S. at 553, 557) (alterations omitted).  Courts have held that "a single plausible plus factor allegation that weakly tips in the plaintiffs' favor, without some further factual support, is not enough to open the floodgates to discovery in antitrust cases."  *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 53 (9th Cir. 2022) (citing *Twombly*, 550 U.S. at 559 ("[I]t is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the [discovery] process will reveal relevant evidence' to support a § 1 claim.")).

However, plaintiffs' allegations that defendants exchanged future compensation data is a plus factor that does more than "weakly tip[ ]" in plaintiffs' favor.  *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th at 53.  In determining whether a plus factor exists, courts look for behavior that would not occur "unaided by an advance understanding among the parties" and conduct that indicates the sort of "sense of obligation that one generally associates with agreement."  *In re*

*Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 790 (citations omitted).  Sharing information about future conduct, such as data about future prices or future compensation schedules, is indicative of an anti-competitive conspiracy.  *Todd v. Exxon Corp.*, 275 F.3d 191, 211 (2d Cir. 2001).  As the court in *Todd* explained, a "major factor for courts to consider in a data exchange case is the 'nature of the information exchanged.'"  *Id.* (quoting *United States v. U.S. Gypsum Co.,* 438 U.S. 422, 441 n.16 (1978)).  *"The exchange of past price data is greatly preferred because current data have greater potential to affect future prices and facilitate price conspiracies.  By the same reasoning, exchanges of future price information are considered especially anticompetitive."  *Id.* at 211–12 (citing *American Column & Lumber Co. v. United States*, 257 U.S. 377, 398–99 (1921)); *see also Cty. of Phila. v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 529 (S.D.N.Y. 2020).  The same logic applies to the exchange of compensation data.  *See Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 161 (N.D.N.Y. 2010) ("Most significantly, these information exchanges contained current and future RN compensation information." (citing *Todd*, 275 F.3d at 211)).

A company sharing its plans for the future would ordinarily place it at a disadvantage by allowing its competitors to anticipate and respond to the company's competitive strategy.  A company is unlikely to share such data unless there is an advance understanding that its competitors would use the information for the parties' mutual benefit.  Competitors sharing future compensation data is indicative of a shared "sense of obligation that one generally associates with agreement."  *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 790, 798 (citing *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 906–07 (6th Cir. 2009) (an industry information clearing

house could be a tool for a price-fixing conspiracy if it "could provide defendants with [the pertinent] information *before* defendants implemented their rate reductions")). Therefore, the Court finds that defendants exchange of future compensation data through the BIWI/PIWI surveys raises the plausible inference that defendants agreed to use the information in the BIWI/PIWI surveys to fix wages.  Moreover, like defendants exclusion of Meng from the Red Meat Industry Compensation Meetings, defendants agreement to keep the results of the BIWI/PIWI surveys confidential is further evidence of their anticompetitive nature.  *In re Loc. TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *12–13 (N.D. Ill. Nov. 6, 2020) ("Plaintiffs allege that the information in question was not made public . . ., which creates a further inference that the information exchange was anticompetitive in nature.").  Plaintiffs' allegations that defendants exchanged competitively sensitive future compensation data and agreed to keep such information confidential are sufficient plus factors for plaintiffs to plausibly state their per se claim against defendants.  *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 790; *Levitch*, 495 F. Supp. at 674; *Fleischman*, 728 F. Supp. 2d at 161; *Todd*, 275 F.3d at 211.

### 3.  Claim Two: Unreasonable Restraint of Trade

Plaintiffs' second claim alleges that, since January 1, 2000, defendants have engaged in a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information about the compensation being paid or to be paid to their employees at red meat processing plants in the continental United States through BIWI/PIWI surveys resulting in an unreasonable restraint of trade in violation of the Sherman Act.  Docket No. 260 at 140, ¶ 437.

To establish a claim for a violation under the Sherman Act, plaintiffs must allege an agreement that illegally restrains trade. *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1359–60 (10th Cir. 1989). Agreements "may be illegal if (1) their purpose or effect is to create an *unreasonable* restraint of trade, *or* (2) they constitute a *per se* violation of the statute." *Id.* Where a per se violation does not exist, "[t]he rule of reason calls for a holistic assessment of the parties' evidence aimed, ultimately, at discerning whether a challenged practice restrains trade unreasonably and so should be prohibited under § 1 of the Sherman Act." *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1310 (10th Cir. 2017).

The Court will evaluate plaintiffs' second claim under the rule of reason standard. *See* Docket No. 219 at 30. Courts in the Tenth Circuit apply a burden-shifting test to evaluate claims under the rule of reason. *Buccaneer Energy*, 846 F.3d at 1310. Plaintiffs have the burden to show an agreement had a substantially adverse effect on competition; defendants must show procompetitive virtues of the alleged wrongful conduct; and plaintiffs must prove the conduct is not necessary to achieve legitimate objectives, resulting in a balancing of the harms and benefits of the alleged wrongful conduct. *Id.* To carry their initial burden, plaintiffs must allege "that an alleged restraint has or is likely to have a significant anticompetitive effect." *Id.* Plaintiffs can accomplish this goal in three ways:

> First, under an abbreviated, quick look rule-of-reason analysis, courts sometimes simply assume the existence of anticompetitive effect where the conduct at issue amounts to a naked and effective restraint on price or output that carries obvious anticompetitive consequences. Under quick-look analysis, the burden in effect immediately shifts to the defendant to demonstrate countervailing procompetitive effects. Second, a plaintiff may directly establish anticompetitive effect by showing, for example, that the defendant has actually reduced output or raised prices. And third, a plaintiff may attempt to indirectly establish anticompetitive

40

effect by defining a relevant product and geographic market and showing the
defendant possesses market power in that market.

*Id.* at 1311 (footnotes, internal citations, and quotations omitted).  Indirect evidence of

anticompetitive effect requires a showing of market power "plus some evidence" that the

challenged conduct has tended to harm competition.  *In re Payment Card Interchange*

*Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 95 (E.D.N.Y. 2024) (citing

*Am. Express*, 585 U.S. at 541).  At the motion-to-dismiss stage, the plaintiff is only

required to show "more than a sheer possibility that a defendant has acted unlawfully."

*Iqbal*, 556 U.S. at 678.

Defendants argue that plaintiffs have failed to allege anticompetitive effects

related to the BIWI/PIWI surveys.  Docket No. 337 at 25.  First, defendants assert that

plaintiffs have not established direct anticompetitive effect related to the BIWI/PIWI

surveys because they allege no facts demonstrating that processor defendants used

BIWI/PIWI surveys to depress wages.  *Id.*  Defendants claim that plaintiffs' only

allegation regarding anticompetitive effect is conclusory.  *Id.* ("Plaintiffs simply assert

that Defendants 'relied on' BIWI and PIWI 'to ensure the industry as a whole paid

materially lower hourly wages than would have been paid in a competitive market.'

Conclusory assertions like this one are not entitled to a presumption of truth as a

general matter, nor are they capable of sustaining Plaintiffs' burden to adequately plead

actual anticompetitive effects." (citing *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir.

2002); *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 (11th Cir. 2016)).  Plaintiffs

respond that the Court has already determined that plaintiffs have plausibly alleged

direct anticompetitive effects, and that the "allegations regarding BIWI and PIWI further

buttress Plaintiffs' direct evidence of anticompetitive effects."  Docket No. 351 at 29.

Plaintiffs argue that, "considered as a whole rather than piecemeal and in isolation, Plaintiffs' allegations of information-sharing among Defendants plausibly support Plaintiffs' wage-suppression claims." *Id.* at 30.

In its previous order, the Court found that plaintiffs had alleged direct evidence of anticompetitive effects because "plaintiffs' allegations of specific wage suppression provide sufficient support at the pleading stage for plaintiffs' broader claims of industry-wide wage suppression." Docket No. 219 at 35. The amended complaint alleges that this conspiracy involved a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information about the compensation being paid or to be paid to defendant processors' employees at red meat processing plants, Docket No. 260 at 140, ¶ 437, and that the BIWI/PIWI surveys contained competitively sensitive information regarding present and future wages. *Id.* at 9, ¶ 7. As discussed above, plaintiffs' allegations regarding wage suppression apply equally to the exchange of wage information via BIWI/PIWI surveys as they do to information exchanged through WMS and Agri Stats because there is nothing in the amended complaint that would require the Court to attribute the wage suppression to the WMS conspiracy and not to the BIWI/PIWI conspiracy. Therefore, defendants' argument that plaintiffs have not alleged direct evidence of anticompetitive effects fails.

Next, defendants argue that plaintiffs have failed to plausibly allege their second claim through indirect evidence. Docket No. 337 at 26. Defendants do not challenge plaintiffs' allegation that defendants had market power. *See id.* ("Setting aside their market-power allegations, Plaintiffs have not adequately pleaded indirect anticompetitive effects because they have not satisfied the second component of

42

*American Express*'s test"); *see also* Docket No. 260 at 7, ¶ 2 ("Defendants include

fifteen red meat processors and several of their subsidiaries ("Defendant Processors"),

which collectively produce more than 80 percent of the red meat sold to consumers in

the United States."); *Chase Mfg., Inc. v. Johns Manville Corp.*, No. 19-cv-00872-MEH,

2022 WL 522345, at *7 (D. Colo. Feb. 22, 2022) ("Indeed, a market share of up to

seventy to eighty percent implies not only market power but also monopoly power.").[14]

Instead, defendants contend that plaintiffs "must allege that the 'conduct, as a matter of

economic theory, harms competition.'"  Docket No. 337 at 26 (quoting *Epic Games, Inc.

v. Apple, Inc.*, 67 F.4th 946, 983–84 (9th Cir. 2023)).  They maintain that plaintiffs do not

allege that the sharing of information in BIWI/PIWI surveys impacted competition in the

labor market for red meat plant workers and that plaintiffs do not present an economic

theory for how the BIWI/PIWI surveys harmed competition.  *Id.* at 27.  Defendants also

argue that plaintiffs cannot rely merely on information sharing, without some other

evidence that tends to prove wages were below competitive levels.[15]  *Id.* at 27–28.

The Court finds that plaintiffs have plausibly alleged indirect evidence of

anticompetitive effects by showing market power "plus some evidence" that the

---

[14] Because defendants do not contest the point, the Court need not consider the
extent to which the market share of defendants who did not participate in the BIWI/PIWI
surveys decreased the market share attributable to the BIWI/PIWI conspiracy.

[15] Defendants cite *Roe v. State Bar of California*, 2023 WL 6194088, at *7 (C.D.
Cal. Apr. 3, 2023), for the proposition that "[t]he Supreme Court has warned courts not
to infer competitive injury from price and output data 'absent some evidence that tends
to prove that output was restricted or prices were above a competitive level.'"  Docket
No. 337 at 27.  This admonishment concerns a court's, or jury's, consideration of
uncontextualized data.  *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209, 237 (1993).  *Roe* does not stand for the proposition that the sharing of
competitively sensitive data amongst defendants required direct proof of wage
depression, which would collapse the distinction between direct and indirect evidence of
anticompetitive effects.

exchange of wage information has tended to harm competition. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d at 95. In evaluating information exchanges, "[t]he first factor to consider is the time frame of the data. The Supreme Court has made clear that '[e]xchanges of current price information, of course, have the greatest potential for generating anti-competitive effects and although not *per se* unlawful have consistently been held to violate the Sherman Act.'" *Todd*, 275 F.3d at 211 (quoting *Gypsum,* 438 U.S. at 441 n.16 (citing *American Column & Lumber*, 257 U.S. 377; *United States v. American Linseed Oil Co.*, 262 U.S. 371 (1923); *United States v. Container Corp. of Am.*, 393 U.S. 333 (1969))). "[E]xchanges of future price information are considered especially anticompetitive." *Id.* at 211–12 (citing *Am. Column & Lumber,* 257 U.S. at 398–99); *see also Fleischman*, 728 F. Supp. 2d at 161 ("Most significantly, these information exchanges contained current and future RN compensation information." (citing *Todd*, 275 F.3d at 211)).

Here, plaintiffs allege that, from at least 2000, defendant processors exchanged sensitive compensation data, including the amount and dates of planned future hourly wage increases, through BIWI/PIWI surveys between one and four times every year. Docket No. 260 at 8–9, ¶ 6. They allege that BIWI and PIWI surveys identified how much each participating defendant processor was currently paying and would be paying in the future to hourly-paid workers at each of defendant processor's red meat processing plants, and that this data was fully disaggregated. *Id.* at 9, 65, ¶¶ 7, 180–81.

Moreover, courts have relied on defendants' efforts to keep the information shared among competitors private as further indication that the information exchange was anti-competitive. *See*, *e.g.*, *In re Loc. TV Advert. Antitrust Litig.*, 2020 WL 6557665,

at *12–13 ("Plaintiffs allege that the information in question was not made public, which creates a further inference that the information exchange was anticompetitive in nature.").  Plaintiffs allege that the information in these surveys was often transmitted by phone rather than written communication, that each BIWI and PIWI survey was labeled "CONFIDENTIAL," and that defendant processors agreed not to share the compensation data beyond those processors that participated in the survey.  *Id.* at 64, 130, ¶¶ 176, 401.

The Court finds plaintiffs' allegations that processor defendants shared confidential and non-anonymous present and future compensation data in order to set internal wage schedules and negotiate with unions, when those processor defendants compose nearly eighty percent of the red meat industry in the United States, plausibly allege indirect evidence of anticompetitive effects by showing market power "plus some evidence" that the exchange of wage information tended to harm competition.  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d at 95. Thus, plaintiffs have satisfied their initial burden under the burden shifting framework. Defendants' claim that "[i]t is plausible – indeed, highly likely – that BIWI and PIWI caused Defendants to *raise* wages," Docket No. 337 at 27, is insufficient to meet their burden of demonstrating the procompetitive virtues of sharing present and future compensation data.  *Buccaneer Energy*, 846 F.3d at 1310.  As such, defendants have not shown that plaintiffs' second claim for relief should be dismissed for failure to plausibly allege anti-competitive effects.

### C.  Statute of Limitations

Defendants argue that plaintiffs' claims regarding the BIWI/PIWI conspiracy are barred by the statute of limitations.  Docket No. 337 at 28.  Plaintiffs filed their amended

complaint on January 12, 2024.  Docket No. 260.  The statute of limitations on plaintiffs'
§ 1 claims is four years.  15 U.S.C. § 15b.  Defendants argue that the last BIWI survey
specifically identified in the amended complaint was created on July 25, 2019 and that
the last PIWI report was created on September 12, 2019, and as such these allegations
are untimely.  Docket No. 337 at 29–30.  In particular, defendants contend that,
"[b]ecause Plaintiffs allege BIWI and PIWI were last created more than four years
before the filing of the Amended Complaint, and because Plaintiffs do not plausibly
allege a 'continuing violation' or 'fraudulent concealment,' Plaintiffs' claims related to
BIWI and PIWI are time-barred."  *Id.* at 29.

Defendants are correct that the amended complaint identifies certain BIWI and
PIWI reports by date.  *See* Docket No. 260 at 66–67, ¶¶ 183–84.  However, the
amended complaint does not allege that these are the only years in which such reports
were circulated.  Rather, the allegations in the amended complaint state that certain
processor defendants participated "in at least" the BIWI and PIWI surveys identified with
particularity in the amended complaint.  *Id.*  The complaint also alleges that "BIWI and
PIWI surveys were conducted on at least an annual basis during every year within the
Class Period, sometimes as many as four times a year."  *Id.* at 9, 63, ¶¶ 9, 175.  For the
reasons discussed above, the Court finds that this allegation is plausible.  Thus,
defendants' assertion that the Court can resolve their statute of limitations defense on a
Rule 12(b)(6) motion because "the dates given in the complaint make clear that the right
sued upon has been extinguished" is incorrect.  Docket No. 337 at 29 (quoting *Sierra
Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 671 (10th Cir. 2016)).  The complaint
plausibly alleges that the BIWI/PIWI conspiracy occurred during the limitations period.

### 1. *Continuing Violation*

Plaintiffs' allegation that the BIWI/PIWI surveys have continued to the present

day is also sufficient to show that the continuing conspiracy exception applies.  Under

the Clayton Act, 15 U.S.C. § 15b, a claim under the Sherman Act "shall be forever

barred unless commenced within four years after the cause of action accrued." *Auraria*

*Student Housing at the Regency, LLC, v. Campus Village Apartments, LLC*, 843 F.3d

1225, 1247 (10th Cir. 2016) (quoting 15 U.S.C. § 15b).  "[A]n overt act will restart the

statute of limitations under the continuing conspiracy exception when the act is (1) 'a

new and independent act that is not merely a reaffirmation of a previous act'; and (2) the

act 'inflict[s] new and accumulating injury on the plaintiff.'" *Id.* at 1248 (quoting *Kaw*

*Valley Elec. Co-op. Co., Inc. v. Kansas Elec. Power Co-op., Inc.*, 872 F.2d 931, 933

(10th Cir. 1989)).  Plaintiffs allege that the defendants have and continue to exchange

competitively sensitive information about present and future wages through the

BIWI/PIWI surveys and, for the reasons discussed above, the exchange of such

information has anticompetitive effects and supports an inference of an agreement to

suppress wages among defendants.  Docket No. 260 at 8–10, 63, 108, ¶¶ 6, 9, 175,

341.  Each new exchange of BIWI/PIWI surveys is an overt act that is not merely a

reaffirmation of a previous act because each BIWI/PIWI survey contains new

competitively sensitive information about a different group of defendants.  *See id.* at 65-

67, ¶¶ 183-84.  Subsequent BIWI/PIWI surveys inflict new and accumulating injury to

plaintiffs by perpetuating the conspiracy and allowing defendants to continue the

suppression of plaintiffs' wages.  Furthermore, the complaint plausibly alleges injury

caused by the BIWI/PIWI conspiracy, such as the harmonizing of wages at specific

processing plants.  *Id.* at 109, ¶ 345.  Therefore, although the amended complaint

alleges that the BIWI/PIWI conspiracy began in 2000, it plausibly alleges that the conspiracy continued into the limitations period.

### 2.  Relation Back

The parties next dispute whether the allegations in the amended complaint relate back to the filing of the original complaint on November 11, 2022.  *See* Docket No. 1 at 1; Docket No. 337 at 31; Docket No. 351 at 44.

"[I]n the case of a 'continuing violation,'. . . each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again . . . . But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Champagne Metals*, 458 F.3d at 1090 (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189–90 (1997) ("Thus, the Klehrs may point to new predicate acts that took place after August 1989, such as sales to other farmers or the printing of new Harvestore advertisements.  But that fact does not help them, for, as the Court of Appeals pointed out, they have not shown how any new act could have caused them harm over and above the harm that the earlier acts caused. . . .  Nor can the presence of the new act help them recover for the injuries caused by pre–1989 acts.")).  As such, plaintiffs may recover damages for the injuries sustained by the alleged conspiracy that occur within the statute of limitations, even if the conspiracy began before the limitations period. However, because the Court has found that plaintiffs have alleged two conspiracies, the Court must consider when the limitations period began for the BIWI/PIWI conspiracy.

"In limited circumstances, Rule 15(c) saves an otherwise untimely amendment by deeming it to 'relate back' to the conduct alleged in the timely original complaint." *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 961 (10th Cir. 2012).  Rule

48

15(c)(1)(B) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when: . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).

Whether an amendment arises out of the same conduct, transaction, or occurrence set out in the original pleading "depends on the existence of a common core of operative facts uniting the original and newly asserted claims."  *May v. Segovia*, 929 F.3d 1223, 1237 (10th Cir. 2019) (citation omitted) (Briscoe, J., concurring).  "For a newly added action to relate back, the basic claim must have arisen out of the conduct set forth in the original pleading."  *Slayton v. Am. Exp. Co.*, 460 F.3d 215, 228 (2d Cir. 2006) (citation and quotations omitted).  Amendments will generally relate back if they "amplify the facts previously alleged, correct a technical defect in the prior complaint, assert a new legal theory of relief, or add another claim arising out of the same facts." *Benton v. Bd. of Cnty. Comm'rs*, No. 06-cv-01406-PSF-MEH, 2007 WL 4105175, at *3 (D. Colo. Nov. 14, 2007), *aff'd*, 303 F. App'x 625 (10th Cir. 2008) (unpublished) (citation omitted).  "On the other hand, amendments generally will not relate back if they interject entirely different facts, conduct, transactions or occurrences."  *Id.* (citation omitted).

Defendants argue that the allegations in the amended complaint do not relate back to the allegations in the original complaint.  Docket No. 337 at 31.  They maintain that an "amendment does not relate back when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth."  *Id.* (quoting *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1018 (10th Cir. 2013)).  Defendants assert that amendments do not relate back "'if the effect of the new

pleading is to fault [the defendants] for conduct different from that identified in the
original complaint, even if the new pleading shares some elements and some facts in
common with the original claim'" and that "the allegations related to BIWI and PIWI
involve a different time period, different conduct, and different Defendants than the
allegations related to WMS and Agri Stats."  *Id.* (quoting *Full Life Hospice*, 709 F.3d at
1018).

Plaintiffs respond that an amended complaint relates back if "the original and
amended complaints allege the same general conduct and general wrong."  Docket No.
351 at 44 (quoting *Hunter v. Romero*, 2021 WL 4947235, at *7 (D. Colo. July 2, 2021),
*report and recommendation adopted*, 2021 WL 11634863 (D. Colo. Dec. 10, 2021)).
Plaintiffs maintain that, in the Tenth Circuit, "when the original complaint alleges a wide
ranging fraudulent scheme, amended complaints relate back when they assert newly
discovered aspects of that scheme."  *Id.* (quoting *Hogan v. Pilgrim's Pride Corp.*, 73
F.4th 1150, 1158 (10th Cir. 2023)).  They contend that, here, plaintiffs' additional
allegations regarding BIWI/PIWI surveys only expand on the allegations in their original
complaint.  *Id.* at 44–45.

In determining whether an amended pleading relates back to the original
pleading, "[t]he key consideration is whether the original complaint 'gave the Defendant
adequate notice of what must be defended against in the Amended Complaint.'"
*Pernick v. Computershare Tr. Co., Inc.*, 136 F. Supp. 3d 1247, 1273–74 (D. Colo. 2015)
(citing *In re Bennett Funding Grp., Inc.*, 275 B.R. 447, 451 (Bankr. N.D.N.Y. 2001)
(collecting cases); *Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149 n.3 (1984)
("The rationale of Rule 15(c) is that a party who has been notified of litigation

concerning a particular occurrence has been given all the notice that statutes of
limitations were intended to provide.")); *Lehman XS Tr., Series 2006-GP2 by U.S. Bank
Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, 916 F.3d 116, 128 (2d Cir. 2019) ("[T]he
central inquiry is whether adequate notice of the matters raised in the amended
pleading has been given to the opposing party within the statute of limitations by the
general fact situation alleged in the original pleading." (citation omitted)); *Se.
Pennsylvania Transportation Auth. v. Orrstown Fin. Servs. Inc.*, 12 F.4th 337, 348–49
(3d Cir. 2021) ("The touchstone of the relation-back analysis is whether would-be
defendants had fair notice of the claim within the limitations period." (citation and
quotation omitted)).

Courts usually have found that conduct that is a separate violation of the law
does not relate back to a prior violation simply because it involves similar conduct.  *See
Eng. Boiler & Tube, Inc. v. W.C. Rouse & Son, Inc.*, 172 F.3d 862, 1999 WL 89125, at
*3 (4th Cir. 1999) (table decision) ("A plaintiff may not baldly allege a broad course of
conduct over a lengthy period of time and later sue on any act that occurred during that
time period.  Because the Hobbs letter is a separate instance of defamation arising from
'facts other than those originally pleaded,' a claim based on that letter does not relate
back to the original filing date.") (citation omitted); *Snider v. Pa. DOC*, 505 F. Supp. 3d
360, 416 (M.D. Pa. 2020) (plaintiff's new allegations against correctional facility did not
relate back to prior claims against a different correctional facility, despite a claim in
original complaint that he "ha[d] similar experiences" at both facilities); *Brightwell v.
Hershberger*, 2016 WL 4537766, at *5 (D. Md. Aug. 31, 2016) (finding new claims did
not relate back where plaintiff initially brought state tort and § 1983 claims based on an

alleged prison assault and then sought to add new claims concerning different assaults, perpetrated by different individuals months before the assault alleged in the original complaint). "Indeed, even an amendment that shares 'some elements and some facts in common' with the original claim does not relate back if its effect is 'to fault [the defendants] for conduct different from that identified in the original complaint.'" *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 383 (D.D.C. 2018) (finding age discrimination claim did not relate back to claim for retaliation based on plaintiff complaining about alleged age discrimination) (quoting *Jones v. Bernanke*, 557 F.3d 670, 674 (D.C. Cir. 2009)); *Slayton*, 460 F.3d at 228 ("even where an amended complaint tracks the legal theory of the first complaint, claims that are based on an 'entirely distinct set' of factual allegations will not relate back").

The Court finds that defendants did not have adequate notice that they could be subject to liability in this action for exchanging BIWI/PIWI surveys based on the allegations in the original complaint that plaintiffs exchanged wage information via WMS and Agri Stats. As discussed above, plaintiffs have plausibly alleged only the existence of separate conspiracies to depress wages, rather than a single conspiracy. *See* Docket No. 260 at 8–9, 64, 71–72, ¶¶ 6, 176, 193, 195–98. Defendants who were not part of the WMS conspiracy were not on notice that they could become part of this litigation. The original complaint alleges that the Red Meat Survey Group had exclusive membership and that the group's existence was a secret from non-participants. *Id.* at 71–72, ¶¶ 193, 195–98. It is not reasonable for defendants to expect that they can be held accountable for the conduct of a group that they are not a part of and which they may not have known existed.

Second, for those defendants who participated in both conspiracies, the BIWI/PIWI conspiracy does not "arise[ ] out of the conduct set forth in the original pleading." *Slayton*, 460 F.3d at 228. The allegations in the amended complaint show that defendants' schemes to depress wages had substantial similarities, such as the fact that both schemes involved sharing present and future compensation data and that they have overlapping participants. Docket No. 260 at 8–9, 64, 71–72, ¶¶ 6, 176, 193, 195–98. However, the similarities are not enough to show that the amended complaint relates back to the original complaint. *Slayton*, 460 F.3d at 228 ("even where an amended complaint tracks the legal theory of the first complaint, claims that are based on an 'entirely distinct set' of factual allegations will not relate back"). The amended complaint does not allege a "common core of operative facts uniting" the allegations regarding the BIWI/PIWI conspiracy and WMS conspiracy. *May*, 929 F.3d at 1237. That is, although the amended complaint alleges facts showing that the conspiracies are similar, there are no allegations showing that the conspiracies have facts in common, i.e. that they rely on the same facts. For example, the amended complaint does not allege that information was exchanged between the two conspiracy groups or that the groups otherwise facilitated each other's fraudulent schemes. As such, the amended complaint does not show that the BIWI/PIWI conspiracy is a "newly discovered aspect[ ]" of the WMS conspiracy. *Hogan*, 73 F.4th at 1158 (quoting *Quaak v. Dexia, S.A.*, 445 F. Supp. 2d 130, 137–38 (D. Mass. 2006); *see also Benton*, 2007 WL 4105175, at *3 (amendments will relate back when they "add another claim arising out of the same facts"). Thus, defendants were not on notice that participating in one information-sharing scheme could make them liable for their participation in the other.

The amended complaint therefore does not relate back to the original complaint, and
plaintiffs' second claim based on the BIWI/PIWI conspiracy is barred by the statute of
limitations for conduct occurring before January 12, 2020.[16]

### 3. Fraudulent Concealment

In addition to the continuing violations doctrine, plaintiffs' amended complaint
alleges their claims are timely because the doctrine of fraudulent concealment tolls the
statute of limitations.  Docket No. 260 at 125–26, ¶ 390.

Fraudulent concealment is an equitable doctrine "read into every federal statute
of limitation."  *In re Credit Default Swaps Auctions Litig.*, 710 F. Supp. 3d at 932
(quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946)).

> The Tenth Circuit requires plaintiffs to show "(1) the use of fraudulent means by
> the party who raises the ban of the statute [of limitations]; (2) successful
> concealment from the injured party; and (3) that the party claiming fraudulent
> concealment did not know or by the exercise of due diligence could not have
> known that he might have a cause of action."

*Id.* (quoting *Ballen v. Prudential Bache Securities, Inc.*, 23 F.3d 335, 336–37 (10th Cir.
1994)).  "The question of whether . . . claims were fraudulently concealed is typically
factual and not amenable to resolution on a motion to dismiss."  *Thompson v. 1-800
Contacts, Inc.*, 2018 WL 2271024, at *10 (D. Utah May 17, 2018).  In an antitrust
conspiracy case, this is generally true where the proof of concealment is in the hands of
the defendant.  *Id.* at *10–11; *see also In re Rubber Chemicals Antitrust Litig.*, 504 F.
Supp. 2d 777, 789 (N.D. Cal. 2007) (collecting cases).

---

[16] *Quaak*, 445 F. Supp. 2d at 138, does not require a different result.  In that
case, the court found that defendants had plausibly alleged a single "wide ranging
scheme Defendant perpetrated to fraudulently inflate the value of L & H stock."  *Id.*
Here, plaintiffs have not plausibly alleged a single conspiracy and *Quaak*'s holding is
inapplicable.

Because a claim of fraudulent concealment is based on fraud, the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies. *Thompson*, 2018 WL 2271024, at *10 (citing *In re: Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000)). Rule 9(b) of the Federal Rules of Civil Procedure requires that, in a pleading alleging fraud, the circumstances constituting fraud or mistake must be stated with particularity. *Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006); Fed. R. Civ. P. 9(b). The purpose of the requirement "is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based," to "safeguard[] defendant's reputation and goodwill from improvident charges of wrongdoing," and "to inhibit the institution of strike suits." *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 987 (10th Cir. 1992) (citation omitted). A complaint alleging fraud must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (citing *Lawrence Nat'l Bank v. Edmonds*, 924 F.2d 176, 180 (10th Cir. 1991)). "Allegations of fraud may be based on information and belief when the facts in question are peculiarly within the opposing party's knowledge and the complaint sets forth the factual basis for the plaintiff's belief." *Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir. 1992). To claim fraudulent concealment, first, plaintiffs must allege the use of fraudulent means by defendants. *Ballen*, 23 F.3d at 336–37.

Defendants argue that the amended complaint does not plausibly allege the first element of fraudulent concealment, namely, that defendants used fraudulent means to

conceal the conspiracy.[17]  Docket No. 337 at 32.  Defendants assert that the amended

complaint alleges only that participants in the BIWI/PIWI surveys "were instructed" to

treat the reports as "confidential and private," but that it "does not allege any specifics

regarding *when* these secrecy instructions occurred, *who* issued the instructions, and

*how* the instructions kept the reports confidential."  *Id.*

Plaintiffs respond that the amended complaint identifies "actions taken to conceal

the BIWI and PIWI with specificity as to 'who, what, when, where, and how.'"  Docket

No. 351 at 35.  Plaintiffs assert that

> [t]he Amended Complaint specifies precisely which Defendants ("who"),
> exchanged fully disaggregated current and future compensation data ("what"),
> from 2000 to 2019, at least annually and up to four times a year, precipitated by
> the request of a participating member in advance of union negotiations or an
> annual compensation review ("when"), provided, via private communications,
> directly to Tyson for assembly ("where"), to facilitate and conceal their conspiracy
> ("why").

---

[17] Courts have applied three different standards to the first element of fraudulent
concealment antitrust claims, namely, "the 'self-concealing' standard, the 'separate and
apart' standard, and the intermediate, 'affirmative acts' standard."  *In re Urethane
Antitrust Litig.*, 913 F. Supp. 2d 1145, 1158 (D. Kan. 2012) (quoting *Supermarket of
Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995)) ("three
standards that have been used for determining whether an antitrust plaintiff has
satisfied the first element of this test").  Plaintiffs maintain that the Tenth Circuit has
adopted the "self-concealing" standard.  Docket No. 351 at 34; Docket No. 179 at 31–32
(citing *King & King Enterprises v. Champlin Petroleum Co.*, 657 F.2d 1147, 1156 (10th
Cir. 1981)); *but see Burge v. Teva Pharms. Indus., Ltd.*, 2024 WL 4692050, at *7 (D.
Kan. Nov. 6, 2024) ("Tenth Circuit law is clear: Fraudulent concealment requires an
affirmative act."); *In re Urethane Antitrust Litig.*, 913 F. Supp. 2d at 1160 ("The Tenth
Circuit has never applied the self-concealing standard, and . . . the Tenth Circuit has
consistently required proof of an affirmative act to support a claim of fraudulent
concealment to toll the statute of limitations.").  The Court finds that it need not resolve
which standard applies to the first element of fraudulent concealment because the Court
finds that plaintiffs have not plausibly alleged the second element of fraudulent
concealment for the reasons discussed below.

*Id.* (citation omitted).  These allegations concern the who, what, when, where, and how of the conspiracy generally, but do not address concealment of the conspiracy.

Plaintiffs also rely on the allegations that BIWI/PIWI data was often transmitted by telephone rather than written communication to avoid detection, that each report was marked "CONFIDENTIAL," that Tyson only shared BIWI/PIWI surveys with participating processors, and that processor defendants agreed not to share BIWI/PIWI surveys with others.  *Id.*  Plaintiffs contend that "[s]uch mutually agreed to and enforced instructions 'requiring the contracting parties to keep the terms of that allegedly anti-competitive agreement private' are plainly 'affirmative acts to conceal.'"  *Id.* at 35–36 (alterations omitted) (quoting *Thompson*, 2018 WL 2271024, at *12; citing *King & King Enterprises*, 657 F.2d at 1155).  The Court finds that it is unnecessary to consider whether these allegations meet the pleading standards of Rule 9 to plausibly allege the first element of fraudulent concealment because the Court finds that plaintiffs have failed to plausibly allege the second element of fraudulent concealment, namely, that defendants successfully concealed the conspiracy.  *See In re Credit Default Swaps Auctions Litig.*, 710 F. Supp. 3d at 932 (plaintiffs must allege successful concealment from the injured party).

Defendants contend that the allegations in the amended complaint are inconsistent because, in addition to alleging that participants were instructed to keep the surveys confidential, the amended complaint also alleges that defendants "used" BIWI/PIWI surveys to negotiate with unions.  Docket No. 337 at 33.  Defendants maintain that "[i]mplicit in this allegation is that Defendants shared BIWI and PIWI information with union representatives and members during [collective bargaining

agreement] negotiations." *Id.* They assert that "[o]penly sharing BIWI and PIWI information in negotiations with third parties cannot be squared with allegations of a secret conspiracy." *Id.*

The allegations in the amended complaint state that, "if a participating Defendant Processor had an upcoming union negotiation or annual compensation review, when wage structure decisions were to be made, it would directly request an updated PIWI and BIWI from Tyson, so that it could use the data from the updated survey during those upcoming negotiations or compensation setting decisions." Docket No. 260 at 9–10, ¶ 9. There are two plausible inferences that can be made from this allegation. First, as defendants suggest, this allegation may indicate that the wage information in the BIWI/PIWI reports, or even the reports themselves, were given to plaintiffs' union representatives so that individual defendants could prove that their compensation was consistent with the compensation practices of their competitors. Alternatively, plaintiffs' allegation that defendants "used" BIWI/PIWI survey information during union negotiations could indicate that defendants privately reviewed the latest BIWI or PIWI surveys to ensure that the results of the union negotiations furthered the goal of the conspiracy, but not that any actual wage information was disclosed.

Defendants argue that the Court must make the first inference because PIWI surveys were specifically referenced in plaintiffs' collective bargaining agreements. *See* Docket No. 337 at 35. Defendants attach to their motion to dismiss the collective bargaining agreements ("CBAs") between Smithfield[18] and Commercial Workers Union

---

[18] The amended complaint claims that Smithfield Packaged Meats Corporation was formerly known as "John Morrell & Co." Docket No. 260 at 27, ¶ 51; *see also* Docket No. 337-3 at 2.

Local 304A governing the period from 2003 to 2007 and from 2009 to 2013. Docket No. 337-2 at 2; Docket No. 337-3 at 2. Defendants argue that the Court may take judicial notice of the collective bargaining agreements. Docket No. 337 at 35 n.3 ("The Court may properly take judicial notice of CBAs like these to establish what was in the public realm at the time." (citing *Dominguez v. W. States Fire Prot. Co.*, 2022 WL 2234955, at *1 n.1 (C.D. Cal. Feb. 2, 2022) ("Courts regularly take judicial notice of a CBA in evaluating whether to dismiss on the pleadings." (quotations and citation omitted)); *Cano-Rodriguez v. Adams Sch. Dist. No. 14*, No. 19-cv-01370-CMA-KLM, 2020 WL 6049531, at *13 n.8 (D. Colo. Apr. 22, 2020) ("Board Policy CBA is a matter of public record of which the Court takes judicial notice."); *Oldham v. Brennan*, No. 15-cv-02464-WJM–MJW, 2016 WL 7375328, at *2 n.2 (D. Colo. Dec. 20, 2016) ("The Court can and does consider the CBA and other filed documents as background helpful in understanding and resolving Defendant's motion under Rule 12(b)(1).")).

"Ordinarily, consideration of material attached to a defendant's answer or motion to dismiss requires the court to convert the motion into one for summary judgment and afford the parties notice and an opportunity to present relevant evidence." *Tal*, 453 F.3d at 1264 n.24 (citing Fed. R. Civ. P. 12(b)). "However, facts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment." *Id.* (citing *Grynberg v. Koch Gateway Pipeline Co.,* 390 F.3d 1276, 1278 n.1 (10th Cir. 2004)). "This allows the court to 'take judicial notice of its own files and records, as well as facts which are a matter of public record." *Id.* (citation and quotation omitted). However, "[t]he documents may only be considered to show their contents, not to prove the truth of matters asserted therein." *Id.*

(alterations in original) (quoting *Oxford Asset Mgmt., Ltd. v. Jaharis,* 297 F.3d 1182, 1188 (11th Cir. 2002)).

Although plaintiffs respond that the collective bargaining agreements do not support defendants' argument, they do not contest whether the Court can take judicial notice of the agreements, nor do they contest the validity of the agreements.  *See* Docket No. 351 at 36.  As such, the Court will take judicial notice of the contents of the collective bargaining agreements.  *See Lujano v. Piedmont Airlines, Inc.*, 734 F. Supp. 3d 988, 995 (C.D. Cal. 2024) (finding on a motion to dismiss that, "because 'Plaintiff neither opposes Defendant's request nor disputes the validity of the CBA,' the court finds this document appropriate for judicial notice" (citing *Bartlett v. All Am. Asphalt*, 2020 WL 6118818, at *4 n.2 (C.D. Cal. Oct. 16, 2020)); *Tal*, 453 F.3d at 1264 n.24.

The CBAs state that, if "at anytime during the term of this Agreement, the above plant production base rate falls below the Pork Industry Wage Index as computed semi-annually by IBP, the above rates will be increased to equal the Pork Industry Wage Index."  Docket No. 337-2 at 9; Docket No. 337-3 at 11.

Plaintiffs respond that there is nothing inconsistent between the allegations that the BIWI/PIWI surveys were kept confidential and used to depress wages and the allegation that the information in these surveys was used in union negotiations.  Docket No. 351 at 36.  They argue that the fact "that Defendants leveraged BIWI and PIWI wage *data* during union negotiations says nothing about the knowledge or understanding union negotiators actually possessed with respect to these indices, including how these indices were assembled and whether they unlawfully contained future, disaggregated, or deanonymized data."  *Id.* at 36–37.

The Court finds that the terms of the collective bargaining agreements make
plaintiffs' allegation that the BIWI/PIWI surveys were kept secret from plaintiffs
implausible.  Plaintiffs' allegation that each BIWI and PIWI survey was marked
"CONFIDENTIAL" and that "Defendant Processors agreed to and understood not to
share the compensation data beyond those processors that participated in the surveys"
alleges that defendants concealed the BIWI/PIWI survey results from other competitors.
Docket No. 260 at 64, 68, ¶¶ 176, 185 (processor defendants used BIWI/PIWI surveys
"to exchange confidential data regarding current and planned future wages at their
respective red meat processing plants that otherwise was not practically accessible to
their competitors" (emphasis omitted)).  Similarly, plaintiffs' allegation that the "collective
bargaining agreements that contained compensation information for unionized plants
were not publicly disclosed and were closely guarded, until the data contained therein
was outdated" alleges that the information in the BIWI/PIWI surveys used in union
negotiations was concealed from the public.  *Id.* at 68, ¶ 185.  However, to plausibly
allege fraudulent concealment, plaintiffs' allegations must show that the BIWI/PIWI
conspiracy was concealed from them.  *See In re Credit Default Swaps Auctions Litig.*,
710 F. Supp. 3d at 932 (plaintiff must allege "successful concealment from the injured
party").

The amended complaint alleges that defendant Ron Brown was employed by
Smithfield during the class period.  Docket No. 260 at 16, ¶ 30.  It further claims that
Smithfield used BIWI and PIWI surveys during union negotiations.  *Id.* at 9–10, ¶ 9.
Collective bargaining agreements between Smithfield and its employees covering eight
years of the class period not only explicitly mention the PIWI surveys but also directly tie

Smithfield's compensation rates to the results of the annual PIWI survey.[19]  Docket No.

337-2 at 9 ("If at anytime during the term of this Agreement, the above plant production

base rate falls below the Pork Industry Wage Index as computed semi-annually by IBP,

the above rates will be increased to equal the Pork Industry Wage Index."); Docket No.

337-3 at 11.  In light of the terms of the collective bargaining agreements, the inference

that defendants "use" of the BIWI/PIWI surveys did not include disclosing the existence

of the BIWI/PIWI surveys or the information they contain is implausible.  Instead,

defendants appear to have disclosed to plaintiffs' union representatives that such

surveys existed, and defendants' representatives negotiated that defendants' pay would

correlate to the results of these surveys.  *See id.*  As such, defendants' conspiracy to

suppress wages through the exchange of compensation information contained in the

BIWI/PIWI surveys was not effectively concealed from plaintiffs.[20]  Plaintiffs have

---

[19] Plaintiffs allege that "if the 'base' rate for [Smithfield's] red meat plant is artificially suppressed, then all hourly wages paid to processing workers in that plant are artificially suppressed."  Docket No. 260 at 68, ¶ 187.

[20] Even if the Court were to find that plaintiffs had plausibly alleged that defendants concealed the conspiracy to depress wages, despite disclosing the existence of BIWI/PIWI surveys generally, the Court would find that plaintiffs have failed to plausibly allege that plaintiffs could not have known that they might have a cause of action through the exercise of due diligence.  *See In re Credit Default Swaps Auctions Litig.*, 710 F. Supp. 3d at 932 (plaintiffs must plausibly allege "that the party claiming fraudulent concealment did not know or by the exercise of due diligence could not have known that he might have a cause of action").  "The due diligence to discover injury does not equate to being certain of injury – rather, due diligence simply means that one could have discovered the injury based on generally available information."  *Othart Dairy Farms, LLC v. Dairy Farmers of Am., Inc.*, 720 F. Supp. 3d 1087, 1103 (D.N.M. 2024) (citing *Dummar v. Lummis*, 543 F.3d 614, 620 (10th Cir. 2008); *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1197–98 (10th Cir. 1998)).  If Mr. Brown is a member of Commercial Workers Union Local 304A, not only did his union contract put him on notice that PIWI surveys dictated his compensation, but it incentivized him to investigate the nature and contents of the surveys because the results of the surveys might entitle him to a raise.  Even if Mr. Brown is not specifically covered by the Commercial Workers Union Local 304A contract, he or his representatives should have been aware of the

therefore failed to plausibly allege the second element of fraudulent concealment.

Accordingly, plaintiffs have not shown that the statute of limitations on plaintiffs' claims

based on the BIWI/PIWI conspiracy should be equitably tolled.  Therefore, although

plaintiffs have plausibly alleged their BIWI/PIWI conspiracy claims and have alleged that

these conspiracies have continued to the present day, plaintiffs are barred from

recovering for injuries that occurred before January 12, 2020.[21]  *See In re Urethane*

*Antitrust Litig.*, 663 F. Supp. 2d at 1077 (dismissing in part plaintiffs' claims for the

period from 1994 to 1998).

## IV.    CONCLUSION

For the foregoing reasons, it is

---

contents of Commercial Workers Union Local 304A's contract with Smithfield, given that
it was a union contract with Mr. Brown's employer.  Either way, due diligence would
have led Mr. Brown to discover the contents of the PIWI surveys.  This, in turn, would
have led him to discover that the PIWI contained disaggregated present and future
compensation data, which is the basis for his conspiracy claims against BIWI/PIWI
participants.
    [21] Some courts have found that a Rule 12(b)(6) is a procedurally improper
mechanism for dismissing only parts of claims.  *See Redwind v. W. Union, LLC*, 2019
WL 3069864, at *4 (D. Or. June 21, 2019), *report and recommendation adopted*, 2019
WL 3069841 (D. Or. July 12, 2019) (collecting cases) ("Although Rule 12(b)(6) is the
proper procedural mechanism to dismiss part of a complaint, many courts have
recognized that a party may not use Rule 12(b)(6) to dismiss only part of a *claim*" (citing
*BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("A motion to dismiss
under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question
at this stage is simply whether the complaint includes factual allegations that state a
plausible claim for relief."))).  However, in such circumstances, courts have considered
whether it was proper to dismiss only part of the allegations supporting a claim rather
than the entire claim.  *See*, *e.g.*, *Limone v. United States,* 271 F. Supp. 2d 345, 364 (D.
Mass. 2003) (holding that a defendant may not "seek dismissal of *facts* rather than
*claims*" under Rule 12(b)(6)).  Here the Court is not dismissing only part of plaintiffs'
claims in the same manner.  Rather, the Court finds that plaintiffs have failed to
plausibly allege the statute of limitations for their first and second claims based on the
BIWI/PIWI conspiracies should be equitably tolled.

**ORDERED** that Defendants' Joint Motion to Dismiss the Amended Complaint for Failure to State a Claim [Docket No. 337] is **DENIED in part** and **GRANTED in part**.  It is further

**ORDERED** that plaintiffs' first and second claims for relief are dismissed to the extent they seek to recover for the alleged BIWI/PIWI conspiracy prior to January 12, 2020.

DATED March 26, 2025.


BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge