IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 22-cv-02946-PAB-STV

RON BROWN, and
MINKA GARMON, individually and on behalf of all others similarly situated,

      Plaintiffs,

      v.

JBS USA FOOD COMPANY,
TYSON FOODS, INC.,
CARGILL, INC.,
CARGILL MEAT SOLUTIONS CORP.,
HORMEL FOODS CORP.,
ROCHELLE FOODS, LLC,
AMERICAN FOODS GROUP, LLC,
TRIUMPH FOODS, LLC,
SEABOARD FOODS, LLC,
NATIONAL BEEF PACKING CO., LLC,
SMITHFIELD FOODS INC.,
SMITHFIELD PACKAGED MEATS CORP.,
AGRI BEEF CO.,
WASHINGTON BEEF, LLC,
PERDUE FARMS, INC.,
GREATER OMAHA PACKING CO., INC.,
INDIANA PACKERS CORPORATION,
QUALITY PORK PROCESSORS, INC.,
AGRI STATS, INC., and
WEBBER, MENG, SAHL AND COMPANY, INC., d/b/a/ WMS & Company, Inc.,

      Defendants.

_____

# ORDER
_____

      The matters before the Court are Defendant Greater Omaha Packing Co., Inc.'s

Motion to Dismiss [Docket No. 338] and IPC's Motion to Dismiss for Failure to State a

Claim, or in the Alternative, Motion for a More Definite Statement [Docket No. 339].  The
Court has jurisdiction pursuant to 28 U.S.C. § 1331.

I.    BACKGROUND

A.  <u>Factual Background</u>[1]

This case arises out of class action antitrust claims against defendants for
allegedly suppressing the wages of the employees at beef- and pork-processing plants
across the United States.  *See* Docket No. 260 at 7.  The Court has discussed at length
the allegations against defendants in the Court's previous orders on defendants motions
to dismiss.  *See* Docket Nos. 219, 220, 400.  Therefore, the Court discusses only those
allegations relevant to the motions to dismiss filed by defendants Greater Omaha
Packing Co., Inc. ("Omaha Packing") and Indiana Packers Corporation ("Indiana
Packers").  Docket Nos. 338, 339.

Plaintiffs Ron Brown and Minka Garmon bring claims on behalf of themselves
individually and on behalf of a class consisting of all individuals employed by
defendants, their subsidiaries, and related entities at beef- and pork-processing plants
in the continental United States from January 1, 2000 to the present day (the "class
period").  Docket No. 260 at 7.  Defendants include fourteen red meat processors[2] and
several of their subsidiaries (the "processor defendants"), including Omaha Packing and
Indiana Packers.  *Id.* at 7-8, ¶ 2.  In addition to the processor defendants, the amended
complaint names two consulting companies as defendants, Agri Stats, Inc. ("Agri Stats")
and Webber, Meng, Sahl and Company, Inc. ("WMS").  *Id.*

_____

[1] The Court assumes that the well-pleaded allegations in plaintiffs' amended
complaint are true in considering the motion to dismiss.  *Brown v. Montoya*, 662 F.3d
1152, 1162 (10th Cir. 2011).

[2] Plaintiffs define red meat as beef and pork.  Docket No. 260 at 7.

Processor defendants collectively produce approximately 80 percent of the red meat that is sold in the United States. *Id.* Processor defendants own and operate approximately 140 red meat processing plants in the continental United States. *Id.* at 8, ¶ 3. Processor defendants employed hundreds of thousands of the members of the class during the class period in various positions and compensated these employees with benefits and either hourly wages or an annual salary. *Id.*, ¶¶ 3-4.

Since 2000, defendants have conspired to fix and depress the wages of their employees at processor defendants' red meat processing plants, which has been facilitated by their exchange of non-public compensation data via Agri Stats, WMS, and surveys called the "Beef Industry Wage Indexes" ("BIWI") and "Pork Industry Wage Indexes" ("PIWI"). *Id.* at 8-15, ¶¶ 6-26.

From 2000 to 2019, processor defendants directly exchanged sensitive compensation data, including the amount and dates of planned future hourly wage increases, through BIWI/PIWI surveys conducted by Tyson Foods Inc. ("Tyson"). *Id.* at 8-9, ¶ 6. Participating processor defendants provided their sensitive compensation information directly to Tyson in private communications for the purpose of assembling the BIWI and PIWI surveys. *Id.* at 130, ¶ 401. Such data was often transmitted by telephone rather than by written communication. *Id.* Each BIWI and PIWI was labeled "CONFIDENTIAL," and processor defendants agreed not to share the compensation data beyond those processors that participated in the surveys. *Id.* at 64, ¶ 176.

The BIWI/PIWI surveys provided fully disaggregated compensation data to participating processor defendants. *Id.* at 9, ¶ 7. The BIWI and PIWI reports identified how much each participating processor defendant was currently paying and would be

3

paying in the future to hourly-paid workers at each of processor defendant's red meat processing plants. *Id.* Each version of the BIWI and PIWI included a calculated weighted average for base wages and reported future wages. *Id.* at 65, ¶¶ 180-81. Processor defendants employ rigid compensation structures "that key off the 'base' rate, depending on the workers' duration of experience," such that "if the 'base' rate for a Processor defendants' red meat plant is artificially suppressed, then all hourly wages paid to processing workers in that plant are artificially suppressed." *Id.* at 68, ¶ 187.

The BIWI and PIWI surveys were conducted on at least an annual basis during every year within the class period, sometimes as many as four times a year. *Id.* at 9-10, ¶ 9. The surveys were initiated by a processor defendant's request for an updated survey, which coincided with that processor defendant's upcoming union negotiation or annual compensation review. *Id.* Processor defendants used the two indices when they were conducting internal wage reviews to modify their compensation schedules and when negotiating with unions to establish wage schedules in collective bargaining agreements. *Id.* at 68, ¶ 186.

From 2014 to 2019, different groups of processor defendants designed and participated in an annual "Red Meat Industry Compensation Survey," in which they exchanged detailed current and future information about wages, salaries, and benefits provided to their workers at red meat processing facilities. *Id.* at 69, ¶¶ 188-89. Participants referred to themselves as the "Red Meat Survey Group." *Id.* at 71, ¶ 193.

WMS participated in the Red Meat Industry Compensation Survey by distributing survey questionnaires to the participating processor defendants, compiling survey results reports, and distributing those reports to participants each year. *Id.* at 69-70,

¶ 190.  Processor defendants, however, collectively managed and controlled the annual Red Meat Industry Compensation Surveys and determined who could join the Red Meat Survey Group.  *Id.* at 71-72, ¶¶ 193, 200-01.  The Red Meat Industry Compensation Survey provided data on base salary, the bonus paid across all survey participants, total compensation, target opportunity percent, maximum opportunity percent, and base salary policy.  *Id.* at 77-78, ¶ 222.  The Red Meat Industry Compensation Surveys that were distributed from 2014 to 2017 included data on planned future salary increases by processor defendants.  *Id.* at 81, ¶ 240.

Representatives from processor defendants attended and participated in annual in-person "Red Meat Industry Compensation Meetings."  *Id.* at 86-87, ¶¶ 259-61.  The meetings consisted of multiple roundtable sessions during which executives from the Red Meat Survey Group would discuss the results of that year's Red Meat Industry Compensation Survey as well as current and future compensation practices at their respective firms.  *Id.* at 88, ¶ 266.  The Red Meat Industry Compensation Meetings were accompanied by "off-the-books dinners and other activities that preceded the Meetings themselves."  *Id.* at 92, ¶ 285.

At the Red Meat Industry Compensation Meetings, Jonathan Meng, president of WMS, was invited to attend one or both of the first two sessions and, during those sessions, he presented a summary of the results of the Red Meat Industry Compensation Survey.  *Id.* at 69, 88, ¶¶ 190, 268-69.  In 2014, 2015, and 2017, after presenting the survey results, Meng left, and the remaining sessions proceeded without him.  *Id.* at 90, ¶¶ 278-79.  In the sessions without Meng, plaintiffs allege that executives

from processor defendants agreed upon and suppressed the wages, salaries, bonuses, and benefits they would provide to employees at red meat processing plants.  *Id.*, ¶ 278.

Throughout the class period, senior executives of processor defendants who had the authority to determine or influence the compensation of members of the class contacted one another in order to align their current and future compensation practices. *Id.* at 96, ¶ 300.

Agri Stats describes itself as a "management and benchmarking company" that "provides consultation on data analysis, action plan development and management practices of participating companies," with a mission to "[i]mprove the bottom line profitability for our participants by providing accurate and timely comparative data while preserving confidentiality of individual companies."  *Id.* at 99-100, ¶ 312.  Agri Stats facilitates the exchange of recent and current competitively sensitive information between competitors.  *Id.* at 100, ¶ 315.  To maintain secrecy, Agri Stats requires that its subscribers share their own data in order to receive data on their competitors and does not sell its data to the public.  *Id.* 100-01, ¶¶ 316-17.  Processor defendants in the pork industry exchanged detailed and competitively sensitive compensation data each month by way of a subscription to Agri Stats.  *Id.* at 99, ¶ 309.  The pork processor defendants used the data from Agri Stats to suppress compensation and to confirm that no conspirator deviated from the compensation-fixing conspiracy.  *Id.* at 107, ¶ 337.

As a result of the conspiracy to depress wages, processor defendants simultaneously and in parallel limited annual wage increases to members of the class. *Id.* at 108, ¶ 341.  Wages were lower than they would have been in the absence of a conspiracy.  *Id.*  For example, in 2017, base wages were increased by only 2% at 17

red meat processing plants operated by several processor defendants. *Id.* at 108-09,

¶ 343. In 2018, base wages were increased by only 2% in 17 plants, including some of

the plants that only received a 2% increase in base wages in 2017. *Id.* at 108-09,

¶¶ 343-44.

Greater Omaha is a Nebraska corporation that participated in the conspiracy to

fix and depress compensation to red meat processing plant workers by exchanging

current and future compensation information via BIWI surveys at least in 2000, 2004,

2006-2009, 2011-2015, and 2019. *Id.* at 34-35, ¶¶ 66-67. Greater Omaha's job

postings advertised that they offer a "Competitive Base Salary;" "Vision, Medical and

Dental Coverage;" "Paid Time Off;" and a "401(k)" for which "[c]ompany match starts

after the first year of service." *Id.* at 127-29, ¶ 396.

Indiana Packers is a Delaware corporation headquartered in Indiana. *Id.* at 36,

¶ 70. Indiana Packers participated in the conspiracy to fix and depress compensation to

red meat processing plant workers by exchanging current and future compensation

information via PIWI surveys at least in 2000, 2002, 2005-2009, 2011, 2013, and 2019.

*Id.* 36-37, ¶ 71. During the class period, Indiana Packers also subscribed to Agri Stats

to exchange current, disaggregated, readily decodable, and plant-specific compensation

data with competing pork processors on a monthly basis. *Id.*

Plaintiffs bring two claims against defendants. First, plaintiffs bring a claim under

§ 1 of the Sherman Act, 15 U.S.C. § 1, for defendants entering "into a continuing

agreement, understanding, and conspiracy in restraint of trade to fix, depress, maintain,

and stabilize the compensation paid to workers at their red meat processing plants in

the continental United States" (the "per se claim"). Docket No. 260 at 138, ¶ 431.

Plaintiffs also bring a claim under § 1 of the Sherman Act for defendants entering into "a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information about the compensation being paid or to be paid to their employees at red meat processing plants in the continental United States" which plaintiffs allege "is an unreasonable restraint of trade" (the "rule of reason claim"). *Id.* at 140, ¶ 437.

### B.  Procedural Background

On November 11, 2022, plaintiffs filed their original complaint, in which they brought claims based on defendants' use of WMS and Agri Stats to exchange compensation data and suppress wages from 2014 to the present.  *See* Docket No. 1 at 1, 121-29, ¶¶ 400-26.  On February 17, 2023, defendants filed a joint motion to dismiss, arguing that plaintiffs had failed to state plausible claims for relief and that plaintiffs' claims were barred by the statute of limitations.  *See* Docket No. 164 at 9-40.  Individual defendants filed supplemental motions to dismiss.  Docket Nos. 159, 160, 161, 162, 163, 165, 166.  On September 27, 2023, the Court ruled on the motions to dismiss. Docket Nos. 219, 220.  The Court found that plaintiffs' claims were not time-barred and that they had plausibly stated their first and second claims as to every defendant then part of the case except defendant Iowa Premium, LLC, who the Court dismissed from the case.  *See* Docket Nos. 219, 220.

On January 11, 2024, the parties filed a stipulated motion to grant plaintiffs leave to amend their complaint.  Docket No. 257 at 2, ¶ 3.  On January 12, 2024, plaintiffs filed an amended complaint in which they added allegations regarding the BIWI/PIWI surveys, extended the class period from 2014 to 2000, and added five new defendants, including Greater Omaha and Indiana Packers.  *See generally id.*

On February 6, 2024, Magistrate Judge Scott Varholak granted a motion to file a
joint motion to dismiss on behalf of all of the defendants except (1) JBS USA Food
Company; Perdue Farms, Inc.; Seaboard Foods, LLC; Triumph Foods, LLC; and
Webber, Meng, Sahl and Company, Inc., who all had reached a settlement agreement
with plaintiffs, and (2) Greater Omaha Packing Co., who, at that time, had not appeared
in the case.  Docket No. 286.  Judge Varholak's order permitted the individual
defendants to file supplemental motions to dismiss.  *Id.*

On April 5, 2024, defendants filed their joint motion to dismiss, which argued that
plaintiffs' claims should be dismissed as they relate to the new allegations in the
amended complaint and as they relate to the expanded time period covered by plaintiffs'
claims.  Docket No. 337 at 7.  That same day Indiana Packers and Greater Omaha filed
supplemental motions to dismiss.[3]  Docket Nos. 338, 339.  Plaintiffs responded to
Indiana Packers' and Greater Omaha's motions to dismiss, Docket Nos. 346, 347, and
Indiana Packers and Greater Omaha replied.  Docket Nos. 354, 357.

On March 26, 2025, the Court ruled on the second joint motion to dismiss.
Docket No. 400.  The Court found that plaintiffs had not plausibly alleged a single
conspiracy to fix and depress wages at the processor defendants' meat packing plants.
*Id.* at 23.  Instead, because the allegations in the complaint demonstrated that non-
participants in the BIWI/PIWI surveys and the Red Meat Industry Compensation
Surveys were excluded from each other's information, the amended complaint alleges
two parallel conspiracies to fix and depress wages (the "BIWI/PIWI conspiracy" and the

---

[3] In the Court's order ruling on the joint motion to dismiss, the Court granted
Greater Omaha's request to join the joint motion to dismiss.  Docket No. 400 at 2 n.1.

"WMS conspiracy").  *Id.* at 23-27.  The Court found that, while plaintiffs have plausibly

alleged their claims based on the BIWI/PIWI conspiracy, they have failed to

demonstrate the statute of limitations should be tolled from 2000 to the present due to

defendants' fraudulent concealment.  *Id.* at 54-63.  The Court granted in part and denied

in part defendants' joint motion to dismiss and dismissed plaintiffs' claims based on the

BIWI/PIWI conspiracy for the period from 2000 to 2020 as to every defendant.  *Id.* at 64.

## II.   LEGAL STANDARD

### A.  Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege

enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . .

plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012)

(citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The 'plausibility' standard

requires that relief must plausibly follow from the facts alleged, not that the facts

themselves be plausible."  *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163,

1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)).

Generally, "[s]pecific facts are not necessary; the statement need only 'give the

defendant fair notice of what the claim is and the grounds upon which it rests.'"

*Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at

555) (alterations omitted).  However, a plaintiff still must provide "supporting factual

averments" with his allegations.  *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir.

2009) ("conclusory allegations without supporting factual averments are insufficient to

state a claim on which relief can be based" (citation omitted)).  The court need not

accept conclusory allegations.  *Moffet v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227,

1232 (10th Cir. 2002).  "[W]here the well-pleaded facts do not permit the court to infer

more than the mere possibility of misconduct, the complaint has alleged – but it has not

shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679

(2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A

plaintiff must nudge [his] claims across the line from conceivable to plausible in order to

survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's

allegations are "so general that they encompass a wide swath of conduct, much of it

innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191

(quotations omitted).  Thus, even though modern rules of pleading are somewhat

forgiving, "a complaint still must contain either direct or inferential allegations respecting

all the material elements necessary to sustain a recovery under some viable legal

theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).  An affirmative defense, such

as the statute of limitations, may be considered on a motion to dismiss under Rule

12(b)(6) only when a plaintiff admits every element of the affirmative defense in the

complaint.  *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018)

(citing *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004)).

### B.  Sherman Act

Section 1 of the Sherman Act states that "[e]very contract, combination in the

form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the

several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  "While

the text of the Sherman Act could perhaps be interpreted to proscribe all contracts, the

Supreme Court has repeated time and again that § 1 outlaw[s] only unreasonable

restraints of trade."  *United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1272 (10th

Cir. 2018) (internal quotations marks omitted).  Certain restraints are unreasonable per

se "because they 'always or almost always tend to restrict competition and decrease

output.'" *See Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (quoting *Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723 (1988)).  Horizontal restraints "imposed by agreement between competitors" qualify as "unreasonable per se."  *Id.* at 2284 (quoting *Sharp*, 485 U.S. at 730).  "Restraints that are not unreasonable per se are judged under the rule of reason" which "requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition."  *Id.* (internal citations, quotations, and alterations omitted).

"The essence of a claim of a violation of Section 1 of the Sherman Act is the agreement itself."  *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556); *see also Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1179 n.28 (10th Cir. 2019) (observing that it is erroneous to use a probability standard to assess allegations in a Sherman Act claim).  An agreement can be shown through direct or indirect evidence.  *Champagne Metals*, 458 F.3d at 1082.  "Direct facts are explicit and require no inferences.  Direct evidence of a § 1 agreement may take the form of a written contract or agreement, such as association rules, or admissions of an agreement.  In contrast, circumstantial facts require inferences to show that an anti-competitive agreement exists."  *Llacua*, 930 F.3d at 1174 n.24 (internal citations, quotations, and alterations omitted).  *Twombly* provides a rule for determining whether plaintiff has sufficiently pled a claim of an agreement in violation of the Sherman Act with circumstantial evidence, namely that "mere allegations of parallel

conduct, absent additional contextual facts, fail to state a plausible conspiracy claim."

*See id.* at 1174-75 (quoting *Twombly*, 550 U.S. at 556-57).

## III. ANALYSIS

### A. Statute of Limitations

Indiana Packers and Greater Omaha argue that the statute of limitations bars

plaintiffs' claims against them.  Docket No. 338 at 7; Docket No. 339 at 7 n.7; Docket

No. 343 at 14.  Under the Clayton Act, 15 U.S.C. § 15b, a claim under the Sherman Act

"shall be forever barred unless commenced within four years after the cause of action

accrued."  *Auraria Student Housing at the Regency, LLC, v. Campus Village*

*Apartments, LLC*, 843 F.3d 1225, 1247 (10th Cir. 2016) (quoting 15 U.S.C. § 15b).

"[A]n overt act will restart the statute of limitations under the continuing conspiracy

exception when the act is (1) 'a new and independent act that is not merely a

reaffirmation of a previous act'; and (2) the act 'inflict[s] new and accumulating injury on

the plaintiff.'"  *Id.* at 1248 (quoting *Kaw Valley Elec. Coop. Co. v. Kansas Elec. Power*

*Coop., Inc.*, 872 F.2d 931, 933 (10th Cir. 1989)).

In the Court's order on the second joint motion to dismiss, the Court found that

the amended complaint did not relate back to the filing of the original complaint under

Federal Rule of Civil Procedure 15(c).  Docket No. 400 at 52-54; *see also* Fed. R. Civ.

P. 15(c)(1)(B) ("[a]n amendment to a pleading relates back to the date of the original

pleading when: . . . the amendment asserts a claim or defense that arose out of the

conduct, transaction, or occurrence set out – or attempted to be set out – in the original

pleading.").  Therefore, the Court concluded that the statute of limitations bars plaintiffs'

claims based on the BIWI/PIWI survey allegations for causes of action that accrued

before January 12, 2020.  Docket No. 400 at 54.

Indiana Packers and Greater Omaha argue that the last BIWI/PIWI surveys identified in the amended complaint occurred in 2019 and therefore the claims against them are time-barred. Docket No. 338 at 7; Docket No. 339 at 7 n.7. However, as discussed in the Court's order on the second joint motion to dismiss, while the amended complaint does identify specific BIWI/PIWI surveys by date, the amended complaint also alleges that the BIWI/PIWI surveys were conducted every year within the class period and sometimes as many as four times a year. Docket No. 260 at 9, ¶ 9; Docket No. 400 at 32. Moreover, as to Indiana Packers and Greater Omaha, the allegations in the amended complaint allege that these defendants participated in "at least" the surveys identified between 2000 and 2019, but it does not allege that these are the only surveys in which they participated. Docket No. 260 at 34-37, ¶¶ 67, 69, 71. While a statute of limitations defense may be resolved on a Rule 12(b)(6) motion when "the dates given in the complaint make clear that the right sued upon has been extinguished," *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 671 (10th Cir. 2016), here the allegations in the amended complaint do not make clear that Indiana Packers and Greater Omaha did not participate in BIWI/PIWI surveys after 2019. Instead, defendants' statute of limitations defense raises an issue of fact. The Court will next consider separately Indiana Packers' and Greater Omaha's motions to dismiss.

## B. **Greater Omaha**

Greater Omaha argues that plaintiffs have failed to plausibly allege that it was part of the conspiracy to fix and depress wages. Docket No. 338 at 3. First, Greater Omaha argues that plaintiffs' first claim fails to plausibly allege either direct or indirect evidence of a conspiracy. *Id.* at 3-5. The Court has found that plaintiffs' allegations lack direct evidence of an agreement to depress and fix wages. Docket No. 219 at 20-21;

Docket No. 400 at 29 n.12.  Greater Omaha also argues that the amended complaint

fails to allege indirect evidence of a conspiracy because there are no allegations of

either parallel conduct or plus factors related specifically to the BIWI/PIWI surveys.

Docket No. 338 at 4-5.  However, the Court has already rejected this argument, which

was made in defendants' joint motion to dismiss and repeated in Greater Omaha's

individual motion.  *Id.*; Docket No. 337 at 18-24.  As the Court discussed in its recent

order on the second joint motion to dismiss, Docket No. 400 at 29-39, plaintiffs have

alleged both parallel conduct and plus factors for this conspiracy through their

allegations regarding instances of wage depression in 2017 and 2018 and the exchange

of future compensation data.  These allegations apply equally to Greater Omaha, who is

alleged to have participated in the exchange of BIWI surveys since at least 2000.

Docket No. 260 at 34-35, ¶¶ 66-67.

Greater Omaha next argues that, regardless of whether plaintiffs have plausibly

alleged their first claim for relief as to other defendants, plaintiffs "fail to plead facts

sufficient to support an inference that Greater Omaha joined any alleged conspiracy."

Docket No. 338 at 4.  Greater Omaha maintains that, "[s]ince liability hinges on a

conspirator's 'conscious commitment to a common scheme,' courts must analyze

whether a complaint sufficiently alleges *each* separate defendant's 'conscious

commitment' to the alleged conspiracy."  *Id.* at 2 (quoting *Monsanto Co. v. Spray-Rite

Serv. Corp.*, 465 U.S. 752, 764 (1984)).  Greater Omaha asserts that,

> since Greater Omaha is not alleged to have participated in the [Red Meat
> Industry Compensation Surveys], "Plaintiffs' allegations that defendants
> controlled the [Red Meat Industry Compensation Surveys] and deanonymized
> the results at in-person meetings" and communicated during "roundtable
> sessions" cannot be imputed to Greater Omaha "to support an inference of an
> agreement" – especially considering Plaintiffs allege there existed "strict rules

for . . . admission into and continued membership in the [Red Meat Industry Compensation Surveys]" premised on participants' attendance at [Red Meat Industry Compensation Surveys] meetings, which would have prohibited Greater Omaha from receiving the information allegedly exchanged through the [Red Meat Industry Compensation Surveys].

*Id.* at 5 (quoting Docket No. 219 at 26, 28-29; citing Docket No. 260 at 34-35, 69-108, 112-16 ¶¶ 67, 188-340, 353).

Plaintiffs respond that they are not required to make allegations of either direct or indirect evidence of a conspiracy as to each defendant. Docket No. 346 at 2. Plaintiffs point out that in the Court's order on the first set of individual motions to dismiss, Docket No. 220, the Court rejected a similar argument, finding that "in a case involving an alleged conspiracy among multiple actors and multiple acts[ ] 'plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. The character and effect of a conspiracy are not to be judged by dismembering it as a whole.'" *Id.* at 1 (quoting Docket No. 220 at 28 (quoting *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 527 F. Supp. 2d 1257, 1293 (D. Kan. 2007))). Plaintiffs maintain that the allegations in the complaint show that Greater Omaha "joined the conspiracy and played a role in it." *Id.* at 3. Specifically, plaintiffs assert that they "allege that Greater Omaha engaged in multiple overt acts in furtherance of the conspiracy by participating in at least 12 exchanges of current and future compensation data with other competing Defendants through the BIWI during a 19 year period." *Id.* They assert that "no courts require plaintiffs to allege that each defendant participated in every facet of a wage-fixing conspiracy; rather, they have long recognized that '[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary.'" *Id.* at 3-4

(quoting *In re Broiler Antitrust Litig.*, 290 F. Supp. 3d 772, 803 (N.D. Ill. 2017)).  Plaintiffs

argue that "[t]he allegations of Greater Omaha's longstanding and consistent BIWI

participation are more than sufficient to make it plausible that Greater Omaha played

*some* role in the conspiracy."  *Id.* at 4.

      At issue is whether these allegations are sufficient to show that Greater Omaha

joined the BIWI/PIWI conspiracy and the WMS conspiracy.  *Jung v. Ass'n of Am. Med.*

*Colleges*, 300 F. Supp. 2d 119, 164 n.27 (D.D.C. 2004) (just because "a plaintiff need

not allege overt acts committed by each defendant in furtherance of a conspiracy" does

not mean "that plaintiffs need not plead that an individual defendant was a participant in

the conspiracy in the first instance"); *see also Abraham v. Intermountain Health Care*

*Inc.*, 461 F.3d 1249, 1257 (10th Cir. 2006) (citing *Monsanto*, 465 U.S. at 764).

      On a motion to dismiss, "a plaintiff's pleading burden is to offer allegations that

plausibly suggest that the defendant agreed to the conspiracy, which, in the antitrust

context, is a conscious commitment to a common scheme designed to achieve an

unlawful objective."  *In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709, 719

(E.D. Pa. 2011).  Plaintiffs bear the "burden of adequately alleging that a conspiracy to

restrain trade existed in the first instance and that each defendant knowingly joined or

agreed to participate in the conspiracy."  *Jung,* 300 F. Supp. 2d at 161; *In re TFT-LCD*

*(Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) ("the complaint

'must allege that each individual defendant joined the conspiracy and played some role

in it because, at the heart of an antitrust conspiracy is an agreement and a conscious

decision by each defendant to join it'" (quoting *In re Elec. Carbon Prods. Antitrust Litig.,*

333 F. Supp. 2d 303, 311-12 (D.N.J. 2004)).  Allegations that an individual defendant

had the opportunity to join a conspiracy "are not enough, in and of themselves, to support an inference that [a defendant] joined the conspiracy." *In re Processed Egg Prod. Antitrust Litig.*, 902 F. Supp. 2d 704, 716 (E.D. Pa. 2012). Instead, plaintiffs must allege facts that plausibly suggest that the individual defendant took advantage of the opportunity to join the conspiracy and agreed to the common scheme. *See*, *e.g.*, *id.* ("The Winn–Dixie Complaint also alleges that Sparboe belonged to the UEP, served in leadership positions within the UEP, and attended various meetings in which the conspiracy was discussed. While such allegations are not enough, in and of themselves, to support an inference that Sparboe joined the conspiracy, they do indicate that Sparboe had an opportunity to do so. And by alleging that Sparboe participated in the chick hatch reduction and a supply adjustment program, the Winn–Dixie Plaintiffs plausibly suggest that Sparboe took advantage of this opportunity and agreed to a common scheme to restrict the supply of eggs.") (internal citations omitted).

In the Court's order on the second joint motion to dismiss, the Court explained that the sharing of future compensation data is "considered especially anticompetitive." Docket No. 400 at 38 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 211-12 (2d Cir. 2001)). The Court found that, because sharing future compensation data with competitors would ordinarily place a company at a disadvantage, sharing such information generally would not occur "unaided by an advance understanding among the parties" and is conduct that indicates the sort of "sense of obligation that one generally associates with agreement." *Id.* at 37-38 (quoting *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 790 (N.D. Ill. 2017)). The amended complaint alleges that Greater Omaha participated in BIWI surveys at least in 2000, 2004, 2006-

2009, 2011-2015, and 2019.  Docket No. 260 at 34-35, ¶¶ 66-67.  The amended

complaint also alleges that BIWI surveys contained sensitive compensation data,

including the amount and dates of planned future hourly wage increases.  *Id.* at 8-9, ¶ 6.

The Court finds that these allegations are sufficient to plausibly allege that Greater

Omaha knowingly joined the BIWI/PIWI conspiracy because it is unlikely to have shared

its competitively sensitive compensation data without an advance agreement between

defendants to use the information for their mutual benefit, such as using the information

to depress wages.

However, the amended complaint also alleges that participants in the Red Meat

Survey Group "consisted exclusively of red meat processors that the Group recruited

after ensuring that they met the Group's membership criteria", including "that a

prospective member needed to have a red meat slaughter facility, a case-ready plant, or

a red meat cook plant."  *Id.* at 71-72, ¶¶ 193, 196-97 (the Red Meat Survey Group

"developed strict rules for a red meat processor's admission into and continued

membership" in the group).  Processor defendants who did not become members of the

group, did not pay an annual due, and did not attend in-person meetings had no access

to the compensation information circulated through the Red Meat Industry

Compensation Surveys.  *Id.* at 71-72, ¶¶ 195, 198.  There are no allegations in the

amended complaint that Greater Omaha was recruited into the Red Meat Survey

Group, that it exchanged competitively sensitive information through the Red Meat

Industry Compensation Surveys, or that it attended Red Meat Industry Compensation

Meetings.  The amended complaint therefore does not plausibly allege that Greater

Omaha joined the WMS conspiracy.  The Court will dismiss plaintiffs' first and second

claims against Greater Omaha to the extent they are based on its participation in the WMS conspiracy.

Finally, Greater Omaha argues that plaintiffs have failed to plausibly allege their second claim for relief against Greater Omaha because plaintiffs have not alleged anticompetitive effects stemming from the BIWI/PIWI surveys.  Docket No. 338 at 7. Greater Omaha contends that "the failure of Plaintiffs' allegations is more profound regarding Greater Omaha" and that the Court should therefore dismiss plaintiffs' second claim as to it.  *Id.* at 6.  In the Court's prior order on the joint motion to dismiss, the Court found that plaintiffs plausibly state their rule of reason claim.  Docket No. 400 at 39-45. The Court rejected defendants' argument that plaintiffs had failed to plausibly allege anticompetitive effects from their agreement to exchange non-public, competitively sensitive compensation data.  *Id.* at 42.  Instead, the Court found that plaintiffs have plausibly alleged direct evidence of anticompetitive effects because plaintiffs' allegations of specific wage suppression at certain plants were attributed to both conspiracies.  *Id.* Moreover, the Court found that plaintiffs had plausibly alleged indirect evidence of anticompetitive effects because the amended complaint alleged sufficient market share among defendants and that defendants had exchanged future compensation data.  *Id.* at 43-45.  Greater Omaha has not shown why, at the motion to dismiss stage, these allegations are insufficient to state plaintiffs' second claim against Greater Omaha. Therefore, the Court will deny Greater Omaha's motion to the extent it seeks to dismiss plaintiffs' claims based on its participation in the BIWI/PIWI conspiracy.

## C. **Indiana Packers**

Indiana Packers claims that the few references to it in the amended complaint "lack well-pled factual allegations linking [Indiana Packers] to any anticompetitive

agreement to exchange wage data, let alone a sprawling, 20-year, industry-wide

conspiracy to suppress wages."  Docket No. 339 at 1.  Indiana Packers argues that the

amended complaint asserts that defendants conspired to fix and depress wages

through the exchange of competitively sensitive information via WMS, Agri Stats, and

BIWI/PIWI surveys, but the amended complaint alleges that Indiana Packers

participated in only Agri Stats and PIWI surveys.  *Id.* at 1-2.  As such, Indiana Packers

maintains that plaintiffs cannot rely on their WMS allegations to support their conspiracy

claims against it.  *Id.* at 2.

    Indiana Packers asserts that plaintiffs' conspiracy claims are implausible

because the complaint does not show direct evidence of Indiana Packers harming

competition or that Indiana Packers had the market power necessary to support an

indirect inference of harm.  *Id.* at 3.  However, Indiana Packers' argument regarding

market power misses the point.  While it is true that, "[i]n the absence of a horizontal

conspiracy, grouping the [defendants'] market share together is inappropriate,"

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 622

(S.D.N.Y. 2013) (citing *Wellnx Life Sciences Inc. v. Iovate Health Sciences Research

Inc.,* 516 F. Supp. 2d 270, 294 (S.D.N.Y. 2007)), here, plaintiffs allege a horizontal

conspiracy to depress wages across red meat processing plants.  *See*, *e.g.*, *Buccaneer

Energy (USA) Inc. v. Gunnison Energy Corp.,* 846 F.3d 1297, 1316 (10th Cir. 2017)

(analyzing defendants market power collectively); *In re Disposable Contact Lens

Antitrust*, 215 F. Supp. 3d 1272, 1302 (M.D. Fla. 2016) ("To establish potential harm, a

plaintiff must define the relevant market and establish that the defendants possessed

power in that market, and make specific allegations linking market power to harm to

competition in that market." (citation and quotation omitted)).  Indiana Packers

acknowledges that the amended complaint alleges that the other defendants "dominate

the pork industry," Docket No. 339 at 3 (citing 260 at 107, ¶ 338), and defendants'

market power could only be greater by including Indiana Packers in the conspiracy.

Next, Indiana Packers argues that, because the allegations regarding the

BIWI/PIWI surveys make general allegations regarding their contents, but do not

specifically include Indiana Packers, plaintiffs do not plausibly allege their conspiracy

claims as to Indiana Packers.  *Id.* at 4.  Indiana Packers focuses on plaintiffs' allegation

that

> [e]ach BIWI and PIWI also included a column that reported future wages.
> Specifically, Defendant Processors reported, for each plant, the "next scheduled
> increase."  Under this column, a Defendant Processor would report a certain
> dollar amount for a future wage increase, as well as a date for the next
> scheduled increase.  Accordingly, the BIWI and PIWI reports allowed
> participating Defendant Processors not only to compare their current hourly
> wages at each of their respective red meat processing plants, but also to
> compare planned future wage increases at those plants.

*Id.* at 5 (quoting Docket No. 260 at 65, ¶ 181).  Indiana Packers claims that the

"allegation comes nowhere close to providing the required detail needed to state a claim

as to IPC."  *Id.*  Specifically, Indiana Packers argues that this allegation is insufficient

because it does not allege that any PIWI reports contained Indiana Packers' next

scheduled increase, or that Tyson communicated with anyone at Indiana Packers.  *Id.*

at 5-6.  However, the allegations in the amended complaint are sufficient to show that

Indiana Packers participated in the PIWI survey exchanges.  The amended complaint

generally describes what information was contained in the PIWI surveys, including the

exchange of present and future compensation data.  Docket No. 260 at 65, ¶ 181.  The

amended complaint also alleges that participants were required to provide such

information in order to receive it from other participants and that Tyson conducted the surveys.  *Id.* at 8-9, ¶¶ 6, 8.  Finally, the amended complaint alleges that Indiana Packers participated in PIWI surveys at least in 2000, 2002, 2005-2009, 2011, 2013, and 2019.  *Id.* 36-37, ¶ 71.  As discussed above, this is sufficient to plausibly allege that Indiana Packers joined the BIWI/PIWI conspiracy.  Therefore, the Court will not dismiss plaintiffs' claims against Indiana Packers based on its participation in the BIWI/PIWI conspiracy.

Indiana Packers contends that mere participation in Agri Stats is insufficient to show that they participated in either a conspiracy to depress wages or to share competitively sensitive information.  Docket No. 339 at 3.  The amended complaint alleges that, during the class period, "Indiana Packers subscribed to Agri Stats to exchange current, disaggregated, readily decodable and plant-specific compensation data with competing pork processors on a monthly basis."  Docket No. 260 at 36-37, ¶ 71.  Because the Court has found that the amended complaint alleges two separate conspiracies, the question remains whether this allegation is sufficient to allege that Indiana Packers joined the WMS conspiracy.  Plaintiffs argue that they have alleged a single conspiracy to depress wages, which argument the Court has rejected, Docket No. 400 at 23, and that plaintiffs have plausibly alleged that Indiana Packers was involved in the conspiracy because Indiana Packers participated in PIWI surveys and Agri Stats.  Docket No. 347 at 3-7.

The Court finds that plaintiffs have failed to plausibly allege that Indiana Packers participated in the WMS conspiracy.  There are no allegations in the amended complaint that Indiana Packers was recruited to join the Red Meat Survey Group, that it

exchanged competitively sensitive information through the Red Meat Industry
Compensation Surveys, or that it attended Red Meat Industry Compensation Meetings.
Because Indiana Packers was excluded from the Red Meat Survey Group, it is not
plausible that it conspired with members of the group to fix and depress wages by
sharing wage information that Indiana Packers could not access.[4]  Therefore, the Court
will dismiss plaintiffs' first and second claims against Indiana Packers to the extent that
they are based on Indiana Packers' participation in the WMS conspiracy.[5]

### IV.    CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant Greater Omaha Packing Co., Inc.'s Motion to Dismiss
[Docket No. 338] is **DENIED in part** and **GRANTED in part**.  It is further

---

[4] The Court notes that each defendant is alleged to have either exchanged
compensation information through BIWI/PIWI surveys or through the Red Meat
Compensation Surveys.  *See* Docket No. 351 at 19.  For the reasons discussed in the
Court's order on the first set of individual motions to dismiss, participation in the Red
Meat Compensation Surveys is sufficient to plausibly allege that a defendant joined the
WMS conspiracy.  *See* Docket No. 220.  As discussed above, participation in the
BIWI/PIWI surveys is sufficient to demonstrate participation in the BIWI/PIWI
conspiracy.  Finally, the issue of whether plaintiffs have plausibly alleged that Agri Stats
joined either conspiracy or whether plaintiffs have plausibly stated their rule of reason
claim against Agri Stats is not before the Court.

[5] Because the Court has found that plaintiffs plausibly allege their first and
second claims against Indiana Packers based on its participation in the BIWI/PIWI
conspiracy, the Court will deny Indiana Packers' request for a more definite statement.
*See* Docket No. 339 at 7; *May v. Rottinghaus Co., Inc.*, 394 F. Supp. 3d 1334, 1338 (D.
Kan. 2019) (a "motion for a more definite statement should not be granted merely
because the pleading lacks detail; rather, 'the standard to be applied is whether the
claims alleged are sufficiently specific to enable a responsive pleading in the form of a
denial or admission.'" (quoting *Creamer v. Ellis Ctny. Sheriff Dept.*, 2009 WL 484491, at
*1 (D. Kan. Feb. 26, 2009)).

ORDERED that plaintiffs' first and second claims against defendant Greater Omaha Packing Co., Inc. are **DISMISSED** to the extent they are based on Greater Omaha Packing Co., Inc.'s participation in the WMS conspiracy.  It is further

ORDERED that IPC's Motion to Dismiss for Failure to State a Claim, or in the Alternative, Motion for a More Definite Statement [Docket No. 339] is **DENIED in part** and **GRANTED in part**.  It is further

ORDERED that plaintiffs' first and second claims against defendant Indiana Packers Corporation are **DISMISSED** to the extent they are based on Indiana Packers Corporation's participation in the WMS conspiracy.

DATED March 26, 2025.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge